IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RECKITT BENCKISER PHARMACEUTICALS, INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | )<br>)<br>)<br>) | Redacted - Public Version |
| Plaintiffs, | )<br>) | |
| v. | ) | C.A. No. 13-1674-RGA |
| WATSON LABORATORIES, INC., | )<br>) | Consolidated |
| Defendant. | )<br>) | |

| | |
|---|---|
| RECKITT BENCKISER PHARMACEUTICALS INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | )<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | ) | C.A. No. 14-0422-RGA |
| PAR PHARMACEUTICAL, INC., and INTELGENX TECHNOLOGIES CORP. | )<br>)<br>) | |
| Defendants. | )<br>) | |

**EXHIBIT "A" TO LETTER TO THE HONORABLE RICHARD G. ANDREWS, DATED NOVEMBER 24, 2014**

JOHN C. PHILLIPS, JR., ESQUIRE (#110)
MEGAN C. HANEY, ESQUIRE (#5016)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE  19806
(302) 655-4200
Attorneys for Defendant
DATED:  November 25, 2014          Watson Laboratories, Inc.

Paper No. ___
Filed:  November 7, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

BIODELIVERY SCIENCES INTERNATIONAL, INC.
Petitioner

v.

RB PHARMACEUTICALS LIMITED
Patent Owner.

---

Case IPR2014-00325
Patent 8,475,832

---

**PATENT OWNER'S RESPONSE**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................... 1

II.  BUPRENORPHINE PHARMACOKINETICS BACKGROUND............. 10

III. CLAIM CONSTRUCTION....................................................................... 17

   A. Legal Standard For Claim Construction In Inter Partes Review.................. 18

   B.  Claim 15's "Wherein" Clause Is Entitled To Patentable Weight............... 18

   C. The '832 Patent Solely Concerns Oral Transmucosal Absorption.............. 20

IV.  CLAIMS 15-19 OF THE '832 PATENT ARE NOT ANTICIPATED BY
     LABTEC    26

   A. Labtec Proposes Only Oral Films Designed To Provide GI Absorption To
      Mimic The Pharmacokinetics Of Peroral GI-Absorbed Dosages ................ 27

   B. Labtec Does Not Anticipate Because It Does Not Disclose Oral-
      Transmucosal Films As Required By The Properly Construed Claims....... 29

   C. Labtec Does Not Anticipate Because It Only Discloses A Wish Or A Goal
      And Not The Claimed Film ........................................................................ 30

   D. Labtec Does Not Anticipate Because It Fails To Enable The Claimed
      Invention ................................................................................................... 32

        1.   Labtec Only Proposes A Film Version Of Suboxone® Tablets By
             Mistake    32

        2.   Even If The Claims Are Not Limited To Oral-Transmucosal Films,
             Labtec Is Inoperable On Its Own Terms If Applied To Suboxone®
             33

        3.   Even If The Claims Are Not Limited To Oral Transmucosal Films,
             GI-Absorbed Dosages Do Not Accomplish Therapeutically
             Acceptable Effects 35

        4.   It Is Not Technically Possible To Meet Claim 19 Through Peroral
             Administration Of Naloxone Under Any Reading Of The Claim 36

V.   CLAIMS 15-19 ARE NOT RENDERED OBVIOUS BY LABTEC, YANG,
     OR BIRCH 38

   A. Labtec Cannot Render Obvious Claims Requiring Oral-Transmucosal Films
      As Required By The Properly Construed Claims........................................ 39

   B. A Person Of Skill In The Art Would Not Look To Labtec In Seeking To
      Develop A Film For Delivery Of Buprenorphine ...................................... 39

i

TABLE OF CONTENTS

Page

C.  Petitioner Failed To Provide Any Evidence That A Person Skilled In The
Art Would Have Had A Reasonable Expectation Of Successfully Combining
Labtec, Birch, And Yang To Arrive At The Claimed Invention .................. 41

    1.  Yang Teaches Pharmaceutical Film Manufacturing Methods To
Achieve Uniformity Of Active Content          41

    2.  Birch Has Nothing To Do With Pharmaceutical Films          43

    3.  Labtec Cannot Be Transmogrified Into Its Opposite          44

D.  Even If Labtec, Yang And Birch Were Combined, It Would Require Undue
Experimentation To Arrive At The Claimed Invention ................................ 47

E.  Secondary Considerations Support A Finding Of Nonobviousness ............ 53

VI.  CONCLUSION .................................................................................................. 57

Case IPR2014-00325
Patent No. 8,475,832

## I.   INTRODUCTION

Patent Owner RB Pharmaceuticals Limited respectfully submits this

Response to BDSI's Petition (Paper 8) seeking *inter partes* review ("IPR") of

Claims 15-19 ("the challenged claims") of U.S. Patent No. 8,475,832 ("the '832

patent") (Ex. 1001).[1]

The only issue presently before the Board is whether Petitioner has carried

its burden of proving that the challenged claims are invalid as i) anticipated by

Labtec or ii) obvious over the combination of Labtec, Yang and Birch.[2] Paper 17,

21. As shown below, the complete record demonstrates that these claims are valid,

and that Petitioner has failed to carry its burden of proving otherwise.

Patent Owner's Preliminary Response did not have the benefit of expert

testimony. Now, in support of this Response, Patent Owner submits the

accompanying declaration of Dr. Thomas Johnston, an expert in the

pharmaceutical sciences, that makes clear that the challenged claims are neither

anticipated nor rendered obvious by the Grounds in issue. In particular, Dr.

Johnston provides critical information about the pharmacokinetics of the relevant

active ingredients, buprenorphine and naloxone, information that fully rebuts

---

[1] This Response is timely because it is filed on revised Due Date 1 set forth in the

Joint Notice of Stipulated Revised Due Dates (Paper 22).

[2] Terms defined in the Board's Institution Decision are used herein as so defined.

-1-

Case IPR2014-00325
Patent No. 8,475,832

Petitioner's invalidity theories of anticipation and obviousness.

### A.   Lack Of Anticipation Overview

Dr. Johnston explains why the knowledge a skilled person would have of the pharmacokinetic profile of buprenorphine in combination with a proper understanding of both Labtec and the '832 patent refute Petitioner's anticipation arguments.  In particular, Dr. Johnston explains that it *has long been known that, due to extensive first-pass metabolism effects, buprenorphine has very poor bioavailability if administered perorally*, i.e., swallowed such that it is absorbed in the gut, as opposed to in the mouth.  Thus, *it has also long been known that it is not therapeutically effective or acceptable to administer buprenorphine perorally* due to buprenorphine's poor bioavailabilty and the expectation that peroral administration would likely increase inter- and intra-patient variability, make effective dosing less predictable and increase the risk of incurring side effects from buprenorphine, which is a potent opioid.  Additionally, given the poor bioavailability resulting from peroral administration, peroral dosing would require significantly higher dosing as compared, for example, to sublingual administration, thus providing more of the agonist to be potentially abused or diverted, as well as increasing the amounts needed, and thus increasing manufacturing costs.  Peroral administration, therefore, would be regarded by those skilled in the art as disfavored and therapeutically inappropriate, particularly given that it has long

2

been known that buprenorphine can be safely and effectively delivered through the oral mucosa, such as by sublingual transmucosal administration, thus by-passing metabolism by the gut wall and the liver.

By its own terms, *Labtec is limited to providing an orally dissolving film that is meant to follow the same metabolic route* and *to use the same dosage amounts as the brand name products listed* in Labtec. All of the brand name products listed in Labtec (in Table A) are meant to be absorbed in the GI tract with the exception of the two buprenorphine-containing products, Subutex® sublingual tablets and Suboxone® sublingual tablets. *Labtec also makes clear that it is limited to non-mucoadhesive dosage forms that are intended to be absorbed only in the GI tract, such as the small intestine, while avoiding oral mucosal absorption.* This is consistent with Labtec's stated objective of providing a film dosage form that follows the same metabolic route as all of the brand products it lists (except for the two buprenorphine-containing products).

As discussed above, Labtec is limited to dosage forms that provide absorption in the GI tract, but a person of ordinary skill in the art would know that peroral administration of buprenorphine is not therapeutically effective or acceptable. Further, both Subutex® and Suboxone® tablets are sublingual products that are intended to deliver buprenorphine through the oral mucosa. For these reasons, the skilled person would immediately conclude that the *Labtec*

3

Case IPR2014-00325
Patent No. 8,475,832

*inventors simply made a mistake* when they included the buprenorphine-containing products, Subutex® and Suboxone® tablets, in Table A among numerous brand name products whose actives are in fact meant to be absorbed in the gut, evidently based on the incorrect assumption that like those products, Subutex® and Suboxone® tablets, too, delivered their actives in the gut.

The skilled person's recognition of this mistake would be further confirmed by the listing in Labtec's Table A of pharmacokinetic data ($C_{max}$ and AUC data) for Suboxone® tablets that corresponds to established dosages of that product. Specifically, Labtec represents that the film dosages provided by Labtec could somehow be used to achieve the *same pharmacokinetic results using the corresponding dosages of Suboxone®* tablets. Because of the extensive first-pass effect that buprenorphine undergoes when taken perorally, however, the skilled person would immediately recognize that it would be *impossible* for Labtec's peroral dosage form to provide pharmacokinetic results equivalent to those provided by sublingual Suboxone tablets® (which provides buprenorphine through the oral mucosa) at the corresponding Suboxone® tablet dosages. Accordingly, this confirms that Suboxone® tablets (and Subutex®) were included in the product list of Table A in Labtec by mistake.[3]

---

[3] Of course, there is no working example in Labtec of a buprenorphine and/or naloxone containing film, nor any specific teachings relating to one, and the only

The person of ordinary skill in the art would appreciate that not only is there no teaching whatsoever in Labtec as to how to make a therapeutically acceptable oral dosage form for the delivery of buprenorphine, namely, one that is intended to allow oral mucosal absorption, but that Labtec affirmatively and definitively states that its non-mucoadhesive dosage form is meant to avoid any oral mucosal absorption.

One of ordinary skill in the art would also appreciate that the '832 patent is directed to providing a rapidly orally dissolving mucoadhesive film that delivers "a pharmaceutically acceptable level" (Ex. 1001, 12:10-15) of buprenorphine through the oral mucosa in order to provide "therapeutically adequate absorption" (13:11-18) with the objective of producing effects that are substantially bioequivalent to those produced by the commercial product Suboxone® sublingual tablets, which also provide buprenorphine by absorption through the oral mucosa. The specification emphasizes the inventors' surprising discovery that inclusion of a buffer that provides a certain (3-3.5) local pH in the presence of saliva at the interface of the dissolving film matrix and the oral mucosa is crucial in obtaining the combination of buprenorphine absorption and inhibition of naloxone absorption

two working examples are of brand name drugs that are meant to be absorbed, not surprisingly, in the GI tract.

5

Case IPR2014-00325
Patent No. 8,475,832

required to produce bioavailability of those actives that is substantially

bioequivalent to Suboxone® tablets.  The concept of "local pH" as used in the

context of the '832 patent would be understood by one of ordinary skill in the art

as solely concerning a region in the mouth (where the matrix is dissolving) and not

to any region in the gut; indeed, a person of ordinary skill would understand that

the concept of local pH as used in the context of the patent has no relevance to

perorally administered actives, because they would encounter a much larger and

stronger volume of acids and bases in the stomach and intestines and whatever

limited quantity of buffer was intended for use in the mouth would be rendered

ineffective in the stomach and intestines.

Finally, in addition to specifically stating that the inventive film formulation

is meant to provide oral mucosal absorption, the pharmacokinetic ranges (Cmax

and AUC) recited in the challenged claims are, as one of ordinary skill would

appreciate, taken directly from Table 3 of the patent and represent bioequivalence

values calculated for Suboxone® tablets which the skilled person would

understand as resulting from oral mucosal absorption.  There is no teaching

whatsoever in the '832 patent of a peroral dosage form approach and the skilled

person would understand that a peroral dosage form for buprenorphine would be

therapeutically ineffective and unacceptable in any event.

For these reasons and as further discussed below, the person of ordinary skill

would understand that the claims refer to a film formulation that provides, and to

pharmacokinetic ranges that result from, oral mucosal absorption.

In view of the foregoing, and as further discussed below, it is clear that

Labtec does not anticipate the challenged claims because:

i) Labtec's inclusion of buprenorphine-containing brand products was

nothing more than a mistake and Labtec's peroral administration route is, given

buprenorphine's extensive first-pass metabolism, clearly non-enabling, indeed

plainly inoperable, to obtain Cmax and AUC levels equivalent to those listed for

Subxone® tablets at the corresponding dosage amounts listed in Labtec Table A;

ii) Labtec requires peroral administration while the challenged claims, once

properly construed to require a film formulation that provides, and

pharmacokinetic ranges that result from, oral transmucosal absorption; and

iii) the '832 patent, which is directed to a film dosage for treating opioid

dependence, clearly describes and claims a dosage for therapeutic use, but Labtec's

peroral administration route for buprenorphine is known not to be therapeutically

effective or acceptable and is, therefore, nonenabling, for that reason as well.

Finally, Labtec does not anticipate Claim 19 for the additional and

independent reason that due to naloxone's extensive first-pass effect, it is not

technically possible for a peroral dosage form of naloxone at the mg dosage

amounts required in dependent Claim 19 to provide a $C_{max}$ within the range recited

7

in Claim 15, from which it depends.

### B.   Non-Obviousness Overview

Dr. Johnston also explains why knowledge of the pharmacokinetic profile of buprenorphine as of the 2009 filing date of the '832 patent and a proper understanding of Labtec and the '832 patent, establishes that Petitioner cannot carry its burden of showing that the challenged claims are obvious over Labtec combined with Yang and Birch.  A person skilled in the art seeking to design a buprenorphine dosage form (which is understood to only be delivered through the oral mucosa) would never have been motivated to look to Labtec in the first place. Indeed, Labtec's proposed oral film for GI absorption (the opposite of oral mucosal delivery) would have been recognized to be a complete nonstarter (as therapeutically unacceptable) for the delivery of buprenorphine.

With the background provided by Dr. Johnston, it is also evident that it would be legally impermissible, and a person of ordinary skill in the art would have no motivation, to combine Labtec and Yang.  To accomplish therapeutically acceptable buprenorphine delivery, the person of ordinary skill would be forced to change the basic principles of operation of Labtec, abandoning its peroral GI absorption route in favor of its opposite, a mucoadhesive film for oral mucosal absorption. Federal Circuit and Board precedent forbid transmogrifying what a reference actually teaches and then trying to apply that artificial construct as a §

8

103 reference.

Finally, Dr. Johnston also shows why, in any event, the combination of

Labtec, Yang and Birch does not render the challenged claims obvious since

Petitioner has not carried its burden of showing that undue experimentation would

not be required to produce the subject matter of the challenged claims.

Specifically, even if the skilled person somehow disregarded Labtec's insistence

on using the peroral route for absorption in the GI tract and decided instead to try

to make the opposite kind of film—a mucoadhesive film for oral mucosal

absorption of the actives—she would have had no reasonable expectation of

success in producing a therapeutically acceptable film that meets the

pharmacokinetic requirements of the challenged claims without having to

undertake undue experimentation.

In designing pharmaceutical films for systemic drug delivery, as Petitioner

recently told the Board in another IPR, "tinkering with even one component may

have a significant effect on the entire system . . . the combination of ingredients

and desired characteristics requires a delicate balance." Ex. 2043, IPR2014-00376,

Paper 22 (October 27, 2014) at 2. Here, none of Petitioner's references come close

to suggesting, much less teaching, how to make a pharmaceutically acceptable film

that provides the $C_{max}$ or AUC values for buprenorphine and naloxone recited in

the challenged claims of the '832 patent. Therefore, with the three asserted

9

Case IPR2014-00325
Patent No. 8,475,832

references in hand, the experimentation that would have been required to get this combination to work given, among other things, that oral pharmaceutical film formulation technology is a relatively recent and emerging art, the multitude and interrelationship of variables to be chosen and parameters to be met, the extensive testing required, including through *in vivo* testing in humans, and the lack of any buprenorphine and/or naloxone film in the prior art, would have been far beyond just tinkering or small changes, and instead would have required undue experimentation to arrive at the claimed films.

## II.    BUPRENORPHINE PHARMACOKINETICS BACKGROUND

Buprenorphine, a (mu) μ opiate receptor partial agonist, has long been known as having characteristics that make it an ideal drug for the treatment of opioid dependence. Ex. 2003, Johnston Dec., ¶ 42. For example, as explained in the '832 patent, "[i]n order to help individuals addicted to narcotics, it is known to provide a reduced level of a drug, which provides an effect of satisfying the body's urge for the narcotic, but does not provide the 'high' that is provided by the misuse of the narcotic." Ex. 1001, 1:36-41.

One of the most important and long known pharmacokinetic facts about buprenorphine is that it undergoes extensive first-pass metabolic effects. These first-pass effects are the result of both gut wall metabolism (extensive conjugation within the intestinal mucosa) and enzymatic degradation by the liver (specifically,

10

Case IPR2014-00325
Patent No. 8,475,832

extensive hepatic oxidative metabolism by cytochrome P450 3A4/5 and 2C8

isoenzymes). Ex. 2003, ¶ 44.  These extensive first-pass metabolic effects have

long been understood to result in very poor peroral bioavailability.[4]  Therefore, it

has long been known that very little of perorally administered buprenorphine enters

the systemic circulation, thus making the peroral route inappropriate for the

treatment of opioid dependence.  *Id.* at ¶ 46.

Petitioner itself has repeatedly acknowledged this during the prosecution of

its own patents and publications relating to its own transmucosal buprenorphine

product. *See, e.g.*, Ex. 2044, International Patent Publication No. WO2013096811,

p. 1, ln. 26-28 ("Buprenorphine is metabolized by the liver, via the CYP3A4

isozyme of the cytochrome P450 enzyme system, into norbuprenorphine (by N-

dealkylation) and other metabolites. Buprenorphine has a low oral bioavailability

due to very high first-pass metabolism."); Ex. 2048, BDSI poster presentation

---

[4] Thus, if buprenorphine is administered perorally, it passes through the gut

mucosa where it is metabolized significantly and is then delivered directly to the

liver via the hepatic portal circulation where it undergoes further metabolism.

Due to buprenorphine's very high first-pass effect, some report that peroral

administration of buprenorphine results in essentially no buprenorphine reaching

the systemic circulation.  Other references estimate that the absolute bioavailability

of peroral buprenorphine is as little as 10 – 15 %.  Ex. 2003, ¶ 45-46.

11

(2010), Background (asserting their oral transmucosal buprenorphine product

"facilitate[s] buccal delivery of buprenorphine, which is poorly bioavailable when

administered orally"). Accordingly, even Petitioner's product "facilitates *buccal*

delivery of buprenorphine" rather than using the peroral route. BDSI poster

presentation (2010), Background (emphasis added).

The person of ordinary skill in the art would also reasonably expect that the

extensive first-pass metabolic effects on perorally administered buprenorphine also

result in a substantial increase in inter- and intra-patient variability. Such increased

variability would reasonably be expected to make effective dosing less predictable

and titration of an individual patient's dosing more difficult, while at the same time

increasing the risk of significant side effects, including nausea and withdrawal, if

not more serious outcomes. Ex. 2003, ¶¶ 46- 47.

For example, in the case of buprenorphine, which is a mu (μ) receptor partial

agonist, there is a plateau of receptor activation with no further effect from a

further escalation in dose, often referred to as the "ceiling effect." It is this partial

agonist activity that makes buprenorphine a safer drug with which to treat opioid

addiction because there is less respiratory depression, less sedation, less

withdrawal symptoms, lower risk of toxicity at higher doses, and a decreased risk

of diversion. The variability in response to drugs is extremely important, because

if a patient is given one drug that interferes in the metabolic pathway of another

Case IPR2014-00325
Patent No. 8,475,832

drug, it may cause toxicity of the former.  For example, it has been reported that midazolam and certain HIV-1 protease inhibitors, when given simultaneously with buprenorphine, interfere in the metabolic pathway for the efficient metabolism of buprenorphine.  When this happens, it is possible to modulate the so-called "ceiling effect" of the partial agonist (buprenorphine), which could potentially result in drug-related morbidity or mortality due to an increase in respiratory depression.  Ex. 2003, ¶ 52.

In terms of inter-individual pharmacokinetic variability, a genetic polymorphism of a metabolic enzyme resulting in a patient that hypermetabolizes buprenorphine could cause that patient to receive inadequate levels of buprenorphine.  That unfortunate patient could start to experience opioid withdrawal, thereby making the perorally administered dose ineffective.  Likewise, a genetic polymorphism resulting in an enzyme deficiency with decreased buprenorphine clearance could result in a normally therapeutic dose causing side effects or potentially worse.   Thus, a peroral dose that is effective in one patient population could lead to withdrawal in another, and a peroral dose that is therapeutic to one may cause significant side effects or potentially have even more serious consequences to another.  Ex. 2003, ¶ 55.

One of ordinary skill in the art would also regard the possibility of intra-individual variability of the metabolism of buprenorphine as making peroral dosing

13

an inappropriate route of administration.  In terms of intra-individual variability,

gut mucosal and liver enzyme activity can be modified by drugs such as

phenobarbital or acetaminophen, food substances such as acetic acid or cruciferous

vegetables, charcoal cooked food, and pollutants, just to name a few.  Therefore,

the same patient may respond significantly differently from day to day depending

on his health, what he eats, or other drugs that he takes.  Therefore, a peroral dose

of buprenorphine that maintains a patient one day may on another day lead to

withdrawal, significant side effects, or potentially worse.  Ex. 2003, ¶ 56.

Beyond the bioavailability and expected variability problems described

above, a person of ordinary skill in the art would be deterred from using the peroral

route for administering therapeutic amounts of buprenorphine since, given the

availability of the sublingual route of delivery, peroral dosing would require

significantly more buprenorphine making the dosage form that much more of a

target for abuse and diversion, contrary to the applicable therapeutic and public

policy objectives.  Ex. 2003, ¶¶ 57-58.

For all of these reasons, as of 2009 (indeed, long before then), peroral

administration of buprenorphine would have been regarded by the person of

ordinary skill in the art as therapeutically inappropriate and ineffective.  Ex. 2003,

¶ 63.

Further, the long-time recognition that peroral administration of

Case IPR2014-00325
Patent No. 8,475,832

buprenorphine is therapeutically inappropriate would be heightened for the person of ordinary skill in the art by the fact that it has also long been known that oral transmucosal absorption *is* a safe and effective route for delivering buprenorphine to treat opioid dependent outpatients. Transmucosal oral delivery is superior to peroral delivery because buprenorphine delivered oral transmucosally is absorbed mainly via the tissues in the oral cavity and cleared by the lingual blood vessels, which are not part of the hepatic portal system. Therefore, oral transmucosal delivery avoids the significant first-pass metabolism buprenorphine undergoes when administered perorally for GI absorption. Ex. 2003, ¶ 61.

Indeed, as one of ordinary skill would know, Suboxone® sublingual tablets deliver buprenorphine primarily through the oral mucosa. Ex. 2003, ¶ 66. Suboxone® tablets were first approved by the FDA in 2002 and introduced to the U.S. market in 2003. RBP's Suboxone® sublingual film (the commercial embodiment of the '832 patent), which was approved in 2010, also delivers buprenorphine through the oral mucosa.

Not surprisingly, prior to 2009, some of the prescribing information relating to sublingual buprenorphine tablets stated that:

> Administration is sublingual. Physicians must advise patients that the sublingual route is the only effective and safe route of administration for this drug.

See  Ex. 2____ : Summary of Product Characteristics for Subutex 0.4 mg, 2 mg,

15

and 8 mg Sublingual tablets at

http://www.medicines.ie/medicine/1658/SPC/Subutex+0.4mg%2c+2mg+and+8mg

+Sublingual+Tablets/ downloaded on Nov. 2, 2014.[5]  Similarly, years before 2009,

it was publicly stated with respect to buprenorphine in the context of information

concerning Suboxone ® tablets:

> When taken orally, buprenorphine undergoes first-pass metabolism with N-
> dealkylation and glucuroconjugation in the small intestine and the liver. *The
> use of SUBOXONE by the oral route is therefore inappropriate.
> SUBOXONE tablets are for sublingual administration.*

Ex. 2007, SUBOXONE® Tablet Data Sheet, 2006 at 2 (emphasis added); Ex.

2003, ¶ 62.

Accordingly, as of 2009, one of ordinary skill in the art would view the

peroral administration of buprenorphine for the treatment of opioid dependence as

therapeutically ineffective and inappropriate.[6]  Ex. 2003, ¶¶ 63.

---

[5] The website reports that the Summary of Product Characteristics was last updated

04/16/2013; however, the document revision history as provided on pages 9-11

indicates that the quote relied upon was present at least as late as 2005.

[6] *See, e.g.,* the statement in the *Handbook of Methadone Prescribing and

Buprenorphine Therapy* that the oral GI route should be avoided because of the

"pharmacokinetic problems of oral and parenteral opioids which include poor GI

absorption, first pass metabolism, and low bioavailability.  Ex. 2___ at ___.

### III.   CLAIM CONSTRUCTION

The Board properly rejected Petitioner's proposed claim constructions for the terms "film formulation" and "provides an *in vivo* plasma profile" and adopted the constructions proposed by Patent Owner. Paper 17, 7-12.  Specifically, the Board adopted the following constructions for these terms:

| Term | Board's Construction |
|---|---|
| film formulation | "'[F]ilm formulation' encompasses *film dosage, film composition, or film*, but not a formulation that is not in the form of a film." Paper 17, 11 (emphasis added). |
| provides an in vivo plasma profile | There is "no need to construe the term 'provides an in vivo plasma profile' beyond its *ordinary meaning*." Paper 17, 12 (emphasis added). |

At this stage, there are two claim construction issues for the Board to address.  The first is an issue raised in the Petition that was not addressed, at least not explicitly, in the Institution Decision, namely, whether the "wherein" clause in Claim 15 should be given patentable weight—as explained below, it should. Second, Patent Owner respectfully submits, as indicated above, that the challenged claims should be construed to require a film formulation that provides, and pharmacokinetic ranges that result from, oral transmucosal absorption.

Case IPR2014-00325
Patent No. 8,475,832

### A.     Legal Standard For Claim Construction In Inter Partes Review

While claim terms are given their broadest reasonable interpretation in this proceeding pursuant to 37 C.F.R. §42.100(b), terms must still be construed as they would be understood by a person of ordinary skill in the art in light of the language of the claims and the specification. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). A claim's construction is not "reasonable" if it does not comport with how a person of ordinary skill would understand the term in light of the claim language and specification. *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999) ("Although the PTO must give claims their broadest reasonable interpretation, this interpretation must be consistent with the one that those skilled in the art would reach.") (reversing Board construction in light of narrower understanding of claim term by one of ordinary skill in view of patent disclosure).

### B.     Claim 15's "Wherein" Clause Is Entitled To Patentable Weight

Petitioner contends that the "wherein clause" contained in Claim 15 recites merely a desired result and is "not entitled to patentable weight." Paper 2 at 23-26. The bulk of Petitioner's argument consists, not of relevant law, but rather the text of Claim 15 and an out of context block quote from an Office Action Response. *Id.* at 23. Petitioner relies only on the *Markman* decision to support its extreme position *(id.* at 24), which would require the Board to effectively read out a significant and properly claimed limitation.

18

Case IPR2014-00325
Patent No. 8,475,832

The language Petitioner quotes from the seminal *Markman* decision (which, of course, held that claim construction is a legal question for a district court judge to determine) merely provides introductory information on the bounds of proper claim scope. *See id.* at 373. *Markman* makes no reference to the "patentable weight" attributable to the claim elements following a wherein clause. There are numerous cases that do address such clauses, but Petitioner does not cite any, evidently not having found them supportive.

The Federal Circuit has confirmed the patentable weight of wherein clauses on numerous occasions. *See, e.g., Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329 (Fed. Cir. 2005) (refusing to read out a whereby clause where "such a construction would be contrary to the fundamental invention, which the specification describes" with particularity); *Griffin v. Bertina*, 285 F.3d 1029, 1033-1034 (Fed. Cir. 2002) (giving limiting effect to a wherein clause because it related back to and clarified what is required by the claim, and where the steps set forth in the claim would lose meaning unless placed in the context of the information described in the wherein clause).

In Claim 15, the "wherein said formulation provides" term is not identifying merely a result of the formulation, but claiming particular and defining characteristics of that formulation. In fact, the Federal Circuit has found that claimed pharmacokinetic profiles of a formulation can be a defining inventive

19

Case IPR2014-00325
Patent No. 8,475,832

characteristic. *See, e.g., Eurand, Inc. v. Myian Pharms., Inc.* 676 F.3d 1063, 1071 (Fed. Cir. 2012) (finding reversible error in a district court's "analysis of the evidence . . . offered to prove the claimed pK values obvious"); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1346-48 (Fed. Cir. 2008) (finding that the prior art "neither describes the product of the [ ] claims nor enables the pharmacokinetic properties that are set forth [therein]"). Here, the recited pharmacokinetic ranges give crucial meaning to, and provide defining characteristics provided by the film formulation at issue. Accordingly, these necessary claim limitations are entitled to full patentable weight.

### C.    The '832 Patent Solely Concerns Oral Transmucosal Absorption

Patent Owner respectfully submits that the challenged claims should be construed as requiring a film formulation that provides, and as reciting pharmacokinetic ranges resulting from, oral transmucosal absorption. The specification read as a whole may reveal that the very character of the invention requires a limitation be a part of every embodiment. *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims."). The reasons this construction is required are: i) the knowledge of one of ordinary skill in the art at the time that the only therapeutically effective and acceptable form of oral

20

administration of buprenorphine was oral transmucosal delivery; and ii) the

entirety of the specification makes clear for numerous reasons that the claimed film

delivers buprenorphine through the oral mucosa and that *all* of the pharmacokinetic

data and ranges in the specification and the claims represent the results of oral

transmucosal absorption.[7]

More specifically, the problem faced by the inventors of the '832 patent was

how to make an improved oral transmucosal formulation containing buprenorphine

and naloxone that would have substantial bioequivalence with the well established

Suboxone® sublingual tablet. *See e.g.*, Ex. 1001, 1:53. The '832 patent, titled

"Sublingual and Buccal Film Compositions," achieves this objective by providing,

for the first time, a "therapeutically effective" (*id.* at 1:8-15) film formulation that

is designed to be an orally dissolving, mucoadhesive (6: 39-41) film that delivers

"a pharmaceutically acceptable level" (12:10-15) of buprenorphine through the

---

[7] Patent Owner did not raise this claim construction issue in its Preliminary

Response because it relies to a large extent on expert testimony concerning the

person of ordinary skill's understanding of buprenorphine's pharmacokinetic

profile and of the patent specification. Patent Owner also notes for clarity that this

construction does not exclude the possibility that some very small fraction of

buprenorphine could be absorbed in the gut, such as could, but not necessarily,

occur if some is unintentionally swallowed. Ex. 2003, ¶ 72.

Case IPR2014-00325
Patent No. 8,475,832

oral mucosa (e.g., 11:10-13). This allows the claimed films to provide

substantially bioequivalent effects to Suboxone®tablets (4:51-58; 3:19-21) by

providing "therapeutically adequate absorption" of buprenorphine (13:11-18),

while at the same time inhibiting absorption of a "therapeutically acceptable

amount" of naloxone, i.e., an amount sufficient to help deter abuse and diversion of

the agonist (15: 6-9). As the specification states (4:51-58):

> Currently, treatment of opioid dependence is aided by administration
> of Suboxone®, which is an orally dissolvable tablet. This tablet
> …provides a combination of buprenorphine (an opioid agonist) and
> naloxone (an opioid antagonist). Therefore, the present invention
> provides a method of treating narcotic dependence by providing an
> orally dissolvable film dosage, which provides a bioequivalent effect
> to Suboxone®.

One of ordinary skill in the art would understand that Suboxone® sublingual

tablets deliver buprenorphine through the oral mucosa. The claimed formulations

are intended to work the same way:

> In a dosage form that is to be placed in the oral cavity, it is desired to
> *absorb the agonist [buprenorphine] bucally*"so as to provide rapid
> integration of the agonist into the body of the user. At the same time,
> it may be desired to prevent or reduce *absorption of any antagonist*
> *[naloxone] bucally*, thereby allowing the antagonist to be swallowed
> and destroyed in the stomach.

Ex. 1001, 11:8-16 (emphasis added). Indeed, as explained in the '832

patent's specification, the claimed film formulation was arrived at by using a

certain carefully matched set of excipients (see Table 1 at col. 16 which

identifies the amounts and ratios of the excipients in the working example)

that would provide the desired film parameters, such as the appropriate

polymer matrix for suitable (rapid) dissolution time, mucoadhesion, taste,

and structural properties. *See e.g., id.* at 4:61-10:67.[8] Ex. 2003, ¶¶ 66-67.

Further confirming the oral transmucosal nature of the claimed film, the

specification notes that a key criterion in polymer selection is "the time period for

which it is desired to maintain the film in contact with the mucosal tissue," because

"[s]ome actives may only require a few minutes for ***delivery through the mucosal***

***tissue***, whereas other actives may require up to several hours or even longer." *Id.*

at 6:42-47.  Ex. 2003, ¶ 68.

The specification repeatedly emphasizes the important role that "local pH"

played in developing the film formulations described in the '832 patent. By

designing the film to contain a buffer that could provide a "local pH" of about 3 to

3.5, the film allowed for the oral transmucosal absorption of desired levels of

buprenorphine (well absorbed) and naloxone (largely inhibited), as in the case of

Suboxone® tablets. *See e.g.*, Ex. 1001, 2: 6-22; 3:27-30; 11:21-61; 12:28-36;

---

[8] One reason for desiring that the film have mucoadhesive properties was so that

the film would be "difficult to remove once placed in the mouth, thereby making

abuse of the agonist difficult." Ex. 1001, 1: 65-2: 2; *see also*, 4: 58-60, 63-65; 6:

39-42; 12:3-6; 15:21-24.

Case IPR2014-00325
Patent No. 8,475,832

21:38- 23:11.[9] The skilled person would appreciate that *the specification's strong*

*emphasis on the use of a buffer to provide a local pH (in the presence of saliva as*

*the matrix dissolves adjacent to the oral mucosa) is solely applicable to oral*

*transmucosal absorption.* As Dr. Johnston explains, the concept of "local pH" as

used in the context of the '832 patent has no relevance to perorally administered

actives, which encounter a much larger and stronger volume of acids and bases in

the stomach and intestines and whatever limited quantity of buffer was intended

for use in the mouth would be rendered ineffective in the stomach and intestines.

Ex. 2003, ¶ 69

   With respect to the challenged claims, only Claim 15 is an independent

claim.  It recites a certain range of $C_{max}$ values for buprenorphine and naloxone that

can be provided by the claimed film.  As one of ordinary skill would appreciate,

that range of $C_{max}$ values, as well as the range of AUC values in Claims 16 and 17,

are taken directly from Table 3 of the '832 patent's specification.  Table 3, as its

heading indicates, is meant to present the inventors' calculation of "Acceptable

Bioequivalence Ranges for Suboxone® Tablets (80-125%)" from dosages of 2 mg

buprenorphine/0.5 mg naloxone up to 16 mg buprenorphine/4 mg naloxone.  *Id.* at

---

[9] *See also* Ex. 1001, 11:23-26: "in a dosage that includes an amount of an agonist,

the local pH may be controlled to a level that maximizes its release and/or

*absorption into the oral cavity* of the user," i.e., oral-transmucosal absorption.

24

Case IPR2014-00325
Patent No. 8,475,832

17:28-40. These values, as the specification explains (*id.* at 17:20-26), are

calculated based on the *in vivo* $C_{max}$ and AUC values tested and shown in Table 2

in col. 16. Similarly, one of skill in the art would appreciate that the

buprenorphine mg dosage range presented in Claim 18 and the naloxone mg

dosage range in Claim 19 correspond with the tested Suboxone® tablet mg dosage

ranges shown in Tables 2, 2A and 3. Ex. 2003, ¶ 70.

The person of ordinary skill in the art would also appreciate that *all* of the

pharmacokinetic data and ranges in the specification relating to Suboxone®

sublingual tablets, including in Tables 2 and 3, result or would be expected to

result from oral transmucosal absorption, the known route employed by that

commercial product. Similarly, the person of ordinary skill would understand that

*all* of the pharmacokinetic data provided about the test film formulations was

intended to and did result from oral transmucosal absorption.[10] In addition, the

skilled person would recognize that there is no suggestion whatsoever, much less

any teaching, in the '832 patent that a therapeutically acceptable film dosage form

---

[10] For example, Table 12, which presents pharmacokinetic data for the test films,

notes "lower *buccal* absorption" of naloxone provided by the films as compared to

the sublingual tablet (with no mention of GI absorption of either active ingredient).

Ex. 1001, 23:46-49.

Case IPR2014-00325
Patent No. 8,475,832

could be delivered perorally or that any of the recited pharmacokinetic ranges are

somehow meant to encompass peroral administration intended to deliver

buprenorphine for absorption in the gut. Ex. 2003, ¶ 71.

Accordingly, it is clear that the pharmacokinetic ranges recited in the

challenged claims should be construed as resulting from oral transmucosal

absorption given the specifications' focus on: i) producing effects bioequivalent to

Suboxone® sublingual tablets (which deliver buprenorphine by oral transmucosal

absorption), ii) having a mucoadhesive film, iii) providing a buffer that provides a

certain local pH in the mouth in the presence of saliva so as to optimize the oral

transmucosal absorption of buprenorphine and inhibit the oral transmucosal

absorption of naloxone, and iv) pharmacokinetic data and ranges that relate to oral

transmucosal absorption, coupled with the person of ordinary skill in the art's

knowledge that peroral administration would not be therapeutically effective or

acceptable.  A broader reading would be completely antithetical to the patent's

disclosure and to the expectations and understanding of one of ordinary skill in the

art.  Ex. 2003, ¶ 72.

## IV.   CLAIMS 15-19 OF THE '832 PATENT ARE NOT ANTICIPATED BY LABTEC

To anticipate a patent claim, a single prior art reference must disclose all

elements of the claimed invention arranged as in the claim. *Net MoneyIN, Inc. v.*

*VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Conopco, Inc. v. Procter &*

26

*Gamble Co.*, IPR2013-00509, Paper 10 at 9 (PTAB Feb. 12, 2014).  Petitioner has

the burden of establishing the claims are unpatentable by a preponderance of the

evidence. 35 U.S.C. § 316(e).  Further, Petitioner was required to identify, "with

particularity, each claim challenged, the grounds on which the challenge to each

claim is based, and the *evidence* that supports the grounds for the challenge to each

claim." *Id.* § 312(a)(3) (emphasis added).  Thus, Petitioner must include in the

Petition sufficient evidence to carry its burden to prove the claims unpatentable.

### A.   Labtec Proposes Only Oral Films Designed To Provide GI Absorption To Mimic The Pharmacokinetics Of Peroral GI-Absorbed Dosages

True to its title, Labtec only discloses "Non-Mucoadhesive Film Dosage

Forms."  Labtec defines "non-mucoadhesive" to "mean[] that the dosage form is

*not* designed for administration of the active pharmaceutical agent through the oral

mucosa."  Ex. 1017 at 9 (emphasis added).  In its Background section, Labtec

recognizes that several manufacturers have proposed film formulations for the

delivery of prescription drugs; however:

> the vast majority of these formulations are "mucoadhesive"
> formulations designed for adhesion of the dosage form to the mucosal
> tissue in the mouth, and transmission of the drug from the dosage
> form through the mucosal tissue into the systemic circulation.

*Id.* at 2. Labtec also recognizes that an:

> *advantage of these mucoadhesive films resides in their ability to*

27

*bypass* the gastrointestinal tract, and *barriers in the gastrointestinal tract to drug absorption such as first pass metabolism* and decomposition of the active ingredient in the stomach.

*Id.* at 3 (emphasis added).

Labtec then, however, contrasts its own films with such mucoadhesive films.

Specifically, Labtec states:

The prior art has not appreciated that an innovator's drug product, be it a tablet, capsule, or other oral dosage form, has already proven itself effective through rigorous clinical testing, and that the innovator's product may already provide the optimum bioavailability of pharmaceutical agent.

*Id.* Thus, according to Labtec:

*What is needed is a film product* that mimics the pharmacokinetics of an innovator's product, and *that follows the same metabolic and bioabsorption pathways as the innovator's product*, to ensure that the dosage form achieves the proven clinical efficacy of the innovator product.

*Id.* (emphasis added).

While Labtec teaches that using the same "bioabsorption and metabolic pathways" as the conventional tablet when making a film is important, the entire disclosure of Labtec is devoted to "*film dosage forms that are formulated or administered for gastrointestinal absorption* of the active pharmaceutical agent." *Id.* at 4 (emphasis added).  Labtec even states that if an active is used that has a

28

tendency to be absorbed through the oral mucosa, the film should include a "means

for retarding absorption of said active pharmaceutical ingredient through the oral

mucosa." *Id.* at 14. This is important because while Table A of Labtec lists 19

different brand name "drugs of interest" for use with its disclosed methods and

their respective pharmacokinetic profiles, each of these brand name products, with

the exception of Suboxone® and Subutex®, use the GI tract as the "metabolic and

bioabsorption pathway." Ex. 2003, ¶ 74.

As described above, however, Suboxone® (and Subutex®) include

buprenorphine and are designed for oral transmucosal absorption. Thus, while

Labtec mentions Suboxone® as a drug for which there is an "interest" in obtaining

a bioequivalent film, Labtec provides neither an embodiment of such a film nor a

method that enables the production of a therapeutically acceptable dosage form of

such a film. Ex. 2003, ¶ 75.

> **B.    Labtec Does Not Anticipate Because It Does Not Disclose Oral-Transmucosal Films As Required By The Properly Construed Claims**

As explained above, in accord with how a person of ordinary skill in the art

would read the claims, the construction of "orally dissolving film formulation

comprising buprenorphine and naloxone" in Claims 15-19 is limited to oral-

transmucosal films, i.e., films designed to provide absorption of the active

ingredients (buprenorphine and naloxone) primarily through the oral mucosa. In

29

contrast, the entire disclosure of Labtec excludes oral mucosal absorption: Labtec's

films are "*not* designed for administration of the active pharmaceutical agent

through the oral mucosa." Ex. 1017 at 9 (emphasis added).  Labtec is instead

devoted to "film dosage forms that are formulated or administered for

gastrointestinal absorption of the active pharmaceutical agent." Ex. 1017 at 4.

Labtec is limited to the opposite of what the properly construed claims require and

therefore cannot anticipate those claims under a proper claim construction.  Ex.

2003, ¶ 77.

### C.   Labtec Does Not Anticipate Because It Only Discloses A Wish Or A Goal And Not The Claimed Film

Regardless of whether Patent Owner's construction is adopted, Labtec fails

as an anticipatory reference because it discloses nothing more than the *goal* of

obtaining a therapeutically acceptable product that is actually disclosed for the first

time and claimed in the '832 patent.

Petitioner has offered no evidence that any pharmaceutical film containing

buprenorphine and/or naloxone actually existed prior to the claimed invention.

Instead of disclosing such a film, Labtec suggests the *idea* of making a film

containing buprenorphine and naloxone, the goal of which would be to achieve

bioequivalence with Suboxone® tablets, but Labtec does not disclose any

embodiment (whether a paper or working example, or any other description) of a

buprenorphine-containing film (with or without naloxone), much less one that is

bioequivalent to Suboxone® tablets.  Since Labtec does not disclose any

embodiment within the scope of Claim 15 of the '832 patent, it does not "clearly

and unequivocally" disclose the claimed composition or direct the skilled artisan to

that composition "without any need for picking, choosing, and combining various

disclosures." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371.[11]

The inability of such a deficient disclosure to operate as an anticipatory

reference runs in parallel to the concerns raised in performing a § 112 analysis

where a patent discloses nothing more than a "wish" or a "goal," a mere recitation

"of the problem to be solved ... leaving it to the pharmaceutical industry to

complete an unfinished invention," and, on that basis, is found to lack a written

description as required by § 112.  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d

1336, 1353 (Fed. Cir. 2010)(en banc).  Just as it is an objective in the written

description context to ensure that patent claims do not overreach "the scope of the

inventor's contribution to the [relevant] field of art" (*id.* at 1353-54), so in the

anticipation context an important objective is to ensure that undue weight or

significance is not given to prior art that failed to actually contribute the subject

---

[11] *See also, Conopco, Inc. v. Procter & Gamble Co.*, IPR2013-00509, Paper 10 at 9

(PTAB Feb. 12, 2014), *citing In re Arkley*, 455 F.2d 586, 587 (CCPA 1972),

(quoted with approval in *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1083

(Fed. Cir. 2008).

31

matter of the challenged claims to the field of art.  Labtec did not contribute

anything toward the subject matter of Claims 15-19 of the '832 patent and cannot

anticipate those claims.

### D.    Labtec Does Not Anticipate Because It Fails To Enable The Claimed Invention

Regardless of whether Patent Owner's construction requiring oral

transmucosal absorption is adopted, Labtec does not anticipate because it fails to

enable a person of ordinary skill in the art to practice the invention of the

challenged claims.

### 1.    Labtec Only Proposes A Film Version Of Suboxone® Tablets By Mistake

Labtec is directed to "a film product that mimics the pharmacokinetics of an

innovator's product, and that follows the same metabolic and bioabsorption

pathways as the innovator's product."  Ex. 1017 at 2.  That is, if an existing tablet

is perorally administered and uses the GI tract as a "metabolic and bioabsorption

pathway," then the new film should also use the GI tract.  And it is this peroral

route of delivery to which the entire disclosure of Labtec is devoted: "The present

invention provides film dosage forms that are formulated or administered for

gastrointestinal absorption of the active pharmaceutical agent, and that are

bioequivalent to and interchangeable with existing orally administered drug

products."  *Id.* at 3.  Ex. 2003, ¶ 79.

Case IPR2014-00325
Patent No. 8,475,832

Labtec lists such existing peroral GI-absorbed "drugs of interest" to mimic through proposed oral films designed to provide GI absorption in Table A. *Id.* at 20. Of the 19 brand-name drugs in Table A, 17 are indeed intended and routinely given for peroral administration and gastrointestinal absorption. Johnston Dec. These 17 drugs fit Labtec's model. But the remaining two brand-name drugs in Table A do not: Patent Owner's Subutex® sublingual tablets and Suboxone® sublingual tablets are of course oral-transmucosal drugs, not peroral drugs for GI absorption. *Id.*; Ex. 2003, ¶ 80.

As a person of ordinary skill in the art would have readily recognized, and Dr. Johnston confirms, the listing of Suboxone® in Labtec's Table A makes no sense and must simply be a mistake. *Id.* at __. An oral film intended to provide GI absorption (the only kind proposed by Labtec) does not follow the same "metabolic and bioabsorption pathway" as oral mucosally absorbed Suboxone® tablets. Suboxone® tablets are—in terms of route of administration—the opposite of the kind of drug that Labtec identifies as "drugs of interest." *Id.*; Ex. 2003, ¶ 81.

   2.   **Even If The Claims Are Not Limited To Oral-Transmucosal Films, Labtec Is Inoperable On Its Own Terms If Applied To Suboxone®**

Labtec proposes oral films designed to provide GI absorption that mimic the pharmacokinetics of existing swallowable GI-absorbed tablet dosage forms "containing the same amount of active pharmaceutical agent." Ex. 1017 at 12.

33

This goal is technically unattainable in the case of Suboxone®. Both active ingredients in Suboxone®, buprenorphine and naloxone, have large differences in bioavailability when administered for oral mucosal absorption compared to peroral administration for GI absorption. Due to its much lower bioavailability, peroral delivery of a given amount of buprenorphine or naloxone cannot possibly give close to the same or substantially bioequivalent $C_{max}$ and AUC values (80-125%) compared to oral-transmucosal delivery of the same amounts of those active ingredients. Johnston Dec. __. Which is why oral mucosal absorption is the only therapeutically acceptable route of delivery contemplated in the '832 patent and is how both Suboxone® tablets and Suboxone® film are delivered. Ex. 2003, ¶ 82.

Specifically, it was known for decades that buprenorphine undergoes an extensive first-pass metabolism effect when administered perorally. This is why peroral administration is considered an inappropriate route of administration and a peroral buprenorphine dosage form has not been commercialized thus far. Oral mucosal bioavailability of buprenorphine has been reported to be around 30 – 50%. Peroral bioavailability, on the other hand, is very low and estimated to be as little as 10-15% or even less. Naloxone has even worse peroral bioavailability than buprenorphine. *Id.* at __. Ex. 2003, ¶¶ 83-84.

Because of the large difference in bioavailability for both actives when delivered perorally and oral-transmucosally, all the evidence indicates that one

34

Case IPR2014-00325
Patent No. 8,475,832

cannot achieve remotely similar (and certainly not substantially bioequivalent)

pharmacokinetic values for buprenorphine or naloxone through use of a peroral GI-

absorbed dosage (such as Labtec's proposed films) instead of an oral-transmucosal

dosage (such as Suboxone® tablets) using the same amount of the active

ingredients in the two dosages. *Id.* at __. Hence, Labtec's stated objective cannot

be reached as it pertains to mimicking the absorption from and producing effects

bioequivalent to Suboxone® tablets with the corresponding dosage amounts (as

listed in Labtec's Table A). Far from enabling the invention of Claims 15-19 of

the '832 patent, Labtec is completely inoperable as a means of arriving at that

subject matter. Ex. 2003, ¶ 85.

> 3.  **Even If The Claims Are Not Limited To Oral Transmucosal Films, GI-Absorbed Dosages Do Not Accomplish Therapeutically Acceptable Effects**

The film formulation claimed in Claims 15-19 is, as the claims and the

specification make clear, intended for pharmaceutical use in achieving therapeutic

objectives (treating opioid dependence) and involves potent opioid drugs. One of

ordinary skill in the art would appreciate that the '832 patent is directed to

providing a rapidly orally dissolving mucoadhesive film that delivers "a

pharmaceutically acceptable level" (Ex. 1001, 12:10-15) of buprenorphine through

the oral mucosa in order to provide "therapeutically adequate absorption" (*id.* at

3:11-18)  with the objective of producing effects that are substantially

35

bioequivalent to those produced by the commercial product Suboxone® sublingual

tablets, which also follow what is presently the only therapeutically acceptable oral

route, namely, absorption through the oral mucosa.  Ex. 2003, ¶ 86.  Hence, the

skilled person would expect the film product recited in the challenged claims to be

therapeutically acceptable in the context of buprenorphine administration.  *Id.* at ¶

88.

Labtec is entirely devoted to "film dosage forms that are formulated or

administered for gastrointestinal absorption of the active pharmaceutical agent."

Ex. 1017 at 4.  As Dr. Johnston explains, such peroral administration of

buprenorphine, as proposed by Labtec, is understood not to be therapeutically

acceptable due to buprenorphine's extensive first-pass effects and resulting poor

bioavailability and expected increased inter- and intra-patient variability.  *Id.*

Thus, regardless of whether the challenged claims are read as directed to oral

mucosal absorption, Labtec cannot anticipate those claims in any event because the

therapeutically unacceptable peroral delivery required by Labtec cannot anticipate

a claim to what is clearly meant to be a therapeutically suitable or acceptable

buprenorphine-containing film formulation.  *Id.*

      4.    **It Is Not Technically Possible To Meet Claim 19 Through
Peroral Administration Of Naloxone Under Any Reading
Of The Claim**

Dependent Claim 19 cannot be anticipated for the additional and

36

Case IPR2014-00325
Patent No. 8,475,832

independent reason that, as explained by Dr. Johnston, due to the first pass-effects

on the bioavailability of naloxone, the scientific literature indicates it is not

possible to achieve the required naloxone $C_{max}$ values recited in independent Claim

15 (requiring at least 41.04 pg/ml) with any of the mg dosage amounts of naloxone

recited in dependent Claim 19 (0.5 mg to 4 mg) through peroral administration and

GI absorption.  Ex. 2003, ¶ 89.

Specifically, Claim 19 requires that the naloxone $C_{max}$ values recited in

Claim 15 be reached using a naloxone dosage between about 0.5 and 4 mg.

Incorporating independent Claim 15, Claim 19 recites a formulation with "about

0.5 to about 4 mg of naloxone" which provides, in part, a $C_{max}$ of "about 41.04

pg/ml to about 323.75 pg/ml for naloxone." The literature indicates that peroral

delivery of naloxone does not achieve any $C_{max}$ value within the range recited in

Claim 15 even using the highest dosage amount of naloxone (4 mg) recited in

Claim 19.  Ex. 2003, ¶ 90; Ex. 2034,  604 (pharmacokinetic study where

administration of a 4 mg peroral solution of naloxone only provided a mean plasma

naloxone $C_{max}$ value of $27.16 \pm 6.29$ pg/ml).  The 4 mg peroral naloxone dosage

reported in Martin instead provided a naloxone $C_{max}$ (27.16) clearly below the

lower limit of the $C_{max}$ range required by Claim 19 (41.04), even though Martin

used the highest dosage allowed by Claim 19 (4 mg).  Therefore, even if the claims

are not read to exclude films designed to provide GI absorption, Labtec cannot

37

Case IPR2014-00325
Patent No. 8,475,832

possibly anticipate or, for that matter, render obvious Claim 19.  Ex. 2003, ¶¶ 90-
92; Ex. 2035.

## V.      CLAIMS 15-19 ARE NOT RENDERED OBVIOUS BY LABTEC, YANG, OR BIRCH

A claim is obvious and therefore unpatentable under 35 U.S.C. § 103(a) only

if the differences between the claimed subject matter and the prior art are such that

the subject matter, as a whole, would have been obvious at the time the invention

was made to a person having ordinary skill in the art to which said subject matter

pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The obviousness

determination requires an analysis of the following factual underpinnings: (1) the

scope and content of the prior art; (2) the differences between the claimed subject

matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective

evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18

(1966).  Furthermore, "knowledge of the goal does not render its achievement

obvious." *Institut Pasteur v. Focarino*, 738 F.3d 1337, 1346 (Fed. Cir. 2013).

"Recognition of an unsolved problem does not render the solution obvious."

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1377 (Fed. Cir.

2004).

Moreover, "[a] party who petitions the Board for a determination of

obviousness *must show* that 'a skilled artisan would have been motivated to

combine the teachings of the prior art references to achieve the claimed invention,

Case IPR2014-00325
Patent No. 8,475,832

*and* that the skilled artisan would have had a reasonable expectation of success

from doing so.'" *3D-Matrix, Ltd. v. Menicon Co.*, IPR2014-00398, Paper 11 (Aug.

1, 2014) (emphasis added) (quoting *P&G v. Teva Pharms. USA, Inc.*, 566 F.3d

989, 994 (Fed. Cir. 2009)).  It is Petitioner's burden to, at the bare minimum,

*address* these factual inquiries and carry its burden of proving its obviousness

contentions by a preponderance of the evidence—a burden that Petitioner has

failed to meet.

> **A.    Labtec Cannot Render Obvious Claims Requiring Oral-
> Transmucosal Films As Required By The Properly Construed
> Claims**

As explained above, the proper construction of "orally dissolving film

formulation comprising buprenorphine and naloxone" in Claims 15-19 is limited to

oral-transmucosal films.  In contrast, the entire disclosure of Labtec excludes oral

mucosal absorption: Labtec's films are "***not*** designed for administration of the

active pharmaceutical agent through the oral mucosa." Ex. 1017 at 9 (emphasis

added).  Since Labtec is limited to the opposite of what the properly construed

claims require, it cannot render those claims obvious under a proper claim

construction.

> **B.    A Person Of Skill In The Art Would Not Look To Labtec In
> Seeking To Develop A Film For Delivery Of Buprenorphine**

Regardless of whether the Board agrees with Patent Owner that the

challenged claims must be read as limited to oral transmucosal films, *a person of*

39

Case IPR2014-00325
Patent No. 8,475,832

*ordinary skill in the art seeking to design a buprenorphine dosage form would*

*never have been motivated to look to Labtec in the first place.*  Ex. 2003, ¶¶ 94-

95.  Labtec's proposed oral films designed to provide GI absorption would have

been recognized as a complete nonstarter for the delivery of buprenorphine.  As

Dr. Johnston explains, peroral delivery of buprenorphine would have been

considered therapeutically ineffective and unacceptable by the skilled person.  *Id.*

at ¶ 95.  As such there would have been no motivation to look to art regarding

peroral drug delivery for GI absorption, which is Labtec's sole delivery route, in

designing a buprenorphine dosage form.  *Id.*

        The fact that Labtec nominally "disclosed" (no more than) the notion of oral

films designed to provide GI absorption to mimic Suboxone tablets does nothing to

alter that conclusion.  The person of ordinary skill would have concluded that the

Labtec inventors made a mistake when they included the buprenorphine-containing

products, Subutex® and Suboxone® tablets, in Table A among numerous brand

name products whose actives are in fact meant to be absorbed in the gut, evidently

based on the incorrect assumption that like those products, Subutex® and

Suboxone® tablets too, delivered their actives in the gut.  *Id.* at ¶ 96.

        That this was a mistake is evident from the fact that Labtec is abundantly

clear that its strategy is limited to mimicking existing GI-absorbed drugs in

proposed oral films designed to provide GI absorption.  Ex. 2003, ¶ 97.

Labtec never suggests that, in addition to this strategy, it would also be a

good idea to do the opposite and mimic oral transmucosal drugs like Suboxone®

tablets in oral films designed to provide GI absorption. *Id.* Much less does Labtec

(or Petitioner) even begin to explain how that could work. Faced with an

obviously mistaken and unintentional suggestion to pursue an avenue for

buprenorphine delivery that was understood to be therapeutically ineffective and

unacceptable, the person of ordinary skill would have disregarded Labtec. *Id.* The

Petition presents no evidence or argument to the contrary, as it is required to do in

order to even present a *prima facie* case of obviousness in view of the well-known

pharmacokinetic profile (extensive first-pass effects) of buprenorphine—a subject

which the Petition conspicuously fails to even mention, let alone address.

Accordingly, Petitioner has failed to carry its burden of showing that the

challenged claims are obvious over Labtec for this reason alone.

    C.    **Petitioner Failed To Provide Any Evidence That A Person
Skilled In The Art Would Have Had A Reasonable Expectation
Of Successfully Combining Labtec, Birch, And Yang To Arrive
At The Claimed Invention**

        1.    **Yang Teaches Pharmaceutical Film Manufacturing
Methods To Achieve Uniformity Of Active Content**

Yang (MonoSol's U.S. Patent No. 7,357,891) discloses methods of making

pharmaceutical films. Ex. 1016, Title, 1:43; Ex. 2003, ¶ 99. Yang recognized that

conventional film manufacturing processes produced inherently non-uniform films.

41

*Id.* at 2:10-13.  Because of this, utilizing those processes would result in films "not

likely [to] meet the stringent standards of governmental or regulatory agencies,

such as the U.S. Federal Drug Administration ('FDA'), relating to the variation of

active in dosage forms." *Id.* at 2:28-35.  Accordingly, Yang "provided []

process[es] for making a film having a substantially uniform distribution of

components and a desired level of active component" in each dosage unit of the

film.  *Id.* at 4:23-35.  Indeed, the '832 patent incorporates Yang by reference as

providing this very teaching. Ex. 1001, 15:29-32.

In fact, the named inventors of Yang, which has a priority date of 2001,

years before the filing of the '832 patent, overlap with the named inventors on the

'832 patent, and both patents were originally assigned to their then employer

MonoSol.  These overlapping inventors evidently understood that the subject

matter of the '832 patent, which was arrived at years later than even the publication

of Yang in 2004, required significant inventive additions—specifically relating to a

buprenorphine naloxone film having substantially bioequivalent effects to

Suboxone tablets—to Yang's much more general disclosure about film technology

manufacturing methods. Ex. 2003, ¶ 100.

Thus, Yang provides no discussion on how to formulate a film to ensure that

it provides the desired absorption levels of the active ingredients, i.e., there is no

disclosure of how to ensure the resulting film provides a bioequivalent effect of a

Case IPR2014-00325
Patent No. 8,475,832

specific tablet. Yang especially does not provide any disclosure of how to control

absorption of actives through the oral mucosa, or specifically how to obtain a

desired level of buprenorphine oral mucosal absorption while achieving a certain

level of inhibition of the oral mucosal absorption of naloxone—neither of which

are specifically discussed in Yang. Moreover, like Labtec, Yang does not disclose

any embodiment of a film formulation containing buprenorphine and naloxone.

Yang does not even mention buprenorphine or naloxone as an active ingredient.

Ex. 2003, ¶ 101.

2.    **Birch Has Nothing To Do With Pharmaceutical Films**

Birch is directed to an aqueous solution for intranasal administration of

buprenorphine for analgesic purposes. Ex. 2003, ¶ 102. Birch has nothing to do

with pharmaceutical film formulations, or with buprenorphine and naloxone to

treat addiction, and, indeed, doesn't even mention naloxone.  Nothing in Birch is

stated in the context of pharmaceutical films or with the goal of attempting to

achieve a certain level of absorption of buprenorphine from an orally dissolvable

film or a certain level of inhibition of absorption of naloxone.  Ex. 2003, ¶ 102.

As Dr. Johnston explains, a person of skill in the art would recognize that

Birch provides a great deal of detail for preparing the formulations in its examples.

However, those examples involve nasal solutions, not oral pharmaceutical films.

The bioavailability of the nasal route of administration is different than the

43

expected bioavailability after administration via the oral cavity.  Pharmacokinetic parameters, such as the tmax, Cmax and AUC, would be expected to be very different for nasal administration than these same corresponding parameters after administration via the oral cavity.  Ex. 2003, ¶ 103.

For these reasons, the person of ordinary skill in the art would not look to Birch, or be motivated by Birch, in any way in the context of a pharmaceutical film to be administered in the oral cavity, including one containing buprenorphine and naloxone.   Here again, the lack of any evidence, including expert evidence, on such issues is conspicuous and fatally deficient to carry Petitioner's burden. Accordingly, Petitioner has failed to establish a *prima facie* case of obviousness based in part on Birch for this reason alone.  Ex. 2003, ¶ 104.

### 3.    Labtec Cannot Be Transmogrified Into Its Opposite

The Petition is completely silent as to whether a person skilled in the art would have had a reasonable expectation of successfully combining Labtec, Yang, and Birch *to arrive at the claimed invention*. Petitioner's entire argument for looking to the disclosure of Yang is as follows:

> It would have been obvious to one of skill in the art to look to *Yang* for methods of forming films and film dosage forms because *Yang* teaches such methods.  The '832 patent states that "film compositions of the present invention may be formed via any desired process." Ex. 1001 at 15:29-30.  The '832 patent admits that "[s]uitable processes

44

are set forth in [*Yang*]." Ex. 1001 at 15:30-31.

Paper 8, 45.

Patent Owner does not dispute that Yang discloses "process[es] for making a film having a substantially uniform distribution of components and a desired level of active component" in each dosage unit of the film. Ex. 1016, 4:23-35; Ex. 2003, ¶ 105. The problem with Petitioner's ground of invalidity, however, is that this disclosure of Yang does not address the deficiencies of Labtec. As discussed throughout, Labtec completely fails to disclose how to make a film that provides the claimed $C_{max}$ and AUC values for buprenorphine and naloxone. Ex. 2003, ¶ 115. Petitioner points to no portion of Birch or Yang to address these issues, nor does Petitioner provide such evidence from a person of ordinary skill in the art (e.g., by way of expert declaration).

Even more problematic is Labtec's mandate to administer films perorally for GI absorption. *Id.* at ¶ 106. To the contrary, Claims 15-19 are directed to films that provide the actives via oral transmucosal absorption. But even if the claims are not construed as requiring oral transmucosal absorption, as Dr. Johnston explains, the person of ordinary skill in the art at the time would regard peroral administration as ineffective and inappropriate, and view the oral transmucosal route as the only therapeutically acceptable oral delivery route to provide buprenorphine and naloxone at the claimed $C_{max}$ values. *Id.*

45

In any event, it would be clear to a person of ordinary skill in the art as of

2009 that the only therapeutically acceptable way to arrive at the claimed invention

would be to completely abandon the peroral GI absorption route mandated by

Labtec in favor of "the antithetical principle[] of operation"–a film for oral

transmucosal absorption.  Both the Federal Circuit and the Board, however, have

repeatedly held that requiring such a divergence from the teachings of the prior art

cannot provide skilled artisans with the reasonable expectation of successfully

arriving at the claimed invention required to establish a motivation to combine the

prior art in the way required to arrive at the claimed invention.  *See, e.g., Uniroyal,*

*Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1052 (Fed. Cir. 1988) ("In view of the

antithetical principles of operation [of the prior art] . . . there is no apparent basis

for the district court's conclusion that is would have been obvious to one skilled in

the art to make the combination."); *Abbott Labs. V. Sandoz, Inc.*, 544 F.3d 1341,

1349 (Fed. Cir. 2008) (affirming district court's finding that "a skilled artisan

would not have had a reasonable expectation of" arriving at the claimed invention

due to "different mechanisms of antibiotic activity [used in the prior art] and the

effect of this activity on pharmacokinetic behavior"); *Ex parte Ross*, Appeal No.

2009-002659, 2009 Pat. App. LEXIS 9068, 26 (B.P.A.I. 2009) (where a

combination eviscerated the primary reference such that it was "not clear what

aspects of the invention are being retained from [the primary reference]" the

46

combination "changed the basic principles of operation" of the primary reference

"such that the proposed modification would not have been obvious"); *Ex parte*

*Dinh*, Appeal No. 2009-002314, 2009 Pat. App. LEXIS 7156, 20 (B.P.A.I. 2009)

(reversing examiner's rejection of obviousness when the modification of the prior

art "would require that drug release occur through a different principle of

operation").

Accordingly, Petitioner's obviousness argument, which hinges, whether

alone or in combination, on Labtec, is fatally flawed for this independent reason,

namely, that a person of ordinary skill in the art cannot have had a reasonable

expectation of successfully combining Labtec, Yang and Birch to arrive at the

claimed invention when doing so would require the skilled person to treat Labtec

as teaching the opposite of what it discloses or otherwise transmogrify Labtec

beyond recognition.

### D. Even If Labtec, Yang And Birch Were Combined, It Would Require Undue Experimentation To Arrive At The Claimed Invention

Even if a motivation to combine these references were somehow found, the

combination of Labtec, Yang and Birch does not render the challenged claims

obvious since Petitioner has not begun to carry its burden of showing that undue

experimentation would not be required to produce the subject matter of the

challenged claims. Ex. 2003, ¶ 108. Even if the skilled person somehow

47

disregarded virtually all of Labtec and decided instead to try to make the opposite

kind of film—a film for oral mucosal absorption of the actives—she would have

had no reasonable expectation of success in controlling the absorption of both

buprenorphine and naloxone such that the blood plasma values in the challenged

claims are achieved.

Pharmaceutical film technology, where a self-supporting film carries the

active ingredient, represents a relatively recent advance in the science of

pharmaceutical formulation that has only come to the fore in recent years. *Id.* at ¶

109. It is only in the last few years for example that the FDA has approved oral

pharmaceutical films intended to produce systemic effects. In fact, Suboxone®

film was the first sublingual pharmaceutical film approved by the FDA (in 2010).

*Id.*

Suboxone® sublingual film is the commercial embodiment of the challenged

claims, id. at ¶¶ 116-118, having achieved such success in controlling the

absorption of both buprenorphine and naloxone as claimed following extensive

research and development. The Suboxone® film formulation is disclosed in Table

1 of the '832 patent. Ex. 1001, 16:1-35. Four years after the filing date of the '832

patent, Petitioner acknowledged that "Suboxone is the only available film

formulation of buprenorphine and naloxone." Ex. 2049.

It undoubtedly took extensive research and development to develop a film

Case IPR2014-00325
Patent No. 8,475,832

formulation that would meet the numerous parameters required for a

therapeutically acceptable orally dissolvable, transmucosal film formulation while

at the same time designing the formulation to produce the claimed films, i.e., to

successfully control the absorption of both buprenorphine (well absorbed) and

naloxone (absorption largely inhibited) as required to provide effects bioequivalent

to Suboxone® tablets.  Ex. 2003, ¶ 110.

As Dr. Johnston explains, designing pharmaceutical films is a complex art.

*Id.* at ¶¶ 110-111, 114-115.  As one of skill in the art understands, altering any

component of a formulation may have a significant effect on the entire system

because the interrelationship of the ingredients and desired characteristics is

complicated.  None of the three references in any combination would teach the

skilled artisan how to strike such a balance and meet the required objectives with a

reasonable expectation of success or without undue experimentation.  *Id.*

Petitioner agrees, taking the position, in a proceeding in which it is

defending its own patent, that in designing pharmaceutical films for systemic drug

delivery, "tinkering with even one component may have a significant effect on the

entire system . . . the combination of ingredients and desired characteristics

requires a delicate balance."  Ex. 2043, IPR2014-00376, Paper 22 (October 27,

2014) at 2.[12]  "[E]ven small changes to the formulation may have drastic effects on

_____

[12] Petitioner here, BDSI, is a real party-in-interest in IPR2014-00376 in addition to

49

Case IPR2014-00325
Patent No. 8,475,832

the entire device." *Id.* at 35.

In the present proceeding, without presenting any scientific evidence or authority—and with no expert testimony on the issue whatsoever—Petitioner would instead have the Board find the challenged formulation claims of the '832 patent obvious over a combination of three references:

1.     Labtec—providing an obviously mistaken suggestion to pursue a bioequivalent film that mimics Suboxone® tablets through a therapeutically ineffective and unacceptable approach (peroral delivery and GI absorption)—the opposite of the oral transmucosal route employed in Suboxone® tablets and in the challenged claims. Ex. 2003, ¶ 111.

2.     Yang—providing a vitally important disclosure for acceptable pharmaceutical films (a method to achieve active ingredient uniformity) but adding nothing to Labtec in terms of controlling absorption of any active and nothing specific about films with buprenorphine and/or naloxone. *Id.*

3.     Birch—directed to an aqueous solution for administration of analgesic doses of buprenorphine alone intranasally, and teaching nothing about how to achieve a certain bioavailability of buprenorphine and/or naloxone in an orally dissolvable film. *Id.*

None of Petitioner's references, alone or in combination, come close to

its subsidiary Arius Two, the patent owner. Ex. 2042, IPR2014-00376, Paper 9.

50

suggesting, much less teaching, how to make a pharmaceutically acceptable film

that provides the $C_{max}$ or AUC values for buprenorphine and naloxone recited in

the challenged claims of the '832 patent. The modifications required to get this

combination to work are far beyond the "tinkering" or "small changes to the

formulation" that Petitioner acknowledges would have "drastic effects" and disrupt

the "delicate balance" in the art of pharmaceutical film design. *Id.* at ¶ 112. In any

event, Petitioner has not begun to explain how the modifications could be

achieved, let alone without undue experimentation, and therefore has not met its

burden of proof.

For instance, as Dr. Johnston explains, if a person of ordinary skill set out to

design an oral transmucosal film that achieves the absorption of buprenorphine and

naloxone required by the challenged claims, with the knowledge in Labtec, Yang

and Birch, an extensive experimental program involving a multitude of parameters

would be required, likely taking months. *Id.* at ¶ 113. The identity, amounts and

ratios of polymers to make up the matrix of the film would have to be selected and

tested as they would affect dissolution of the film, which in turn affects absorption

of the specific actives. *Id.* The oral transmucosal absorption of a drug substance is

affected by among other things a fine balance of: 1) the molecular weight of the

drug compound of interest, 2) its degree of ionization, 3) its aqueous solubility, and

4) its lipophilicity, as well as consideration of 5) the surface area and dissolution

51

profile of the film (provided by the polymer components) and 6) whether the film

is mucoadhesive. *Id.* at ¶ 114. Adjustment of any of these numerous parameters

can affect the others. And, as discussed above, there was no prior art embodiment

of buprenorphine-containing films and none of Labtec, Yang or Birch teach the

person of ordinary skill anything specific in regard to making an oral transmucosal

buprenorphine and/or naloxone film. *In vitro* dissolution testing would be

performed. If a promising film formulation were arrived at, *in vivo* testing in

human subjects would need to be performed to determine the pharmacokinetic

results achieved. *Id.*

As Dr. Johnston concludes, this development project, initiated with simply

the wish for an oral transmucosal film that provides the claimed pharmacokinetic

profiles of both buprenorphine and naloxone, would require efforts far beyond

routine experimentation. *Id.* at 108-114. In the presence of references that provide

no specific teachings about the specific subject matter of the challenged claims and

in light of the substantial experimentation that would be needed to achieve such a

film, Petitioner presents no evidentiary basis, much less sufficient evidence to

carry Petitioner's burden of proof, that the person of ordinary skill in the art could

somehow rely on routine experimentation in order to fill the enormous gap

between Labtec's mere suggestion of such a film to the '832 patent's actual

invention of it. Accordingly, clearly, on this record, Petitioner's obviousness

contention should be rejected for this reason as well.

### E.    Secondary Considerations Support A Finding Of Nonobviousness

Suboxone® sublingual films, which are covered by the challenged claims of

the '832 patent[13], have achieved significant commercial success and have received

praise from others in the field, which provides objective indicia that Claims 15-19

are nonobvious. *See Apple Inc. v. ITC*, 725 F.3d 1356, 1366 (Fed. Cir. 2013)

(finding reversible error in the ITC's failure to consider evidence of commercial

success, copying, and praise by others). The Federal Circuit has recently confirmed

that when "the Board is reviewing evidence of obviousness—including objective

indicia—submitted by two adversarial parties for the claims of an issued patent[,]

. . . the Board should give the objective indicia its proper weight and place in the

obviousness analysis, and not treat objective indicia of nonobviousness as an

afterthought." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir.

2013).  Indeed, "[s]econdary considerations evidence can establish that an

---

[13] Suboxone® sublingual films are oral transmucosal buprenorphine/naloxone

films approved and marketed in four dosage strengths, which are covered by

claims 15-19. Ex. 2003, ¶ 117. The mean $C_{max}$ and AUC values are reported as

falling within the claimed ranges and the amounts of buprenorphine and naloxone

fall within the ranges specified in claims 18 and 19. *Id. at* ¶ 118 (providing

detailed analysis of the claims' coverage of Suboxone® sublingual films).

Case IPR2014-00325
Patent No. 8,475,832

invention appearing to have been obvious in light of the prior art was not and may

be the most probative and cogent evidence in the record." *Apple*, 725 F.3d at 1366

(internal quotations and citations omitted).

Secondary considerations are probative of nonobviousness when "there is a

nexus between the merits of the claimed invention and the secondary

considerations." *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d

281, 306; *see also CBS v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper

21, at 22 (Mar. 25, 2013) (instituting IPR).  However, no "strict" connection

between the claim language and the secondary considerations is required. *Rambus*

*Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013).  Rather, "[o]bjective evidence of

nonobviousness need only be 'reasonably commensurate with the scope of the

claims.'" *Id.*

Here, there is strong evidence, indeed from Petitioner's own public

statements, that embodiments of Claims 15-19 have achieved significant

commercial success and have been praised by others, which provides objective

indicia that the claims of the '832 patent are nonobvious.  For example, it can

hardly be disputed that Suboxone® film is the recognized leader in buprenorphine

containing drugs for the treatment of opioid dependence.  Indeed, statements by the

Petitioner acknowledge just this.  For example, Petitioner has previously stated that

"[t]he total market for buprenorphine containing products for opioid dependence

54

exceeded $1.7 billion in 2013," Ex. 2045 (SEC 10k statement) at 17, but it also

conceded that "Suboxone [is] the market leader" in this area with "2013 sales of

Suboxone sublingual film inceas[ing] to more than $1.3 billion" of the $1.7 billion

total, Ex. 2046 (BDSI press release) at 1-2. Further, Petitioner's Vice President of

Marketing and Corporate Development recently stated that "the vast majority of

the market for buprenorphine/naloxone products is dominated by films

formulations Suboxone film in particular . . . with 80% of prescriptions now being

for film." Ex. 2047 (analysis event transcript) at 15. Indeed, Petitioner itself has

stated that Suboxone® films have continued to dominate the marketplace even

after the introduction of generics. *Id.* ("We've shifted [our forecast] a bit in favor

of branded products [which are dominated by Suboxone ® films] based on more

limited use of generics that we might have originally projected."); *see also* Ex.

2045 at 17 ("[T]he impact of generic buprenorphine/naloxone tablets on

Suboxone® film sales has been limited to date.").

   Petitioner has also conceded that commercial embodiments of Claims 15-19

of the '832 patent have received significant praise from others, with both doctors

and patients preferring the film dosages embodied by Claims 15-19 over

conventional tablets. *See, e.g.*, Ex. 2048 (BDSI's CEO's presentation) at 4 ("I

think the other thing is [the Patent Owner] did an outstanding job of converting

people from their sublingual table to their sublingual film and it convinced

Case IPR2014-00325
Patent No. 8,475,832

physicians that is just better overall than tablets."); Ex. 2045 at 17 ("The actions

taken by [Patent Owner] as well as patient preference for a film formulation of

Suboxone® resulted in significant conversion of the Suboxone® market to the

branded film formulation.").

There is also a strong nexus between the Claims 15-19 and the commercial

success and praise received. First, the '832 patent is listed in the Orange Book as

covering Suboxone® film. Ex. 2050. Second, Suboxone® film was the first

systemic buprenorphine-containing film approved by the FDA. It was approved by

the FDA about 8 years after the FDA's approval of Suboxone® tablets—with no

systemic buprenorphine-containing films being approved or commercialized in the

interim. Third, inventive aspects of the films produced by the '832 patent

substantially contribute to the commercial success enjoyed Suboxone® film since,

as further discussed above, the entire patent is directed to providing a

buprenorphine/naloxone containing film that provides effects substantially

equivalent to Suboxone® tablets, including designing the formulation specifically

to achieve the desired oral transmucosal absorption of buprenorphine and the

desired oral transmucosal inhibition of naloxone. Further, as discussed above, the

commercial success enjoyed by Patent Owner has stemmed, according to Petitioner

itself, at least in part from patient and physician preference for films over

conventional tablets, even in the face of generic versions of the tablets having

Case IPR2014-00325
Patent No. 8,475,832

entered the market place.

Accordingly, Patent Owner submits that the significant evidence of commercial success and praise by others conceded, indeed publicly declared, by Petitioner, "present[s] compelling secondary considerations evidence that [] rebut[s] even a strong showing under the first three Graham factors." *See Apple*, 725 F.3d at 1366.

## VI.   Conclusion

For at least the reasons set forth herein, Patent Owner submits that Petitioner has failed to meet its burden of establishing that Claims 15-19 of the '832 patent are unpatentable over the cited prior art.

Respectfully submitted,

By: /James M. Bollinger/
    James M. Bollinger, Reg. No. 32,555
    Daniel A. Ladow, *pro hac vice*

IPR2014-00325

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing Patent Owner Response and associated exhibits were served electronically via email on November 7, 2014, on attorneys for Petitioner:

Danielle L. Herritt
Kia L. Freeman
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, MA 02110

dherritt@mccarter.com
IPR832@mccarter.com

Dated:  November 7, 2014                     /James M. Bollinger/
                                             James M. Bollinger
                                             Reg. No. 32,555

1