# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

RECKITT BENCKISER
PHARMACEUTICALS, INC., RB
PHARMACEUTICALS LIMITED, and
MONOSOL RX, LLC,

                    Plaintiffs,

v.

WATSON LABORATORIES, INC.,

                    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 13-1674-RGA

Consolidated

**HIGHLY CONFIDENTIAL**

## DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE PLAINTIFFS FROM RELYING ON REFERENCES DATED AFTER THE PRIORITY DATE OF THE '514 PATENT[*]

John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200 (telephone)
(302) 655-4210 (facsimile)

*Attorneys for Defendant Watson Laboratories, Inc.*

Dated:  October 16, 2015

Steven J. Fineman (#4025)
Katharine C. Lester (#5629)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
fineman@rlf.com
lester@rlf.com

*Attorneys for Defendants Par Pharmaceutical, Inc. and IntelGenx Technologies Corp.*

---

[*]    To reduce the volume of the Pretrial Order, Defendants have attached excerpts of the cited documents as exhibits.  Full versions of these documents are available at the Court's request.

Defendants hereby submit this motion *in limine* to preclude Plaintiffs from relying on references dated after the priority date of the '514 patent as substantive evidence supposedly supporting the alleged non-obviousness of the claims of the '514 patent as of its priority date.

## I.    FACTUAL BACKGROUND

In his opening expert report, Defendants' expert Dr. S. Craig Dyar, opined that several prior art references, including Chen (PCT Appl. No. WO 2000/42992), taught uniform films, and that a person of ordinary skill in the art would have been able to apply conventional knowledge to those films to achieve a film that varies by no more than 10% of the intended amount of active. (Ex. 1, ¶¶ 257-260.) In response, Plaintiffs' expert, Dr. Langer, cited numerous publications that post-date the '514 patent to assert that the '514 patent purportedly provided a novel solution to the alleged uniformity problems of the prior art. (Ex. 2, ¶¶ 112-144.)

These post-dated references do not make any attempt to actually apply the teachings of Chen or any other prior art reference cited by Defendants—indeed, they do not even cite these references. For example, Dr. Langer cites a thesis and a related article by Perumal that investigated the use of silicone molded trays within individual wells to evaluate uniform films. (Ex. 2, ¶¶ 113-134.) Likewise, several of Dr. Langer's other post-dated references critique the general state of the art, largely by citing self-serving statements in related applications to the '514 patent—in some cases copying the '514 patent inventors' descriptions verbatim. (Ex. 3, ¶ 105.) Similarly, Dr. Langer cites a patent application that attempts to make a self-serving statement regarding lack of uniformity in an attempt to establish the novelty of its own invention. (*Id.* ¶ 109.)

In relying on these post-dated references, Dr. Langer at no point independently evaluated the reliability of the techniques described, and he did not attempt to assert that the analysis conducted was of the type on which an expert in his field would rely. Instead, Dr. Langer merely

substituted the judgment of the authors of these out-of-court statements for his own independent

expert opinion, assuming the statements contained in these references were true.

## II.     ARGUMENT

Under Federal Rule of Evidence 802, out of court statements offered for their truth are

inadmissible hearsay.  Here, Plaintiffs attempt to offer references dated after the priority date of

the '514 patent for the mere fact that they allegedly state that content uniformity was an issue as

of 2008.  Plaintiffs ask the Court to accept that the statements in these references are true,

although Dr. Langer's report contains no basis for concluding that any hearsay exception applies.

An expert may only rely on inadmissible evidence "[i]f experts in a particular field would

reasonably rely on those kinds of facts or data in forming an opinion on the subject."  Fed. R.

Evid. 703; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d. Cir. 1994).  In order

for such information to be admissible, the court must find "good grounds on which to find the

[information] reliable."  *In re Paoli*, 35 F.3d at 748-49.  Dr. Langer's opinions regarding these

references do not satisfy this standard.  Dr. Langer merely recites the teaching of these references

without independently assessing the reliability of the techniques described in those references,

and without connecting the analyses in those references to the prior-art relied upon in this case.

Indeed, many of these references merely recite the same self-serving statements contained in the

specification of the '514 patent and do not contain any data or facts whatsoever, let alone the

type on which an expert in his field would reasonably rely.  To allow Plaintiffs to rely on those

references for the truth of the matters asserted therein is improper, and the references are not

admissible evidence.  Dr. Langer was not familiar with any of the authors of the references, their

credentials, or the basis for any of their statements.  (Ex. 4, Langer Tr., at 240:24-242:14,

258:21-259:7, 265:3-268:12.)  His reliance on them is simply a naked attempt to introduce

hearsay opinions that are not subject to cross examination or in-court credibility evaluations.

Further, Dr. Langer relies on statements in these references that essentially amount to the authors' opinions as to the state of the art. Rather than independently analyzing those conclusions, Dr. Langer attempts to substitute those opinions for his own. Having failed to verify the work in these references, Dr. Langer should not be able to use them to establish the non-obviousness of the claims. *See In re TMI Litig.*, 193 F.3d 613, 714-16 (3d Cir. 1999); *see also Muhsin v. Pacific Cycle, Inc.*, No. 2010-060, 2012 WL 2062396, at *4-6 (D.V.I. June 8, 2012); *Jung v. Neschis*, No. 01 Civ. 6993, 2007 WL 5256966, at *16 (S.D.N.Y. Oct. 23, 2007).

Moreover, even if these references could be deemed somehow admissible, they are irrelevant. For example, although Dr. Langer asserts that the testing in Perumal establishes that films produced by "[c]onventional oral thin film-forming methods and processes, such as those disclosed in the Chen application, typically resulted in the production of films with poor DCU" (Ex. 2, ¶ 113), Perumal did not cite Chen, and the purportedly "conventional" techniques described by Perumal were different than those taught by Chen. (Ex. 3, ¶¶ 107-108.) Perumal discloses films having a different formulation from those of Chen, and which were formed and dried using entirely different methods. (Ex. 4, at 248:13-250:17.) Because the films of Perumal bear no resemblance to those of Chen, the post-dated Perumal references are irrelevant as to the obviousness of the '514 patent.

III. **CONCLUSION**

Because the post-dated references relied upon by Dr. Langer are irrelevant, inadmissible hearsay, Defendants respectfully request that the Court preclude Plaintiffs from offering Dr. Langer's testimony on these references, or from offering the references into evidence. To the extent the Court permits testimony regarding these references, Defendants respectfully request that the Court provide Defendants the opportunity to present rebuttal testimony from Dr. Dyar to explain why these references are irrelevant to his opinions of obviousness.

3

/s/ John C. Phillips, Jr.
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200 (telephone)
(302) 655-4210 (facsimile)

Michael K. Nutter
Tyler Johannes
Sharick Naqi
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600 (telephone)
(312) 558-5700 (facsimile)

Peter E. Perkowski
David P. Dalke
WINSTON & STRAWN LLP
333 S. Grand Ave., Suite 3800
Los Angeles, CA 90071
(213) 615-1700 (telephone)

Melinda K. Lackey
WINSTON & STRAWN LLP
1111 Louisiana, 25th Floor
Houston, TX 77002
(713) 651-2600 (telephone)

*Attorneys for Defendant Watson Laboratories, Inc.*

Dated:  September 25, 2015

/s/ Steven J. Fineman
Steven J. Fineman (#4025)
Katharine C. Lester (#5629)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
fineman@rlf.com
lester@rlf.com

Daniel G. Brown
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
(212) 906-1200
Daniel.Brown@lw.com

James K. Lynch
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
Jim.Lynch@lw.com

Jennifer Koh
B. Thomas Watson
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400
Jennifer.Koh@lw.com
Thomas.Watson@lw.com

Emily C. Melvin
Brenda Danek
LATHAM & WATKINS LLP
330 North Wabash Drive, Suite 2800
Chicago, IL  60606
(312) 876-7700
Emily.Melvin@lw.com
Brenda.Danek@lw.com

Terry Kearney
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025

(650) 328-4600
Terry.Kearney@lw.com

*Attorneys for Defendants Par Pharmaceutical, Inc.
and IntelGenx Technologies Corp.*

## CERTIFICATE OF SERVICEE

I hereby certify that on September 25, 2015, true and correct copies of the foregoing document were caused to be served upon the following counsel of record as indicated:

**VIA ELECTRONIC MAIL**
Mary W. Bourke
Dana K. Severance
Daniel Attaway
Womble Carlyle Sandridge & Rice, LLP
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
(302) 252-4320
mbourke@wcsr.com
dseverance@wcsr.com
dattaway@wcsr.com

**VIA ELECTRONIC MAIL**
James F. Hibey
Timothy C. Bickham
Rachel M. Hofstatter
David L. Hecht
Cassandra Adams
Steptoe & Johnson LLP
1330 Connecticut Ave. NW
Washington, DC 20036
(202) 429-3000
jhibey@steptoe.com
tbickham@steptoe.com
rhofstatter@steptoe.com
dhecht@steptoe.com
cadams@steptoe.com
MonoSolLit@steptoe.com

**VIA ELECTRONIC MAIL**
Daniel Ladow
James M. Bollinger
Timothy P. Heaton
J. Magnus Essunger
Bennet J. Moskowitz
Troutman Sanders LLP
875 Third Avenue
New York, NY 10022
(212) 704-6000
Daniel.ladow@troutmansanders.com
James.bollinger@troutmansanders.com
Timothy.heaton@troutmansanders.com
Magnus.essunger@troutmansanders.com
Bennet.moskowitz@troutmansanders.com

Jeffrey B. Elikan
Erica Andersen
Jeffrey Lerner
Ashley Kwon
Covington & Burling LLP
One City Center
850 Tenth Street NW

**VIA ELECTRONIC MAIL**
Troy S. Kleckley
Puja R. Patel
Andrew D. Regan
Troutman Sanders LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308
Troy.kleckley@troutmansanders.com
Puja.patel@troutmansanders.com
Andrew.regan@troutmansanders.com

Robert E. Browne, Jr.
Troutman Sanders LLP
55 West Monroe Street, Suite 300
Chicago, IL 60603
(312) 759-1923
Robert.browne@troutmansanders.com

Charanjit Brahma
Troutman Sanders LLP
580 California Street, Suite 1100
San Francisco, CA 94101-1032

6

Washington, DC 20001-4956
(202) 662-5873
jelikan@cov.com
eandersen@cov.com
jlerner@cov.com
 akwon@cov.com

(415) 477-5700
Charanjit.brahma@troutmansanders.com

Douglas D. Salyers
Troutman Sanders LLP
600 Peachtree Street, NE Suite 5200
(404) 885-3000
Doug.salyers@troutmansanders.com


*/s/ Katharine C. Lester*
Katharine C. Lester (#5629)
lester@rlf.com

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RECKITT BENCKISER PHARMACEUTICALS, INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 13-1674-RGA (Consolidated) |
| v. | ) ) | |
| WATSON LABORATORIES, INC., | ) ) | |
| Defendant. | ) ) | |

| | | |
|---|---|---|
| RECKITT BENCKISER PHARMACEUTICALS, INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| PAR PHARMACEUTICAL, INC., INTELGENX TECHNOLOGIES CORP., | ) ) ) ) | C.A. No. 13-1461-RGA |
| Defendants. | ) ) | |

**EXPERT REPORT OF CRAIG DYAR, Ph.D.**

**MAY CONTAIN HIGHLY CONFIDENTIAL INFORMATION**

1

# TABLE OF CONTENTS

I.     Introduction ..................................................................................................................4

II.    Personal Background and Expert Qualifications ........................................................4

III.   Summary of Opinions ...................................................................................................6

IV.    Priority Date of the '514 Patent ...................................................................................7

V.     Legal Standards .............................................................................................................8

VI.    Background and Tutorial ...........................................................................................11

    A.   Polymers In General ............................................................................................. 11

    B.   Particles ................................................................................................................. 14

    C.   Role of Viscosity ................................................................................................... 14

    D.   Drying of Suspensions .......................................................................................... 17

    E.   Role of Uniformity in Drug Formulations ......................................................... 19

    F.   Flavoring of Pharmaceutical Formulations ...................................................... 19

VII.   The '514 Patent ..........................................................................................................20

    A.   The Asserted Claims of the '514 Patent ............................................................. 20

    B.   The '514 Patent Specification .............................................................................. 28

    C.   Prosecution History of the '514 Patent .............................................................. 36

        1.   The '272 Application ...................................................................................... 37

        2.   The '276 Provisional Application .................................................................. 46

        3.   The '594 PCT Application .............................................................................. 47

        4.   The '809 Application ...................................................................................... 49

        5.   The '176 Application ...................................................................................... 49

        6.   The '484 Application ...................................................................................... 50

    B.   Claim Construction of the Asserted Claims ...................................................... 64

VIII.  The Asserted Claims Only Enjoy A Priority Date Of July 10, 2007, or, Alternatively, September 27, 2002 ......................................................................................................64

IX.    The Level of Ordinary Skill in the Art ......................................................................65

X.     The Asserted Claims are Indefinite ...........................................................................66

    A.   "cast film comprising a flowable water-soluble or water swellable film-forming matrix" and "capable of being dried without loss of substantial uniformity" ........................... 66

    B.   "viscosity sufficient to aid in substantially maintaining non-self-aggregating uniformity of the active in the matrix" Is Indefinite As It Fails To Inform A Person Of Ordinary Skill In The Art With Reasonable Certainty The Scope Of This Claim Limitation ...... 67

XI.    Obviousness of the Asserted Claims ...........................................................................69

    A.   Obviousness As Of October 12, 2001 ................................................................. 70

2

1.    Scope and Content of the Prior Art as of October 12, 2001 .................................... 70

2.    Comparison Between the Prior Art and the Subject Matter Claimed in the '514 Patent.................................................................................................................... 81

3.    The Asserted Claims Would Have Been Obvious As Of October 12, 2001 Over The '116 Patent In Combination With Chen And The Knowledge Of One Of Ordinary Skill In The Art. .................................................................................................... 85

4.    A Skilled Artisan Would Have Been Motivated To Combine The Teachings Of The Prior Art And Would Have Had A Reasonable Expectation Of Success In Developing The Claimed Subject Matter. .............................................................. 89

5.    The Dependent Claim Limitations Do Not Render The '514 Asserted Claims Nonobvious. ............................................................................................................ 89

6.    Additional Limitations In Independent Claims 28 And 62 Do Not Render Those Claims Non-Obvious Over The Same Prior Art. ..................................................... 91

7.    Applicants' Attempts to Distinguish Chen Before the PTO Have No Merit........... 92

B.    Obviousness As Of June 10, 2007 ................................................................................ 95

1.    Scope and Content of the Prior Art as of June 10, 2007....................................... 95

2.    Comparison Between the Prior Art and the Subject Matter Claimed in the '514 Patent.................................................................................................................... 96

C.    Lack of Any Objective Indicia of Nonobviousness ..................................................... 97

XII.  The Asserted Claims are Invalid for Lack of Written Description ......................................97

A.    The Specification Provides No Description Of A Drying Technique That Meets The Definition Provided In The '514 Patent......................................................................... 98

XIII. To the Extent They Would Not Have Been Obvious, The Asserted Claims are Invalid for Lack of Enablement. ..............................................................................................................99

A.    There Is No Instruction, Other Than Conventional Drying Techniques, For Achieving A Uniform Cast And Dried Film. ................................................................................ 100

B.    Claims 10, 11, 37, 38, 66, And 67 Are Also Not Enabled With Respect To The Degree Of Drug Variation Claimed. ...................................................................................... 100

XIV.  The Asserted Claims are Invalid under the Doctrine of Obviousness-Type Double Patenting ........................................................................................................................101

XV.   Supplementation, Disclosure, and Rebuttal ....................................................................104

## I.     **Introduction**

1.      I, Craig Dyar, Ph.D., hereby submit this expert report on behalf of Defendants Watson Laboratories, Inc., Par Pharmaceutical, Inc., and IntelGenx Technologies, Corp.

2.      Defendants have retained me to provide technical expertise and my expert opinion regarding United States Patent No. 8,603,514 ("the '514 patent") (attached as Exhibit 1 to my report).  The '514 patent relates to cast film products for pharmaceutical uses.

3.      I understand that the Plaintiffs have asserted claims 1-3, 5-15, 28-30, 32-43, 45-47, 62-67, 69-73, and 75 of the '514 patent ("the asserted claims") against Defendants.

4.      This report offers, among other things, my opinions regarding the validity of the asserted claims.

5.      The opinions to which I will testify at trial, if asked, are set forth in this report.  My opinions in this report are based upon the information I have received so far.  They may be supplemented or modified if additional information is received.  They also may be supplemented to reply to additional information or opinions provided by the parties (or witnesses retained by the parties) and issues that may arise at trial.

6.      I may rely on demonstrative exhibits at trial to assist in explaining my trial testimony.

## II.    **Personal Background and Expert Qualifications**

7.      I expect to testify regarding my background, qualifications, and experience related to my opinions expressed in this report.  Further details are given in my curriculum vitae, attached as Appendix A.

8.      I received my Bachelor's degree in Biology in 1984 from the University of South Carolina.  I continued my education at the Medical University of South Carolina and received a

bachelor's degree in Pharmacy.  I also hold a Ph.D. in Pharmaceutical Science from the Medical University of South Carolina.

9.      I have more than 28 years of experience in the pharmaceutical sciences, including pharmacy, industry, and research.

10.      Throughout my career, I have published several peer-reviewed articles related to pharmaceutical sciences, as well as a book chapter on Melt-Extruded Particulate Dispersions in Pharmaceutical Extrusion Technology.  I have also been invited to give presentations at national meetings, including "How to Pursue and Assess Potential Technologies as Synergistic Fits for your Program", "Navigating the Challenges of Early Phase Development in Ophthalmology", and "Technology Differentiation: How are Similar Technologies Effectively Evaluated?"

11.      I am a member of Rho Chi Honor Society, which is an academic pharmacy honor society.  I am also member of the American Association of Pharmaceutical Sciences. Additionally, I am a Fellow of the American Foundation for Pharmaceutical Education (AFPE)—an organization that supports pharmaceutical education and from which I received a fellowship during my graduate work.  I am also a Delegate to the United States Pharmacoepeia (USP), which is primarily responsible for setting standards for the identity, strength, quality, and purity of medicines, food ingredients, and dietary supplements manufactured, distributed and consumed worldwide.  USP's drug standards are enforceable in the United States by the Food and Drug Administration, and these standards are used in more than 140 countries.

12.      I am named as an inventor on two pending patent applications entitled, "Pharmaceutical Compositions of Amorphous Atorvastatin and Process for Preparing Same" (U.S. Publ. No. 2009-0088465) and "Process and System for Controlled-Release Drug Delivery"

(U.S. Publ. No. 2002-0119197).   These patents generally relate to pharmaceutical compositions consisting of mixtures of polymers and drugs formed using melt extrusion technology.

13.     I have not previously testified as an expert in a deposition or trial.

14.     I am being compensated at a rate of $300 per hour, plus expenses, for my time in this case.  No part of my compensation depends on the outcome of this matter.

15.     In addition to the materials cited in the text of this Report, a list of the materials I considered in reaching my opinion is provided in Appendix C.  The bases for my opinions in this matter are the patents, articles, studies, and other materials identified throughout this report and Appendix C, as well as my education, training and more than 28 years of experience in pharmaceutical sciences.

III.    **Summary of Opinions**

16.     In reaching the opinions I set forth in this report, I have reviewed the '514 patent, as well the file history of the '514 patent.  I have also reviewed certain references, including textbooks, reference books, peer-reviewed journal articles, and other publicly available information, which is detailed below or provided in the attached Appendix C.  In addition, I have relied on my education, background, training, and experience in the relevant field in reaching my conclusions and forming the opinions set forth in my report.

17.     Based on the analysis and discussion provided below, my opinions are summarized as follows:

A.     The asserted claims are entitled to a priority date of no earlier than June 10, 2007; alternatively, the asserted  claims are entitled to a priority date of no earlier than September 27, 2002.

B.     The asserted claims are indefinite for failing to provide reasonable certainty with respect to at least the terms "cast film comprising a flowable . . . matrix,"

6

patent).)  The '528 patent, like others well known in the art, included polymers.  (Ex. 37, '528

patent, at Abstract, 10:66-11:3.)  Uniform, cast films were also well known in the art.  (*See, e.g.*,

Ex. 38, '003 patent, at 3:40, 5:51-53; Ex. 40, Mitra, at 4:15.)  For example, in 1997 Guo

disclosed film formulations containing pharmaceutical actives that could be manufactured using

"conventional" techniques that "meet the requirements of the specific application."  (Ex. 39,

Guo, at 227.)

<b>v.     It Was Commonly Known To Use Taste-<br>
Masking Agents, Particularly When The<br>
Pharmaceutical Active Of Interest Was Known<br>
To Be Bitter Or Have A Bad Taste.</b>

251.    By 2001, many oral films included taste-masking agents.  (Ex. 27, '116 patent, at

4:1-67.)  These were also used by Chen and others "to achieve masking of taste for active agents

that are bitter."  (Ex. 28, Chen, at 9:14-16.)  Chen further disclosed that "encapsulation of the

active agents may also be utilized to achieve masking of taste for active agents." (Ex. 28, Chen,

at 9:14-16.)

252.    I understand that Mr. Garry Myers, a named inventor on the '514 patent, testified

that taste-masking agents coat the particle, and are different from flavor-masking agents, which

only obscure the flavor.  (Ex. 31, Myers Vol. 1 Tr., at 113:4-21.)

<b>3.     The Asserted Claims Would Have Been Obvious As Of October 12,<br>
2001 Over The '116 Patent In Combination With Chen And The<br>
Knowledge Of One Of Ordinary Skill In The Art.</b>

253.    Claims 1, 28, and 62 require a cast film comprising a flowable, water-soluble or

water swellable film-forming matrix.  The '116 patent teaches a cast film (Ex. 27, '116 patent, at

8:47-48) that includes film-forming, water-soluble polymers.  (Ex. 27, '116 patent, at Abstract,

5:1-16.)  Chen discloses "a water-soluble hydrocolloid, mucosal surface-coat-forming film."

(Ex. 23, '024 patent, at 4:7-8; Ex., 28, Chen, at 3:30-32.)

254.    Claims 1, 28, and 62 further require "one or more substantially water-soluble or water swellable polymers."  Both the '116 patent and Chen disclose film-forming polymers such as at least "hydroxypropylmethylcellulose."  (Ex. 27, '116 patent, at 5:1-12; Ex. 28, Chen, at 24:2-15.)

255.    Claims 1, 28, and 62 require at least one particulate active to be present in the claimed formulation and that the particulate active be no larger than 200 microns.  Both the '116 patent and Chen disclose active ingredients in the claimed dosage forms.  Specifically, the '116 patent describes narcotic-analgesics, including opiates, present in individual dosage forms. (Ex. 27, '116 patent, at 3:32-35.)  The '116 patent further discloses a particulate active in the film formulation that is between 60-200 microns.  (Ex. 27, '116 patent, at 11:54-57.)  Similarly, Chen discloses active ingredients that include analgesics.  (Ex. 28, Chen, at 10:22-24.)

256.    Claims 1, 28, and 62 require a viscosity that is "sufficient to aid in substantially maintaining non-self-aggregating uniformity of the active in the matrix."  A person of ordinary skill in the art as of October 12, 2001 would understand that any dosage form, divided into smaller portions or dosages, such as cut, thin films must have uniformity of the active.  Indeed, individual dosage forms had to be uniform with respect to at least active distribution across those films in order to obtain regulatory approval.  (*See e.g.*, Ex. 28, Chen, at 15:19-16:8, *see also* Ex. 36, '246 patent, at 1:56-63 ("requisite constant weight and uniform active ingredient distribution . . . are nowadays required [for dosage forms]").)

257.    Chen teaches this uniformity.  In particular, Chen teaches that the process of mixing the components of a cast film formulation prior to casting was done particularly to ensure the components were "uniformly dispersed . . . in the hydrocolloid."  (Ex. 28, Chen, at 17:7-11.)

Chen also makes clear that a film can be formed from "a substantially homogenous preparation."
(Ex. 28, Chen, at 4:24-32.)

258.    Further, those of ordinary skill in the art knew that aggregation in a suspension
was a problem that could be remedied in several ways, including by increasing viscosity of the
suspension.  (Ex. 5, The Theory and Practice of  Industrial Pharmacy, at 470, 655.)  In fact, the
'514 patent acknowledges that it was known in the prior art to incorporate ingredients that would
reduce aggregation of the film components prior to drying, in order to increase the film's
viscosity.  (Ex. 1, '514 patent, at 2:60-3:1.)  In fact, the idea that viscosity and particle size affect
uniformity is conceptualized and exemplified in Stoke's law.  (Ex. 6, Theory of Pharmaceutical
Systems, Volume II Heterogeneous Systems, at 9.)

259.    Claims 1, 28, and 62 require that the "flowable water-soluble or water swellable
film-forming matrix is capable of being dried without loss of substantial uniformity in the
stationing of said particulate active . . . ."  These claim limitations do not recite an actual drying
process.  Instead, these limitations only require that the matrix has potential to be dried.
Therefore, it is my opinion that this limitation does not impart any patentability to these claims.
In any event, film-forming matrices capable of being dried while maintaining uniformity were
well known in the art by October 12, 2001.  (*See* Ex. 42, Le Person, at 257 (drying conditions
must "ensure the right product quality . . . i.e. physical and chemical homogeneity and an
appropriate distribution of active substance"); Ex. 43, '233 patent, at 4:59-5:1 ("[d]rying of the
cast film can be carried out in a high-temperature air bath using a drying oven or a drying tower
. . . [to result in] homogenous and soft adhesive film.").)

260.    Claims 1, 28, and 62 also require that the amount of active varies by no more than
10% from the intended amount of active.  As I explained above, the necessity of uniformity was

well known in the art.  And, there is nothing inventive in the 10% limitation.  (Ex. 28, Chen, at 15:19-16:8; Ex. 36, '246 patent, at 1:56-69 (disclosing ranges of uniformity across dosage forms "± 5% to max. 10%"); *see also*, Ex. 42, Le Person, at 257; Ex, 43, '233 patent, at 4:67-5:3.)  A person of ordinary skill in the art would have readily been able to apply conventional knowledge and well known techniques to achieve a film that varies by no more than 10% of the intended amount of active.

261.    Therefore, in my opinion, it would have been obvious to one of skill in the art that each film dosage form must be uniform, with respect to the active, in view of the '116 patent and Chen, as well as the prior art set forth above.

262.    Claims 1, 28, and 62 require that a "taste masking agent" be present in the cast film.  Claims 1 and 28 further require that the taste masking agent be "coated [on] or intimately associated with" the particulate active.

263.    The '116 patent teaches the inclusion of a taste-masking agent that coats at least portions of the active with a thin film.  (Ex. 27, '116 patent, at 4:1-67.)   One of ordinary skill in the art would understand that polysaccharides, such as cellulose partially hydrolyzed starch reasonably has an average molecular weight of 40,000 or greater.  Further, one of ordinary skill in the art would understand that many polymers can act as taste-masking agents if they sufficiently coat the active, including HPMC, hydroxyethyl cellulose, hydroxypropyl cellulose, PVP, carboxymethyl cellulose PVA, sodium alginate, PEG, and xanthan gum.  Each of these potential taste-masking agents is disclosed by the '116 patent.  (Ex. 27, '116 patent, at 5:1-16.)

264.    Chen also discloses taste-masking agents that "encapsulate[e] the active ingredient."  (Ex. 28, Chen, at 9:14-16)

March 3, 2015
Date

S. Craig Dyar, Ph.D.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RECKITT BENCKISER PHARMACEUTICALS INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 13-1674-RGA (Consolidated) |
| v. | ) ) | |
| WATSON LABORATORIES, INC., | ) ) | |
| Defendant. | ) | |
| RECKITT BENCKISER PHARMACEUTICALS INC., RB PHARMACEUTICALS LIMITED,  and MONOSOL RX, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 14-0422-RGA |
| v. | ) ) | |
| PAR PHARMACEUTICAL, INC., INTELGENX TECHNOLOGIES CORP., | ) ) ) | |
| Defendants. | ) ) | |

**EXPERT REPORT OF ROBERT S. LANGER, Sc.D.
REGARDING VALIDITY OF U.S. PATENT No. 8,603,514**

# Table of Contents

I.      INTRODUCTION ....................................................................................................... 1

II.     SCOPE OF THE REPORT ........................................................................................ 1

III.    SUMMARY OF OPINIONS ...................................................................................... 2

IV.     EVIDENCE CONSIDERED ...................................................................................... 3

V.      SUMMARY OF QUALIFICATIONS ....................................................................... 3

VI.     COMPENSATION ..................................................................................................... 6

VII.    LEGAL STANDARDS AND LEVEL OF SKILL..................................................... 6

        A.      Presumption of Validity.................................................................................. 6

        B.      Person of Ordinary Skill in the Art ................................................................ 7

        D.      Obviousness ................................................................................................... 8

        E.      Definiteness.................................................................................................... 9

        F.      Enablement .................................................................................................... 9

        G.      Written Description....................................................................................... 10

        H.      Priority ......................................................................................................... 10

VIII.   REVIEW OF THE DISCLOSURES OF THE '514 PATENT................................... 10

IX.     CLAIM CONSTRUCTION and DEFINITENESS ................................................... 28

        A.      The Active Content Uniformity Claim Limitations....................................... 29

        B.      "Flowable" matrix that is "capable of being dried"...................................... 31

        C.      "viscosity sufficient to aid in substantially maintaining non-self aggregating
                uniformity of the active in the matrix" (claims 1, 28, 62) .......................... 35

X.      THE CHALLENGED CLAIMS ARE ENTITLED TO A PRIORITY DATE OF AT
        LEAST SEPTEMBER 27, 2002, AND THE SPECIFICATION ADEQUATEly
        DESCRIBES THE CLAIMS AND ENABLES A PERSON OF ORDINARY SKILL TO
        MAKE AND USE THE INVENTION.................................................................... 39

XI.     THE CLAIMED INVENTION WAS NOT OBVIOUS IN LIGHT OF THE PRIOR ART
        AS A WHOLE, MUCH LESS THE LIMITED REFERENCES CITED BY DR. DYAR . 45

        A.      State of the art at the date of invention ....................................................... 49

        B.      Publications that post-date the invention of the '514 patent acknowledge the problems
                it addressed and confirm it was a novel solution. ........................................ 57

                1.      V.A. Perumal et al., "Investigating a New Approach to Film Casting for
                        Enhanced Drug Content Uniformity in Polymeric Films," *Drug Dev. & Indust.
                        Pharm.*, 34:1036-1047 (2008) ("Perumal 2008 article," Ex. P) ........................ 58

                2.      V. A. Perumal, "Multipolymeric Monolayered Mucoadhesive Films for Drug
                        Therapy," Master's Thesis (2007) ("Perumal Thesis"; Ex. Q).......................... 67

i

3.   Morales et al., "Manufacture and Characterization of Mucoadhesive Buccal Films," European Journal of Pharmaceutics and Biopharmaceutics, 77:187-199 (2011) ("Morales 2011"; Ex. N) ...................................................................... 71

4.   U.S. Patent Publication. No. US2007/0184099 to Nowak et al. ("Nowak Publication"; Ex. F) ........................................................................................ 73

5.   Goel et al. "Orally Disintegrating Systems: Innovations in Formulation and Technology", Recent Patents on Drug Delivery & Formulation, 2:258-274 (2008) ("Goel 2008"; Ex. L) ....................................................................... 74

6.   Kathpalia and Gupte "An Introdution to Fast Dissolving Oral Thin Film Drug Delivery Systems: A Review", Drug Delivery & Formulation, 10:667-684 (2013) ("Kathpalia 2013"; Ex. M) ..................................................................... 75

7.   Borges et al. "Oral Films: Current Status and Future Perspectives I – Galenical Development and Quality Attributes, Journal of Controlled Release, 206:1-19 (2015) ("Borges 2015-I"; Ex. J) and II – Intellectual Property, Technologies and Market Needs, Journal of Controlled Release, 206:108-121 (2015) (Borges 2015-II; Ex. K) .......................................................................................... 76

C.   Deficiencies in particular prior art references cited by Dr. Dyar ............................... 78

1.   Chen Application (WO2000/42992 – Dyar Ex. 28) and U.S. Patent No. 6,552,024 to Chen et al. ("'024 Patent" – Dyar Ex. 23) ................................... 78

2.   Bess  reference (WO2001/70194 – Dyar Ex. 35) and U.S. Patent No. 7,067,116 to Bess ("'116 patent" – Dyar Ex. 27) ......................................................... 100

3.   '298 Patent (U.S. Patent No. 6,596,298) – Dyar Ex. 13 ................................. 101

4.   '246 Patent (U.S. Patent No. 4,849,246) to Schmidt – Dyar Ex. 36............... 103

5.   U.S. Patent No. 5,393,528 to Staab ("'528 patent" – Dyar Ex. 37)................ 106

6.   U.S. Patent No. 5,629,003 to Horstmann et al. ("'003 Patent" – Dyar Ex. 38) 107

7.   Guo article (Dyar Ex. 39) and U.S. Patent No. 5,948,430 to Zerbe et al. ("'430 Patent" – Dyar Ex. 41) ............................................................................... 109

8.   Mitra (EP 0090560 B1) – Dyar Ex. 40 ......................................................... 110

9.   Le Person article – Dyar Ex. 42 ................................................................... 113

10.  U.S. Patent No. 5,166,233 to Kuroya et al. ("'233 Patent" – Dyar Ex. 43)..... 116

11.  U.S. Patent No. 4,713,243 to Schiraldi et al. ("'243 Patent" – Dyar Ex. 44) .. 117

12.  Other references relied upon by Dyar.............................................................. 118

XII.   THE CHALLENGED CLAIMS MEET THE WRITTEN DESCRIPTION AND ENABLEMENT REQUIREMENTS................................................................................. 118

A.   Drying methods................................................................................................... 119

B.   Uniformity Limits in Dependent Claims ............................................................. 123

C.   Obviousness-Type Double Patenting.................................................................... 124

## I.       INTRODUCTION

1.       My name is Dr. Robert S. Langer. I am currently an Institute Professor (one of 11 Institute Professors, the highest rank awarded to a faculty member) at the Massachusetts Institute of Technology (MIT).   My appointments include those in the Department of Chemical and Biomedical Engineering at MIT, Whitaker College of Health Sciences, Technology and Management and the Harvard-MIT Division of Health Sciences and Technology.

2.       I have been retained on behalf of Reckitt Benckiser Pharmaceuticals Inc., RB Pharmaceuticals Limited, and Monosol Rx, LLC, who I understand to be plaintiffs in the patent litigation identified in the caption of this report, to provide my opinions regarding the validity of claims of U.S. Patent No. 8,603,514 ("the '514 patent") and related issues, including opinions expressed by Dr. Craig Dyar, who I understand has been retained as an expert by defendants Watson Laboratories, Inc., Par Pharmaceuticals, Inc., and IntelGenx Technologies Corp. in this litigation.

3.       My opinions are based on my review of relevant documents and information, my experience in the fields of chemical engineering, pharmaceutical development, drug delivery, and polymer chemistry, particularly as applied to pharmaceutical products, and my understanding of the relevant legal framework as explained to me by counsel.

## II.      SCOPE OF THE REPORT

4.       I have been asked by plaintiffs Reckitt Benckiser Pharmaceuticals Inc., RB Pharmaceuticals Limited, and Monosol Rx, LLC (collectively, "Plaintiffs") to provide my opinions as an expert in the fields of chemical engineering, pharmaceutical development, drug delivery, polymer chemistry and, in particular, the formulation and properties of polymeric films as those issues relate to the validity of certain claims of the '514 patent.  I have been asked to

1

consider and respond to certain opinions expressed in the March 3, 2015, Expert Report of Craig

Dyar, Ph.D. ("Opening Report").

5.      The claims of the '514 patent that Dr. Dyar addresses in detail in his Opening Report are

Challenged Claims 1-3, 5-15, 28-30, 32-43, 45-47, 62-67, 69-73, and 75 ("Challenged Claims").

(I understand that of these, the claims of the '514 patent that are presently asserted by Plaintiffs

are claims 1-3, 9, 15, 62-65, 69, 71-73, and 75.) Therefore, I have only addressed in detail his

invalidity arguments as to those claims. I can provide opinions and analysis of the remaining

claims of the '514 patent if called upon to do so.  The bases for my opinions are detailed in this

report.  I anticipate providing testimony at trial regarding my opinions discussed herein.

## III.    SUMMARY OF OPINIONS

6.      By way of summary, based on information currently available to me, it is my opinion

that:

- The Challenged Claims of the '514 patent are fully described in, and enabled by, the disclosure of U.S. Provisional Patent App. No. 60/414,276 and, therefore, are entitled to a priority date of September 27, 2002, the filing date of that provisional application;

- The Challenged Claims of the '514 patent are not invalid as obvious in view of the prior art cited in Dr. Dyar's Opening Report;

- As indicated by the References Cited and Background of the Related Technology sections of the '514 patent, many of the of the prior art references cited by Dr. Dyar were in front of the U.S. Patent & Trademark Office ("PTO") during prosecution of the '514 patent, and it is my opinion that those that he cites that were not in the prosecution are cumulative of art that was in front of the PTO examiner before the '514 patent issued;

- At the time of the invention, a person of ordinary skill in the art would not have had a reason to combine the prior art references cited by Dr. Dyar in the manner he suggests in his report without the benefit of hindsight.  Nor would such a person of ordinary

479, for the premise that suspensions include active ingredients that are dispersed throughout the continuous phase).   What Dr. Dyar does not note is that:   (1) the textbook he references throughout this discussion does not mention the use of cast films as a pharmaceutical dosage form, instead limiting its discussion of pharmaceutical films to film coatings applied to the surface of another dosage form, like a tablet; and (2) this discussion of suspensions has to do with liquid suspensions, like those commonly used to administer antibiotics or the "shakes" containing imaging contrast agents ingested before a diagnostic test.   As anyone familiar with such suspensions knows, they typically require the patient to shake them to re-mix the ingredients before administration.

111.    However, it is likely not feasible to constantly mix the coating solution of a cast film as it is being dried.   The inventors of the '514 patent disclosed that they could instead maintain the dispersion of a particulate active in a cast film without impacting the other required characteristics of a pharmaceutically acceptable film if they maintained a relatively high viscosity and dried the films in a manner that prevented migration of the active during drying.

### B.    Publications that post-date the invention of the '514 patent acknowledge the problems it addressed and confirm it was a novel solution.

112.    Several papers published after the relevant priority date of the '514 patent appear to contradict Dr. Dyar's arguments with respect to obviousness and instead support the conclusion that (i) the invention of the '514 patent was novel and not obvious and (ii) 'the 514 patent addressed and provided a solution to a significant issue with oral thin films that was unaddressed in the art as of 2002.  Specifically, these references show that lack of DCU was a known problem associated with conventionally produced oral thin films.   These references further teach that attempts to solve this problem that predated the invention of the '514 patent, including much of the prior art Dr. Dyar cites in his Opening Report, were inadequate, and that those of ordinary

skill in the art (or even of more than ordinary skill) credited the inventors of the '514 patent as the first to teach a monolayer film casting process that yielded individual film dosage units with substantial drug content uniformity.

> **1.   V.A. Perumal et al., "Investigating a New Approach to Film Casting for Enhanced Drug Content Uniformity in Polymeric Films,"** ***Drug Dev. & Indust. Pharm.*, 34:1036-1047 (2008) ("Perumal 2008 article," Ex. P)**

113.    The Perumal 2008 article describes the results of studies examining a new approach to enhancing the drug content uniformity of polymeric oral thin films that involves the use of individual wells to prepare films versus cutting individual film dosage units from a larger film-cast sheet, as was done conventionally.   In the course of describing this new technique, the Perumal 2008 article makes the following points that are relevant to the non-obviousness of the Challenged Claims of the '514 patent:

- Lack of DCU was a known problem with drug-containing films that was not addressed and largely ignored in the research literature but was addressed in the patent literature;
- Conventional oral thin film-forming methods and processes, such as those disclosed in the Chen application, typically resulted in the production of films with poor DCU;
- The '514 patent was one of only a few patents/applications that attempted to provide novel solutions to address this issue even as of 2008, years after the priority date of the '514 patent.

114.    Perumal 2008 teaches the fact that films formed via conventional casting processes were known to be associated with poor DCU:

> "***Films prepared by conventional casting onto trays such as teflon-coated perspex trays (TCPTs) suffer from poor drug content uniformity.*** The aim of this study was to prepare a silicone molded tray (SMT) with individual wells for film casting and to evaluate it in terms of enhancing drug content uniformity. Films were prepared by solvent evaporation or emulsification and cast onto TCPT and SMT. ***Preparation of films by the SMT method was superior in terms of meeting drug content uniformity requirements.*** As compared with the TCPT

58

> method, the SMT casting method also reduced the variability in mucoadhesivity,
> drug release, and film thickness. Reproducibility of the SMT method was
> demonstrated in terms of drug content, mucoadhesion, and drug release."

(Perumal 2008, Ex. P abstract; emphasis added.)

115.    The Perumal 2008 article teaches that, although DCU was known to be an important

quality attribute of oral thin films for drug delivery with respect to therapeutic efficacy and

regulatory approvability, films produced by conventional methods typically displayed poor

results with respect to DCU and were thus non-uniform with respect to their drug content when

divided into individual dosing units.

> "Preliminary investigations in our laboratories using both methods of film
> preparation and casting onto teflon-coated trays as above for cutting into specified
> sizes indicated nonuniform drug distribution across the individual film units. A
> prerequisite for therapeutic efficacy, safety, and regulatory approval of a medicine
> is drug content uniformity. Failure to achieve a high degree of accuracy with
> respect to the amount of drug in individual unit doses of the film can result in
> therapeutic failure, nonreproducible effects, and, importantly, toxic effects to the
> patient."

(Perumal 2008, Ex. P at p. 1036.)

116.    The process of developing drug-containing oral thin films was described to be a complex

and multivariate process, with researchers attempting to create new oral thin film products

attempting to optimize several attributes relevant to the therapeutic efficacy of said films, such as

mucoadhesivity, mechanical properties and drug release.   With respect to conventional film-

forming methods, the Perumal 2008 article states that:

> "Films are conventionally prepared by the solvent-casting method in which the
> drug and polymer(s) of similar solubilities are dissolved in a single vehicle and
> cast onto trays, which are then left to dry to facilitate solvent evaporation. This
> forms a sheet of film which is cut into desired sizes to provide a specified dose of
> drug (Amnuaikit, Ikeuchi, Ogawara, Higaki, & Kimura, 2005; Dhanikula &
> Panchagnula, 2004; Perugini, Genta, Conti, Modena, & Pavanetto, 2003;
> Remunan-Lopez, Portero, Vila- Jato, & Alonso, 1998). Simultaneous
> optimization of mucoadhesivity and drug release profiles of monolayered films

may require the blending of drug and polymer(s) of opposing solubilities and therefore may not be simply dissolved in a single vehicle for film casting."

(Perumal 2008, Ex. P at p. 1036.)

117.    Despite the importance of DCU, the Perumal 2008 article teaches that researchers in the field appeared to focus on the other attributes of their oral thin films besides DCU when reporting their studies.  This led Perumal et al. to conclude that DCU was an issue with said films that was inadequately addressed in the research literature even as of 2008:

> "An extensive literature search with respect to drug content uniformity in polymeric films showed that although the literature is replete with formulation and several physicochemical characterization studies on films, surprisingly, the majority of papers did not report any assay values (Table 1). Of the very few that did, in three researchers had measured drug content by dissolving a known weight of the film for analysis (Ahmed et al., 2004; Amnuaikit, Ikeuchi, Ogawara, Higaki, & Kimura, 2005; Dhanikula & Panchagnula, 2004). This is not an accurate reflection of drug uniformity because sheets of film are cut into unit doses. An assay of film area rather than weight would be more appropriate for assessing drug content uniformity in such films. In addition, Dhanikula and Panchagnula (2004) only stated that uniformity results in their study indicated that the variation in drug distribution was <15%, but they did not report any data, whereas Perugini et al. (2003) reported assay values as a statement of drug content being more than 70%. The lack of reported data on this crucial characterization property of any novel drug delivery system led to the assumption that researchers in this field may also have been experiencing difficulty with this aspect of film characterization. Yet no paper to date, to the best of our knowledge, in the published pharmaceutical literature has highlighted this difficulty."

(Perumal 2008, Ex. P at pp. 1036-37.)  That the authors' "extensive literature search … with respect to drug content uniformity in polymeric films" turned up 23 papers concerning pharmaceutical films of which only 5 were published in 2001 or earlier, speaks to the limited understanding of drug-containing thin films like those contemplated in the '514 patent.  And even in 2008, although the difficulty of maintaining DCU in such films was understood, few researchers focused on that problem.  As I describe further below, this may at least be in part that

the development of pharmaceutical thin films was still a new endeavor in its early stages of development as of 2008 with no such prescription films being approved until after this date.

118.    In contrast to the results seen in the literature (or lack thereof), the Perumal 2008 article teaches that the issue of DCU was discussed and addressed in several patent applications as of 2008, with the '514 patent and its related applications being a key example.  The Perumal 2008 article notes that the problem of DCU in cast films and the causes for that nonuniformity in films produced by traditional casting and drying methods was described in detail in the U.S. Provisional Patent App. Ser. No. 60/443,741 ("'741 Provisional," Ex. I), one of the patent applications from which the '514 patent claims priority:

> "It was only a search of patent applications that confirmed the assumption that difficulties with achieving uniform drug distribution in films did indeed exist, as some patent applications that attempted to directly address the problems encountered with nonuniformity in films were identified. Although the identification of these patents confirmed the existence of this problem, it was intriguing that the published pharmaceutical literature omitted the reporting of assay values, yet revealed the undertaking of other complex characterization studies (Table 1) without focusing on overcoming this simple but mandatory prerequisite for development of any drug delivery system. *In these patent applications, it was explained that films prepared via the conventional casting technique, as used in the literature, suffered from the aggregation or conglomeration of particles, which rendered them inherently nonuniform in terms of all film components, including polymers and drug. It was found that the formation of agglomerates randomly distributed the film components as well as any active present, thus leading to the poor drug content uniformity (US Patent No. 60/443,741, 2004). The formation of agglomerates was attributed to the relatively long drying times, which facilitated intermolecular attractive forces, convection forces, and air flow which aided in the formation of such conglomerates (US Patent No. 60/443,741, 2004)."*

(Perumal 2008, Ex. P at p. 1038; emphasis added.)  Thus, the Perumal 2008 article cites the '741 Provisional as the primary example of a patent application that addressed the issues related to lack of DCU for films produced via conventional methods and proposed a novel solution to this issue.  As is also described in the '514 patent, as evidenced in the above quote, the Perumal 2008

61

article refers to the fact that the lack of drug content uniformity in conventionally produced films was thought to arise from the formation of aggregates due to the long drying times and other process features associated with conventional film casting and drying methods.

119.    The Perumal 2008 article also discussed the prior art Schmidt patent (U.S. Patent No. 4,849,246), which attempted to avoid these shortcomings of traditional casting methods by "abandon[ing] the concept that a monolayered film may provide accurate dosing and instead attempted to solve the problems of aggregation by forming a multilayered film." (Perumal 2008 article, Ex. P at p. 1038.) But the Perumal 2008 article noted that these efforts in the Schmidt patent "had the disadvantage[s] of requiring additional components, which translated to additional cost and manufacturing steps," "employ[ing] the use of time-consuming drying methods such as high-temperature air-bath using a drying oven, drying tunnel, vacuum dryer, or other such drying equipment, all of which aided in promoting the aggregation of film components and active" and "subject[ing] the active to prolonged exposure to moisture and elevated temperatures, which might render it ineffective or even harmful ....":

> "Some approaches that attempted to prevent agglomeration are described briefly. Schmidt (US Patent No. 4,849,246 in US Patent No. 60/443,741, 2004) abandoned the concept that a monolayered film may provide accurate dosing and instead attempted to solve the problem of aggregation by forming a multilayered film. The incorporation of additional excipients, i.e. gel formers and polyhydric alcohols respectively, to increase the viscosity of the film prior to drying in an effort to reduce aggregation of the components in the film is described (US Patent No. 60/443,741, 2004). These methods had the disadvantage of requiring additional components, which translated to additional cost and manufacturing steps. Furthermore, these methods employed the use of time-consuming drying methods such as high-temperature air-bath using a drying oven, drying tunnel, vacuum dryer, or other such drying equipment, all of which aided in promoting the aggregation of film components and active. In addition, such processes subjected the active to prolonged exposure to moisture and elevated temperatures, which might render it ineffective or even harmful (US Patent No. 60/443,741, 2004). Also, approaches described in US Patent No. 60/443,741, 2004 for enhancing drug uniformity, required sophisticated drying equipment and additional pharmaceutical excipients, which lead to unfeasible increased

> manufacturing costs and multi-step processing. Thus, a method that uses minimal
> additional excipients into the formulation, uses simple technology, and also
> provides uniform drug content throughout the film clearly needed to be
> identified."

(Perumal 2008, Ex. P at p. 1038-39.)

120.    Although the Perumal 2008 article focuses on only a few of the aspects of '741

Provisional (*i.e.*, the optimization of the viscosity of the matrix in order to reduce the potential

for aggregation and the use of alternative drying methods), a distinction is clearly drawn between

the disclosures of the '741 Provisional versus patents and patent applications focusing on oral

thin films produced utilizing conventional methods (such as the Chen Application).  Claiming

that the '741 Provisional application requires the use of additional excipients and complex drying

methods, Perumal et al. allege simpler methods for producing oral thin films, such as their

proposed method utilizing individual wells (SMT films), still needed to be identified even as of

2008:

> "Thus, a method that uses minimal additional excipients into the formulation, uses
> simple technology, and also provides uniform drug content throughout the film
> clearly needed to be identified. Instead of considering additional excipients or
> introducing new expensive and complicated drying technologies, a specially
> designed tray with built-in predetermined wells for forming polymeric films with
> uniform drug content was proposed and evaluated in this study. It was expected
> that this simple approach, which would involve casting specified volumes of
> polymer–drug mixtures into wells, would lead to improved drug uniformity
> because the drug would be entrapped in each film unit, irrespective of the
> migration of the active within that well during drying. Such an improvement will
> not only be useful in the field of buccal drug delivery for formulation
> optimization, but it will also impact on other fields because mucosal films are
> used for a variety of other routes of administration, that is, vaginal, rectal, and
> ocular."

(Perumal 2008, Ex. P at p. 1038.)

121.    The experimental results that the Perumal 2008 article reported with respect to drug

content uniformity and drug dissolution/release for their SMT films (produced in individual

wells) versus those produced via conventional methods are particularly relevant with respect to the allegations made by Dr. Dyar with respect to Figure 5 from the Chen Application for at least two reasons.  First, the Perumal 2008 article, and several of the prior studies described in this article, show that standard and routine methods for assessing the dissolution and drug release from oral thin films were known and utilized in the art over the time period from at least 2000 to 2008 and were known to be associated with low variability.  As I discuss further below with respect to my opinions concerning Figure 5 from Chen, these methods typically employed a standard USP dissolution apparatus or variant thereof combined with routine UV analysis of release media samples in order to quantify the amount of drug present.

122.    Second, by comparing the results of the conventionally prepared films and those made using Perumal et al.'s individual well method (SMT), it is clear that the lack of drug content uniformity in the conventionally prepared films resulted from the formulation and preparation process itself, not from measurement errors or analytical variability.  The authors of the Perumal article, with full knowledge of the teachings of the prior art, created a cast film by applying a coating preparation containing the active ingredient propranolol hydrochloride (PHCl) to the surface of a teflon-coated perspex tray (TCPT), drying the film using typical, prior-art conditions ("at 30°C for approximately 24 h"), and cutting it into individual dosage units.  (Perumal 2008, Ex. P at p. 1039 (Materials and Methods) and 1040 (Preparation of Polymer-Drug Solutions/Emulsions for Film Casting).)  The results reported in Perumal confirm that prior art film drying processes were inadequate to ensure active content uniformity.  "This yielded films with uniform surface morphology *but poor drug content uniformity values*, i.e., 110.00 ± 66.63%, indicating a large coefficient of variation (CV) of 60.57%." (Perumal 2008, Ex. P at p.

1042; emphasis added.)   The authors attributed the lack of drug content uniformity in these conventionally prepared films to drug agglomeration and migration during drying:

> "Table 2 depicts the pictures of trays used in the study for film casting and a summary of the assay and morphology of films generated.  Homopolymeric CHT films were initially prepared by employing the conventional casting technique whereby the polymeric solution is cast onto TCPTs to form a sheet of film that is cut into individual film units of desired sizes. ***This yielded films with uniform surface morphology but poor drug content uniformity values, i.e., 110.00 ± 66.63%, indicating a large coefficient of variation (CV) of 60.57%. The poor drug uniformity with these TCPTs was attributed to the reasons given in several patent applications, that is, to the formation of conglomerates and migration of drug throughout the tray during the drying process.***"

(Perumal 2008, Ex. P at pp. 1041-42; emphasis added.)

123.    Based on the statements from Perumal 2008 shown in paragraph 119 above, Perumal et al. appear to be referring to the '741 Application and its related applications in the statement shown above, thus experimentally confirming the teachings and disclosures of the '741 Application (and thus the '514 patent) with respect to the fact that conventionally produced films were prone to displaying poor DCU due to drug aggregation and migration during the film forming process, with the single well technique developed by Perumal et al. resulting in films with a significantly higher degree of DCU:

> "This modification, that is, using the SMT with inserts, resulted in films that satisfied the desired requirements, that is, good surface morphology and once again acceptable assay values of 104.84 ± 1.30% were achieved, as required by compendial specifications for PHCl dosage forms (92–107.5%) (British Pharmacopoeia, 2003)."

(Perumal 2008, Ex. P at p. 1043.)  Thus, these results indicate that the large variability seen for the films made via conventional methods resulted from the process used to make them, not from errors in the standard and routine assay method utilized to measure drug content.  The Perumal 2008 article also reported conducting reproducibility experiments that confirm the low degree of variability in drug content uniformity for their STM films.

> "The CV for assay values for each tray was low, indicating minimal intra-tray variability. Also these values were all within the compendial specifications of 92–107.5% (British Pharmacopoeia, 2003).
>
> …
>
> The in vitro drug release profiles of films from the three trays were also compared, as shown in Figure 3. The profiles for films from all three trays appeared to be almost superimposable."

(Perumal 2008, Ex. P at p. 1044.)  As can be seen in Figure 3 from the Perumal 2008 article, the error bars associated with the drug release profiles were tight, again indicating a low degree of variability associated with the standard and routine dissolution assay utilized by Perumal et al.

124.    Based on all of these results, Perumal et al. concluded that (i) conventional methods of oral thin film formulation and manufacture were associated with a high degree of variability with respect to drug content uniformity that prevented them from meeting industry-accepted compendia standards for acceptability; and (ii) utilizing individual wells for the production of thin films greatly reduced this variability via locking in the drug content present in the precursor film matrix (and thus removing the potential for the drying process to result in agglomeration and drug migration):

> "Therefore, multipolymeric films with PHCl+CHT+HPMC (drug and polymers with similar solubilities) and films with PHCl+CHT+EUD 100 (drug and polymers with opposing solubilities) were prepared by using the conventional TCPT and the SMT with inserts for film casting. The findings for both these methods were compared. Table 5 indicates the assay values, whereas Table 6 presents a composite summary of the drug release profiles of the films prepared in both types of trays. ***As is evident from Table 5 all films prepared with the SMT were within compendial specifications (92–107.5%) (British Pharmacopoeia, 2003) and all CVs for assays were low, that is, less than 4%, thus indicating the suitability of the SMT for the preparation of both homopolymeric and multipolymeric films with drug and polymer(s) of similar and/or opposing solubilities.  None of the films prepared with the TCPT were within compendial specifications. They exhibited very high CVs for assays, that is, as high as 60%, indicating the unsuitability of these trays for all types of film preparation.***"

(Perumal 2008, Ex. P at p. 1045; emphasis added.)

66

125.    The fact that the SMT individual well technique led to such markedly improved drug content uniformity supported the conclusion in the Perumal 2008 article that lack of drug content uniformity in the conventionally prepared films resulted from the migration and agglomeration of drug that occurs during the relatively long film drying process:

> "As can be seen from the drug release profiles (Table 6), the percentage drug released from all films prepared in the TCPT have relatively large SDs at each time point, whereas those prepared in the SMT with inserts have relatively small SDs. These results can be attributed to the migration of drug that occurs during the formation of aggregates during the drying process, leading to nonuniform drug content resulting in nonreproducible drug release profiles in the case of the TCPT. The small SDs and reproducible release profiles of all films prepared in the SMT with inserts are due to the containment of the drug within a predetermined well that prevents drug migration during drying and that maintains uniformity of content (US Patent No. 60/443,741, 2004)."

(Perumal 2008, Ex. P at p. 1045.)   Table 6 referred to in the passage above shows that the conventionally-produced films all displayed relatively large error bars with respect to their release profiles (i.e., greater than +/- 10%),  whereas the SMT-inserts displayed relatively tight error bars (within +/- 5%).  These results from Perumal 2008 indicate that the variability in drug content uniformity observed in these films is due to the conventional casting process itself and not to the standard and routine assay and dissolution methods utilized to measure drug release.

### 2.    V. A. Perumal, "Multipolymeric Monolayered Mucoadhesive Films for Drug Therapy," Master's Thesis (2007) ("Perumal Thesis"; Ex. Q)

126.    The Perumal Thesis also supports the results described above with respect to the Perumal 2008 article and provides additional details that support the conclusions above with respect to the validity of the assay and dissolution analytical methods utilized for the characterization of oral thin films.  For example, the Perumal Thesis also discusses the known association of poor drug content uniformity with conventionally-produced drug-containing oral thin films:

> "It was discovered through preliminary investigations and a comprehensive literature search that the conventional film casting method of film preparation suffered from poor drug content uniformity."

(Perumal Thesis, Ex. Q at p. iv.)

127.    The Perumal Thesis also discusses the influence of the long drying times associated with conventional methods of oral thin film production on a lack of DCU of the resultant films:

> "Although this method is cost effective and does not require the use of sophisticated apparatus, it has certain limitations.  These limitations are due to the use of relatively long drying times during which the formation of agglomerates randomly distributes the film components and any active present as well.  Since sheets of film are usually cut into unit doses, certain doses may therefore be devoid of or contain an insufficient amount of drug for the recommended treatment, which is ultimately harmful to the patient (US Patent No. 60/443,741, 2004)."

(Perumal Thesis, Ex. Q at pp. 49-50.)

128.    Chapter 4 of the Perumal Thesis discusses the same studies that were described in Perumal 2008 reference described above and provides additional information concerning the qualification/validation of the analytical methods utilized, the results of which again in my opinion support the conclusion that the variability seen for the conventionally produced films described in Perumal 2008 was not due to analytical method variability, instead being due primarily to the variability in DCU observed for films produced via conventional film casting methods:

> "This is the standard method of film coating as described in the literature (Kohda et al., 1997; Remunan-Lopez et al., 1998; Okamoto et al., 2001; Perugini et al., 2003; Yoo et al., 2006).  A pre-requisite for therapeutic efficacy, safety and regulatory approval of a medicine is drug content uniformity. Therefore initial characterization studies on MMFs encompassed assays of the films.  However, the preliminary data indicated non-uniform drug distribution across the individual film units."

(Perumal Thesis, Ex. Q at p. 96.)   The Perumal Thesis also stresses the importance of DCU related to the regulatory approval or pharmaceutical oral thin film candidates:

68

"Failure to achieve a high degree of accuracy with respect to the amount of drug in individual unit doses of the film can result in therapeutic failure, non-reproducible effects and, importantly, toxic effects on the patient.  Hence, drug content uniformity is mandatory for regulatory approval of new medicines by regulatory authorities, i.e. the Medicines Control Council (MCC) (SA), Food and Drug Administration (FDA) (USA) and the European Medicines Agency (EMEA) (UK).  Current requirements by various world regulatory authorities specify small variations only from the stated active amount in a dosage form.  Generally, a $\pm 5\%$ deviation from the stated active amount is allowed.  For registration and commercialization of products by regulatory bodies and, more importantly, for reproducible therapeutic effects in patients, it is essential that drug uniformity across the individual film units be achieved."

(Perumal Thesis, Ex. Q at p. 96.)

129.    Section 4.1 of the Perumal Thesis contains the same discussion that I reviewed above related to Perumal 2008 regarding (i) the lack of literature articles published as of 2007 discussing pharmaceutical oral thin films and DCU and (ii) the fact that DCU is addressed in several patents published prior to 2007, including the discussion concerning the teachings and disclosures of the '741 Application as well as the Schmidt, Zerbe and Hortsmann patents.

130.    Section 4.2.2.3 of the Perumal Thesis entitled "Drug Quantification in Films" details the method development and qualification that were conducted related to the qualification of the assay and in vitro dissolution methods that were utilized to quantify the amounts of drugs initially present in the films under study as well as the amount of drug released as a function of time in the in vitro dissolution tests.  As described on pages 107 through 117 of the Perumal Thesis, the method development procedures followed were: (i) a wavelength scan of the model drug (propranolol HCl) to determine the maximum absorbance wavelength, including a confirmation that the other film components (polymers) and reagents utilized did not interfere with the drug at this wavelength, (ii) preparation of a calibration curve to be utilized in both assay and dissolution studies, including an assessment of linearity (noting that, as indicated on pages 108 and 117, the relative standard deviations for the concentration were all less than 0.3%

and the correlation coefficient of the calibration curve was 0.999, indicative of low method variability and good reproducibility) and (iii) precision and accuracy methods (the results of which again confirmed the low degree of variability associated with the method).

131.    Section 4.2.2.4 of the Perumal Thesis entitled "In Vitro Drug Release Method" describes the method development that was performed towards the identification and qualification of an in vitro dissolution method to assess drug release from the oral thin films understudy.  Perumal first notes that, as of 2007 (and thus earlier), there were no official in vitro dissolution methods specified for the testing of such dosage forms:

> "Currently,there are no official methods for the in vitro dissolution testing for buccalmucoadhesive controlled release dosage forms. Therefore, researchers are using several different methods as describedin the literature.  These include:rotating basket in a beaker (Ishida et al., 1981); USP rotating paddle method(Remunan Lopez et al., 1998; Perugini et al., 2003); shaking water bath (Gavender et al., 2005) and Franz diffusion cells (Rossi et al., 2003)."

(Perumal Thesis, Ex. Q at p. 110)

132.    As described on page 110, Perumal chose a shaking water bath dissolution method for film drug release analysis.  The analytical methods and qualification procedures utilized by Perumal et al. described above constituted standard analytical methods and method development activities that were well known and associated with the characterization of several different types of oral dosage forms, including oral thin films.  In my opinion, such methods based on the analysis of drug content via either UV absorption or HPLC-based analytical methods were routinely used for the analysis of such films and typically demonstrated a relatively high degree of accuracy and precision.  As a result, as I will describe further below with respect to the Chen Application, I disagree with Dr. Dyar's comments concerning the source of variability associated with the data shown in Figure 5 of the Chen Application to be due to method variability or analytical error versus being due to the variability in the DCU in the films under study by Chen.

70

133.    Similar conclusions are described in Section 4.4 of the Perumal Thesis as were described above for the Perumal 2008 article concerning the lack of DCU of conventionally-produced pharmaceutical oral thin films:

> "Preliminary investigations in our laboratories, as well as a comprehensive search of the literature and patents filed, indicated that the conventional film casting method onto Teflon-coated trays produced a sheet of film that suffered from poor drug content uniformity.  The aim of this study was therefore to prepare a specially designed tray for film casting and to evaluate it in terms of enhancing drug content uniformity."

(Perumal Thesis, Ex. Q at p. 127.)

134.    Thus, both the Perumal 2008 article and the Perumal Thesis support the conclusion that (i) DCU was a major issue with respect to the development of pharmaceutical oral thin films as of 2007 and earlier, (ii) this issue was poorly addressed in the literature, (iii) as indicated in several patents and patent applications dealing with pharmaceutical oral thin films, conventional film formulation and production methods resulted in films with poor DCU and (iv) the '741 patent application disclosed a novel approach to addressing this issue.

### 3.    Morales et al., "Manufacture and Characterization of Mucoadhesive Buccal Films," European Journal of Pharmaceutics and Biopharmaceutics, 77:187-199 (2011) ("Morales 2011"; Ex. N)

135.    The 2011 article entitled "Manufacture and Characterization of Mucoadhesive Thin Films" authored by J. Morales and J. McConville (Morales 2011; Ex. N) also discusses the inherent issues with respect to drug content uniformity associated with oral thin films of various types and singles out U.S. Patent No. 7,425,292 to Yang et al. (Ex. E) as addressing this issue. Morales 2011 first provides an overview of the process steps associated with the production of conventional oral thin films and the importance of rheology with respect to these steps:

> "The film casting method is undoubtedly the most widely used manufacturing process for making films found in the literature. This is mainly due to the ease of the process and the low cost that the system setup incurs at the research laboratory

71

scale. The process consists of at least six steps: preparation of the casting solution; deaeration of the solution; transfer of the appropriate volume of solution into a mold; drying the casting solution; cutting the final dosage form to contain the desired amount of drug; and packaging. ***During the manufacture of films, particular importance is given to*** the rheological properties of the solution or suspension, air bubbles entrapped, **content uniformity**, and residual solvents in the final dosage form [65]. ***The rheology of the liquid to be casted will determine the drying rates and uniformity in terms of the active content as well as the physical appearance of the films****.*"

(Morales 2011, Ex. N at p. 189; emphasis added.)

136.    The Morales 2011 article (i) teaches that drug content uniformity was known to be a major challenge with respect to the production of oral thin films via conventional formulation and processing methods; (ii) teaches that prior art attempts to create drug-containing films, such as the Schmidt patent (U.S. Patent No. 4,849,246, Dyar Ex. 36) did not adequately solve this problem; and (ii) specifically cites the work of Yang et al. (the '292 patent from which the Challenged Claims of the '514 patent claim priority is cited in this example) as the primary example of research that was conducted to identify solutions to this important issue:

"Since the early development of medicated films, content uniformity has been a major challenge for the pharmaceutical scientist. Schmidt proposed one of the earliest approaches to increase the drug uniformity of medicated films [72], by stating that the nonuniformity of films is inherent to their monolayered nature. Schmidt proposed a multistep method for the manufacture of multilayered films to overcome the heterogeneity of the monolayered form. However, Yang et al. reported that using the protocol proposed by Schmidt did not render uniform films [73] and went onto say that to overcome the non-uniformity of films, a manufacturing process for orally disintegrating films could be easily adapted for the manufacture of mucoadhesive buccal films. Yang et al. indicated that self-aggregation was one of the main reasons why films usually show poor uniformity, and in particular the drying process was found to be crucial in preventing aggregation or conglomeration of the ingredients of the film formulation [73]. During an inherently long drying process, intermolecular attractive and convective forces are favored, leading to the problem of self-aggregation. In order to avoid non-uniformity, addition of viscous agents such as gel formers or polyhydric alcohols was proposed to alleviate potential self-aggregation [73]."

(Morales 2011, Ex. N at p. 191)

137.     The Morales 2011 article also discusses the results of the work performed in the Perumal

2008 article (which it refer to as reference [74]) with respect to the known issues related to the

lack of drug content uniformity of conventionally produced oral thin films as of 2007:

> "Recently, one of the main challenges in the film casting process, content
> uniformity along the casting surface, has been addressed [74]. Film
> characterization in terms of mucoadhesive, mechanical, permeation, and release
> properties has been widely investigated. However, prior to 2007, few reports
> pertaining to drug content uniformity can be found [70,86,99–101,141,151,153].
> The most common approach to measure the content uniformity is the
> determination of drug by weight and not by casting area. Perumal et al. postulate
> that the determination by weight is erroneous because the final dosage form is
> determined by area instead of weight in the particular case of films. They
> demonstrate that custom-made silicone-molded trays, with individual casting
> wells for each dosage form, improved several characteristics significantly,
> including the content uniformity per casting area unit, mucoadhesive properties,
> drug release, and thickness uniformity of monopolymeric or multipolymeric films
> [74]. Even though this approach may solve the problem of uniformity per dosage
> form, it does not guarantee the uniformity along the dosage unit itself and also
> imposes limitations on scaling up possibilities."

(Morales 2011, Ex. N at p. 191.)

138.     Thus, similar to the case described above with respect to Perumal 2008 and the Perumal

Thesis, Morales 2011 also supports the conclusion that that (i) DCU was a major issue with

respect to the development of pharmaceutical oral thin films as of 2007 and earlier, (ii)

conventional film formulation and production methods resulted in films with poor DCU and (iii)

the work of Yang et al. as represented by the '292 patent disclosed the mechanisms behind the

lack of DCU of conventionally produced pharmaceutical oral thin films and disclosed a novel

approach to addressing this issue.

### 4.     U.S. Patent Publication. No. US2007/0184099 to Nowak et al. ("Nowak Publication"; Ex. F)

139.     The Nowak Publication (filed February 18, 2005, claiming priority to a U.K. Patent App.

No. 0403808.9 filed February 20, 2004, and published Aug. 9, 2007 as Pub. No.

US2007/0184099; "Nowak Publication", Ex. F) also shows that those of ordinary skill working in the field after the invention of the '514 patent had been disclosed acknowledged that the problem of active ingredient aggregation in cast films was known:

> "Water-soluble films cast from aqueous solutions containing medications can suffer from the aggregation or conglomeration of particles. Self-aggregation of any active ingredient will make the film inherently non-uniform in its composition. If such films were to include low dosages of an active ingredient, it is possible that portions of the film may be substantially devoid of any e.g. medication."

(Nowak Publication, Ex. F at ¶ [0006].) The Nowak Publication also teaches the effect of long drying on the lack of DCU of the resultant films due to the aggregation of the active ingredient:

> "Furthermore, conventional film casting employs the use the [sic: of] time-consuming drying equipment such as a high-temperature air-bath, drying ovens, drying tunnels, vacuum driers, or other such drying equipment. The long length of drying time aids in promoting the aggregation of the active ingredient and/or other adjuvant. Such process also run the risk of exposing the active ingredient, i.e., a drug or vitamin or other components[,] to prolonged exposure to moisture and elevated temperatures, which may render it ineffective or even harmful."

(Nowak Publication, Ex. F at ¶ [0007].)

### 5.    Goel et al. "Orally Disintegrating Systems: Innovations in Formulation and Technology", Recent Patents on Drug Delivery & Formulation, 2:258-274 (2008) ("Goel 2008"; Ex. L)

140.    Goel 2008 is a review article summarizing the innovations made with respect to orally disintegrating systems as of 2008. Pages 269 through 270 of this article contains a section summarizing the state of the art (with a focus on the patent literature) with respect to orally disintegrating films. The authors first discuss the disclosures of the Fuchs, Schmidt, Hortsmann and Zerbe patents that were discussed above with respect to the specification of the '514 patent, then provide a discussion concerning the issues associated with conventional drying methods (skin formation, rippling and lack of DCU, etc.) that supports the teachings and disclosures of the '514 patent with respect to this point (Goel 2008; Ex. L at p. 269, ¶ 4). Goel then discusses the

disclosures of patent applications to Fuisz et al. (US20080075825, Ex. G) and Myers et al. (US20080050422, Ex. H) as examples of disclosures related to non self-aggregating orally disintegrating films that address the issues described above (Goel 2008; Ex. L at p. 270, ¶¶ 3-4).

6.      **Kathpalia and Gupte "An Introdution to Fast Dissolving Oral Thin Film Drug Delivery Systems: A Review", Drug Delivery & Formulation,** 10:667-684 **(2013) ("Kathpalia 2013"; Ex. M)**

141.    Kathpalia 2013 (Ex. M) is another review article focusing on summarizing the development history and state of the art with respect to fast dissolving oral thin films as of its publication date.  Like other review articles describing the status of oral thin film development, Kathpalia et al. state that although oral thin films were known for several years with respect to oral hygiene and OTC products, pharmaceutical (i.e., prescription) oral thin films were still in the early stages of becoming mainstream products even as of 2013.  Kathpalia et al. note that two of the first approved prescription oral thin films (OTFs) were both based on the MonoSol technology associated with the '514 patent, these being Zuplenz (Ondansetron) and Suboxone® film:

> "USFDA defines OTFs as, "a thin, flexible, non-friable polymeric film strip containing one or more dispersed active pharmaceutical ingredients (APIs) which is intended to be placed on the tongue for rapid disintegration or dissolution in the saliva prior to swallowing for delivery into the gastrointestinal tract" [3]. OTFs are coming into their own as mainstream pharmaceutical products. The first approved prescription OTF was Zuplenz (Ondansetron hydrochloride- 4 mg, 8 mg) which was approved in 2010. The second approved one was Suboxone (Buprenorphine and Naloxone)."[6]

(Kathpalia 2013, Ex. M at p. 667.)  With respect to DCU, even as late as 2013, Kathapalia et al. also state that one of the disadvantages of OTFs is that "[d]ose uniformity is difficult to maintain" (Kathpalia 2013, Ex. M at p. 668.)

---

[6] I understand that the FDA had approved one other prescription film before these in 2009, a fentanyl containing film called Onsolis made by BioDelivery Sciences International (BDSI).  I understand that Suboxone® film was the first prescription sublingual film approved by the FDA.

      **7.**      **Borges et al. "Oral Films: Current Status and Future Perspectives I – Galenical Development and Quality Attributes, Journal of Controlled Release, 206:1-19 (2015) ("Borges 2015-I"; Ex. J) and II – Intellectual Property, Technologies and Market Needs, Journal of Controlled Release, 206:108-121 (2015) (Borges 2015-II; Ex. K)**

142.   The two articles authored by Borges et al. from 2015 also summarize the current status of OTFs as well as summarize the patent landscape related to these films. Borges 2015-I teaches the importance of DCU with respect to the development of OTFs:

> "The individual weight of the films and the dosage uniformity must also be controlled during the process. It is also important to have a deep knowledge of the process and the product so slight adjustments may be performed during manufacturing if necessary."

(Borges 2015-I, Ex. J at p. 13.)   Borges et al. also describe the evolution of OTFs from oral hygiene products to approved pharmaceutical thin films, and indicate that MonoSol was one of the pioneering companies with respect to the latter:

> "MonoSol, one of the pioneer companies in the oral film industry owns a protected drug delivery technology, PharmFilm®. MonoSol's film technology is supposed to be more stable and robust than other conventional dosage forms with a loading capacity up to 80 mg. The Pharmfilm® is a polymeric matrix based on polyethylene oxide and hydroxypropylmethyl cellulose,which normally is related with fast dissolution rates and rapid drug absorption [19]. However, MonoSol claims that this technological platform can be used for both fast dissolving system or buccal delivery. In fact, ondansetron hydrochloride had been successfully incorporated into the PharmFilm® technology as fast dissolving system and other drug substances such as montelukast sodium, rizatriptan, escitalopram oxalate, donezepil hydrochloride and epinephrine are being considered or under development as oral quick release formulations [20–25]. Additionally, as previously referred, the Pharmfilm® technology is also available as a slower release sublingual formulation (Suboxone® sublingual film) [25]."

(Borges 2015-II, Ex. K at p. 109.)

143.   Similar to the case described above for Kathapalia 2013, Borges et al. refer to the 2010 approval of ondansetron OTF products (Setofilm and Zuplenz) based on MonoSol technologies

as originating the market with respect to prescription OTFs, with the following approval of

Suboxone® film being hugely successful:

> "It was only in 2010 that the first Rx oral film, the ondansetron Rapidfilm® (Setofilm®) and the ondansetron Pharmfilm® (Zuplenz®), received European and FDA approval, respectively. Labtec GmBh, APR Applied Pharma Research SA (APR) and MonoSol Rx LLC (MonoSol) entered in the market with an ondansetron oral thin film for the prevention of nausea and vomiting, staunch that would capture a broad share of an appellative market that generated 1.9 billion dollars in the same year [139]. A month after Zuplenz® launch, MonoSol together with Reckitt Benckiser Pharmaceuticals received FDA approval for Suboxone® sublingual film [135,140]. This thin film, with two drug substances, buprenorphine and naloxone, approved for the treatment of opioid dependence in adults, was a huge success contributing to boost the oral films market. In 2011, Suboxone® thin film recorded sales of 513 million dollars and accounted for 96% of the oral transmucosal film market [141]. In 2012, US sales of Suboxone® sublingual film alone exceeded 1.5 billion dollars and continue with gradual growth [142]. During clinical trial the patients seemed to prefer the Suboxone® sublingual film rather than Suboxone® sublingual tablets, due to its fast dissolution and more pleasant taste profile [140]. These factors attracted other companies, as Alvogen Pine Brook, Actavis, Intelgenx and BioDelivery Sciences International (BDSI) to develop similar technologies. In fact, the first three companies have recently filled abbreviated new drug applications (ANDAs) for generic products of Suboxone® sublingual film whereas BDSI submitted a NDA with its own buccal film technology, the BUNAVAIL™. BDSI believes that BUNAVAIL™, which adheres to the inside of the cheek, has the potential to offer advantages over the Suboxone® sublingual film [43,142].
>
> At the moment, none of these competitors' products are on the market since a patent infringement lawsuit against these applicants was submitted by Reckitt Benckiser [143]. The success of the Reckitt Benckiser's prescription thin film proved the viability and value of this pharmaceutical form in the Rx market. In the US the oral films had come into a strong prominence and the prescriptions confirm the preference of these pharmaceutical forms [144]."

(Borges 2015-II, Ex. K at p. 116.)

144.    Thus, these references published subsequent to 2002 indicate that ensuring DCU was still

a critical issue associated with pharmaceutical oral thin films, in particular for those made via

convention film formulation and drying processes, such as those described in the Chen patents

and applications as I discuss further below.  The Perumal 2008 and Morales 2011 references

discussed above also indicate that the inventions of Yang et al. represented the leading attempts

at both understanding the mechanisms behind the lack of DCU in conventionally produced films as well as the disclosure of novel formulation and processing methods for the production of pharmaceutical oral thin films with significantly enhanced DCU. Additionally, in my opinion, these multiple references from independent groups of researchers acknowledged that the invention of the '514 patent was pioneering and overcame a substantial obstacle of drug content uniformity that had confounded others trying to develop such films prior to 2001.

### C.     Deficiencies in particular prior art references cited by Dr. Dyar

145.    With respect to the specific prior art references that Dr. Dyar alleges make obvious the Challenged Claims of the '514 patent, it is my opinion that none of these references considered alone, together or in the context of the entirety of the state of the art as of October 2002 make obvious the Challenged Claims of the '514 patent.  I discuss my opinions with respect to each of the references considered by Dr. Dyar with respect to obviousness below.

### 1.     Chen Application (WO2000/42992 – Dyar Ex. 28) and U.S. Patent No. 6,552,024 to Chen et al. ("'024 Patent" – Dyar Ex. 23)

146.    The Chen Application was discussed extensively during the prosecution of the application from which the '514 patent issued before the Patent Office deemed the Challenged Claims valid and nonobvious.  The disclosures of the '024 patent are substantially the same as those of the Chen Application, and I have focused my citations below on those from the Chen Application.

147.    The Chen Application relied upon by Dr. Dyar does not directly report data regarding content uniformity of the active ingredient in any film the reference discloses.  Nevertheless, Dr. Dyar suggests that the Chen Application discloses a film that meets the limitation in the Challenged Claims that "the uniformity subsequent to casting and drying of the matrix is measured by substantially equally sized individual unit doses which do not vary by more than

I reserve the right to revise or supplement my opinions as additional information becomes available.  Exhibits to be used in support of the opinions stated in this report include all of the tables, graphics, and information contained herein as well as materials cited in or accompanying this report.  Additional demonstrative exhibits may be prepared for trial and used to support my opinions.

Dated: April 10, 2015

Robert S. Langer, Sc.D.

125

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RECKITT BENCKISER PHARMACEUTICALS, INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 13-1674-RGA (Consolidated) |
| v. | ) ) | |
| WATSON LABORATORIES, INC., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| RECKITT BENCKISER PHARMACEUTICALS, INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PAR PHARMACEUTICAL, INC., INTELGENX TECHNOLOGIES CORP., | ) ) ) ) | C.A. No. 13-1461-RGA |
| Defendants. | ) ) | |

**<u>REPLY EXPERT REPORT OF CRAIG DYAR, Ph.D.</u>**

**<u>MAY CONTAIN HIGHLY CONFIDENTIAL INFORMATION</u>**

# TABLE OF CONTENTS

I.     Introduction ............................................................................................................ 1

II.    Personal Background and Expert Qualifications ................................................... 1

III.   Summary of Opinions ............................................................................................ 1

IV.    Asserted Claims ..................................................................................................... 3

V.     The '514 Patent's Self-Serving Statements Do Not Establish the State of the Art as
       of the Filing Date ................................................................................................... 6

VI.    Dr. Langer's Attempts to Change the Court's Claim Construction Cannot Overcome
       Indefiniteness ....................................................................................................... 13

VII.   The Asserted Claims Only Enjoy A Priority Date Of July 10, 2007, or,
       Alternatively, September 27, 2002 ...................................................................... 19

VIII.  The Asserted Claims Would Have Been Obvious Regardless of the Alleged Priority
       Date ...................................................................................................................... 19

       A.   Dr. Langer's Limited View of the Scope of the Prior Art Is Incorrect .................... 20

       B.   Prior Art Formulations Routinely Utilized Active Drugs in Particulate Form ......... 21

       C.   The Use of a Flowable Matrix With a Viscosity Sufficient to Aid In
            Maintaining Uniformity Was Known in The Prior Art ............................................ 22

       D.   The Role of Particle Size in Maintaining Uniformity Was Known in the
            Prior Art .................................................................................................................... 24

       E.   It Would Have Been Obvious to Create a Film with Less than 10%
            Variation in the Intended Amount of the Active ...................................................... 25

       F.   The Cited Prior Art References Demonstrate that a Person of Ordinary Skill
            in the Art Could Have Successfully Achieved A Uniform Film ............................. 30

            a.   Dr. Langer's Citation to Post-Filing Date References Do Not
                 Establish Nonobviousness Of the Claimed Invention ................................. 39

       G.   Secondary Considerations of Nonobviousness ........................................................ 43

            1.   Dr. Langer has not established that the claimed films ever met any unmet
                 need with sufficient viscosity to prevent aggregation of actives .................. 44

IX.    Supplementation, Disclosure, and Rebuttal ........................................................ 45

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**STATUTES**

35 U.S.C. § 103 ................................................................................................................. 2

35 U.S.C. § 112 ................................................................................................................. 2

I.    **Introduction**

1.    I, Craig Dyar, Ph.D., hereby submit this reply expert report on behalf of defendants Watson Laboratories, Inc., Par Pharmaceutical, Inc., and IntelGenx Technologies, Corp.  This reply is in support of my opening  report, submitted March 3, 2015, which set forth my opinions regarding the invalidity of the '514 patent.

2.    This report offers, among other things, my opinions regarding the validity of the asserted claims, particularly in response to the expert report of Robert S. Langer, Sc.D.

3.    The opinions to which I will testify at trial, if asked, are set forth in this report and in my opening report.  My opinions are based upon the information I have received so far.  They may be supplemented or modified if additional information is received.  They also may be supplemented to reply to additional information or opinions provided by the parties (or witnesses retained by the parties) and issues that may arise at trial.

II.    **Personal Background and Expert Qualifications**

4.    My background, qualifications, and credentials are set forth in detail in my opening report and in my *curriculum vitae*, a copy of which is attached as appendix A to my opening report.

III.    **Summary of Opinions**

5.    In reaching the opinions set forth in this report, I reviewed the Langer report and all exhibits and documents cited therein.  I also reviewed the '514 patent and its file history.  I further reviewed certain references, including textbooks, reference books, peer-reviewed journal articles, and other publicly available information, which are described in either my opening report (including appendix C) or below.  In addition, I have relied on my education, background, training, and experience in the relevant field.

migration is substantially prevented within the film." (*Id.*)  Similarly, the '430 patent to Zerbe recognized that homogeneous water-soluble films were recognized in the art, and the inventors of the '430 patent succeeded in achieving uniform films using top-down drying techniques.  (Ex. 41 to Dyar Op. Report ('430 patent), at 1:54-57; Conversation with Horst Zerbe (May 14, 2015)).)

103.    Chen, Le Person, and Zerbe are just three examples of uniform films in the prior art.  As discussed in my opening report, there are numerous others.  (Dyar Op. Report ¶¶ 182-292.)

        **a.**      **Dr. Langer's Citation to Post-Filing Date References Do Not Establish Nonobviousness Of the Claimed Invention**

104.    Initially, I note that most of the references cited by Dr. Langer that post-date the '514 filing date either (1) cite back to the '514 patent itself (or related applications), which does not establish the state of the art, or (2) do not even acknowledge the existence of relevant art, such as Chen, Bess, and other relevant art.[8]

105.    For example, Perumal 2008 cites to a provisional application listed on the face of the '514 patent (U.S. Pat. Appl. No. 60/443,741) as "evidence" that "difficulties with achieving uniform drug distribution in films did . . . exist."  (Ex. P to Langer Report at 1038.)  In fact, it is apparent that some sections of the '514 specification were copied almost verbatim from the '741 application.  (*Compare* Ex. P, at 1038, "Schmidt…abandoned the concept that a mono-layered film may provide accurate dosing and instead attempted to solve the problem of aggregation by

---

[8] Dr. Langer cites to references after 2008 and claims that because those films continued to seek ways of achieving uniformity, the prior art must have necessarily been insufficient for a person of ordinary skill to achieve a uniform film.  Dr. Langer relies on that fact in asserting the claims are not obvious.  However, because the disclosure of the '514 patent was public at the time of that experimentation, if these references demonstrate non-obviousness based on the prior art (and I do not agree that they do), they also demonstrate lack of enablement.

forming a multilayered film" *with* '514 patent, at 2:54-57, "Schmidt abandoned the idea that a mono-layered film…may provide an accurate dosage form and instead attempted to solve this problem by forming a multi-layered film.")  Perumal does not discuss the state of the art; it simply quotes from the '514 (via the '741 application) specification (which does not itself provide any support for these propositions, as discussed above).  Further, Exhibit L to Dr. Langer's report also quotes, almost verbatim, from the '514 specification, particularly the section cited by Dr. Langer that discusses allegedly unresolved issues with drug content uniformity.  (*See* Ex. L to Dr. Langer's Report at 269).

106.    Moreover, Perumal 2008 does not represent "an extensive literature search with respect to drug content uniformity in polymeric films." (Ex. P to Langer Report at 1036).  Notably, not a single reference cited in my opening report nor the references identified on the face of the '514 patent are listed in Table 1 of Perumal, which reports the "Summary of Film Characteri[stics]…Results from a Literature Search."   (Ex. P to Langer Report at 1037.)  Similarly, Perumal 2008 does not discuss the references that even the '514 patent admits "addressed the problems of particle self-aggregation and non-uniformity in conventional film-forming techniques," such as the '003 (Horstmann) or '430 (Zerbe) patents that I discussed in my opening report.  (Ex. 1 to Dyar Op. Report ('514 patent), at 2:60-3:12.)  I therefore disagree that Perumal 2008 establishes that the issue of drug content uniformity in oral films had not been addressed and solved in the prior art.

107.    Finally, Perumal 2008 directly contradicts the '514 specification when it states that "measur[ing] drug content by dissolving a known weight of the film for analysis…is not an accurate reflection of drug uniformity."  According to the '514 specification, weight analysis is a method for determining drug content uniformity.  (*Compare* Exhibit P to Langer Report at 1036

*with* Ex. 1 to Dyar Op. Report ('514 patent), at 40:64-42:44, "dosage forms of substantially identical size were cute from the film of inventive composition (E) above…[t]hen…these dosage forms were…additively weighed….  The individual dosages were consistent[], which shows that the distribution of the components within the film was consistent and uniform.")

108.    The Perumal Thesis—on which Dr. Langer relies—is similarly defective.  The Perumal Thesis's allegation of a problem does not establish that (1) the actual problem existed or (2) that prior art publications had not already provided a solution.  The fact that the prior art solution is different than the one chosen by the Perumal Thesis—*e.g.*, chitosan-based films— does not undermine the fact that uniform drug content in oral thin films was disclosed and known to one of ordinary skill in the art as of September 27, 2002.

109.    The Nowak reference—like the '514 patent—fails to establish the state of the art from the perspective of one of ordinary skill because patent applications necessarily disparage prior art in a self-serving attempt to demonstrate novelty.  (*See, e.g.*, Ex. F to Langer Report.) There is no discussion in Nowak about Chen or any other prior art that I rely on in my opening report—making it irrelevant to this discussion.  As stated previously, the mere fact that one group takes one approach to achieving uniformity does not mean that uniformity has not already been achieved using another approach.  Therefore, even though Nowak and other post-filing date literature discuss drug content uniformity and attempt to discover ways to achieve it in various drug formulations, that does not undercut my opinion that Chen and those of ordinary skill in the art as of 2002 had already achieved uniformity.

110.    The Borges I reference supports my opinion that Chen discloses processes that result in uniform oral films.  (*See* Ex. J to Langer Report.)  For example, at p. 13, section 8, Borges I states that "[b]oth [solvent-casting and hot-melt extrusion] techniques allow the

preparation of films with good characteristics, but generally the solvent casting method is the most widely used…."  Further, Borges I discloses, at figure 4, the "[m]ost common techniques to prepare oral films" which matches almost exactly with the technique disclosed in Chen at figure 2.  (*See* Ex. J to Langer Report at 16.)  The Borges "[s]olvent casting technique" is shown below:



110.    (Ex. J to Langer Report at 16).  And here, for comparison, is the process disclosed in Chen:



FIG.2

(Ex. 28 to Dyar Op. Report at Fig. 2). Thus, even as late as 2008, similar casting methods were being used to manufacture uniform oral thin films according to the same process that was disclosed in Chen in 2000.

111.    In summary, none of the post-filing date references cited by Dr. Langer provides any evidence that the prior art cited in my opening report lacked uniformity.

**G.    Secondary Considerations of Nonobviousness**

112.    Further, in my opinion, these references fail to set forth any long felt and unmet need for the claimed invention.

113.    The claimed invention requires at least the following:

- A cast film[9]

- that is flowable[10]

---

[9] Ex. 1 to Dyar Op. Report ('514 patent) at 67:35 and 73:49.

[10] Ex. 1 to Dyar Op. Report ('514 patent) at 67:35 and 73:49.

08/15/2015
Date

S. Craig Dyar, Ph.D.

# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF DELAWARE

 3

 4  RECKITT BENCKISER              )

 5  PHARMACEUTICALS, INC.,         )

 6  et al,                         )

 7              Plaintiffs,        )

 8  vs.                            ) Civil Action

 9  WATSON LABORATORIES, INC.,     ) No. 13-1674-RGA

10  et al,                         ) VOLUME I

11              Defendants.        )

12  _____

13

14

15      Videotaped Deposition of DR. ROBERT

16      LANGER, taken at 50 Broadway, Cambridge,

17      Massachusetts, commencing at 7:58 a.m.,

18      Thursday, June 4, 2015, before Jeanette

19      N. Maracas, Registered Professional

20      Reporter and Notary Public.

21

22

23

24  JOB No. 2078739

25  PAGES 1 - 270
```

                                            Page 1

1    and tested for the amount of active in        03:36:04
2    films of particular size."              03:36:07
3        Is that a chemical analysis as you     03:36:12
4    would describe it?                    03:36:15
5 A.  It can be.  It depends what's done, but if   03:36:16
6    you have measurements of that molecule, then   03:36:20
7    I'd say yes.                          03:36:25
8 Q.  And that chemical testing that they're      03:36:27
9    describing in column 34 -- let me restate     03:36:31
10   the question.                        03:36:38
11       This patent doesn't report any         03:36:38
12   data from the chemical analysis method that   03:36:40
13   they describe at column 42, line 34 through   03:36:46
14   38, correct?                          03:36:51
15 A.  Well, yes and no.  Like the example I gave   03:36:52
16   you earlier, it does with the dye.  I would   03:36:55
17   consider that a chemical analysis.          03:36:58
18 Q.  They don't report any chemical analysis     03:37:04
19   data from any dosage form containing a       03:37:06
20   particulate active ingredient, correct?      03:37:10
21 A.  I'd have to check on that.  I'd have to     03:37:12
22   check on that to be sure.              03:37:16
23 Q.  You don't recall any from your review of    03:37:23
24   the patent right now, correct?            03:37:26
25 A.  Again, it's something I would need to check.  03:37:28

Page 238

1    I'm not sure.                         03:37:32
2        MR. BROWN:  Let's take a break and     03:37:34
3    we'll come back for the final.            03:37:36
4        VIDEOGRAPHER:  The time is 3:38.  We   03:37:38
5    are now off the record.                03:37:40
6        (Break taken)                      03:37:44
7        VIDEOGRAPHER:  The time is 3:49.  We   03:49:27
8    are now back on the record.            03:49:38
9        MR. BROWN:  Can we mark what I think   03:49:41
10   are 11 and 12.                        03:49:42
11       (Exhibit 11 and Exhibit 12 marked     03:49:46
12   for identification.)                    03:50:13
13 Q.  I marked Exhibits Langer 11 and Langer 12.   03:50:13
14   Do you recognize Langer 11 as the first     03:50:18
15   Perumal reference you discussed in your     03:50:25
16   expert report?                        03:50:27
17 A.  Yes.                               03:50:28
18 Q.  And do you recognize Langer Exhibit 12 as   03:50:29
19   the Perumal thesis?                    03:50:35
20 A.  Yes, I do.                          03:50:41
21 Q.  So in Paragraph 164 --                 03:50:41
22 A.  We're on my report?                   03:51:14
23 Q.  In your report, yes.  Page 90, Paragraph 164,  03:51:15
24   you state, "the results obtained by Perumal,  03:51:22
25   et al, described in the Perumal 2008 and     03:51:26

Page 239

1    Perumal thesis references I discussed above   03:51:29
2    clearly support the conclusions that a high   03:51:29
3    degree of variability seen in the results    03:51:33
4    for dissolution testing of oral thin films   03:51:37
5    produced via conventional methods is        03:51:40
6    primarily due to a high degree of variability  03:51:42
7    associated with the drug content of said    03:51:46
8    films."  Now, I want to go back to Paragraphs  03:52:05
9    121 through 124 of your report.            03:52:15
10 A.  121 through 124, okay.                  03:52:22
11 Q.  Yes.                               03:52:29
12 A.  Okay.                              03:52:30
13 Q.  So in Paragraph 121 -- sorry.            03:52:31
14 A.  It's fine.                          03:53:33
15 Q.  Let me start with a few background questions.  03:53:47
16   The Perumal thesis is identified -- I believe  03:53:52
17   her name is Velisha Ann Perumal.  Is this a   03:53:58
18   person you're familiar with?              03:54:03
19 A.  Not personally, no.                   03:54:04
20 Q.  Do you have any opinion as to Valisha      03:54:06
21   Perumal's professional reputation?         03:54:16
22 A.  Only that she's published things in reviewed  03:54:20
23   journals.                            03:54:26
24 Q.  Do you know any of the other authors of     03:54:26
25   Exhibit Langer 11, the first Perumal        03:54:29

Page 240

1    publication?                          03:54:35
2 A.  Again, I don't believe I know any of them    03:54:35
3    personally, though I would qualify them as I  03:54:40
4    said before, that people probably met me at   03:54:40
5    conferences just like I mentioned the others,  03:54:44
6    but none of those names ring any bells.      03:54:47
7 Q.  Are you familiar with the University of     03:54:49
8    KwaZulu-Natal in Durban, South Africa?      03:54:51
9 A.  I mean, I'm sure I probably heard of it at   03:54:57
10   some point.  Let me put it this way.  I'm    03:54:59
11   certainly familiar with the journal of Drug   03:55:01
12   Development and Industrial Pharmacy.  That's  03:55:04
13   a peer-reviewed journal, but I don't know    03:55:06
14   the university very well, let me put it that  03:55:08
15   way, or the people very well, but I do know   03:55:11
16   of the journal.                        03:55:14
17 Q.  And the Perumal thesis was submitted in     03:55:16
18   January 2007, correct?                  03:55:22
19 A.  Correct.                            03:55:24
20 Q.  And it says on the face of it, "submitted    03:55:24
21   in part fulfillment of the requirements for   03:55:28
22   the degree of Master of Medical Science,     03:55:30
23   Pharmaceutical Sciences."  Am I correct that  03:55:36
24   under your definition of a person of ordinary  03:55:42
25   skill in the art, Ms. Perumal would not      03:55:46

Page 241

61 (Pages 238 - 241)

1  qualify at the time of the thesis because   03:55:49
2  she would not have a Master's degree, plus   03:55:51
3  two years of experience?   03:55:54
4  A.  She'd probably be less than that.  That's   03:55:56
5  probably true, but that doesn't disqualify   03:55:59
6  her in any means from doing thorough   03:56:03
7  literature reviews and doing experiments.   03:56:06
8  And I don't see her -- I don't know whether   03:56:08
9  she's filed patents or not.   03:56:11
10  Like I say, I'd like to say it   03:56:16
11  this way.  I have very good students at my   03:56:18
12  lab at MIT and they wouldn't qualify under   03:56:21
13  my definition either, but I think anybody   03:56:22
14  would want to hire them and do.   03:56:25
15  Q.  So let's go to the graphs that you reproduced   03:56:45
16  from Perumal on Pages 92 and 94 of your   03:56:52
17  expert report.   03:57:02
18  A.  Okay.   03:57:03
19  Q.  Let's start with figure three.   03:57:17
20  A.  Okay.   03:57:19
21  Q.  As reported in your expert report, figure   03:57:20
22  three is titled "drug release profiles of   03:57:25
23  films prepared from the silicon-molded tray   03:57:28
24  for reproducibility studies."   03:57:31
25  A.  Correct.   03:57:34

Page 242

1  Q.  And, in your opinion, this dissolution   03:57:35
2  chart shows that Perumal obtained good drug   03:57:41
3  content uniformity, correct?   03:57:47
4  A.  No.  I think what I was trying to say --   03:57:49
5  where are you reading that from?   03:57:53
6  Q.  That is -- well, you state that, "as is   03:57:55
7  clearly evident from this figure" --   03:58:08
8  A.  Can you just tell me where you are?   03:58:10
9  Q.  Sorry.  Paragraph 165 on Page 91, "figure   03:58:11
10  three from Perumal Exhibit P as shown below   03:58:14
11  as is clearly evident from this figure as   03:58:19
12  compared to Chen figure five, the error   03:58:21
13  bars associated with the data for trays A,   03:58:24
14  B and C are much tighter than those shown   03:58:27
15  for the films in Chen figure five."   03:58:29
16  A.  Yes.   03:58:32
17  Q.  What's the relevance of that?   03:58:32
18  A.  Well, it's just that if something is -- it   03:58:34
19  goes to what we said before.  If you got   03:58:39
20  reproducible release kinetics, to me that   03:58:41
21  supports the conclusion that you probably   03:58:45
22  have a more reproducible system, most likely   03:58:47
23  that's due to a drug content uniformity.   03:58:50
24  That's what they were trying to achieve   03:58:57
25  here.   03:58:59

Page 243

1  Q.  The X axis in figure three from Perumal is   03:59:09
2  time and hours, correct?   03:59:14
3  A.  Mm-hmm.   03:59:15
4  Q.  And the X axis in figure five from Chen is   03:59:15
5  time and minutes, correct?   03:59:21
6  A.  Yes.   03:59:23
7  Q.  And so the entirety of the chart in figure   03:59:26
8  five, if it were superimposed on to figure   03:59:34
9  three of Perumal, would be the first little   03:59:36
10  slice that we see, the first one-sixth of   03:59:41
11  the time between zero and one hours, correct?   03:59:44
12  A.  If that's the way you want to look at it,   03:59:50
13  that's fair.   03:59:52
14  Q.  Am I correct that the drug in the drug dosage   03:59:57
15  forms in Perumal were not prepared by any   04:00:00
16  method described in the '514 patent?   04:00:09
17  A.  Correct.   04:00:15
18  Q.  And if we look --   04:00:15
19  A.  Actually, let me just go through before I   04:00:27
20  give you -- let me just take a look.   04:00:31
21  (Witness examines document).   04:00:40
22  Let me try to put it this way.  To   04:01:03
23  the extent that Dyar tries to claim that   04:01:06
24  some of the other things, other papers for   04:01:08
25  which they didn't give very much detail on   04:01:10

Page 244

1  certain things could have been the same as   04:01:12
2  the '514, that may be also said here, too.   04:01:14
3  I don't personally think of it that way   04:01:18
4  because, which is why I answered that   04:01:20
5  question the way I did initially, but I   04:01:22
6  don't think that they've measured -- my   04:01:26
7  sense here is that they're not measuring   04:01:27
8  viscosity, and the same thing with drying.   04:01:29
9  So you don't get the sense here just like   04:01:32
10  you don't get the sense in Chen or any of   04:01:35
11  the others that they're controlling the   04:01:38
12  parameters that they do in the '514, but   04:01:40
13  I guess what I'd say is it's certainly   04:01:43
14  possible that certain of those things could   04:01:45
15  have been done.   04:01:46
16  Q.  Let's look at table six.   04:01:48
17  A.  Where are you now?   04:01:51
18  Q.  Table six on Page 94 of your expert report.   04:01:53
19  A.  Oh, okay.   04:01:58
20  Q.  And what is -- let me restate the question.   04:01:59
21  In the left-hand column there are   04:02:16
22  four dosage forms prepared that have large   04:02:19
23  error bars, correct?   04:02:30
24  A.  Well, they have -- I mean, again, everything   04:02:32
25  is relative.  Certainly those error bars   04:02:35

Page 245

62 (Pages 242 - 245)

1    are larger than the ones on the right-hand          04:02:37
2    side.                                               04:02:39
3  Q. And you state in Paragraph 167 of your            04:02:40
4    report, "as is clearly evident from the            04:02:44
5    graphs, the conventionally-produced films          04:02:47
6    displayed a high degree of variability at          04:02:52
7    each time point as indicated by the wide           04:02:52
8    error bars with a clear trend evident with         04:02:54
9    respect to variability increasing with             04:02:58
10   error bars at each time point for the films        04:03:03
11   with a higher assay standard deviation."           04:03:05
12 A. Is that the question you want me to answer?        04:03:12
13 Q. So you characterized them as wide error           04:03:15
14   bars, correct?                                      04:03:20
15 A. I did, because I was comparing them to the         04:03:21
16   right-hand side, like I said.  And I go on          04:03:23
17   in contrast to support that.                        04:03:30
18 Q. So then in the graphs on the left-hand            04:03:31
19   column, those are all cast into Teflon-coated       04:03:38
20   perspex trays, correct?                             04:03:45
21 A. Let me just check.  I think that's right,          04:03:48
22   yes.                                                04:03:52
23 Q. And the dosage forms on the right are cast         04:03:52
24   into silicon-molded trays, correct?                 04:03:58
25 A. Correct.                                            04:04:01

Page 246

1  Q. And in all other respects, these two dosage       04:04:01
2    forms, the dosage forms on the left-hand           04:04:06
3    side and the dosage forms on the right-hand        04:04:11
4    side are prepared identically, correct?            04:04:14
5  A. That's what they're trying to do as I read        04:04:22
6    it, yes.                                            04:04:24
7  Q. And am I correct that the Chen reference did      04:04:25
8    not use casting in a Teflon-coated perspex         04:04:34
9    tray, correct?                                      04:04:38
10 A. Correct.                                            04:04:41
11 Q. So this doesn't provide any evidence              04:04:41
12   regarding the variability that would be            04:04:46
13   expected from carrying out the Chen                04:04:53
14   reference, is that correct?                         04:04:55
15 A. Well, I don't know that I would agree with        04:04:56
16   that.  There's many things that were done          04:04:59
17   here.  One, they did an extensive literature       04:05:00
18   review, as they pointed out, and they didn't       04:05:05
19   find anybody that really looked any of these       04:05:07
20   things.  With respect to Chen, you can't           04:05:13
21   tell that either.                                   04:05:16
22       I think the other thing I think          04:05:19
23   that points out is that -- and I believe this      04:05:20
24   was on some of the things that you were            04:05:24
25   referring to me earlier, is I believe Dyar         04:05:26

Page 247

1    pointed out at one point or suggested that         04:05:29
2    the error bars in Chen were not due to drug        04:05:33
3    content uniformity, but due to analytical          04:05:37
4    techniques.  And so I think what this shows        04:05:41
5    you, given your hypothesis, of which I agree       04:05:44
6    with, that they're prepared essentially the        04:05:48
7    same in both cases, that both of them have         04:05:51
8    the same analytics, and yet in one you get         04:05:54
9    very tight bars and in the other you don't,        04:05:59
10   so what that suggests if somebody is doing         04:06:02
11   these kinds of things, that analytics is not       04:06:06
12   the problem.                                        04:06:09
13 Q. Were the dosage forms in Perumal dried under      04:06:13
14   conditions comparable to the drying                04:06:20
15   conditions in Chen?                                 04:06:22
16 A. I don't think we know how Chen dried his --       04:06:26
17   I think we went over that before.  I don't         04:06:28
18   think -- I mean, I don't think it's possible       04:06:31
19   to give an answer to that in the sense that        04:06:32
20   we don't know how Chen dried his samples.  He      04:06:35
21   doesn't give you the details.  You have to         04:06:39
22   make lots of assumptions about what he did.        04:06:42
23   So I'm just saying, so the answer is we don't      04:06:46
24   know.                                               04:06:49
25 Q. Let's look at Chen again, Page 17 and lines       04:06:49

Page 248

1    14 to 15.                                           04:06:57
2  A. Chen 17, lines 14 to 15, sure.                    04:06:59
3  Q. And it says there that the films were,           04:07:01
4    quote, "dried in a hot air circulating oven        04:07:07
5    at 50 degrees C for nine minutes," correct?        04:07:11
6  A. In that particular case, yes.                     04:07:15
7  Q. If we look in Perumal, Exhibit 11, on Page       04:07:24
8    1040, there's a heading, "preparation of          04:07:26
9    polymer drug solution/emulsions for film          04:07:31
10   casting."                                           04:07:34
11 A. Yes.                                               04:07:35
12 Q. And about a couple sentences in there's a        04:07:36
13   sentence that says, "all trays containing          04:07:46
14   the cast polymeric solution/emulsions were         04:07:48
15   allowed to dry."  Do you see that?                 04:07:51
16 A. Yes.  Let me go through it exactly.  Where        04:07:53
17   are you referring to exactly?                       04:07:56
18 Q. It says, "all trays containing the cast" --      04:07:58
19 A. What page and what line?                           04:07:59
20 Q. It's Page 1040 and it is in the -- below         04:08:00
21   the heading "preparation of polymer drug           04:08:11
22   solution/emulsions for film casting."  Do          04:08:13
23   you see that heading?                               04:08:17
24 A. Right above it, you're saying?                     04:08:19
25 Q. Right below that.                                  04:08:21

Page 249

63 (Pages 246 - 249)

1 A. Below homopolymeric films, that part?    04:08:23
2 Q. Above homopolymeric films.    04:08:26
3 A. Okay.  All right.    04:08:26
4 Q. About two sentences above that it says,    04:08:26
5    "all trays containing the cast polymeric    04:08:26
6    solutions/emulsions.    04:08:36
7 A. I see what you're saying.  Yes, those are    04:08:37
8    different conditions.  I agree with that.    04:08:39
9 Q. So these were all dry, both sets of films    04:08:41
10    were dried at 30 degrees C for approximately    04:08:44
11    24 hours, correct?    04:08:49
12 A. That's correct.    04:08:50
13 Q. That's a very different condition than is    04:08:50
14    applied in Chen, correct?    04:08:52
15 A. Oh, I agree with that.  I think all these    04:08:54
16    people are doing it differently, not just    04:08:57
17    Chen and this, but other papers as well.    04:08:59
18 Q. Now, you said a couple times that Perumal    04:09:14
19    conducted an extensive literature review?    04:09:31
20 A. That's what they said in the peer-reviewed    04:09:35
21    journal, yes.    04:09:37
22 Q. So let's look at that.  Where do you see the    04:09:38
23    evidence that they conducted an extensive    04:09:42
24    literature review?    04:09:44
25 A. They say that, and so they say in paragraph    04:09:46
                                                    Page 250

1    on the first Page 1036, "an extensive" --    04:09:50
2    it's the last paragraph on the bottom.    04:09:53
3 Q. Yup.    04:09:56
4 A. So it says an extensive literature review    04:09:56
5    with respect to drug content uniformity in    04:09:59
6    polymeric films would be helpful to continue.    04:10:03
7 Q. And in they're extensive literature review,    04:10:10
8    they didn't find the Chen reference, correct?    04:10:14
9 A. First of all -- and I think this is relevant    04:10:18
10    as a scientist -- Chen is a patent.  So it's    04:10:22
11    not to say that you don't look at patents,    04:10:25
12    sometimes you do, but scientists generally    04:10:27
13    look at scientific papers.  My experience    04:10:29
14    as a professor is that scientific papers set    04:10:32
15    a higher bar on these things than patents,    04:10:36
16    and I'm making a generalization.    04:10:39
17       So generally they looked at papers,    04:10:41
18    but you can look at patents, too, but I don't    04:10:44
19    see that Chen reported those things anyhow,    04:10:48
20    so I'm not sure they would have necessarily    04:10:57
21    found them and Chen, as we discussed, that    04:11:00
22    wasn't really the goal of what Chen was    04:11:02
23    trying to do.    04:11:04
24 Q. So on Page 1038 --    04:11:04
25 A. Of their paper?    04:11:07
                                                    Page 251

1 Q. Of Perumal.    04:11:08
2 A. Yes, 1038.  Okay.    04:11:10
3 Q. In the text in the left-hand column, about    04:11:11
4    a little, a little bit down there's a    04:11:19
5    sentence that starts, "the lack of reported    04:11:22
6    data on this crucial characterization    04:11:24
7    property --    04:11:28
8 A. Where are you exactly?    04:11:29
9 Q. 1038, left-hand column of the text, and it    04:11:31
10    starts in the fifth line down.    04:11:36
11 A. Oh, "the lack."  Okay.    04:11:39
12 Q. "The lack of reported data on this crucial    04:11:42
13    characterization property of any reported" --    04:11:42
14    sorry, "of any novel drug delivery system    04:11:45
15    led to the assumption that researchers in    04:11:48
16    this field may also have been experiencing    04:11:52
17    difficulty with this aspect of film    04:11:53
18    characterization."  Is that a valid    04:11:55
19    assumption, in your view?    04:12:00
20 A. The lack of reported data...   (Witness    04:12:06
21    examines document).    04:12:06
22       I think it's probably, what I watch    04:12:29
23    on these things, it's probably a reasonable    04:12:31
24    assumption, yes.    04:12:33
25 Q. Consistent with your statement earlier that    04:12:38
                                                    Page 252

1    they focused on the scientific literature?    04:12:47
2 A. Right.    04:12:49
3 Q. Rather than the patent literature, what's    04:12:49
4    the basis for assuming that the scientific,    04:12:52
5    that the authors in the scientific literature    04:12:57
6    would decide not to disclose an issue that    04:12:59
7    they were having difficulty with?    04:13:06
8 A. I almost hate to say this, but scientists,    04:13:09
9    a lot of times scientists, when they write    04:13:13
10    papers, don't report negative data.  I've    04:13:16
11    seen that happen a number of times.  So    04:13:18
12    negative data in and of itself is generally,    04:13:20
13    a lot of people don't do that, and a lot of    04:13:24
14    journals, usually they're looking for a    04:13:27
15    breakthrough, let's say.  This is just the    04:13:29
16    fact of what happens in academia, and I    04:13:31
17    shouldn't limit it to academia, but that's    04:13:35
18    what happens in published papers more often    04:13:39
19    than not.    04:13:41
20 Q. So, in your opinion, in table one, there    04:13:43
21    are one, two, three, four, five, six, seven,    04:13:52
22    eight, nine, ten, 11, 12, 13, 14, 15, 16, 17,    04:13:54
23    18, 19, 20, 21, 22, 23 film characterization    04:14:00
24    studies that are reported, and in the    04:14:10
25    conclusion of these authors, no paper to the    04:14:17
                                                    Page 253

64 (Pages 250 - 253)

1   date -- "no paper to date, to the best   04:14:20
2   of our knowledge, in the published   04:14:23
3   pharmaceutical literature has highlighted   04:14:25
4   this difficulty." So is it your opinion   04:14:28
5   that the reason none of these 20-plus   04:14:31
6   published papers on film characterization   04:14:34
7   studies reported any problem with drug   04:14:37
8   content uniformity is because they were   04:14:40
9   just hiding negative data?   04:14:43
10 A. No, I'm not saying that. I really can't   04:14:45
11   speak to the -- I mean, I tried to answer   04:14:48
12   your last question as best I could. I think   04:14:50
13   that the assumption they make is a reasonable   04:14:53
14   assumption, but I can't say for sure. I   04:14:56
15   haven't done an analysis myself like they've   04:14:59
16   done so I'm taking them at their word and   04:15:03
17   I'm taking the reviewers at their word   04:15:05
18   because this does go through peer review   04:15:09
19   unlike in a way different than say a patent   04:15:11
20   or other things. This is definitely a   04:15:13
21   peer-reviewed journal.   04:15:17
22 Q. Isn't this at least an equally plausible   04:15:18
23   possibility for the reason that there was   04:15:21
24   no published pharmaceutical literature   04:15:23
25   highlighting the difficulty is because the   04:15:25

Page 254

1   Perumal authors were having difficulties   04:15:30
2   that no other folks in the scientific   04:15:33
3   literature were having?   04:15:38
4 A. No, I don't agree with that because you   04:15:39
5   can go and take a look at other papers like   04:15:41
6   Morales and others, and they make similar   04:15:43
7   points. So I would say that that's, you   04:15:46
8   know, there's a number of papers and patents   04:15:48
9   that I cited after the fact that came well   04:15:49
10   after 2001. If you want, I can pull out   04:15:53
11   Morales and some of the comments that they   04:15:56
12   make, but I think what you want to do is   04:15:58
13   read these in light of together collectively,   04:16:02
14   and when you do, I think there's something   04:16:06
15   like seven or eight papers that discuss   04:16:08
16   that it is a problem and none that discusses   04:16:10
17   that it's an easily solved problem, so I   04:16:14
18   think that's how you have to take it   04:16:17
19   scientifically.   04:16:19
20   We can get Morales, if you want,   04:16:22
21   I'll go over some of that, but you certainly   04:16:25
22   get the impression from all the reviews   04:16:27
23   and all the patents that this statement is   04:16:29
24   reasonable. You can't isolate those, take   04:16:33
25   away those papers. I didn't see any paper   04:16:38

Page 255

1   that said, boy, this is simple, everybody's   04:16:45
2   done it, and I didn't see any patent that   04:16:47
3   said it either, and I don't think Dyar ever   04:16:50
4   found anything close to that. If I saw   04:16:52
5   that, that might change my opinion, but I   04:16:58
6   didn't and we looked.   04:17:00
7 Q. Within the Perumal reference and going to   04:17:06
8   Page 1038, there is a discussion in the   04:17:10
9   second column about halfway down, maybe   04:17:27
10   nine or ten lines down, there's a sentence   04:17:34
11   that says, "some approaches that attempted   04:17:37
12   to prevent agglomeration are briefly   04:17:39
13   described." Do you see that?   04:17:41
14 A. Yes.   04:17:42
15 Q. And there's a discussion of the Schmidt   04:17:42
16   reference, and just if you would read   04:17:46
17   starting with Schmidt all the way forward   04:17:55
18   to the top of the next column.   04:18:04
19 A. You want me to read it out loud?   04:18:07
20 Q. No, just to yourself.   04:18:09
21   (Witness examines document)   04:18:11
22 Q. Then in there's a citation at the end, U.S.   04:18:30
23   patent number --   04:18:35
24 A. Right.   04:18:36
25 Q. Do you recognize all of the text that you   04:18:36

Page 256

1   just read as being taken directly from   04:18:40
2   the specification of the '514 patent?   04:18:42
3 A. It's certainly similar. I'd have to check   04:18:50
4   it word for word, and I'm happy to take your   04:18:52
5   word for it that it's similar. They're   04:18:55
6   referring to it also. They're referring to   04:18:57
7   the '741.   04:19:03
8 Q. Correct. And then in the following sentence   04:19:03
9   Perumal says, "approaches described in U.S.   04:19:06
10   patent No. 60/443,741 for enhancing drug   04:19:09
11   uniformity required sophisticated drying   04:19:15
12   equipment and additional pharamaceutical   04:19:18
13   excipients which led to unfeasible increased   04:19:20
14   manufacturing costs and multi-step   04:19:22
15   processing."   04:19:25
16   So Perumal did not view the teaching   04:19:28
17   of the '514 patent as a solution to the drug   04:19:31
18   content uniformity difficulties that had   04:19:37
19   been, that she posits existed, correct?   04:19:41
20 A. Well, I mean, I don't know that I would   04:19:45
21   agree with that. They're just simply saying   04:19:49
22   that it's not perfect, they're saying other   04:19:52
23   things that need to be done.   04:19:54
24   By the way, Schmidt, just to go   04:19:57
25   over a point that you raised also, if we go   04:19:59

Page 257

65 (Pages 254 - 257)

1  over it I recall said that this is an        04:20:01
2  unsolved problem, that people have been      04:20:04
3  trying to do for many years in addition to   04:20:07
4  the ones in the future. After 2001 there     04:20:09
5  were ones like Schmidt that -- and I could   04:20:12
6  get that quote for you, if it's helpful,     04:20:14
7  that said this is a big problem.             04:20:17
8         Would it be helpful if I read        04:21:32
9  the exact quote from Schmidt, or do you not  04:21:34
10 want you to do that?                         04:21:36
11 Q. I don't need you to do that right now.    04:21:37
12 A. Okay.                                     04:21:41
13 Q. Let's go to Morales.                      04:21:42
14 A. Sure. Also I just wanted to get a time    04:21:46
15 check, if we could.                          04:21:49
16        VIDEOGRAPHER: Six hours,             04:21:49
17 40 minutes.                                  04:21:51
18 A. Okay.                                     04:21:56
19        (Exhibit 13 marked for               04:21:57
20 identification.)                             04:22:34
21 Q. So Morales is Exhibit Langer 13. Are you  04:22:34
22 familiar with either Javier Morales or Jason 04:22:53
23 McConville?                                  04:22:57
24 A. You know, I'm not sure. I've lectured at  04:22:58
25 the University of Texas at Austin so I may   04:23:05
                                          Page 258

1  have met them, but, again, I'd have to       04:23:08
2  give you the same answer that I've given     04:23:09
3  before, that they're certainly not names     04:23:12
4  that ring any bells for me.                  04:23:16
5  Q. You're not personally familiar with their 04:23:18
6  professional reputation?                     04:23:21
7  A. No. Again, this a review journal also.    04:23:23
8  Q. So let's turn to Page 191.                04:23:46
9  A. Okay.                                     04:24:04
10 Q. And there is a sentence in the first full 04:24:05
11 paragraph that I believe you rely on. It     04:24:11
12 states, "since the early development of      04:24:14
13 medicated films, content uniformity has been 04:24:15
14 a major challenge for the pharmaceutical     04:24:19
15 scientist."                                  04:24:21
16 A. Mm-hmm.                                   04:24:21
17 Q. And the first -- the next sentence says,  04:24:23
18 "Schmidt proposed one of the earliest        04:24:27
19 approaches to increase the drug uniformity   04:24:29
20 of medicated films by stating that the       04:24:32
21 non-uniformity of the films is inherent to   04:24:35
22 their mono-layered nature."                  04:24:38
23 A. Right.                                    04:24:42
24 Q. And the next sentence, "Schmidt proposed a 04:24:43
25 multi-step method for the manufacture of     04:24:44
                                          Page 259

1  multi-layered films to overcome the         04:24:47
2  heterogeneity of the mono-layered form,"     04:24:49
3  and then it continues, "however, Yang, et    04:24:54
4  al., reported that using the protocol        04:24:56
5  proposed by Schmidt did not render uniform   04:24:59
6  films and went on to say that to overcome    04:25:03
7  the non-uniformity of films, a manufacturing 04:25:07
8  process for orally disintegrating films      04:25:09
9  could be easily adapted for the manufacture  04:25:12
10 of mucoadhesive buccal films." And Yang,     04:25:16
11 et al., is, I think, footnoted as reference  04:25:24
12 73, and just have a look at that. But you    04:25:29
13 recognize that statement as being attributed 04:25:35
14 to the inventors of the '514 patent?         04:25:38
15 A. Which statement now?                      04:25:41
16 Q. The statement where it says, "Yang, et al, 04:25:42
17 reported that using the protocol proposed    04:25:45
18 by Schmidt did not render uniform films      04:25:48
19 and went on to say that to overcome the      04:25:51
20 non-uniformity of the film, the manufacturing 04:25:56
21 process for orally disintegrating films      04:25:56
22 could be easily adapted for the manufacture  04:25:59
23 of mucoadhesive buccal films."               04:26:01
24 A. I think they said it differently, if I    04:26:04
25 recall. Maybe I'll try to get that for you,  04:26:06
                                          Page 260

1  if you want. My recollection was that they  04:26:08
2  said it was -- it wasn't, that it couldn't   04:26:10
3  be done, but that it was more complex. Why   04:26:14
4  don't I try to find that just to --          04:26:16
5  Q. I don't have that question. I only have a 04:26:19
6  few minutes left. So my question is, the     04:26:21
7  entire sentence that I just read is          04:26:24
8  attributed to the inventors of the '514      04:26:27
9  patent, correct, that's footnote --          04:26:33
10 A. It's attributed, but I'm saying that may  04:26:35
11 not be exactly correct. That's all.          04:26:38
12 Q. This sentence does not reflect any        04:26:39
13 independent evaluation by the authors of     04:26:45
14 this publication, is that correct?           04:26:48
15 A. That single sentence?                     04:26:50
16 Q. Yes.                                      04:26:52
17 A. I can't say. I mean, I don't know. I      04:26:56
18 don't know what they did or not, and I       04:27:01
19 don't know, you know, the way they wrote     04:27:06
20 it, I certainly can see what you're saying,  04:27:07
21 but I can't say that for sure from reading   04:27:09
22 this. They certainly could have done it      04:27:12
23 or they may not have done it.                04:27:14
24 Q. I guess I have the same question for the  04:27:16
25 entire remainder of this paragraph. Do you   04:27:17
                                          Page 261

66 (Pages 258 - 261)

| | | |
|---|---|---|
| 1 | have any view as to whether this reflects | 04:27:25 |
| 2 | any independent analysis by the Morales | 04:27:28 |
| 3 | authors or are they just reporting what's | 04:27:34 |
| 4 | stated by the '514 patent inventors? | 04:27:38 |
| 5 | A. Well, see, I would make a broader statement | 04:27:41 |
| 6 | than that. This is -- when you looked at | 04:27:44 |
| 7 | the first page, this in contrast to the | 04:27:44 |
| 8 | Perumal article which is, say, an original | 04:27:47 |
| 9 | research article, this is actually now if | 04:27:51 |
| 10 | you go to the front page a review article. | 04:27:53 |
| 11 | Q. Yes. | 04:27:56 |
| 12 | A. When somebody writes a review article, | 04:27:57 |
| 13 | that's more of an analysis of what other | 04:27:59 |
| 14 | people have done. I would say this entire | 04:28:01 |
| 15 | paper is an analysis of what other people | 04:28:03 |
| 16 | have done. | 04:28:07 |
| 17 | Look, ideally, and I've been an | 04:28:09 |
| 18 | editor of journals as well, so ideally what | 04:28:11 |
| 19 | you expect and hope when people write these | 04:28:14 |
| 20 | things is that they are analyzing and writing | 04:28:16 |
| 21 | about what other people have done, but | 04:28:20 |
| 22 | trying to be, put their own thinking into it. | 04:28:22 |
| 23 | That's usually what a review article does, | 04:28:27 |
| 24 | so you want to maybe distinguish. So I'm | 04:28:30 |
| 25 | not disagreeing with what you're saying. | 04:28:32 |

Page 262

| | | |
|---|---|---|
| 1 | review article to state something like that, | 04:29:54 |
| 2 | and they did not. They just simply said | 04:29:56 |
| 3 | Yang says he did this. | 04:29:59 |
| 4 | So I think when I read something | 04:30:12 |
| 5 | like that, I take it as he did something | 04:30:13 |
| 6 | important or they wouldn't have put it in, | 04:30:17 |
| 7 | but I'm not a mindreader there either. | 04:30:18 |
| 8 | VIDEOGRAPHER: There are ten minutes | 04:30:57 |
| 9 | remaining. | 04:30:59 |
| 10 | A. Should I put this away? | 04:31:37 |
| 11 | Q. Yes, you can. | 04:31:40 |
| 12 | MR. BROWN: Why don't we go off | 04:32:33 |
| 13 | the record. I just want to confer with my | 04:32:35 |
| 14 | co-counsel and see if we have anything more. | 04:32:37 |
| 15 | VIDEOGRAPHER: The time is 4:32. We | 04:32:39 |
| 16 | are now off the record. | 04:32:41 |
| 17 | (Break taken) | 04:32:45 |
| 18 | VIDEOGRAPHER: The time is 4:36. We | 04:36:50 |
| 19 | are now back on the record. | 04:36:57 |
| 20 | BY MR. BROWN: | 04:36:59 |
| 21 | Q. So, Doctor, I'm just right now, I'm looking | 04:36:59 |
| 22 | at the table of contents of your expert | 04:37:02 |
| 23 | report, and looking at -- | 04:37:05 |
| 24 | MR. BOLLINGER: It's at the very | 04:37:09 |
| 25 | bottom. | 04:37:09 |

Page 264

| | | |
|---|---|---|
| 1 | I'm just saying the whole point of this | 04:28:34 |
| 2 | article, not just that statement, but the | 04:28:36 |
| 3 | entire article is to do these kinds of | 04:28:38 |
| 4 | things, if that's helpful. | 04:28:41 |
| 5 | Q. Yes. | 04:28:43 |
| 6 | A. This is a peer-reviewed review article, | 04:28:44 |
| 7 | and many times review articles are even | 04:28:48 |
| 8 | requested. I don't know if it has been here. | 04:28:50 |
| 9 | Q. These authors don't report that Yang, et al, | 04:29:00 |
| 10 | solved the challenge of content unionformity | 04:29:03 |
| 11 | for cast films, correct? | 04:29:10 |
| 12 | A. No. I think you can only read what they | 04:29:11 |
| 13 | wrote. They decided what Yang did was | 04:29:16 |
| 14 | important enough so that they made statements | 04:29:18 |
| 15 | that they went on to say that they overcame | 04:29:22 |
| 16 | it, so they're qualifying it. But they | 04:29:25 |
| 17 | clearly felt it was important enough to put | 04:29:30 |
| 18 | in this peer-reviewed article that they felt | 04:29:31 |
| 19 | that they overcame it, so I take it at its | 04:29:34 |
| 20 | face. | 04:29:38 |
| 21 | If they didn't think -- by the way, | 04:29:42 |
| 22 | usually if you write a critical review | 04:29:44 |
| 23 | article and you felt that the person who | 04:29:46 |
| 24 | said something made some errors or overstated | 04:29:48 |
| 25 | something, it would be very reasonable in a | 04:29:52 |

Page 263

| | | |
|---|---|---|
| 1 | A. I see, okay. You guys are trying to give | 04:37:10 |
| 2 | me a hard time. Okay. | 04:37:13 |
| 3 | Q. And I'm looking -- you've listed seven | 04:37:15 |
| 4 | references in part Roman numeral 11B as | 04:37:18 |
| 5 | publications that post-date the invention | 04:37:24 |
| 6 | of the '514 patent and acknowledge the | 04:37:27 |
| 7 | problems and addressed and confirm it was | 04:37:30 |
| 8 | a novel solution. So we covered Perumal, | 04:37:32 |
| 9 | both Perumal references and Morales, and | 04:37:37 |
| 10 | now continuing for references four through | 04:37:41 |
| 11 | seven, are you familiar with who Nowak, et | 04:37:50 |
| 12 | al, are? | 04:38:05 |
| 13 | A. Do you mean -- what do you mean by that. | 04:38:05 |
| 14 | MR. BOLLINGER: No. 4. | 04:38:06 |
| 15 | A. Do I know them personally? | 04:38:08 |
| 16 | Q. Yes. | 04:38:09 |
| 17 | A. I'd have to give you the same answer on | 04:38:10 |
| 18 | all these people, though I should probably | 04:38:13 |
| 19 | take -- just to be safe, why -- do you have | 04:38:20 |
| 20 | those four papers and I'll take a quick | 04:38:23 |
| 21 | look at the authors? | 04:38:25 |
| 22 | Q. Yes. | 04:38:26 |
| 23 | A. Nowak, him, herself, I don't think I know, | 04:38:28 |
| 24 | but there may be some, if that's what you're | 04:38:30 |
| 25 | asking when you say, et al, I feel... | 04:38:33 |

Page 265

67 (Pages 262 - 265)

1 Q.  The questions that I will ask for each of      04:38:36
2    these references are do you know the            04:38:38
3    individual personally and do you have an        04:38:40
4    opinion as to their professional reputation?    04:38:44
5 A.  Okay.                                          04:38:46
6 Q.  While we're getting the process of marking     04:39:08
7    that, for any of these, any of the authors      04:39:10
8    that you identify in Roman numeral 11B, one     04:39:20
9    through eight, do you know if any of those      04:39:26
10   authors had personal knowledge of the state     04:39:30
11   of the art in thin film technologies as of      04:39:38
12   2001?                                           04:39:41
13 A.  As opposed to doing reviews?                  04:39:44
14 Q.  Correct.                                      04:39:49
15 A.  I'll just give you my best answers, and       04:39:52
16   the question is do I know?                      04:39:55
17 Q.  Yes.                                          04:39:56
18 A.  So why don't I take a look.                   04:40:01
19       MR. BOLLINGER:  Why don't you just          04:40:11
20   clip them all together.                         04:40:12
21 A.  If you want, just give me...                  04:40:13
22       MR. BROWN:  We can just mark this           04:40:22
23   as one exhibit.                                 04:40:26
24       (Exhibit 14 marked for                      04:40:28
25   identification.)                                04:40:31

Page 266

1 A.  Okay.  So I'll just go through this one.       04:41:16
2   These are all of them?                           04:41:20
3 Q.  Yes.                                           04:41:21
4 A.  I would say that none of these people --       04:41:22
5   well, George Coelho, that sounds somewhat        04:41:30
6   familiar, but I can't say for sure, but          04:41:33
7   he sounds somewhat familiar, but I don't         04:41:37
8   know the answer to what their -- I really        04:41:43
9   can't speak to their reputation.  I think        04:41:45
10   this is a high-impact journal, so a journal     04:41:47
11   that is a well-respected journal so I think     04:41:54
12   that's significant.  It's got an impact         04:41:57
13   factor of about seven.  I don't know either     04:42:01
14   of them with the same caveats I've been         04:42:04
15   answering with you earlier.                      04:42:06
16 Q.  Next the Goel reference?                       04:42:07
17 A.  Yes -- no, no, that's the Kathpalia            04:42:09
18   reference.  And the Goel reference, I don't      04:42:19
19   know them personally either, as far as I        04:42:21
20   know.  And Nowak, I don't think I know him,      04:42:23
21   though I've done some work for McDermott,        04:42:28
22   Will & Emery also, but I don't think I've        04:42:31
23   met him, but I could be wrong.  Is that what     04:42:35
24   you're looking for?                              04:42:41
25 Q.  Correct.  And do you know whether any of the   04:42:42

Page 267

1   individuals who authored the publications       04:42:46
2   listed in Part 11B, one through seven, were     04:42:52
3   working in the field of pharmaceutical film     04:43:00
4   formulations as of 2002 and, thus, would       04:43:06
5   have personal knowledge of the art at that     04:43:10
6   time?                                           04:43:12
7 A.  I don't know one way or the other, but my     04:43:12
8   expectation would be if they were asked to     04:43:15
9   write these reviews or if they wrote them,      04:43:16
10   there's a reasonable chance they could be,     04:43:18
11   but I haven't investigated that one way or     04:43:20
12   the other.                                      04:43:22
13 Q.  Thank you, Doctor.  I have no further         04:43:23
14   questions.  Thank you for your time.           04:43:25
15       MR. BOLLINGER:  I'll spare you the         04:43:27
16   blistering cross.                               04:43:29
17       THE WITNESS:  Okay.  We have a             04:43:31
18   deal.  Thank you.                               04:43:31
19       VIDEOGRAPHER:  The time is 4:43.           04:43:32
20   This is the end of Tape No. 4 as well as the   04:43:35
21   deposition, and we are now off the record.     04:43:37
22       (Whereupon the deposition was              04:43:39
23   concluded at 4:43 p.m.)

Page 268

1     I declare under penalty of perjury
2   under the laws that the foregoing is
3   true and correct.
4
5     Executed on _____ , 20___,
6   at _____, _____.
7
8
9
10
11     _____
12       DR. ROBERT LANGER
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 269

Veritext Legal Solutions
866 299-5127

```
 1  COMMONWEALTH OF MASSACHUSETTS)
 2  SUFFOLK, SS. )
 3
 4      I, Jeanette Maracas, Registered
    Professional Reporter and Notary Public in
 5  and for the Commonwealth of Massachusetts, do
 6  hereby certify that there came before me on
    the 4th day of June, 2015, at 7:58 a.m., the
 7  person hereinbefore named, who was by me duly
 8  sworn to testify to the truth and nothing but
    the truth of his knowledge touching and
 9  concerning the matters in controversy in this
10  cause; that he was thereupon examined upon
    his oath, and his examination reduced to
11  typewriting under my direction; and that the
12  deposition is a true record of the testimony
    given by the witness.
13      I further certify that I am neither
14  attorney or counsel for, nor related to or
    employed by, any attorney or counsel employed
15  by the parties hereto or financially
16  interested in the action.
17      In witness whereof, I have hereunto
18  set my hand this 9th day of June, 2015.
19
20
21
22
23      <%signature%>
24      Notary Public
25      My commission expires 8/14/20
                                        Page 270
```

Veritext Legal Solutions
866 299-5127

EXHIBIT 5

*Drug Development and Industrial Pharmacy*, 34:1036–1047, 2008
Copyright © Informa UK, Ltd.
ISSN: 0363-9045 print / 1520-5762 online
DOI: 10.1080/03639040801928952

**informa**
healthcare

# Investigating a New Approach to Film Casting for Enhanced Drug Content Uniformity in Polymeric Films

**V. A. Perumal and T. Govender**
*School of Pharmacy and Pharmacology, University of KwaZulu-Natal, Durban, South Africa*

**D. Lutchman**
*Abbott South Africa, Abbott Place, Constantia Kloof, Gauteng, South Africa*

**I. Mackraj**
*School of Medical Sciences, University of KwaZulu-Natal, Durban, South Africa*

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For p    use only.

Films prepared by conventional casting onto trays such as teflon-coated perspex trays (TCPTs) suffer from poor drug content uniformity. The aim of this study was to prepare a silicone-molded tray (SMT) with individual wells for film casting and to evaluate it in terms of enhancing drug content uniformity. Films were prepared by solvent evaporation or emulsification and cast onto TCPT and SMT. Preparation of films by the SMT method was superior in terms of meeting drug content uniformity requirements. As compared with the TCPT method, the SMT casting method also reduced the variability in mucoadhesivity, drug release, and film thickness. Reproducibility of the SMT method was demonstrated in terms of drug content, mucoadhesion, and drug release.

**Keywords**  films; buccal; drug uniformity; mucoadhesion; drug release

## INTRODUCTION

Mucoadhesive controlled release drug-loaded films are being extensively studied for the buccal route (Ahmed, Barry, Williams, & Davis, 2004; Khoo, Frantzich, Rosinski, Sjostrom, & Hoogstrate, 2003; Lin, Lee, & Lin, 1995; Okamoto, Taguchi, Iida, & Danjo, 2001; Yoo, Dharmala, & Lee, 2006). Films are particularly advantageous for the buccal route because they offer flexibility and comfort and may be preferred over adhesive tablets. Films can also circumvent the relatively short residence time of oral gels on the mucosa, which is easily washed away and removed by saliva (Peh & Wong, 1999). Films are conventionally prepared by the solvent-casting method in which the drug and polymer(s) of similar solubilities are dissolved in a single vehicle and cast onto trays, which are then left to dry to facilitate solvent evaporation. This forms a sheet of film which is cut into desired sizes to provide a specified dose of drug (Amnuaikit, Ikeuchi, Ogawara, Higaki, & Kimura, 2005; Dhanikula & Panchagnula, 2004; Perugini, Genta, Conti, Modena, & Pavanetto, 2003; Remunan-Lopez, Portero, Vila-Jato, & Alonso, 1998). Simultaneous optimization of mucoadhesivity and drug release profiles of monolayered films may require the blending of drug and polymer(s) of opposing solubilities and therefore may not be simply dissolved in a single vehicle for film casting. Such films have been recently prepared by a novel emulsification/solvent evaporation method but were conventionally cast onto trays as mentioned above, which forms film sheets that can be cut into predetermined sizes to provide specified doses (Perugini et al., 2003). Preliminary investigations in our laboratories using both methods of film preparation and casting onto teflon-coated trays as above for cutting into specified sizes indicated nonuniform drug distribution across the individual film units. A prerequisite for therapeutic efficacy, safety, and regulatory approval of a medicine is drug content uniformity. Failure to achieve a high degree of accuracy with respect to the amount of drug in individual unit doses of the film can result in therapeutic failure, nonreproducible effects, and, importantly, toxic effects to the patient.

An extensive literature search with respect to drug content uniformity in polymeric films showed that although the literature is replete with formulation and several physicochemical characterization studies on films, surprisingly, the majority of papers did not report any assay values (Table 1). Of the very few that did, in three researchers had measured drug content by dissolving a known weight of the film for analysis (Ahmed et al., 2004; Amnuaikit, Ikeuchi, Ogawara, Higaki, & Kimura, 2005; Dhanikula & Panchagnula, 2004). This is not an accurate reflection of drug uniformity because sheets of film are cut into unit doses. An assay of film area rather than weight would be more appropriate for assessing drug content uniformity in such

---

Address correspondence to T. Govender, School of Pharmacy and Pharmacology, Private Bag X54001 Durban, 4000, KwaZulu Natal, South Africa. E-mail: govenderth@ukzn.ac.za

R I G H T S  L I N K

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For personal use only.

DRUG CONTENT UNIFORMITY IN POLYMERIC FILMS                1037

TABLE 1
Summary of Film Characterization Studies and Reported Drug Content Uniformity/Assay Results from a Literature Search

| Polymer(s) | Drug | Film Characterization Studies | Assay Results | Reference |
|---|---|---|---|---|
| EUD E100 | Piroxicam | Transparency and SEM, peel adhesion test, drug–polymer interaction study, in vitro membrane permeation study | Not Reported | Lin et al., 1995 |
| EC, HPC | Lidocaine HCl | In vitro dissolution, DSC, IR, measurement of pore size distribution, adhesion of films | Not Reported | Kohda et al., 1997 |
| EC, CHT glutamate | PHCl, Nifedipine | In vitro drug release, morphology (SEM) | Not Reported | Remunan-Lopez et al., 1998 |
| PCL | Chlorhexidine | In vivo test | Not Reported | Medlicott, Holborow, Rathbone, Jones, & Tucker, 1999 |
| HPC | Lidocaine | In vitro permeation, dissolution studies, determination of penetration rate and release rate | Not Reported | Okamoto et al., 2001 |
| Polycarbophil, EUD S100 | Plasmid DNA, β-Galactosidase | Release studies, rabbit immunization studies | Not Reported | Cui and Mumper, 2002 |
| CHT, PVA, PEO, PVP | Model drug | Swelling and erosion studies, in vitro drug release, in vivo animal studies, thermal transitions, Fourier transform infrared spectroscopy (FTIR), tensile testing | Not Reported | Khoo et al., 2003 |
| PLGA, CHT glutamate | Ipriflavone | Morphology, water absorption capability, degradation, in vitro dissolution, drug content uniformity, in vitro drug release | Reported | Perugini et al., 2003 |
| PAA, CHT HCl | Acyclovir | Hydration, rheology, mucoadhesion, drug release, permeation | Not Reported | Rossi et al., 2003 |
| Potato starch, potato starch acetate | Timolol, Sotalol-HCl | In vitro release, weight loss and water content | Not Reported | Tuovinen, Peltonen, & Jarvinen, 2003 |
| EUD NE30D, PVP | Penciclovir | Drug content, microscopy, DSC, X-ray diffraction, Higuchi release kinetics | Reported | Ahmed et al., 2004 |
| CHT | Nystatin | Water uptake, in vitro release, gel stability, in vivo studies on hamsters | Not Reported | Aksungur et al., 2004 |
| Gelatin, carrageenan | Timolol | Water uptake, drug release, washability test, mucoadhesion | Not Reported | Bonferoni et al., 2004 |
| CHT | Paclitaxel | Stability of paclitaxel, content uniformity, release studies, film thickness, tensile strength, DSC, FTIR, SEM, X-ray diffraction, in vivo implantation, histology | Reported | Dhanikula & Panchagnula, 2004 |
| PVA, PVP | S-nitrosogluta-thione (GSNO) | DSC, mechanical properties, SEM, dissolution, diffusion of GSNO | Not Reported | Seabra, Ganzarolli, & de Oliveira, 2004 |
| Dextran-PCL co-polymer | Paclitaxel | Swelling, DSC, X-ray diffraction, in vitro release, morphology | Not Reported | Shi and Burt, 2004 |

*(Continued)*

RIGHTS LINK

V. A. PERUMAL ET AL.

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For personal use only.

TABLE 1
(*Continued*)

| Polymer(s) | Drug | Film Characterization Studies | Assay Results | Reference |
|---|---|---|---|---|
| PLGA | Ethacrynic acid | In vitro release, SEM, water uptake, pH value, weight loss, in vivo eye test | Not Reported | Wang, Challa, Epstein, & Yuan, 2004 |
| EC, PVP | PHCl | Thickness, drug content, moisture uptake, in vitro drug release, in vitro skin permeation | Reported | Amnuaikit et al., 2005 |
| CHT, PAOMA co-polymer | Model drug | In vitro drug release, kinetic analysis, SEM, | Not Reported | Yoshizawa, Shin-ya, Hong, & Kajiuchi, 2005 |
| Sodium alginate, gelatin | Ciprofloxacin HCl | FTIR, X-ray diffraction, in vitro release, morphology, mechanical properties, swelling | Not Reported | Dong, Wang, & Du, 2006 |
| CHT, guar gum | Celecoxib | Swelling, mucoadhesion, in vitro and in vivo degradation, drug release | Not Reported | Haupt, Zioni, Gati, Kleinstern, & Rubinstein, 2006 |
| PLGA, PVA-g-PLGA | Paclitaxel | DSC, wide angle X-ray diffraction, size exclusion chromatography, SEM, in vitro release, in vitro degradation | Not Reported | Westedt et al., 2006 |
| Carbopol, PEG, HPMC | SDS | Film thickness, drug content, tensile strength, measurement of contact angle, swelling, erosion, SDS release | Reported | Yoo et al., 2006 |

EUD, Eudragit; EC, ethylcellulose; HPMC, hydroxypropylmethyl cellulose; CHT, chitosan; PHCl, propranolol hydrochloride; PCL polycaprolactone; PLGA, poly(D,L lactide-co-glycolide); PAA, poly(acrylic acid); PEO, poly(ethylene oxide); PVP, polyvinylpyrrolidone; PAOMA polyalkyleneoxide-maleic acid; PVA, poly(vinyl alcohol); PEG, poly(ethylene glycol); HPC, hydroxypropyl cellulose; SDS, sodium dodecyl sulphate.

films. In addition, Dhanikula and Panchagnula (2004) only stated that uniformity results in their study indicated that the variation in drug distribution was <15%, but they did not report any data, whereas Perugini et al. (2003) reported assay values as a statement of drug content being more than 70%. The lack of reported data on this crucial characterization property of any novel drug delivery system led to the assumption that researchers in this field may also have been experiencing difficulty with this aspect of film characterization. Yet no paper to date, to the best of our knowledge, in the published pharmaceutical literature has highlighted this difficulty. It was only a search of patent applications that confirmed the assumption that difficulties with achieving uniform drug distribution in films did indeed exist, as some patent applications that attempted to directly address the problems encountered with nonuniformity in films were identified. Although the identification of these patents confirmed the existence of this problem, it was intriguing that the published pharmaceutical literature omitted the reporting of assay values, yet revealed the undertaking of other complex characterization studies (Table 1) without focusing on overcoming this simple but mandatory prerequisite for development of any drug delivery system. In these patent applications, it was explained that films prepared via the conventional casting technique, as used in the literature, suffered from the

aggregation or conglomeration of particles, which rendered them inherently nonuniform in terms of all film components, including polymers and drug. It was found that the formation of agglomerates randomly distributed the film components as well as any active present, thus leading to the poor drug content uniformity (US Patent No. 60/443,741, 2004). The formation of agglomerates was attributed to the relatively long drying times, which facilitated intermolecular attractive forces, convection forces, and air flow which aided in the formation of such conglomerates (US Patent No. 60/443,741, 2004). Some approaches that attempted to prevent agglomeration are described briefly. Schmidt (US Patent No. 4,849,246 in US Patent No. 60/443,741, 2004) abandoned the concept that a monolayered film may provide accurate dosing and instead attempted to solve the problem of aggregation by forming a multilayered film. The incorporation of additional excipients, i.e. gel formers and polyhydric alcohols respectively, to increase the viscosity of the film prior to drying in an effort to reduce aggregation of the components in the film is described (US Patent No. 60/443,741, 2004). These methods had the disadvantage of requiring additional components, which translated to additional cost and manufacturing steps. Furthermore, these methods employed the use of time-consuming drying methods such as high-temperature air-bath using a drying oven,

RIGHTS LINK

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For personal use only.

drying tunnel, vacuum dryer, or other such drying equipment, all of which aided in promoting the aggregation of film components and active. In addition, such processes subjected the active to prolonged exposure to moisture and elevated temperatures, which might render it ineffective or even harmful (US Patent No. 60/443,741, 2004). Also, approaches described in US Patent No. 60/443,741, 2004 for enhancing drug uniformity, required sophisticated drying equipment and additional pharmaceutical excipients, which lead to unfeasible increased manufacturing costs and multi-step processing. Thus, a method that uses minimal additional excipients into the formulation, uses simple technology, and also provides uniform drug content throughout the film clearly needed to be identified. Instead of considering additional excipients or introducing new expensive and complicated drying technologies, a specially designed tray with built-in predetermined wells for forming polymeric films with uniform drug content was proposed and evaluated in this study. It was expected that this simple approach, which would involve casting specified volumes of polymer–drug mixtures into wells, would lead to improved drug uniformity because the drug would be entrapped in each film unit, irrespective of the migration of the active within that well during drying. Such an improvement will not only be useful in the field of buccal drug delivery for formulation optimization, but it will also impact on other fields because mucosal films are used for a variety of other routes of administration, that is, vaginal, rectal, and ocular.

Therefore, the aim of this study was to develop and evaluate a specially designed silicone-molded tray (SMT) with built-in predetermined wells for film casting as a method for achieving drug uniformity. Propranolol hydrochloride (PHCl) was used as the model drug. Initially, the SMT was evaluated with a simple homopolymeric film containing drug and polymer of similar solubilities. Thereafter, its applicability to monolayered multipolymeric films with drug and polymers of both similar and opposing solubilities was also assessed. In addition to drug content uniformity, thickness, and morphology, the films from the trays were also characterized in terms of mucoadhesivity and in vitro drug release properties. These two properties measure retention on the mucosae and drug release behavior, respectively, and are essential in the evaluation of drug delivery systems for the buccal route.

## MATERIALS AND METHODS

### Materials

Chitosan (CHT) (MW 110 000) (Primex Ingredients ASA, Avaldsnes, Norway), Hydroxypropylmethylcellulose (HPMC) (Fluka, Buchs, Switzerland), Propranolol HCl (PHCl) (Frankel Chemicals, Johannesburg, SA), Mucin (Sigma-Aldrich, Dorset UK), Lactic Acid (BDH Lab Supplies, Poole, UK), Perspex (Maizey Plastics, Durban, SA), and Teflon (Coated Fabrics, Johannesburg, SA) were purchased and used as received.

Eudragit® RS100 (EUD100) (Rhom Pharma, Darmstadt, Germany) was donated by Degussa Africa (Pty) Ltd. Wacker Silicone M4514 (Elastosil®) (amt Composites, Durban, SA) was mixed with its supplied catalyst (T 26) prior to use. All other chemicals used were of analytical or reagent grade.

## Methods

### Preparation of Trays for Film Casting

Drug containing polymeric solutions/emulsions were cast onto conventional teflon-coated perspex trays (TCPTs) as well as onto two other trays, that is, TCPTs with a removable chamber system and SMTs with built-in wells. The description and preparation of these trays are presented hereunder. Digital photographs of the trays are presented below in Figure 1.

(a)



(b)



(c)



FIGURE 1.  Digital photographs of trays used for casting of drug-polymeric films. (A) Conventional teflon-coated perspex tray (TCPT); (B) TCPT with a removable chamber system, (i) separate components and (ii) chambers inserted into TCPT; (C) silicone-molded tray (SMT) (i) without inserts and (ii) with teflon-coated perspex inserts.

RIGHTS LINK

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For pr    use only.

*Teflon-Coated Perspex Trays.* TCPTs were prepared by gluing together pieces of 4-mm clear perspex (Maizey Plastics) to form a tray of dimensions $11 \times 7 \times 3$ cm with an area of 77 cm². Thereafter, the trays were coated with a self-adhesive fabric teflon (Cofab, Johannesburg, SA) and were ready for immediate use. The TCPT yielded a sheet of film that was then cut into individual $1 \times 3$ cm² film units for analyses. The tray is shown in Figure 1A.

*TCPT with a Removable Chamber System.* The TCPT was prepared as described in the Section "Teflon-Coated Perspex Trays," and the removable chamber system was prepared by gluing together pieces of perspex to form a grid that formed 16 individual compartments of $1 \times 3$ cm² each when inserted into the TCPT. These compartments were coated with teflon fabric (Cofab). Films that were of $1 \times 3$ cm² size were retrieved from each compartment. The tray is shown in Figure 1B.

*Silicone-Molded Trays.* SMTs were prepared by combining Wacker silicone (150 mL) with its catalyst (T 26) (7.5 mL) (AMT Composites) in a glass beaker, by stirring with a glass rod for approximately 8 min to form a silicone mixture with a pot life of 20 min, and then pouring it into a greased wooden mold and allowing it to cure at room temperature (20°C) for 5 h. The cured silicone was then demolded to yield a flexible silicone tray with 20 individual $1 \times 3$ cm² wells. This tray was also investigated with the addition of teflon-coated perspex inserts into each tray. The inserts were prepared by cutting 4-mm clear perspex pieces (Maizey Plastics) into $1 \times 3$ cm² rectangles and coating them with the self-adhesive fabric teflon (Cofab). These inserts were then firmly placed into each well of the SMT prior to film casting. The SMT yielded individual film units of $1 \times 3$ cm² from each well. The tray is shown in Figure 1C.

*Preparation of Polymer–Drug Solutions/Emulsions for Film Casting*

All PHCl-containing polymeric solutions/emulsions were prepared at a concentration of 15 mg/mL to ensure that each $1 \times 3$ cm² film unit theoretically contained a 15 mg/3 cm² dose. The total volume of PHCl containing polymeric solution/ emulsion was cast onto the TCPT, whereas 1 mL of the solution was cast into each well of the SMT. All trays containing the cast polymeric solutions/emulsions were allowed to dry in an oven (Series 2000, Scientific, South Africa) at 30°C for approximately 24 h, until the solvent had evaporated (until constant weight). Films were stored in foil bags in a tightly sealed amber bottle at room temperature (20°C) until further use. The preparation of the polymeric solutions/emulsions for casting onto the different trays is described below.

*Homopolymeric Films.* Homopolymeric films containing CHT and PHCl were prepared at a 1:1 ratio. The required amount of CHT and plasticizer, that is, glycerol (30% wt/wt of polymer weight), was dissolved in a 1% lactic acid solution (30 mL) under magnetic stirring. PHCl was then dissolved in

the above CHT solution. The resulting drug containing polymeric solution was allowed to stand until air bubbles were removed before casting onto a TCPT or SMT. The quantities used ensured that each $1 \times 3$ cm² film unit would theoretically comprise 15 mg PHCl.

*Multipolymeric Films.* Multipolymeric films, in which drug and polymers were all of similar solubilities (i.e., PHCl+ CHT+HPMC) and also those in which drug and polymers were of opposing solubilities (i.e., PHCl + CHT + EUD100), were prepared for evaluation. The films were prepared in a 1:0.5:0.5 drug:polymer:polymer ratio. Plasticizer was added at 30% wt/wt of polymer weight.

Monolayered multipolymeric films, in which PHCl and the polymers (CHT and HPMC) were all hydrophilic, were prepared as follows: CHT and glycerol as plasticizer (30%, wt/wt) were dissolved in a 1% lactic acid solution (15 mL), and thereafter PHCl was added and allowed to dissolve. HPMC was dissolved separately in water (15 mL) and then added to the PHCl–CHT preparation and allowed to mix under magnetic stirring. When this drug-containing multipolymeric solution was homogenously combined, it was cast onto the respective trays and dried as described above.

Monolayered multipolymeric films with the hydrophilic drug PHCl and a hydrophilic (CHT) as well as a hydrophobic polymer (EUD100) were prepared as per a method modified from Perugini et al. (2003): CHT and glycerol (30%, wt/wt) were dissolved in a 1% lactic acid solution (15 mL), and thereafter PHCl was added and allowed to dissolve. EUD100 and triethyl citrate (30%, wt/wt, used as a plasticizer) were separately dissolved in acetone (15 mL). Both polymeric solutions were brought to the same temperature (20°C) and then combined by emulsification (IKA Homogenizer, 9,500 rpm for 5 min). During homogenization, the polymeric solution was maintained in an ice bath. The resulting drug-containing emulsion was cast onto the respective trays and dried as described above.

*Evaluation of Films*

*Assay of PHCl Polymeric Films.* A $1 \times 3$ cm² film, either as a unit from the SMT or cut into this specified size with a scalpel from the film sheet of a TCPT, was cut into pieces with a surgical blade in a mortar. Thereafter, the contents of the mortar were transferred into a 100 mL volumetric flask. The mortar was washed several times with the selected solvent system (water or water/ethanol), which was also transferred into the flask after each washing. The mixture was then mechanically agitated in a shaking water bath maintained at 40°C for 24 h before being brought up to volume with additional solvent. This stock solution (0.15 mg/mL) was also agitated for 5 min and then filtered (Millipore® Filter, 0.45 μm). A subsequent 1 in 10 dilution was performed before UV analysis of the solution at 290 nm (UV-Spectrophotometer, 1650 PC, Shimadzu, Tokyo, Japan). It should be noted that at the outset, it was established that all solvents, polymers, and other excipients employed in this study did not interfere with drug analysis at

RIGHTS LINK

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For personal use only.

the reported wavelengths. Precision and accuracy tests were undertaken and confirmed the validity of the assay method used.

*In Vitro Drug Release Profiles.* A modified shaking water bath dissolution method was employed to determine drug release profiles of the films. The shaking water bath apparatus (100 strokes per minute) consisted of a water bath, thermostatically controlled at 37 ± 0.5°C and a mechanical shaker platform onto which a bottle holder plate was positioned. Glass bottles (125 mL), the caps of which were modified to hold a stainless steel basket into which each film was placed so as to contain all fragments of the dosage form as it disintegrated during the dissolution process, were secured in the holders of the holder plate. The baskets used were dissolution baskets with a height of 35 mm, a diameter of 20 mm, and a mesh size of 0.4 mm. Phosphate-buffered saline (PBS) (100 mL) equilibrated to 37 ± 0.5°C was used as the dissolution medium. A minimum of three replicate determinations were performed for all dissolution tests. At specified time intervals (0.25; 0.5; 0.75; 1; 2; 3; 4; 5; 6; 7; and 8 h), 2-mL aliquots of sample were removed from each vessel using a syringe and filtered through a Millipore® Filter (0.45 µm). An equal volume (2 mL) of fresh PBS was replaced into dissolution vessel, to ensure a constant volume of dissolution medium throughout the duration of the test. All dissolution samples were analyzed using a UV spectrophotometer (Shimadzu) at a wavelength of 289 nm.

*Mucoadhesivity of Films.* The mucoadhesivity of the films was measured with the aid of a software-controlled penetrometer, TA-XT2i texture analyzer (Stable Micro Systems, Surrey, UK) equipped with a 5-kg load cell, a force measurement accuracy of 0.0025%, and a resolution distance of 0.0025 mm. The pretest, test, and post-test speeds were set at 1.0, 0.5, and 1.0 mm/s, respectively, with an acquisition rate of 200 points per second. A removable stainless steel probe with dimensions $1 \times 3$ cm$^2$ was used for all measurements. A sample of the prepared polymeric film ($1 \times 3$ cm$^2$) was attached to the base of the probe with cyanoacrylate (superglue) and prehydrated with PBS (pH 6.8, 20 µL) before being fixed to the mobile arm of the TA-XT2i, where the film was allowed to continue to undergo hydration for the remaining period of the 2 min prehydration phase. In the interim, 1 mL of mucin (30%, wt/wt at 37°C) was spread onto a glass slide that was firmly attached to the base plate of the TA-XT2i. Upon completion of the prehydration period (2 min), the film was brought into contact with the mucin for 30 s. The mucoadhesive performance of the samples was determined by measuring the maximum detachment force (MDF) (mN) and/or work (mJ). The MDF represents the force required to detach the film from the mucin. The area under the force/distance curve was also determined to represent the work or energy required for detachment of the two systems (mucin/polymeric film) (Eouani, Piccerelle, Prinderre, Bouret, & Jaochim, 2001). A typical force/distance curve generated for each mucoadhesivity measurement from which the MDF and/or work performed was determined is illustrated in Figure 2. A minimum of 10 replicate determinations was performed.



FIGURE 2.   A typical detachment profile (force–distance curve) for the mucoadhesivity testing of a polymeric film.

*Appearance and Morphology.* Film surface was evaluated optically by a digital camera (Nikon Coolpix 5900, Tokyo, Japan). Film morphology was also characterized by scanning electron microscopy. Samples were mounted on round brass stubs (12 mm diameter) using double-backed adhesive tape and then sputter-coated for 8 min at 1.1 LV under argon atmosphere with gold (Polaron SC 500 Sputter Coater, Watford, UK) before examination under the scanning electron microscope (JEOL JSM-6100 Scanning Electron Microscope, Avaldsnes, Japan). The images were captured on an Ilford PANF 50 black and white 35-mm film.

*Thickness Measurements.* The thickness of each film was measured at five different locations (center and four corners) using an electronic digital micrometer (Mitutoyo Co., Kawasaki, Japan). Data are represented as a mean ± *SD* of five replicate determinations.

*Statistical Analysis.* All statistical analyses of data were undertaken using GraphPad Instat, version 3.05 (GraphPad Software Inc., San Diego, CA, USA), whereas all mathematical calculations were undertaken with Microsoft Excel® (Version 2002, USA). The assay data were specifically analyzed using a Kruskal–Wallis test with Dunn's Post Hoc tests, whereas the mucoadhesivity data were analyzed using one-way ANOVA with Bonferroni Post Hoc tests. Data were considered statistically significant if $p < 0.05$.

## RESULTS AND DISCUSSION

### Development of Trays for Enhancing Drug Uniformity in Films

Table 2 depicts the pictures of trays used in the study for film casting and a summary of the assay and morphology of films generated. Homopolymeric CHT films were initially

RIGHTS L I N K

1042                                    V. A. PERUMAL ET AL.

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For pr       use only.

### TABLE 2
#### Description of Tray Development and Film Characteristics



| Tray Type | Picutre of Tray | Assay (%) Mean ± SD | Electron Micrograph of Film |
|---|---|---|---|
| TCPT | | $110.00 \pm 66.63$ CV = 60.57% | |
| TCPT with removable chambers | | $116.33 \pm 28.31$ CV = 24.34% | |
| SMT | | $104.06 \pm 3.31$ CV = 3.18% | |
| SMT with teflon-coated perspex inserts | | $104.84 \pm 1.30$ CV =1.24% | |

TCPT, teflon-coated perspex tray; SMT, silicone-molded tray.

prepared by employing the conventional casting technique whereby the polymeric solution is cast onto TCPTs to form a sheet of film that is cut into individual film units of desired sizes. This yielded films with uniform surface morphology but poor drug content uniformity values, i.e., $110.00 \pm 66.63\%$, indicating a large coefficient of variation (CV) of 60.57%. The poor drug uniformity with these TCPTs was attributed to the reasons given in several patent applications, that is, to the formation of conglomerates and migration of drug throughout the tray during the drying process. To prevent this from occurring,

R I G H T S L I N K⟩

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For personal use only.

a TCPT with a removable unit that encompassed chambers (each chamber = $1 \times 3$ cm$^2$) was developed. This was an attempt to contain the drug-containing polymeric solution dispensed into each chamber within that chamber. Although this method improved the drug uniformity as compared with the TCPT, that is, the CV decreased from 60.57 to 24.34%, the values were still unacceptable for regulatory approval. This poor drug uniformity may have been due to seepage of the polymeric mixture to adjacent chambers because it was detachable and the solution could seep from one chamber to the next. The difficulty also experienced with this type of tray was the inability to remove the dried films without damage due to rigidity of the tray This, coupled with the poor assay values, led to the realization that a flexible tray for easy film removal was required and that the tray should also possess individual predetermined wells completely separate from one another, to facilitate entrapment of the polymeric solution.

One of the suitable materials that satisfy the abovementioned factors is silicone, as it can be easily molded to yield a flexible product. In addition, silicone products have a relative inert state that minimizes the risk of chemical reaction with drug (Maillard-Salin, Becourt, & Couarraze, 2000). Silicones also resist acids, bases, solvents, chemicals, oils, and water. Furthermore, it has been previously used in the literature as a component of novel drug delivery systems (Maillard-Salin et al., 2000; Schierholz, Jansen, Jaenicke, & Pulverer, 1994).

Taking these factors into consideration, an SMT with 20 individual separate wells was developed. Instead of being cast as a single film to be cut up into different sizes, a specified volume of drug–polymeric solution/emulsion was cast into each well of the SMT and dried to form individual film units. Films prepared using this tray exhibited assay values of $104.06 \pm 3.31\%$, that is, a CV of 3.18% (Table 2). Hence as compared with the TCPT method, the SMT method significantly reduced the CV for assay values from 60.57 to only 3.18%, thus confirming its suitability to enhance drug content uniformity. Also, flexibility of the molded tray enabled the easy removal of films for evaluation. However, the films from this tray displayed poor surface morphology as they appeared

porous (Table 2). This could possibly be due to the physical nature of silicone when it is heated and dried, that is, adhesion of the films directly onto the silicone surface may have resulted in the film porosity observed. Because the TCPT produced films with nonporous, uniform morphology, teflon-coated perspex inserts were designed for insertion into each well to overcome the poor surface morphology. This modification, that is, using the SMT with inserts, resulted in films that satisfied the desired requirements, that is, good surface morphology and once again acceptable assay values of $104.84 \pm 1.30\%$ were achieved, as required by compendial specifications for PHCl dosage forms (92–107.5%) (British Pharmacopoeia, 2003).

The above studies showed that the SMT proved successful in enhancing drug content uniformity. In addition to drug content uniformity, mucoadhesivity and thickness of films from the SMT and TCPT were also compared. A comparison of the assay, mucoadhesivity, and thickness of films cast onto the TCPT and the newly developed SMT with the perspex inserts showed significant improvements in uniformity of the films in terms of the above properties with the SMT (Table 3). As a result of aggregation, the absence of thickness uniformity, as observed in the TCPT films, detrimentally affected uniformity of component distribution throughout the film. This directly impacted on the mucoadhesive property of the individual film doses, as the mucoadhesive polymer was randomly distributed, resulting in nonuniform mucoadhesive performance of films from the TCPT.

## Reproducibility Study

As the SMT with inserts showed excellent assay values and acceptable film surface morphology, this tray was selected for reproducibility studies to validate this method of film preparation. Three batches of the homopolymeric films, i.e., PHCl and CHT, were prepared as described in the Section "Homopolymeric Films," using three different SMTs with teflon-coated perspex inserts. These batches were subjected to characterization studies in terms of assays, drug release, mucoadhesion, and thickness measurements. The assay, mucoadhesion, and thickness data obtained for the three formulations for the reproducibility study are shown in Table 4.

TABLE 3
Summary of Results for Characterization Studies on Films Prepared with the TCPT and SMT Methods of Film Casting

| Characterization Study | TCPT | | SMT | |
|---|---|---|---|---|
| | Mean $\pm$ SD | CV (%) | Mean $\pm$ SD | CV (%) |
| Assay (%) | $110.00 \pm 66.63$ | 60.57 | $106.87 \pm 0.59$ | 0.55 |
| Mucoadhesivity (mN) | $154 \pm 82$ | 53.68 | $134 \pm 28$ | 20.88 |
| Thickness (mm) | $0.21 \pm 0.10$ | 47.62 | $0.13 \pm 0.02$ | 15.38 |

TCPT, teflon-coated perspex tray; SMT, silicone-molded tray.

RIGHTS LINK

1044                                V. A. PERUMAL ET AL.

### TABLE 4
#### Summary of Results for Characterization Studies to Evaluate Reproducibility of the SMT for Film Casting

| Characterization Study | Tray A | | Tray B | | Tray C | |
|---|---|---|---|---|---|---|
| | Mean ± SD | CV (%) | Mean ± SD | CV (%) | Mean ± SD | CV (%) |
| Assay(%) | 106.87 ± 0.59 | 0.55 | 104.84 ± 1.30 | 1.24 | 104.06 ± 3.31 | 3.19 |
| Mucoadhesivity MDF (mN) | 134 ± 28 | 20.88 | 168 ± 45 | 26.97 | 143 ± 26 | 18.40 |
| Thickness(mm) | 0.13 ± 0.02 | 15.38 | 0.13 ± 0.02 | 15.38 | 0.10 ± 0.01 | 10.00 |

SMT, silicone-molded tray; MDF, maximum detachment force.

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13 For personal use only.

The CV for assay values for each tray was low, indicating minimal intra-tray variability. Also these values were all within the compendial specifications of 92–107.5% (British Pharmacopoeia, 2003). The mean assay values between the three trays were statistically analyzed using a Kruskal–Wallis test with Dunn's Post Hoc tests. Data were considered statistically significant if $p < .05$. Statistical analyses indicated no significant differences between the three trays for assays because $p=.3407$. The intra-batch variability for the mucoadhesivity of films from the SMTs was less than 30% and was consistent with those reported in the literature for other preparations (Eouani et al., 2001; Shojaei, Paulson, & Honary, 2000). The differences between the mean MDF values for mucoadhesion of the three trays were statistically analyzed using one-way ANOVA with Bonferroni Post Hoc tests. Statistical analyses indicated no significant differences between the three trays for mucoadhesivity because $p = .2922$. Minimal intra-tray variability for thickness was noted as CVs were very low, i.e., less than 16% for all three trays.

The in vitro drug release profiles of films from the three trays were also compared, as shown in Figure 3. The profiles for films from all three trays appeared to be almost superimposable. To confirm the similarity of these dissolution profiles,

the similarity factor was used. The *similarity factor* denoted as $f_2$ (Moore & Flanner, 1996), directly compares the similarity between percentage drug dissolved per unit time for a test and reference product. The *similarity factor* ($f_2$) is a logarithmic transformation of the sum-squared error of differences between the test $T_j$ and reference product $R_j$ over all time points:

$$f_2 = 50 \ \log \left\{ \left[ 1 + \left( \frac{1}{n} \right) \sum_{j=1}^{n} \left| R_j - T_j \right|^2 \right]^{-0.5} \right\} \times 100 \qquad (1)$$

In general, $f_2$ values higher than 50 (50–100) show similarity of the dissolution profiles. The calculated $f_2$ obtained for this study for tray A versus tray B, tray B versus tray C, and tray A versus tray C was 92.76, 90.99, and 86.06, respectively. These results confirmed that the drug release profiles were similar for films from all three trays.

Analyses of the data for drug content, mucoadhesivity, and thickness, coupled with the above $f_2$ values showing similarity in drug release profiles, confirmed the intra- and inter-batch reproducibility of the SMT method for film casting and preparation.

## Applicability of the SMT with Teflon-Coated Perspex Inserts to Multipolymeric Films with Drug and Polymers of Similar and Opposing Solubilities

While the SMT with the inserts was demonstrated to provide drug content uniformity with monolayered homopolymeric films of drug and a single polymer with similar solubilities, it was essential to assess its applicability to the use of monolayered multipolymeric films, with polymer(s) and drug of similar and opposing solubilities, because polymer blending is common for optimizing both mucoadhesivity and drug release profiles. Although polymer blending with drug and polymers of similar solubilities have been widely reported in the literature for the preparation of monolayered multipolymeric films (Ahmed et al., 2004; Khoo et al., 2003; Rossi, Sandri, Ferrari, Bonferoni, & Caramella, 2003; Yoo, Dharmala, & Lee, 2006), the blending of polymers and drug of opposing solubilities using an emulsification method has only been recently described by Perugini et al. (2003). Their study used a conventional film casting technique



FIGURE 3.  Drug release profiles of films prepared from the silicone-molded tray (SMT) for reproducibility studies.

RIGHTS LINK

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For p′ use only.

and a hydrophobic drug. The preparation of monolayered multi-polymeric films with a hydrophilic drug and polymers of opposing solubilities as well as it being cast into individual wells such as the SMT method has not been reported before. Therefore, multipolymeric films with PHCl+CHT+HPMC (drug and polymers with similar solubilities) and films with PHCl+CHT+EUD 100 (drug and polymers with opposing solubilities) were prepared by using the conventional TCPT and the SMT with inserts for film casting. The findings for both these methods were compared. Table 5 indicates the assay values, whereas Table 6 presents a composite summary of the drug release profiles of the films prepared in both types of trays. As is evident from Table 5 all films prepared with the SMT were within compendial specifications (92–107.5%) (British Pharmacopoeia, 2003) and all CVs for assays were low, that is, less than 4%, thus indicating the suitability of the SMT for the preparation of both homopolymeric and multipolymeric films with drug and polymer(s) of similar and/or opposing solubilities. None of the films prepared with the TCPT were within compendial specifications. They exhibited very high CVs for assays, that is, as high as 60%, indicating the unsuitability of these trays for all types of film preparation.

As can be seen from the drug release profiles (Table 6), the percentage drug released from all films prepared in the TCPT have relatively large $SD$s at each time point, whereas those prepared in the SMT with inserts have relatively small $SD$s. These results can be attributed to the migration of drug that occurs during the formation of aggregates during the drying process, leading to nonuniform drug content resulting in nonreproducible drug release profiles in the case of the TCPT. The small $SD$s and reproducible release profiles of all films prepared in the SMT with inserts are due to the containment of the drug within a predetermined well that prevents drug migration during drying and that maintains uniformity of content (US Patent No. 60/443,741, 2004). Furthermore, changes to the polymer ratio of PHCl:CHT:EUD100 from 1:0.5:05 to 1:0.5:10 to modify the drug release profile to achieve a more controlled release of PHCl confirmed the suitability of the SMT for again enhancing the drug content uniformity and minimizing variability in the drug release profile (Tables 5 and 6).

It is therefore evident from Tables 5 and 6 that the SMT with inserts can be successfully used to prepare both homo- and multipolymeric films with drug and polymers of both similar and opposing solubilities.

## CONCLUSIONS

Preparation of homopolymeric and multipolymeric films (including drug and polymers of similar and opposing solubilities) via casting using a specially designed SMT was superior to the conventional TCPT method, in terms of meeting drug content uniformity requirements. This method of film casting as compared with the TCPT method also reduced the variability in mucoadhesivity, drug release, and film thickness. Reproducibility of this SMT method was also demonstrated in terms of drug content, mucoadhesion, and drug release. The use of a SMT with individual wells for film casting makes an important contribution to film formulation optimization for mucosal drug delivery.

TABLE 5
Assay Values of Homopolymeric and Multipolymeric Films Prepared
in the TCPT and SMT with Inserts

| Film Type | TCPT Assay (%) | | SMT Assay (%) | |
|---|---|---|---|---|
| | Mean $\pm$ $SD$ | CV (%) | Mean $\pm$ $SD$ | CV (%) |
| Homopolymeric film: PHCl+CHT(1:1) | 110.00 $\pm$ 66.63 | 60.57 | 104.84 $\pm$ 1.30 | 1.24 |
| Multipolymeric film: similar solubilities PHCl+CHT+HPMC (1:0.5:0.5) | 114.04 $\pm$ 22.78 | 19.97 | 97.62 $\pm$ 3.05 | 3.13 |
| Multipolymeric film: opposing solubilities PHCl+CHT+EUD100 (1:0.5:0.5) | 113.76 $\pm$ 13.21 | 11.61 | 104.08 $\pm$ 1.33 | 1.28 |
| Multipolymeric film: opposing solubilities PHCl+CHT+EUD100 (1:0.5:10) | 116.05 $\pm$ 14.42 | 12.43 | 100.71 $\pm$ 2.66 | 2.64 |

TCPT, teflon-coated perspex tray; SMT, silicone-molded tray; EUD, Eudragit; HPMC, hydroxypropyl-methyl cellulose; CHT, chitosan; PHCl, propranolol hydrochloride.

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For pe⁻ ⁻ use only.

1046                                             V. A. PERUMAL ET AL.

TABLE 6
Summary of PHCl Release Profiles from Films Prepared in the TCPT and SMT with Inserts



| Film Type | TCPT | SMT with Inserts |
|---|---|---|
| Monolayered homopolymeric film Drug+CHT (1:1) | | |
| Monolayered multipolymeric film: similar solubilities Drug+CHT+ HPMC (1:0.5:0.5) | | |
| Monolayered multipolymeric film: opposing solubilities Drug+CHT+EUD100 (1:0.5:0.5) | | |
| Monolayered multipolymeric film: opposing solubilities Drug+CHT+EUD100 (1:0.5:10) | | |

TCPT, teflon-coated perspex tray; SMT, silicone-molded tray; EUD, Eudragit; HPMC, hydroxypropylmethyl cellulose; CHT, chitosan.

RIGHTS LINK

## ACKNOWLEDGMENTS

The authors are grateful to the National Research Foundation of South Africa and University of KwaZulu-Natal (UKZN) for financial support. Degussa Africa (Pty) Ltd is also acknowledged for their kind gift of the Eudragit® RS100 polymer. The authors also thank Mrs TM Esterhuizen from the Biostatistics Programme, College of Health Sciences, UKZN for assistance with the statistical analyses. Mr. V. K. Ramnarian is acknowledged for his assistance with photography in the study.

## REFERENCES

Ahmed, A., Barry, B. W., Williams, A. C., & Davis, A. F. (2004). Penciclovir solubility in Eudragit films: A comparison of X-ray, thermal, microscopic and release rate techniques. *J. Pharm. Biomed. Anal., 34*, 945–956.

Aksungur, P., Sungur, A., Unal, S., Iskit, A. B., Squier, C. A., & Senel, S. (2004). Chitosan delivery systems for the treatment of oral mucositis: In vitro and in vivo studies. *J. Control Release, 98*, 269–279.

Amnuaikit, C., Ikeuchi, I., Ogawara, K., Higaki, K., & Kimura, T. (2005). Skin permeation of propranolol from polymeric film containing terpene enhancers for transdermal use. *Int. J. Pharm., 289*, 167–178.

Bonferoni, M. C., Chitoni, P., Giunchedi, P., Rossi, S., Ferrari, F., Burgalassi, S., & Caramella, C. (2004). Carrageenan-gelatin mucoadhesive systems for ion-exchange based ophthalmic delivery: In vitro and preliminary in vivo studies. *Eur. J. Pharm. Biopharm., 57*, 465–472.

British Pharmacopoeia BP. (2003). Her Majesty's Stationery Office Ltd., London, pp. 2598–2599.

Cui, Z., & Mumper, R. J. (2002). Bilayer films for mucosal (genetic) immunization via the buccal route in rabbits. *Pharm. Res., 19*, 947–953.

Dhanikula, A. B., & Panchagnula, R. (2004). Development and characterisation of biodegradable chitosan films for local delivery of paclitaxel. *AAPS J., 3*, 1–12.

Dong, Z., Wang, Q., & Du, Y. (2006). Alginate/gelatin blend films and their properties for drug controlled release. *J. Membr. Sci., 280*, 37–44.

Eouani, C., Piccerelle, P., Prinderre, P., Bouret, E., & Jaochim, J. (2001). In vitro comparative study of buccal mucoadhesive performance of different polymeric films. *Eur. J. Pharm. Biopharm., 52*, 45–55.

Haupt, S., Zioni, T., Gati, I., Kleinstern, J., & Rubinstein, A. (2006). Luminal delivery and dosing considerations of local celecoxib administration to colorectal cancer. *Eur. J. Pharm. Sci., 55*, 47–56.

Khoo, C. G. L., Frantzich, S., Rosinski, A., Sjostrom, M., & Hoogstrate, J. (2003). Oral gingival delivery systems from chitosan blends with hydrophilic polymers. *Eur. J. Pharm. Biopharm., 55*, 47–56.

Kohda, Y., Kobayashi, H., Baba, Y., Yuasa, H., Ozeki, T., Kanaya, Y., & Sagara, E. (1997). Controlled release of lidocaine hydrochloride from buccal mucosa-adhesive films with solid dispersion. *Int. J. Pharm., 158*, 147–155.

Lin, S., Lee, C., & Lin, Y. (1995). Drug-polymer interaction affecting the mechanical properties adhesion strength and release kinetics of piroxicam-loaded Eudragit E films plasticised with different plasticisers. *J. Control Release, 33*, 375–381.

Maillard-Salin, D. G., Becourt, P., & Couarraze, G. (2000). Physical evaluation of a new patch made of a progestomimetic in a silicone matrix. *Int. J. Pharm., 199*, 29–38.

Medlicott, N. J., Holborow, D. W., Rathbone, M. J., Jones, D. S., & Tucker, I. G. (1999). Local delivery of chlorhexidine using a tooth-bonded delivery system. *J. Control Release, 337*, 337–343.

Moore, J. W., & Flanner, H. H. (1996). Mathematical comparison of dissolution profiles. *Pharm. Technol., 20*, 64–74.

Okamoto, H., Taguchi, H., Iida, K., & Danjo, K. (2001). Development of polymer film dosage forms of lidocaine for buccal administration: I. Penetration rate and release rate. *J. Control Release, 77*, 253–260.

Peh, K. K., & Wong, C. F. (1999). Polymeric films as vehicles for buccal delivery: Swelling, mechanical and bioadhesive properties. *J. Pharm. Pharm. Sci., 2*, 53–61.

Perugini, P., Genta, I., Conti, B., Modena, T., & Pavanetto, F. (2003). Periodontal delivery of ipriflavone: New chitosan/PLGA film delivery system for lipophilic drug. *Int. J. Pharm., 252*, 1–9.

Remunan-Lopez, C., Portero, A., Vila-Jato, J. L., & Alonso, M. J. (1998). Design and evaluation of chitosan/ethylcellulose mucoadhesive bilayered devices for buccal drug delivery. *J. Control Release, 55*, 143–152.

Rossi, S., Sandri, G., Ferrari, F., Bonferoni, M. C., & Caramella, C. (2003). Buccal delivery of acyclovir from films based on chitosan and polyacrylic acid. *Pharm. Dev. Technol., 8*, 199–208.

Schierholz, J., Jansen, B., Jaenicke, L., & Pulverer, G. (1994). In vitro efficacy of an antibiotic releasing silicone ventricle catheter to prevent shunt infection. *Biomaterials, 15*, 996–1000.

Seabra, A. B., Ganzarolli, M., & de Oliveira, G. (2004). Poly(vinyl alcohol) and poly(vinyl pyrrolidone) blended films for local nitric oxide release. *Biomaterials, 25*, 3773–3782.

Shi, R., & Burt, H. M. (2004). Amphiphilic dextran-graft-poly(ε-caprolactone) films for the controlled release of paclitaxel. *Int. J. Pharm., 271*, 167–179.

Shojaei, A. H., Paulson, J., & Honary, S. (2000). Evaluation of poly(acrylic acid-co-ethylhexyl acrylate) films for mucoadhesive drug delivery: Factors affecting the force of mucoadhesion. *J. Control Release, 67*, 223–232.

Tuovinen, L., Peltonen, S., & Jarvinen, K. (2003). Drug release from starch-acetate films. *J. Control Release, 91*, 345–254.

Wang, Y., Challa, P., Epstein, D. L., & Yuan, F. (2004). Controlled release of ethacrynic acid from poly(lactide-co-glycolide) films for glaucoma treatment. *Biomaterials, 25*, 4279–4285.

Westedt, U., Wittmar, M., Hellwig, M., Hanefeld, P., Greiner, A., Schaper, A. K., & Kissel, T. (2006). Paclitaxel releasing films consisting of poly(vinyl alcohol)-graft-poly(lactide-co-glycolide) and their potential as biodegradable stent coatings. *J. Control Release, 111*, 235–246.

Yang, R. K., Fuisz, R. C., Myers, G. L., & Fuisz, J. M. (2004). Thin film with non-self-aggregating uniform heterogeneity and drug delivery systems made therefrom. U.S. Patent 60/443,741.

Yoo, J. W., Dharmala, K., & Lee, C. H. (2006). The physicodynamic properties of mucoadhesive polymeric films developed as female controlled drug delivery system. *Int. J. Pharm., 309*, 139–145.

Yoshizawa, T., Shin-ya, Y., Hong, K., & Kajiuchi, T. (2005). pH- and temperature-sensitive release behaviours from polyelectrolyte complex films composed of chitosan and PAOMA copolymer. *Eur. J. Pharm. Biopharm., 59*, 307–313.

Drug Development and Industrial Pharmacy Downloaded from informahealthcare.com by Michael Chakansky on 08/19/13
For personal use only.

# EXHIBIT 6



US008603514B2

(12) **United States Patent**
     Yang et al.

(10) **Patent No.:**     **US 8,603,514 B2**
(45) **Date of Patent:**     **Dec. 10, 2013**

(54) **UNIFORM FILMS FOR RAPID DISSOLVE DOSAGE FORM INCORPORATING TASTE-MASKING COMPOSITIONS**

(75) Inventors: **Robert K. Yang**, Fushing, NY (US); **Richard C. Fuisz**, McLean, VA (US); **Garry L. Myers**, Kingsport, TN (US); **Joseph M. Fuisz**, Washington, DC (US)

(73) Assignee: **MonoSol RX, LLC**, Warren, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 779 days.

(21) Appl. No.: **11/775,484**

(22) Filed: **Jul. 10, 2007**

(65) **Prior Publication Data**

    US 2008/0044454 A1     Feb. 21, 2008

    **Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/768,809, filed on Jan. 30, 2004, now Pat. No. 7,357,891, and a continuation-in-part of application No. PCT/US02/32575, filed on Oct. 11, 2002, and a continuation-in-part of application No. 10/074,272, filed on Feb. 14, 2002, now Pat. No. 7,425,292, said application No. 10/768,809 is a continuation-in-part of application No. PCT/US02/32594, filed on Oct. 11, 2002, and a continuation-in-part of application No. 10/074,272, said application No. 10/768,809 is a continuation-in-part of application No. PCT/US02/32542, filed on Oct. 11, 2002, and a continuation-in-part of application No. 10/074,272, application No. 11/775,484, which is a continuation-in-part of application No. 10/856,176, filed on May 28, 2004, now Pat. No. 7,666,337, and a continuation-in-part of application No. 10/768,809.

(60) Provisional application No. 60/443,741, filed on Jan. 30, 2003, provisional application No. 60/386,937, filed on Jun. 7, 2002, provisional application No. 60/328,868, filed on Oct. 12, 2001, provisional application No. 60/414,276, filed on Sep. 27, 2002, provisional application No. 60/473,902, filed on May 28, 2003.

(51) **Int. Cl.**
    *A61F 13/00*     (2006.01)
    *A61K 9/00*     (2006.01)
    *A61K 9/70*     (2006.01)
(52) **U.S. Cl.**
    USPC ........................................... **424/435**; 424/484
(58) **Field of Classification Search**
    None
    See application file for complete search history.

(56) **References Cited**

    U.S. PATENT DOCUMENTS

    307,537 A     11/1884     Foulks
    688,446 A     12/1901     Stempel
    (Continued)

    FOREIGN PATENT DOCUMENTS

    DE     2432925     1/1976
    DE     2449865     4/1976
    (Continued)

    OTHER PUBLICATIONS

Lazaridou et al.; Thermophysical properties of chitosan, chitosan-starch and chitosan-pullulan films near the glass transition; Carbohydrate Polymers, Applied Science Publishers, Ltd; Barking, GB, vol. 48, No. 2, May 1, 2002, pp. 170-190.

    (Continued)

*Primary Examiner* — Anand Desai
*Assistant Examiner* — Melissa Mercier
(74) *Attorney, Agent, or Firm* — Hoffmann & Baron, LLP

(57) **ABSTRACT**

The present invention relates to rapid dissolve thin film drug delivery compositions for the oral administration of active components. The active components are provided as taste-masked or controlled-release coated particles uniformly distributed throughout the film composition. The compositions may be formed by wet casting methods, where the film is cast and controllably dried, or alternatively by an extrusion method.

**76 Claims, 34 Drawing Sheets**



US 8,603,514 B2

**1**

UNIFORM FILMS FOR RAPID DISSOLVE
DOSAGE FORM INCORPORATING
TASTE-MASKING COMPOSITIONS

CROSS-REFERENCE TO RELATED
APPLICATIONS

This application is a continuation-in-part of U.S. application Ser. No. 10/768,809, filed Jan. 30, 2004, which claims benefit to U.S. Provisional Application No. 60/443,741 filed Jan. 30, 2003; U.S. application Ser. No. 10/768,809 is also a continuation-in-part of PCT/US02/32575, filed Oct. 11, 2002, which claims priority to U.S. Provisional Application No. 60/386,937, filed Jun. 7, 2002, and is a continuation-in-part of U.S. application Ser. No. 10/074,272, filed Feb. 14, 2002, which claims priority to U.S. Provisional Application No. 60/328,868, filed Oct. 12, 2001; U.S. application Ser. No. 10/768,809 is also a continuation-in-part of PCT/US02/32594, filed Oct. 11, 2002, which claims priority to U.S. Provisional Application No. 60/414,276, filed Sep. 27, 2002, and U.S. Provisional Application No. 60/386,937, filed Jun. 7, 2002, and is a continuation-in-part of U.S. application Ser. No. 10/074,272, filed Feb. 14, 2002, which claims priority to U.S. Provisional Application No. 60/328,868, filed Oct. 12, 2001; and U.S. application Ser. No. 10/768,809 is also a continuation-in-part of PCT/US02/32542, filed Oct. 11, 2002, which claims priority to U.S. Provisional Application No. 60/386,937, filed Jun. 7, 2002, and U.S. Provisional Application No. 60/371,940, filed Apr. 11, 2002, and is a continuation-in-part of U.S. application Ser. No. 10/074,272, filed Feb. 14, 2002, which claims priority to U.S. Provisional Application No. 60/328,868, filed Oct. 12, 2001; this application is also a continuation-in-part of U.S. application Ser. No. 10/856,176, filed May 28, 2004, which claims priority to U.S. Provisional Application No. 60/473,902, filed May 28, 2003; U.S. application Ser. No. 10/856,176 is also a continuation-in-part of U.S. application Ser. No. 10/768,809; the contents all of which are incorporated herein by reference.

FIELD OF THE INVENTION

The present invention relates to rapidly dissolving films and methods of their preparation. The films contain a polymer component and active ingredients as taste-masked or controlled-release coated particles uniformly distributed throughout the film.

BACKGROUND OF THE RELATED
TECHNOLOGY

Active ingredients, such as drugs or pharmaceuticals, may be prepared in a tablet form to allow for accurate and consistent dosing. However, this form of preparing and dispensing medications has many disadvantages including that a large proportion of adjuvants that must be added to obtain a size able to be handled, that a larger medication form requires additional storage space, and that dispensing includes counting the tablets which has a tendency for inaccuracy. In addition, many persons, estimated to be as much as 28% of the population, have difficulty swallowing tablets. While tablets may be broken into smaller pieces or even crushed as a means of overcoming swallowing difficulties, this is not a suitable solution for many tablet or pill forms. For example, crushing or destroying the tablet or pill form to facilitate ingestion, alone or in admixture with food, may also destroy the controlled release properties.

**2**

As an alternative to tablets and pills, films may be used to carry active ingredients such as drugs, pharmaceuticals, and the like. However, historically films and the process of making drug delivery systems therefrom have suffered from a number of unfavorable characteristics that have not allowed them to be used in practice.

Films that incorporate a pharmaceutically active ingredient are disclosed in expired U.S. Pat. No. 4,136,145 to Fuchs, et al. ("Fuchs"). These films may be formed into a sheet, dried and then cut into individual doses. The Fuchs disclosure alleges the fabrication of a uniform film, which includes the combination of water-soluble polymers, surfactants, flavors, sweeteners, plasticizers and drugs. These allegedly flexible films are disclosed as being useful for oral, topical or enteral use. Examples of specific uses disclosed by Fuchs include application of the films to mucosal membrane areas of the body, including the mouth, rectal, vaginal, nasal and ear areas.

Examination of films made in accordance with the process disclosed in Fuchs, however, reveals that such films suffer from the aggregation or conglomeration of particles, i.e., self-aggregation, making them inherently non-uniform. This result can be attributed to Fuchs' process parameters, which although not disclosed likely include the use of relatively long drying times, thereby facilitating intermolecular attractive forces, convection forces, air flow and the like to form such agglomeration.

The formation of agglomerates randomly distributes the film components and any active present as well. When large dosages are involved, a small change in the dimensions of the film would lead to a large difference in the amount of active per film. If such films were to include low dosages of active, it is possible that portions of the film may be substantially devoid of any active. Since sheets of film are usually cut into unit doses, certain doses may therefore be devoid of or contain an insufficient amount of active for the recommended treatment. Failure to achieve a high degree of accuracy with respect to the amount of active ingredient in the cut film can be harmful to the patient. For this reason, dosage forms formed by processes such as Fuchs, would not likely meet the stringent standards of governmental or regulatory agencies, such as the U.S. Federal Drug Administration ("FDA"), relating to the variation of active in dosage forms. Currently, as required by various world regulatory authorities, dosage forms may not vary more than 10% in the amount of active present. When applied to dosage units based on films, this virtually mandates that uniformity in the film be present.

The problems of self-aggregation leading to non-uniformity of a film were addressed in U.S. Pat. No. 4,849,246 to Schmidt ("Schmidt"). Schmidt specifically pointed out that the methods disclosed by Fuchs did not provide a uniform film and recognized that that the creation of a non-uniform film necessarily prevents accurate dosing, which as discussed above is especially important in the pharmaceutical area. Schmidt abandoned the idea that a mono-layer film, such as described by Fuchs, may provide an accurate dosage form and instead attempted to solve this problem by forming a multi-layered film. Moreover, his process is a multi-step process that adds expense and complexity and is not practical for commercial use.

Other U.S. patents directly addressed the problems of particle self-aggregation and non-uniformity inherent in conventional film forming techniques. In one attempt to overcome non-uniformity, U.S. Pat. No. 5,629,003 to Horstmann et al. and U.S. Pat. No. 5,948,430 to Zerbe et al. incorporated additional ingredients, i.e. gel formers and polyhydric alcohols respectively, to increase the viscosity of the film prior to drying in an effort to reduce aggregation of the components in

US 8,603,514 B2

**3**

the film. These methods have the disadvantage of requiring additional components, which translates to additional cost and manufacturing steps. Furthermore, both methods employ the use the conventional time-consuming drying methods such as a high-temperature air-bath using a drying oven, drying tunnel, vacuum drier, or other such drying equipment. The long length of drying time aids in promoting the aggregation of the active and other adjuvant, notwithstanding the use of viscosity modifiers. Such processes also run the risk of exposing the active, i.e., a drug, or vitamin C, or other components to prolonged exposure to moisture and elevated temperatures, which may render it ineffective or even harmful.

In addition to the concerns associated with degradation of an active during extended exposure to moisture, the conventional drying methods themselves are unable to provide uniform films. The length of heat exposure during conventional processing, often referred to as the "heat history", and the manner in which such heat is applied, have a direct effect on the formation and morphology of the resultant film product. Uniformity is particularly difficult to achieve via conventional drying methods where a relatively thicker film, which is well-suited for the incorporation of a drug active, is desired. Thicker uniform films are more difficult to achieve because the surfaces of the film and the inner portions of the film do not experience the same external conditions simultaneously during drying. Thus, observation of relatively thick films made from such conventional processing shows a non-uniform structure caused by convection and intermolecular forces and requires greater than 10% moisture to remain flexible. The amount of free moisture can often interfere over time with the drug leading to potency issues and therefore inconsistency in the final product.

Conventional drying methods generally include the use of forced hot air using a drying oven, drying tunnel, and the like. The difficulty in achieving a uniform film is directly related to the rheological properties and the process of water evaporation in the film-forming composition. When the surface of an aqueous polymer solution is contacted with a high temperature air current, such as a film-forming composition passing through a hot air oven, the surface water is immediately evaporated forming a polymer film or skin on the surface. This seals the remainder of the aqueous film-forming composition beneath the surface, forming a barrier through which the remaining water must force itself as it is evaporated in order to achieve a dried film. As the temperature outside the film continues to increase, water vapor pressure builds up under the surface of the film, stretching the surface of the film, and ultimately ripping the film surface open allowing the water vapor to escape. As soon as the water vapor has escaped, the polymer film surface reforms, and this process is repeated, until the film is completely dried. The result of the repeated destruction and reformation of the film surface is observed as a "ripple effect" which produces an uneven, and therefore non-uniform film. Frequently, depending on the polymer, a surface will seal so tightly that the remaining water is difficult to remove, leading to very long drying times, higher temperatures, and higher energy costs.

Other factors, such as mixing techniques, also play a role in the manufacture of a pharmaceutical film suitable for commercialization and regulatory approval. Air can be trapped in the composition during the mixing process or later during the film making process, which can leave voids in the film product as the moisture evaporates during the drying stage. The film frequently collapse around the voids resulting in an uneven film surface and therefore, non-uniformity of the final film product. Uniformity is still affected even if the voids in the film caused by air bubbles do not collapse. This situation

**4**

also provides a non-uniform film in that the spaces, which are not uniformly distributed, are occupying area that would otherwise be occupied by the film composition. None of the above-mentioned patents either addresses or proposes a solution to the problems caused by air that has been introduced to the film.

Therefore, there is a need for methods and compositions for film products, which use a minimal number of materials or components, and which provide a substantially non-self-aggregating uniform heterogeneity throughout the area of the films. Desirably, such films are produced through a selection of a polymer or combination of polymers that will provide a desired viscosity, a film-forming process such as reverse roll coating, and a controlled, and desirably rapid, drying process which serves to maintain the uniform distribution of non-self-aggregated components without the necessary addition of gel formers or polyhydric alcohols and the like which appear to be required in the products and for the processes of prior patents, such as the aforementioned Horstmann and Zerbe patents. Desirably, the films will also incorporate compositions and methods of manufacture that substantially reduce or eliminate air in the film, thereby promoting uniformity in the final film product.

SUMMARY OF THE INVENTION

In one aspect, this invention provides rapid-dissolve film products for drug delivery whereby the active agents are taste-masked or controlled-release coated particles uniformly distributed throughout the film. The uniform films of this invention can be divided into equally sized dosage units having substantially equal amounts of each compositional component present. This advantage is particularly useful because it permits large area films to be initially formed, and subsequently cut into individual dosage units without concern for whether each unit is compositionally equal. Pharmaceutical film dosage forms to date have not been marketed largely due to the inability to achieve this result. Thus, for example, the films of the present invention have particular applicability as pharmaceutical dosage delivery systems because each dosage unit, e.g., each individual dosage film unit, will contain the proper predetermined amount of drug.

In a further aspect of the present invention, methods of forming the films of this invention are provided, by wet casting methods and hot melt extrusion methods. In a wet casting method, the film product is formed by combining a polymer and a polar solvent, forming the combination into a film, and drying the film in a controlled manner. Preferably, the film is dried initially only applying heat to the bottom side of the film, in order to maintain a non-self-aggregating uniform heterogeneity. Desirably, during the initial bottom drying stage, substantially no convection currents, i.e., hot air currents, are permitted to travel across the top of the film until the visco-elastic properties of the film are such that the film components are "locked" in place and cannot move to cause non-uniformity. At that stage, other methods of heating to effect drying may be employed.

The films may be formed with a polar solvent which may be water, a polar organic solvent, or a combination thereof. An active ingredient may be added to the polymer and water combination prior to the drying step. Alternatively, or in addition to controlling the drying the film, the polymer may be selected in order to provide a viscosity that maintains the non-self-aggregating uniform heterogeneity. Moreover, the composition desirably is mixed in a manner to minimize the incorporation of air into the mixture and is desirably deaerated, such as by conditioning at room temperature, vacuum

US 8,603,514 B2

**5**

treatment or the like, to allow trapped air to escape prior to the drying process. This serves to eliminate bubble and void formation in the final film product, thereby further improving uniformity. Reverse roll coating is one particularly useful coating technique may also be used to form the film.

Another embodiment of the present invention may include a rapid-dissolve film product containing at least one water-soluble polymer including polyethylene oxide alone or in combination with a hydrophilic cellulosic polymer, wherein the film product may be free of added plasticizers. Preferably, the rapid-dissolve film product includes at least one water-soluble polymer containing about 20% to 100% by weight polyethylene oxide, about 0% to 80% by weight hydroxypropylmethyl cellulose, and about 0% to 80% by weight hydroxypropyl cellulose; an active component; sweetener; at least one flavoring; and at least one colorant, wherein the film product optionally is free of added plasticizers, surfactants, and polyalcohols.

In another aspect of the present invention, the films employing polyethylene oxide as the film-forming polymer may be formed by a hot melt extrusion process, whereby an edible film-forming polymer is provided, and active components are added during manufacture, and the mixture is blended at elevated temperature in the absence of additional solvent to form a uniform matrix, and extruded to form a film. Desirably, the film will be further shaped by rollers to a specified thickness, and allowed to cool and harden to form a self supporting film. A particularly desirable film forming polymer for extrusion manufacture is polyethylene oxide, which is heated to about 65° C. to about 80° C. during blending to provide a pliable uniform matrix. The extrusion may be accomplished with a single screw extrusion apparatus or other suitable extrusion apparatus.

A particular advantage of the aforementioned extrusion processes when employed with particulate coated active ingredients is that the absence of additional solvent during the manufacturing process lessens the likelihood of dissolution or release of the taste-masked or controlled-release coated active agent during manufacture due to dissolution or solvent effects.

Another aspect of the present invention provides films containing coated particles that include an active agent and a taste-masking and/or controlled-release coating. Accordingly, there is provided a drug delivery composition that includes (i) a flowable water-soluble film forming matrix; (ii) a particulate bioeffecting agent uniformly stationed therein; and (iii) a taste-masking agent or controlled-release agent coated or intimately associated with the particulate to provide taste-masking of the bioeffecting agent. In some embodiments, the combined particulate and taste-masking agent have a particle size of 200 microns or less and the flowable water-soluble film forming matrix is capable of being dried without loss of uniformity in the stationing of the particulate bioeffecting agent therein.

In some other embodiments, the taste-masking or controlled-release coated particles may have a particle size of 50 to 250 microns, and the flowable water-soluble film forming matrix is capable of being dried without loss of uniformity in the stationing of the particulate bioeffecting agent therein. The importance of particle size is heightened in orally ingestible thin films, where uniformity is also of particular importance, and the prior art has failed to recognize such critically important features.

Desirably, the size of the combined particulate and taste-masking agent have a particle size of 150 microns or less, or 100 microns or less. The flowable water-soluble film forming matrix is formable into a dry film of less than about 380

**6**

microns in thickness, for example less than about 250 microns in thickness. Desirably, the coated particles are embedded entirely within the finished films. In other words the dry films of the present invention desirably have smooth surfaces free of exposed agents or coated particles that could impart grittiness or maldistribution of the active. Thus, in one aspect of the invention there is provided a film vehicle which contains a uniform distribution of actives, as defined herein, being suitably free of particles which accumulate on the film surface when dried.

Desirably, the taste-masking or controlled-release agent is a thin film coating over portions of the bioeffecting agent. Useful taste-masking agents include polymeric materials. Water-soluble polymers are also useful. Desirably, the water-soluble polymer has an average molecular weight of equal to or greater than about 40,000. Furthermore, water-soluble polymers may be acrylic polymers, cellulosic polymers, and combinations thereof. Additionally, vinyl polymers, crown ethers, hydrogenated oils and waxes, and combinations thereof may also be used as taste-masking agents.

In some embodiments described herein, a thin film drug delivery composition includes: (a) an edible water-soluble film forming matrix; and (b) a coated particulate active component uniformly stationed therein, wherein the coating on the particulate active component is a taste-masking or controlled-release agent and wherein the coated particulate active component has a particle size of 50 to 250 microns and is uniformly distributed in the film composition.

In some other embodiments, there is provided a thin film drug delivery composition, which includes: (a) an edible water-soluble film forming matrix including at least one water-soluble polymer including polyethylene oxide alone or in combination with a hydrophilic cellulosic polymer; and (b) a coated particulate active component uniformly stationed therein, wherein the coating on the particulate active component is a taste-masking and/or controlled-release agent, and wherein the active component is uniformly distributed in the film composition.

Some other embodiments provide a drug delivery vehicle including:

a dry mucoadhering film having a thickness defined by opposed surfaces; the film including:

(i) a water-soluble polymer;

(ii) a pharmaceutically active particle including a pharmaceutically active agent; and a taste-masking agent;

wherein the particle having a particle size of less than about 200 microns and the taste-masking agent being present in amounts of about 15-80% by weight of the particle.

Still other embodiments provide a method of preparing a thin film drug delivery vehicle including:

(a) providing a pharmaceutically active agent/taste-masking agent complex;

(b) combining the complex with a water-soluble polymer and a solvent to form a mixture with uniform distribution of the complex therein;

(c) casting the mixture onto a planar carrier surface to form a thin film on the carrier surface; and

(d) controllably drying the thin film to form a distribution variance of the complex having less than about 10% variance throughout any given area of the thin film.

In still other embodiments, there is provided a method of preparing a thin film drug delivery vehicle having a substantially uniform distribution of components including:

(a) forming a masterbatch pre-mix of an edible water-soluble polymer component and water;

(b) feeding a predetermined amount of the premix to at least one mixer;

US 8,603,514 B2

7

(c) adding to the at least one mixer a predetermined amount of a taste-masked active component including a particulate active component and a taste masking agent coating the particulate active component;

(d) mixing the premix and the taste-masked active component in the at least one mixer to form a uniform matrix;

(e) forming a wet film from the matrix;

(f) rapidly forming a visco-elastic film by applying hot air currents to the bottom side of the wet film with substantially no top air flow; and

(g) drying the visco-elastic film to form a self-supporting edible film.

In yet other embodiments, there is provided a process for making a self-supporting, edible film having a substantially uniform distribution of components including:

(a) forming a premix of an edible water-soluble polymer component containing polyethylene oxide and optionally one or more additional polymers;

(b) blending into the premix a taste-masked active component including a particulate active component coated with a taste masking agent, to form a uniform matrix;

(c) extruding a film from the matrix; and

(d) cooling the film to form a self-supporting edible film.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a side view of a package containing a unit dosage film of the present invention.

FIG. **2** shows a top view of two adjacently coupled packages containing individual unit dosage forms of the present invention, separated by a tearable perforation.

FIG. **3** shows a side view of the adjacently coupled packages of FIG. **2** arranged in a stacked configuration.

FIG. **4** shows a perspective view of a dispenser for dispensing the packaged unit dosage forms, dispenser containing the packaged unit dosage forms in a stacked configuration.

FIG. **5** is a schematic view of a roll of coupled unit dose packages of the present invention.

FIG. **6** is a schematic view of an apparatus suitable for preparation of a pre-mix, addition of an active, and subsequent formation of the film.

FIG. **7** is a schematic view of an apparatus suitable for drying the films of the present invention.

FIG. **8** is a sequential representation of the drying process of the present invention.

FIG. **9** is a photographic representation of a film dried by conventional drying processes.

FIG. **10** is a photographic representation of a film dried by conventional drying processes.

FIG. **11** is a photographic representation of a film dried by conventional drying processes.

FIG. **12** is a photographic representation of a film dried by conventional drying processes.

FIG. **13** is a photographic representation of a film dried by conventional drying processes.

FIG. **14** is a photographic representation of a film dried by conventional drying processes.

FIG. **15** is a photographic representation of a film dried by conventional drying processes.

FIG. **16** is a photographic representation of a film dried by conventional drying processes.

FIG. **17** is a photographic representation of a film dried by the inventive drying process.

FIG. **18** is a photomicrographic representation of a film containing fat coated particles dried by the inventive drying process.

8

FIG. **19** is a photomicrographic representation of a film containing fat coated particles dried by the inventive drying process.

FIG. **20** is a photomicrographic representation of a film containing fat coated particles dried by the inventive drying process.

FIG. **21** is a photomicrographic representation of a film containing fat coated particles dried by the inventive drying process.

FIG. **22** is a photomicrographic representation of a film containing fat coated particles dried by the inventive drying process.

FIG. **23** is a photomicrographic representation of a film containing fat coated particles dried by the inventive drying process.

FIG. **24** is a photomicrographic representation of a film containing fat coated particles dried by the inventive drying process.

FIG. **25** is a photomicrographic representation of a film containing fat coated particles dried by the inventive drying process.

FIG. **26** is a photomicrographic representation of fat coated particles not in film, heated for 9 minutes at 80° C.

FIG. **27** is a photomicrographic representation of fat coated particles not in film, heated for 9 minutes at 80° C.

FIG. **28** is a photomicrographic representation of fat coated particles at room temperature prior to processing.

FIG. **29** is a photomicrographic representation of fat coated particles at room temperature prior to processing.

FIG. **30** is a photomicrographic representation of fat coated particles at room temperature prior to processing.

FIG. **31** is a photomicrographic representation of fat coated particles at room temperature prior to processing.

FIG. **32** is a graphical representation of a microarray on the blood of a human after ingestion by the human of a film of the present invention containing a bovine derived protein.

FIG. **33** is a graphical representation of the temperature differential between the inside and outside of a film of the present invention during drying.

FIG. **34** is a graphical representation of the temperature differential between the inside and outside of a film of the present invention during drying.

FIG. **35** is a schematic representation of a continuously-linked zone drying apparatus in accordance with the present invention.

FIG. **36** is a schematic representation of a separate zone drying apparatus in accordance with the present invention.

FIG. **37** is a schematic representation of a single screw extrusion apparatus for use in producing films of the present invention.

FIG. **38** is a table providing examples of thin film compositions of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

For the purposes of the present invention the term non-self-aggregating uniform heterogeneity refers to the ability of the films of the present invention to provide a substantially reduced occurrence of, i.e. little or no, aggregation or conglomeration of components within the film as is normally experienced when films are formed by conventional drying methods such as a high-temperature air-bath using a drying oven, drying tunnel, vacuum drier, or other such drying equipment. The term heterogeneity, as used in the present invention, includes films that will incorporate a single component, such as a polymer, as well as combinations of components, such as a polymer and an active. Uniform heterogeneity

9

10

includes the substantial absence of aggregates or conglomerates as is common in conventional mixing and heat drying methods used to form films.

Furthermore, the films of the present invention have a substantially uniform thickness, which is also not provided by the use of conventional drying methods used for drying water-based polymer systems. The absence of a uniform thickness detrimentally affects uniformity of component distribution throughout the area of a given film.

The film products of the present invention may be produced by a wet casting method, using a combination of a properly selected polymer and a polar solvent, optionally including an active ingredient as well as other fillers known in the art. In an alternative embodiment, a hot melt extrusion process may be used.

The film products of the present invention contain active agents in taste-masked or controlled-release coated particles uniformly distributed throughout the film. The active agents may be flavors, cooling agents, pharmaceuticals, vitamins, nutraceuticals, or other bioeffecting agents.

The coatings on the taste-masked or controlled-release particles desirably have a protective function, in addition to the taste-masked or controlled-release activity. The coatings desirably are sufficiently physically capable of withstanding the mechanical and thermal forces associated manufacturing processes, such as mixing, casting, rolling, drying, and hot melt extrusion.

Additionally, the coatings desirably do not prematurely release the active agent or substantially expose the active agent to the environment, e.g., solvent or air, such that the active has the potential to hydrolyze, oxidize, or otherwise be deleteriously affected by undesired release from the particle coating. Moreover, maintenance of the physical and chemical integrity of the coating not only preserves the activity of the active agent, but also allows for the coating to perform its taste-masked or controlled-release function when consumed.

In embodiments of this invention employing particulate active agents, whether coated or not, it is important that the particles not release the active agent during manufacture of the film, yet provide suitable release in the stomach or mouth during dosing, or during dissolution testing. Thus, the particles must reside intact during mixing, coating, film forming, and drying steps, so that the particles remain ready to dissolve in the finished film only in an appropriate environment. Accordingly, manufacturing conditions must be balanced with the composition of the particles to provide stability during manufacture, yet appropriate release of drug. Note that by employing daughter mixers **30** and **30′** (see FIG. **6**) in wet casting embodiments of this invention, and not adding active drug to the master batch **22**, there is less concern over stability of the particles during possibly extended periods after the master batch is mixed but prior to film forming operations. With the daughter mixers **30** and **30′**, the active agent or other ingredients that are incompatible with extended hold times in the master batch can be mixed just prior to the film forming operations with only minimal contact with the liquid ingredients prior to film forming. Even so, the particles should be stable in the liquid film forming ingredients for a sufficient period of time to compensate for the time required to form and dry the film after the film forming ingredients leave the daughter mixers. This time period may be as long as 30 minutes.

Similarly, a particular advantage to the extrusion processes of this invention is that solvents are not normally used in the extrusion methods as described herein. Accordingly, there is a greater likelihood that a coated active agent, if present, will be stable during the manufacture. Without a solvent in the film

forming process, there is less likelihood that a coated particle will dissolve and release the active agent prematurely.

Film-Forming Polymers

The polymer may be water soluble, water swellable, water insoluble, or a combination of one or more either water soluble, water swellable or water insoluble polymers. The polymer may include cellulose or a cellulose derivative. Specific examples of useful water soluble polymers include, but are not limited to, polyethylene oxide (PEO), pullulan, hydroxypropylmethyl cellulose (HPMC), hydroxyethyl cellulose (HPC), hydroxypropyl cellulose, polyvinyl pyrrolidone, carboxymethyl cellulose, polyvinyl alcohol, sodium alginate, polyethylene glycol, xanthan gum, tragacanth gum, guar gum, acacia gum, arabic gum, polyacrylic acid, methylmethacrylate copolymer, carboxyvinyl copolymers, starch, gelatin, and combinations thereof. Specific examples of useful water insoluble polymers include, but are not limited to, ethyl cellulose, hydroxypropyl ethyl cellulose, cellulose acetate phthalate, hydroxypropyl methyl cellulose phthalate and combinations thereof.

Polymers for Wet-Cast Films

Polymers for wet-cast films may employ a polar solvent, such as water or alcohol, during the manufacturing process to soften or dissolve the polymeric film forming materials. Preferably, the polymers will be water soluble. As used herein the phrase "water soluble polymer" and variants thereof refer to a polymer that is at least partially soluble in water, and desirably fully or predominantly soluble in water, or absorbs water. Polymers that absorb water are often referred to as being water swellable polymers. The materials useful with the present invention may be water soluble or water swellable at room temperature and other temperatures, such as temperatures exceeding room temperature. Moreover, the materials may be water soluble or water swellable at pressures less than atmospheric pressure. Desirably, the water soluble polymers are water soluble or water swellable having at least 20 percent by weight water uptake. Water swellable polymers having a 25 or greater percent by weight water uptake are also useful. Films or dosage forms of the present invention formed from such water soluble polymers are desirably sufficiently water soluble to be dissolvable upon contact with bodily fluids.

Other polymers useful for incorporation into the films of the present invention include biodegradable polymers, copolymers, block polymers and combinations thereof. Among the known useful polymers or polymer classes which meet the above criteria are: poly(glycolic acid) (PGA), poly (lactic acid) (PLA), polydioxanoes, polyoxalates, poly(α-esters), polyanhydrides, polyacetates, polycaprolactones, poly(orthoesters), polyamino acids, polyaminocarbonates, polyurethanes, polycarbonates, polyamides, poly(alkyl cyanoacrylates), and mixtures and copolymers thereof. Additional useful polymers include, stereopolymers of L- and D-lactic acid, copolymers of bis(p-carboxyphenoxy) propane acid and sebacic acid, sebacic acid copolymers, copolymers of caprolactone, poly(lactic acid)/poly(glycolic acid)/polyethyleneglycol copolymers, copolymers of polyurethane and (poly(lactic acid), copolymers of polyurethane and poly(lactic acid), copolymers of α-amino acids, copolymers of α-amino acids and caproic acid, copolymers of α-benzyl glutamate and polyethylene glycol, copolymers of succinate and poly(glycols), polyphosphazene, polyhydroxy-alkanoates and mixtures thereof. Binary and ternary systems are contemplated.

Other specific polymers useful include those marketed under the Medisorb and Biodel trademarks. The Medisorb materials are marketed by the Dupont Company of Wilmington, Del. and are generically identified as a "lactide/glycolide

US 8,603,514 B2

**11**

co-polymer" containing "propanoic acid, 2-hydroxy-poly-mer with hydroxy-polymer with hydroxyacetic acid." Four such polymers include lactide/glycolide 100 L, believed to be 100% lactide having a melting point within the range of 338°-347° F. (170°-175° C.); lactide/glycolide 100 L, believed to be 100% glycolide having a melting point within the range of 437°-455° F. (225°-235° C.); lactide/glycolide 85/15, believed to be 85% lactide and 15% glycolide with a melting point within the range of 338°-347° F. (170°-175° C.); and lactide/glycolide 50/50, believed to be a copolymer of 50% lactide and 50% glycolide with a melting point within the range of 338°-347° F. (170°-175° C.).

The Biodel materials represent a family of various polyan-hydrides which differ chemically.

Although a variety of different polymers may be used, it is desired to select polymers to provide a desired viscosity of the mixture prior to drying. For example, if the active or other components are not soluble in the selected solvent, a polymer that will provide a greater viscosity is desired to assist in maintaining uniformity. On the other hand, if the components are soluble in the solvent, a polymer that provides a lower viscosity may be preferred.

The polymer plays an important role in affecting the vis-cosity of the film. Viscosity is one property of a liquid that controls the stability of the active in an emulsion, a colloid or a suspension. Generally the viscosity of the matrix will vary from about 400 cps to about 100,000 cps, preferably from about 800 cps to about 60,000 cps, and most preferably from about 1,000 cps to about 40,000 cps. Desirably, the viscosity of the film-forming matrix will rapidly increase upon initia-tion of the drying process.

The viscosity may be adjusted based on the selected active depending on the other components within the matrix. For example, if the component is not soluble within the selected solvent, a proper viscosity may be selected to prevent the component from settling which would adversely affect the uniformity of the resulting film. The viscosity may be adjusted in different ways. To increase viscosity of the film matrix, the polymer may be chosen of a higher molecular weight or crosslinkers may be added, such as salts of calcium, sodium and potassium. The viscosity may also be adjusted by adjusting the temperature or by adding a viscosity increasing component. Components that will increase the viscosity or stabilize the emulsion/suspension include higher molecular weight polymers and polysaccharides and gums, which include without limitation, alginate, carrageenan, hydrox-ypropyl methyl cellulose, locust bean gum, guar gum, xan-than gum, dextran, gum arabic, gellan gum and combinations thereof.

It has also been observed that certain polymers which when used alone would ordinarily require a plasticizer to achieve a flexible film, can be combined without a plasticizer and yet achieve flexible films. For example, HPMC and HPC when used in combination provide a flexible, strong film with the appropriate plasticity and elasticity for manufacturing and storage. No additional plasticizer or polyalcohol is needed for flexibility.

Polymers for Extruded Films

In an alternative embodiment of this invention, hot melt extrusion may be used to form films. For extrusion processes, the polymers must be thermoplastic, meaning the polymers can be melted in a suitable apparatus, blended with other ingredients as desired, and extruded under pressure through an orifice to provide a film.

Among the polymers recited above, polyethylene oxide (PEO), when used alone or in combination with a hydrophilic cellulosic polymer, is particularly suited to hot melt extrusion

**12**

processes, and achieves flexible, strong films. Additional plasticizers or polyalcohols may optionally be included. Non-limiting examples of suitable cellulosic polymers for combi-nation with PEO include HPC and HPMC. PEO and HPC have essentially no gelation temperature, while HPMC has a gelation temperature of 58-64° C. (Methocel EF available from Dow Chemical Co.). Moreover, these films are suffi-ciently flexible even when substantially free of organic sol-vents, which may be removed without compromising film properties. As such, if there is no solvent present, then there is no plasticizer in the films. PEO based films also exhibit good resistance to tearing, little or no curling, and fast dissolution rates when the polymer component contains appropriate lev-els of PEO.

To achieve the desired film properties, the level and/or molecular weight of PEO in the polymer component may be varied. Modifying the PEO content affects properties such as tear resistance, dissolution rate, and adhesion tendencies. Thus, one method for controlling film properties is to modify the PEO content. For instance, in some embodiments rapid dissolving films are desirable. By modifying the content of the polymer component, the desired dissolution characteris-tics can be achieved.

In accordance with the present invention, PEO desirably ranges from about 20% to 100% by weight in the polymer component. In some embodiments, the amount of PEO desir-ably ranges from about 1 mg to about 200 mg.

In some embodiments of the instant invention, a hydro-philic cellulosic polymer such as HPMC may also be used as a water soluble polymer, in from about 0% to about 80% by weight, or in a ratio of up to about 4:1 with the PEO, and desirably in a ratio of about 1:1.

In some embodiments, it may be desirable to vary the PEO levels to promote certain film properties. To obtain films with high tear resistance and fast dissolution rates, levels of about 50% or greater of PEO in the polymer component are desir-able. To achieve adhesion prevention, i.e., preventing the film from adhering to the roof of the mouth, PEO levels of about 20% to 75% are desirable. In some embodiments, however, adhesion to the roof of the mouth may be desired, such as for administration to animals or children. In such cases, higher levels of PEO may be employed. More specifically, structural integrity and dissolution of the film can be controlled such that the film can adhere to mucosa and be readily removed, or adhere more firmly and be difficult to remove, depending on the intended use.

The molecular weight of the PEO may also be varied. High molecular weight PEO, such as about 4 million, may be desired to increase mucoadhesivity of the film. More desir-ably, the molecular weight may range from about 100,000 to 900,000, more desirably from about 100,000 to 600,000, and most desirably from about 100,000 to 300,000. In some embodiments, it may be desirable to combine high molecular weight (600,000 to 900,000) with low molecular weight (100,000 to 300,000) PEOs in the polymer component.

For instance, certain film properties, such as fast dissolu-tion rates and high tear resistance, may be attained by com-bining small amounts of high molecular weight PEOs with larger amounts of lower molecular weight PEOs. Desirably, such compositions contain about 60% or greater levels of the lower molecular weight PEO in the PEO-blend polymer com-ponent.

To balance the properties of adhesion prevention, fast dis-solution rate, and good tear resistance, desirable film compo-sitions may include about 50% to 75% low molecular weight PEO, optionally combined with a small amount of a higher

US 8,603,514 B2

13

molecular weight PEO, with the remainder of the polymer component containing a hydrophilic cellulosic polymer (HPC or HPMC).

Controlled Release Films

The term "controlled release" is intended to mean the release of active at a pre-selected or desired rate. This rate will vary depending upon the application. Desirable rates include fast or immediate release profiles as well as delayed, sustained or sequential release. Combinations of release patterns, such as initial spiked release followed by lower levels of sustained release of active are contemplated. Pulsed drug releases are also contemplated.

The polymers that are chosen for the films of the present invention may also be chosen to allow for controlled disintegration of the active. This may be achieved by providing a substantially water insoluble film that incorporates an active that will be released from the film over time. This may be accomplished by incorporating a variety of different soluble or insoluble polymers and may also include biodegradable polymers in combination. Alternatively, coated controlled-release active particles may be incorporated into a readily soluble film matrix to achieve the controlled-release property of the active inside the digestive system upon consumption.

Films that provide a controlled-release of the active are particularly useful for buccal, gingival, sublingual and vaginal applications. The films of the present invention are particularly useful where mucosal membranes or mucosal fluid is present due to their ability to readily wet and adhere to these areas.

The convenience of administering a single dose of a medication which releases active ingredients in a controlled fashion over an extended period of time as opposed to the administration of a number of single doses at regular intervals has long been recognized in the pharmaceutical arts. The advantage to the patient and clinician in having consistent and uniform blood levels of medication over an extended period of time are likewise recognized. The advantages of a variety of sustained release dosage forms are well known. However, the preparation of a film that provides the controlled-release of an active has advantages in addition to those well-known for controlled-release tablets. For example, thin films are difficult to inadvertently aspirate and provide an increased patient compliance because they need not be swallowed like a tablet. Moreover, certain embodiments of the inventive films are designed to adhere to the buccal cavity and tongue, where they controllably dissolve. Furthermore, thin films may not be crushed in the manner of controlled release tablets which is a problem leading to abuse of drugs such as Oxycontin.

The actives employed in the present invention may be incorporated into the film compositions of the present invention in a controlled release form. For example, particles of drug may be coated with polymers such as ethyl cellulose or polymethacrylate, commercially available under brand names such as Aquacoat ECD and Eudragit E-100, respectively. Solutions of drug may also be absorbed on such polymer materials and incorporated into the inventive film compositions. Other components such as fats and waxes, as well as sweeteners and/or flavors may also be employed in such controlled release compositions.

The actives may be taste-masked prior to incorporation into the film composition, as set forth in PCT Application No. PCT/US02/32594, titled, Uniform Films For Rapid Dissolve Dosage Form Incorporating Taste-Masking Compositions, (based on U.S. Provisional Application No. 60/414,276, Express Mail Label No.: EU552991605 US of the same title, filed Sep. 27, 2003) the entire subject matter of which is

14

incorporated by reference herein. Taste-masking of actives, as disclosed therein, is described in detail herein below.

Particle Formation

The active agents employed in the present invention are incorporated into the film compositions of the present invention in a taste-masked or controlled-release form. Taste-masking is useful to avoid unpleasant taste effects, such as bitterness, often associated with the active agents such as pharmaceuticals. In this embodiment, particles of drug may be coated with taste-masking agents, for example polymers, oils, or waxes. Additionally, organoleptic agents, such as, but not limited to sweeteners and/or flavors, may also be employed in such taste-masked compositions, including in the coating layer of the taste masking agent. In alternative embodiments, the particle coatings impart controlled-release, delayed-release, or sustained-release characteristics, delaying the release of active agent from the particle in the mouth or gut of the consumer.

The taste-masked or controlled-release particles may be any useful organoleptic agent, cosmetic agent, pharmaceutical agent, or combinations thereof.

Useful organoleptic agents include flavors and sweeteners. Useful cosmetic agents include breath freshening or decongestant agents, such as menthol, including menthol crystals.

Compositions employing particulate active agents incorporated into films with taste-masked coatings are disclosed in PCT application WO 2003/030883, titled "Uniform Films For Rapid Dissolve Dosage Form Incorporating Taste-Masking Compositions," the entire subject matter of which is incorporated by reference herein. As used in this application, any reference to taste-masking by coating particulate active agents should also be understood to encompass controlled-release coatings of particulate active agents.

An important consideration for the film based drug delivery compositions involving a controlled-release or taste-mask particle technology is that the drug containing particles remain chemically stable and do not release the active drug during the mixing and film forming operations of the manufacturing process. Accordingly, with respect to films formed by a wet casting method, the controlled-release or taste-mask particle compositions should be sufficiently stable in the mixer prior to the film forming steps, and the casting and drying steps, so that the particles remain intact in the finished product. In the hot melt extrusion film manufacturing process, the particles must be stable in the extrusion apparatus and any subsequent steps, so that the particles remain intact in the finished product.

In one embodiment, the taste-masking or controlled-release agent is a thin film coating over a particulate bioeffecting agent. Useful coatings in this embodiment include polymeric and non-polymeric materials.

Non-limiting examples of polymers include acrylic polymers, cellulosic polymers or vinyl polymers. Non-limiting examples of non-polymeric materials include crown ethers, fully hydrogenated oils and waxes. Moreover, the taste masking agents may be water soluble, water insoluble or partially water soluble.

For example, the coating material may be carboxymethyl cellulose; methyl cellulose; ethyl cellulose; hydroxyl methyl cellulose; hydroxyethyl cellulose; hydroxypropyl cellulose; hydroxypropylmethyl cellulose; hydroxymethylpropyl cellulose; gum arabic; xanthan gum; tragacanth; acacia; carageenan; guar gum; locust bean gum; pectin; alginates; gelatinized, modified or unmodified starch, including tapioca starch, rice starch, corn starch, potato starch, and wheat starch; polyvinyl alcohol; polyacrylic acid; polyvinyl pyrrolidone; poly(meth)acrylate; poly(meth)copolymers; dextrin;

US 8,603,514 B2

15

dextran; proteins, such as, gelatin, zein, gluten, soy protein, soy protein isolate, and whey protein; whey protein isolate; casein; levin; collagen; chitin; chitosin; polydextrose and combinations thereof.

Useful acrylic polymers include those available under the trade name Eudragit® from Röhm America, LLC, such as methacrylic acid co-polymers sold under the trade names Eudragit E®, Eudragit L®, Eudragit RD® and Eudragit S®, and polyethylacrylate-methylmethacrylate sold under the trade name, Eudragit NE®. These acrylic polymers are generally water soluble materials.

Useful cellulosic polymers include alkylcelluloses such as methyl or ethyl cellulose, and hydroxyalkylcelluloses, such as hydroxylmethyl cellulose, hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxymethylpropyl cellulose, and combinations thereof. Useful alkylcelluloses include those sold under the trade names Methocel E™ by Dow Chemicals. Additionally, useful ethylcelluloses are commercially available commercially available from FMC Corporation under brand name Aquacoat ECD. These polymers are generally water soluble materials.

Moreover, the pharmaceutically active agents may be sprayed and congealed with fully hydrogenated oils or waxes considered safe for human consumption and are relatively stable. Useful, but non-limiting, pharmaceutically acceptable oils include mineral oil, peanut oil, soybean oil, sunflower oil, corn oil, olive oil, hard palm oil and rapeseed oil.

Furthermore, crown ether compounds, such as cyclodextrins, are also useful for coating the pharmaceutically active agents. The pharmaceutically active agents are taste masked with crown ethers through entrapment or coaccervation methods. Useful cyclodextrins are commercially available under the trade name of Trappsol® from CTD, Inc.

In some embodiments, the aforementioned polymeric coatings that affect taste masking may be desirable over complexation with ion exchange resins, as has been disclosed in, for example, European Patent No. EP1267829 B1, because of the high drug loadings that are possible with the polymeric coatings as compared to complexation with ion exchange resins. Despite allegations to the contrary, we have found the highest useful drug loading on an ion exchange resin is about 30% by weight. By contrast, the particle coating of this invention can be used with 50-95% drug loading, meaning that a taste-masked particle can contain up to about 95% by weight active and as little as 5% by weight taste-masking polymer. This is a substantially greater drug loading than known ion exchange resins, and very important given the limited size and weight of a film dosage unit, in which maximizing drug loading into a uniform film is an important consideration.

In some embodiments, the taste-masking or control-release agent may be present in the amount of about 5-80% by weight of the particle. In another embodiment, the taste-masking agent is present in the amount of about 5-60% by weight of the particle. In yet another embodiment, the taste-masking agent is present in the amount of about 25-35% by weight of the particle. The precise loading of drug in the taste-mask coated particle is a function of many parameters, including the drug, the coating, and any flavors present in the particle or the film forming matrix.

Pharmaceutically active agents may be taste-masked with the above-described taste-masking agents by a variety of techniques. The techniques coat the pharmaceutically active agents or portions of the pharmaceutically active agents with taste-masking agents to avoid unpleasant taste effects, such as bitterness, often associated with the pharmaceutically active agents or drugs. Useful coating techniques include, but are not limited to, fluidized bed coating, spray congealing coat-

16

ing, agglomeration or granulation coating, entrapment coating, coaccervation coating, infusion coating, spin coating, ion exchange coating and the like.

The fluidized bed coating method is commonly used in pharmaceutical industries for taste masking pharmaceutically active agents. Fluidized bed coaters achieve fluidization of the pharmaceutically active agents by introducing a continuous stream of process gas into a chamber. The coating material is deposited onto the suspended agent as it passes through the spray path of the coating material. The coated agent is dried. A relative low water solubility polymer is typically used to coat the active particles' surface. Minimum limits on particle sizes are about 100 to 120 microns. Smaller particle sizes are difficult to achieve due to process limitation and product loss. Water insoluble pharmaceutically active agents may be suitable coated with water soluble taste masking agents with this method.

In the spray congealing method both the pharmaceutically active agents and the coating materials are sprayed simultaneously into a chamber supplied with process gas to create a uniformly coated active. This method typically involves the coating of the actives with material that could be melted at reasonable temperatures, for example fatty materials or polymers such as certain Eudragit® polymers. The mix of materials are sprayed through a fine nozzle and cooled through a temperature-control air stream or a cold surface. Consideration of mixture temperature is important. The melting temperature of the coating agent selected should not exceed a degradation temperature of the pharmaceutically active agent.

In the agglomeration or granulation method, the pharmaceutically active agents are mixed with the taste-masking agents and a solvent by mechanical means or by spray drying. The solvent is gradually removed by vacuum or heating, or both. Particles are then agglomerated. The agglomerated particles are not typically coated entirely with the taste masking agent and some bitterness may result accordingly. The bitterness, however, may be further reduced by incorporating such coated particles in the films of the present invention.

In typical entrapment coating methods, certain compounds having specific properties that can trap pharmaceutically active agents into its molecule cages must first be selected. Compounds, like certain specifically made starches and crown ether type molecules, such as cyclodextrins and zeolites, are useful with this method. The compounds and the agents are entrapped by ionic attraction. The entrapped agents are then precipitated from solution.

The coaccervation coating method uses two polymers with opposite charges in solution. When the solution is neutralized an insoluble matrix will precipitate from solution and trap the pharmaceutically active agents therein. Examples include interactions of gum arabic and gelatin solutions and interactions of cyclodextrins and protein solutions.

In the infusion method pharmaceutically active agents and flavors or sweeteners are dissolved and infused into a polymer matrix to form a dry powder. In spin coating methods, pharmaceutically active agents are combined with sugars or fats and spun into coated particles. Details of the method are disclosed in U.S. Pat. No. 5,028,632, the contents of which is incorporated herein by reference. In ion exchange coating, ionic bonding of pharmaceutically active agents to ion exchange resins masks the tastes of the agents.

Extrusion and spheronization methods may also be used for taste-masking pharmaceutically active particulates. Ratios of active(s) and polymer(s) (such as, starch, cellulose, gum and/or combinations thereof) are first mixed and thicken by adding a small amount of water. The thickened mixture is

US 8,603,514 B2

17

then extruded through a single or double nozzle screw. Small spherical particles are formed by a Marumerization® process. Desirable particle sizes are obtained through process control and particulate sieving.

Lyophilization (Freeze-Drying) methods may also be used with the practice of the present invention A combination of polymer(s) (such as, starch, gum, cellulose and/or combinations thereof) with active(s) are mixed and dissolved (or dispersed) in aqueous medium. This mixture is then freeze-dried on a pre-form substrate. Desirable particles sizes can be obtained by process control and product sieving.

In some instances, taste-masking may amount to the addition of two components together, neither of which are particularly pleasing to the taste, but which, due to their chemical makeup, counteract each other or allow for a third substance or more of one of the substances to be added without a concomitant reduction in pleasantness of the taste.

The edible water-soluble delivery system of the present invention further includes one or more members selected from antifoaming agents, plasticizing agents, surfactants, emulsifying agents, thickening agents, binding agents, cooling agents, saliva-stimulating agents, sweetening agents, antimicrobial agents, antigens and combinations thereof.

The particles used in the present invention desirably have a particle size of less than about 200 microns and the taste-masking agent is present in amounts of about 15-80% by weight of the particle. A particle size of about 150 microns or less is also useful. Desirably, the particle size of the particle is about 100 microns or less. Desirably, the thickness of the film is less than about 380 microns, for example, less than about 250 microns. Furthermore, the taste-masking agent may be present in the amount of about 20-60% by weight of the particle. Desirably, the taste-masking agent is present in the amount of about 25-35% by weight of the particle.

In some embodiments, the particulate bioeffecting agent coated with a taste-masking or controlled-release polymer may have a particle size of between 50 to 250 microns. Desirably, the size of the combined particulate and taste-masking agent have a particle size of 150 microns or less, for example 100 microns or less. Particle sizes less than 50 microns may be unsuitable in some embodiments because it is inefficient to coat such small particles due to the large surface area.

Particle sizes of greater than 250 microns may be unsuitable in some embodiments because the larger particles can "bridge" during the film forming process, meaning that the particle can extend from the bottom surface to the top surface of the film, or even protrude beyond the surface of the film. Such bridging may cause streaking and non-uniformity of the finished film. Any protruding particles also may be subject to environmental stresses and premature decomposition, leading to non-uniformity of dosing.

The aforementioned particles may be spherical, substantially spherical, or non-spherical, such as irregularly shaped particles or ellipsoidally shaped particles. Ellipsoidally shaped particles or ellipsoids are especially desirable because of their ability to maintain uniformity in the film forming matrix as they tend to settle to a lesser degree as compared to spherical particles.

When an active agent is present in the film, the amount of active per unit area is determined by the uniform distribution of the film. For example, when the films are cut into individual dosage forms, the amount of the active in the dosage form can be known with a great deal of accuracy. This is achieved because the amount of the active in a given area is substantially identical to the amount of active in an area of the same

18

dimensions in another part of the film. The accuracy in dosage is particularly advantageous when the active is a medicament, i.e., a drug.

The uniformity is determined by the presence of no more than a 10% by weight of drug variance throughout the matrix. Desirably, the drug variance is less than 5% by weight, less than 2% by weight, less than 1% by weight, or less than 0.5% by weight. Moreover, the particulates have a particle size of 200 microns or less. Furthermore, the film matrix desirably has a thickness of less than about 380 microns.

Active Agents

The active components that may be incorporated into the films of the present invention include, without limitation, pharmaceutical and cosmetic actives, drugs, medicaments, proteins, antigens or allergens such as ragweed pollen, spores, microorganisms, seeds, mouthwash components, flavors, fragrances, enzymes, preservatives, sweetening agents, colorants, spices, vitamins and combinations thereof.

Drugs

A wide variety of medicaments, bioactive active substances and pharmaceutical compositions may be included in the dosage forms of the present invention. Examples of useful drugs include ace-inhibitors, antianginal drugs, anti-arrhythmias, anti-asthmatics, anti-cholesterolemics, analgesics, anesthetics, anti-convulsants, anti-depressants, anti-diabetic agents, anti-diarrhea preparations, antidotes, anti-histamines, anti-hypertensive drugs, anti-inflammatory agents, anti-lipid agents, anti-manics, anti-nauseants, anti-stroke agents, anti-thyroid preparations, anti-tumor drugs, anti-viral agents, acne drugs, alkaloids, amino acid preparations, anti-tussives, anti-uricemic drugs, anti-viral drugs, anabolic preparations, systemic and non-systemic anti-infective agents, anti-neoplastics, anti-parkinsonian agents, anti-rheumatic agents, appetite stimulants, biological response modifiers, blood modifiers, bone metabolism regulators, cardiovascular agents, central nervous system stimulates, cholinesterase inhibitors, contraceptives, decongestants, dietary supplements, dopamine receptor agonists, endometriosis management agents, enzymes, erectile dysfunction therapies, fertility agents, gastrointestinal agents, homeopathic remedies, hormones, hypercalcemia and hypocalcemia management agents, immunomodulators, immunosuppressives, migraine preparations, motion sickness treatments, muscle relaxants, obesity management agents, osteoporosis preparations, oxytocics, parasympatholytics, parasympathomimetics, prostaglandins, psychotherapeutic agents, respiratory agents, sedatives, smoking cessation aids, sympatholytics, tremor preparations, urinary tract agents, vasodilators, laxatives, antacids, ion exchange resins, anti-pyretics, appetite suppressants, expectorants, anti-anxiety agents, anti-ulcer agents, anti-inflammatory substances, coronary dilators, cerebral dilators, peripheral vasodilators, psycho-tropics, stimulants, anti-hypertensive drugs, vasoconstrictors, migraine treatments, antibiotics, tranquilizers, anti-psychotics, anti-tumor drugs, anti-coagulants, anti-thrombotic drugs, hypnotics, anti-emetics, anti-nauseants, anti-convulsants, neuromuscular drugs, hyper- and hypo-glycemic agents, thyroid and anti-thyroid preparations, diuretics, anti-spasmodics, terine relaxants, anti-obesity drugs, erythropoietic drugs, anti-asthmatics, cough suppressants, mucolytics, DNA and genetic modifying drugs, and combinations thereof.

Examples of medicating active ingredients contemplated for use in the present invention include antacids, $H_2$-antagonists, and analgesics. For example, antacid dosages can be prepared using the ingredients calcium carbonate alone or in

**19**

combination with magnesium hydroxide, and/or aluminum hydroxide. Moreover, antacids can be used in combination with $H_2$-antagonists.

Analgesics include opiates and opiate derivatives, such as oxycodone (available as Oxycontin®), ibuprofen, aspirin, acetaminophen, and combinations thereof that may optionally include caffeine.

Other preferred drugs for other preferred active ingredients for use in the present invention include anti-diarrheals such as immodium AD, anti-histamines, anti-tussives, deconges- tants, vitamins, and breath fresheners. Common drugs used alone or in combination for colds, pain, fever, cough, congestion, runny nose and allergies, such as acetaminophen, chlorpheniramine maleate, dextromethorphan, pseudoephedrine HCl and diphenhydramine may be included in the film compositions of the present invention.

Also contemplated for use herein are anxiolytics such as alprazolam (available as Xanax®); anti-psychotics such as clozopin (available as Clozaril®) and haloperidol (available as Haldol®); non-steroidal anti-inflammatories (NSAID's) such as dicyclofenacs (available as Voltaren®) and etodolac (available as Lodine®), anti-histamines such as loratadine (available as Claritin®), astemizole (available as Hismanal™), nabumetone (available as Relafen®), and Clemastine (available as Tavist®); anti-emetics such as granisetron hydrochloride (available as Kytril®) and nabilone (available as Cesamet™); bronchodilators such as Bentolin®, albuterol sulfate (available as Proventil®); anti-depressants such as fluoxetine hydrochloride (available as Prozac®), sertraline hydrochloride (available as Zoloft®), and paroxtine hydro- chloride (available as Paxil®); anti-migraines such as Imigra®, ACE-inhibitors such as enalaprilat (available as Vasotec®), captopril (available as Capoten®) and lisinopril (available as Zestril®); anti-Alzheimer's agents, such as nicergoline; and $Ca^{++}$-antagonists such as nifedipine (available as Procardia® and Adalat®), and verapamil hydrochloride (available as Calan®).

Erectile dysfunction therapies include, but are not limited to, drugs for facilitating blood flow to the penis, and for effecting autonomic nervous activities, such as increasing parasympathetic (cholinergic) and decreasing sympathetic (adrenersic) activities. Useful non-limiting drugs include sildenafils, such as Viagra®, tadalafils, such as Clalis®, vardenafils, apomorphines, such as Uprima®, yohimbine hydrochlorides such as Aphrodyne®, and alprostadils such as Caverject®.

The popular $H_2$-antagonists which are contemplated for use in the present invention include cimetidine, ranitidine hydrochloride, famotidine, nizatidien, ebrotidine, mifentidine, roxatidine, pisatidine and aceroxatidine.

Active antacid ingredients include, but are not limited to, the following: aluminum hydroxide, dihydroxyaluminum aminoacetate, aminoacetic acid, aluminum phosphate, dihydroxyaluminum sodium carbonate, bicarbonate, bismuth aluminate, bismuth carbonate, bismuth subcarbonate, bismuth subgallate, bismuth subnitrate, bismuth subsilysilate, calcium carbonate, calcium phosphate, citrate ion (acid or salt), amino acetic acid, hydrate magnesium aluminate sulfate, magaldrate, magnesium aluminosilicate, magnesium carbonate, magnesium glycinate, magnesium hydroxide, magnesium oxide, magnesium trisilicate, milk solids, aluminum mono-ordibasic calcium phosphate, tricalcium phosphate, potassium bicarbonate, sodium tartrate, sodium bicarbonate, magnesium aluminosilicates, tartaric acids and salts.

Anti-inflammatory agents include steroidal anti-inflammatory drugs, such as cortisone, triamcinalone, prednisone, prednisolone, and the like.

**20**

Other Actives

The pharmaceutically active agents employed in the present invention may include allergens or antigens, such as, but not limited to, plant pollens from grasses, trees, or ragweed; animal danders, which are tiny scales shed from the skin and hair of cats and other furred animals; insects, such as house dust mites, bees, and wasps; and drugs, such as penicillin.

An anti-oxidant may also be added to the film to prevent the degradation of an active, especially where the active is photosensitive.

Cosmetic active agents may include breath freshening compounds like menthol, other flavors or fragrances, especially those used for oral hygiene, as well as actives used in dental and oral cleansing such as quaternary ammonium bases. The effect of flavors may be enhanced using flavor enhancers like tartaric acid, citric acid, vanillin, or the like.

Dosages

The film products of the present invention are capable of accommodating a wide range of amounts of the active ingredient. The films are capable of providing an accurate dosage amount (determined by the size of the film and concentration of the active in the original polymer/water combination) regardless of whether the required dosage is high or extremely low. Therefore, depending on the type of active or pharmaceutical composition that is incorporated into the film, the active amount may be as high as about 300 mg, desirably up to about 150 mg or as low as the microgram range, or any amount therebetween.

The film products and methods of the present invention are well suited for high potency, low dosage drugs. This is accomplished through the high degree of uniformity of the films. Therefore, low dosage drugs, particularly more potent racemic mixtures of actives are desirable.

Flavors

Flavors may be chosen from natural and synthetic flavoring liquids. An illustrative list of such agents includes volatile oils, synthetic flavor oils, flavoring aromatics, oils, liquids, oleoresins or extracts derived from plants, leaves, flowers, fruits, stems and combinations thereof. A non-limiting representative list of examples includes mint oils, cocoa, and citrus oils such as lemon, orange, grape, lime and grapefruit and fruit essences including apple, pear, peach, grape, strawberry, raspberry, cherry, plum, pineapple, apricot or other fruit flavors.

Useful flavors or flavoring agents include natural and artificial flavors. These flavorings may be chosen from synthetic flavor oils and flavoring aromatics, and/or oils, oleo resins and extracts derived from plants, leaves, flowers, fruits and so forth, and combinations thereof. Non-limiting flavor oils include: spearmint oil, cinnamon oil, peppermint oil, clove oil, bay oil, thyme oil, cedar leaf oil, oil of nutmeg, oil of sage, and oil of bitter almonds. Also useful are artificial, natural or synthetic fruit flavors such as vanilla, chocolate, coffee, cocoa and citrus oil, including lemon, orange, grape, lime and grapefruit, and fruit essences including apple, pear, peach, strawberry, raspberry, cherry, plum, pineapple, apricot and the like. These flavorings can be used individually or in combination. Commonly used flavors include mints such as peppermint, artificial vanilla, cinnamon derivatives, and various fruit flavors, whether employed individually or in combination. Flavorings such as aldehydes and esters including cinnamylacetate, cinnamaldehyde, citral, diethylacetal, dihydrocarvyl acetate, eugenyl formate, p-methylanisole, and the like may also be used. Further examples of aldehyde flavorings include, but are not limited to acetaldehyde (apple); benzaldehyde (cherry, almond); cinnamicaldehyde (cinna-

US 8,603,514 B2

21

mon); citral, i.e., alpha citral (lemon, lime); neral, i.e. beta
citral (lemon, lime); decanal (orange, lemon); ethyl vanillin
(vanilla, cream); heliotropine, i.e., piperonal (vanilla, cream);
vanillin (vanilla, cream); alpha-amyl cinnamaldehyde (spicy
fruity flavors); butyraldehyde (butter, cheese); valeraldehyde
(butter, cheese); citronellal (modifies, many types); decanal
(citrus fruits); aldehyde C-8 (citrus fruits); aldehyde C-9 (cit-
rus fruits); aldehyde C-12 (citrus fruits); 2-ethyl butyralde-
hyde (berry fruits); hexenal, i.e. trans-2 (berry fruits); tolyl
aldehyde (cherry, almond); veratraldehyde (vanilla); 12,6-
dimethyl-5-heptenal, i.e. melonal (melon); 2 dimethyloctanal
(greenfruit); and 2-dodecenal (citrus, mandarin); cherry;
grape; mixtures thereof; and the like.

Other useful flavorings include aldehydes and esters such
as benzaldehyde (cherry, almond), citral i.e., alphacitral
(lemon, lime), neral, i.e., beta-citral (lemon, lime), decanal
(orange, lemon), aldehyde C-8 (citrus fruits), aldehyde C-9
(citrus fruits), aldehyde C-12 (citrus fruits), tolyl aldehyde
(cherry, almond), 2,6-dimethyloctanol (green fruit), and
2-dodecenal (citrus, mandarin), combinations thereof and the
like.

The amount of flavoring employed is normally a matter of
preference, subject to such factors as flavor type, individual
flavor, and strength desired. The amount may be varied in
order to obtain the result desired in the final product. Such
variations are within the capabilities of those skilled in the art
without the need for undue experimentation. In general,
amounts of about 0.1 to about 30 wt % are useful with the
practice of the present invention.

Sweeteners

Suitable sweeteners include both natural and artificial
sweeteners. Non-limiting examples of suitable sweeteners
include, e.g.:

water-soluble sweetening agents such as monosaccha-
rides, disaccharides and polysaccharides such as xylose,
ribose, glucose (dextrose), mannose, galactose, fructose (le-
vulose), sucrose (sugar), high fructose corn syrup, maltose,
invert sugar (a mixture of fructose and glucose derived from
sucrose), partially hydrolyzed starch, corn syrup solids, and
dihydrochalcones;

water-soluble artificial sweeteners such as the soluble sac-
charin salts, i.e., sodium or calcium saccharin salts, cyclamate
salts, the sodium, ammonium or calcium salt of 3,4-dihydro-
6-methyl-1,2,3-oxathiazine-4-one-2,2-dioxide,   the   potas-
sium salt of 3,4-dihydro-6-methyl-1,2,3-oxathiazine-4-one-
2,2-dioxide (acesulfame-K), the free acid form of saccharin
and the like;

dipeptide based sweeteners, such as L-aspartic acid
derived sweeteners, such as L-aspartyl-L-phenylalanine
methyl ester (aspartame), L-alpha-aspartyl-N-(2,2,4,4-tet-
ramethyl-3-thietanyl)-D-alaninamide hydrate, methyl esters
of L-aspartyl-L-phenylglycerin and L-aspartyl-L-2,5,dihy-
drophenylglycine, L-aspartyl-2,5-dihydro-L-phenylalanine,
L-aspartyl-L-(1-cyclohexyen)-alanine, and the like;

water-soluble sweeteners derived from naturally occurring
water-soluble sweeteners, such as a chlorinated derivatives of
ordinary sugar (sucrose), known, for example, as sucralose;
and

protein based sweeteners such as thaurnatoccous danielli
(Thaurnatin I and II).

naturally occurring high intensity sweeteners, such as Lo
Han Kuo, stevia, steviosides, monellin, and glycyrrhizin.

In general, an effective amount of auxiliary sweetener is
utilized to provide the level of sweetness desired for a par-
ticular composition, and this amount will vary with the sweet-
ener selected. This amount will normally be 0.01% to about
10% by weight of the composition. These amounts may be

22

used to achieve a desired level of sweetness independent from
the flavor level achieved from any optional flavor oils used. Of
course, sweeteners need not be added to films intended for
non-oral administration.

Colors

Color additives useful in this invention include food, drug
and cosmetic colors (FD&C), drug and cosmetic colors
(D&C), or external drug and cosmetic colors (Ext. D&C).
These colors are dyes, their corresponding lakes, and certain
natural and derived colorants. Lakes are dyes absorbed on
aluminum hydroxide.

Other examples of coloring agents include known azo
dyes, organic or inorganic pigments, or coloring agents of
natural origin. Inorganic pigments are preferred, such as the
oxides or iron or titanium, these oxides, being added in con-
centrations ranging from about 0.001 to about 10%, and pref-
erably about 0.5 to about 3%, based on the weight of all the
components.

Film Forming Processes

The films of the present invention may be formed by sev-
eral different techniques known in the art of forming films, for
example, wet casting, or hot melt extrusion methods.

Desirably, the thickness of the film is less than about 380
microns, for example, less than about 250 microns.

Wet-Cast Films

In the wet casting processes, the films may have a non-self-
aggregating uniform heterogeneity of the components within
them by utilizing a selected casting, deposition, or extrusion
film forming method and a controlled drying process.
Examples of controlled drying processes include, but are not
limited to, the use of the apparatus disclosed in U.S. Pat. No.
4,631,837 to Magoon ("Magoon"), herein incorporated by
reference, as well as hot air impingement across the bottom
substrate and bottom heating plates. Another drying tech-
nique for obtaining the films of the present invention is con-
trolled radiation drying, in the absence of uncontrolled air
currents, such as infrared and radio frequency radiation (i.e.
microwaves).

The objective of the drying process is to provide a method
of drying the films that avoids complications, such as the
noted "rippling" effect, that are associated with conventional
drying methods and which initially dry the upper surface of
the film, trapping moisture inside. In conventional oven dry-
ing methods, as the moisture trapped inside subsequently
evaporates, the top surface is altered by being ripped open and
then reformed. These complications are avoided by the
present invention, and a uniform film is provided by drying
the bottom surface of the film first or otherwise preventing the
formation of polymer film formation (skin) on the top surface
of the film prior to drying the depth of the film. This may be
achieved by applying heat to the bottom surface of the film
with substantially no top air flow, or alternatively by the
introduction of controlled microwaves to evaporate the water
or other polar solvent within the film, again with substantially
no top air flow. Yet alternatively, drying may be achieved by
using balanced fluid flow, such as balanced air flow, where the
bottom and top air flows are controlled to provide a uniform
film. In such a case, the air flow directed at the top of the film
should not create a condition which would cause movement
of particles present in the wet film, due to forces generated by
the air currents. Additionally, air currents directed at the bot-
tom of the film should desirably be controlled such that the
films do not lift up due to forces from the air. Uncontrolled
air currents, either above or below the film, can create non-
uniformity in the final film products. The humidity level of the

US 8,603,514 B2

23

area surrounding the top surface may also be appropriately adjusted to prevent premature closure or skinning of the polymer surface.

This manner of drying the films provides several advantages. Among these are the faster drying times and a more uniform surface of the film, as well as uniform distribution of components for any given area in the film. In addition, the faster drying time allows viscosity to quickly build within the film, further encouraging a uniform distribution of components and decrease in aggregation of components in the final film product. Desirably, the drying of the film will occur within about ten minutes or fewer, or more desirably within about five minutes or fewer.

The present invention yields exceptionally uniform film products when attention is paid to reducing the aggregation of the compositional components. By avoiding the introduction of and eliminating excessive air in the mixing process, selecting polymers and solvents to provide a controllable viscosity and by drying the film in a rapid manner from the bottom up, such films result.

The products and processes of the present invention rely on the interaction among various steps of the production of the films in order to provide films that substantially reduce the self-aggregation of the components within the films. Specifically, these steps include the particular method used to form the film, making the composition mixture to prevent air bubble inclusions, controlling the viscosity of the film forming composition and the method of drying the film. More particularly, a greater viscosity of components in the mixture is particularly useful when the active is not soluble in the selected polar solvent in order to prevent the active from settling out. However, the viscosity must not be too great as to hinder or prevent the chosen method of casting, which desirably includes reverse roll coating due to its ability to provide a film of substantially consistent thickness.

In addition to the viscosity of the film or film-forming components or matrix, there are other considerations taken into account by the present invention for achieving desirable film uniformity. For example, stable suspensions are achieved which prevent solid (such as drug particles) sedimentation in non-colloidal applications. One approach provided by the present invention is to balance the density of the particulate ($\rho_p$) and the liquid phase ($\rho_l$) and increase the viscosity of the liquid phase ($\mu$). For an isolated particle, Stokes law relates the terminal settling velocity (Vo) of a rigid spherical body of radius (r) in a viscous fluid, as follows:

$$V_o = (2gr^2)(\rho_p - \rho_l)/9\mu$$

At high particle concentrations, however, the local particle concentration will affect the local viscosity and density. The viscosity of the suspension is a strong function of solids volume fraction, and particle-particle and particle-liquid interactions will further hinder settling velocity.

Stokian analyses have shown that the incorporation of a third phase, dispersed air or nitrogen, for example, promotes suspension stability. Further, increasing the number of particles leads to a hindered settling effect based on the solids volume fraction. In dilute particle suspensions, the rate of sedimentation, v, can be expressed as:

$$v/V_o = 1/(1 + \kappa\phi)$$

where $\kappa$=a constant, and $\phi$ is the volume fraction of the dispersed phase. More particles suspended in the liquid phase results in decreased velocity. Particle geometry is also an important factor since the particle dimensions will affect particle-particle flow interactions.

24

Similarly, the viscosity of the suspension is dependent on the volume fraction of dispersed solids. For dilute suspensions of non-interaction spherical particles, an expression for the suspension viscosity can be expressed as:

$$\mu/\mu_o = 1 + 2.5\phi$$

where $\mu_o$ is the viscosity of the continuous phase and $\phi$ is the solids volume fraction. At higher volume fractions, the viscosity of the dispersion can be expressed as

$$\mu/\mu_o = 1 + 2.5\phi + C_1\phi^2 + C_2\phi^3 + \dots$$

where $C$ is a constant.

The viscosity of the liquid phase is critical and is desirably modified by customizing the liquid composition to a viscoelastic non-Newtonian fluid with low yield stress values. This is the equivalent of producing a high viscosity continuous phase at rest. Formation of a viscoelastic or a highly structured fluid phase provides additional resistive forces to particle sedimentation. Further, flocculation or aggregation can be controlled minimizing particle-particle interactions. The net effect would be the preservation of a homogeneous dispersed phase.

The addition of hydrocolloids to the aqueous phase of the suspension increases viscosity, may produce viscoelasticity and can impart stability depending on the type of hydrocolloid, its concentration and the particle composition, geometry, size, and volume fraction. The particle size distribution of the dispersed phase needs to be controlled by selecting the smallest realistic particle size in the high viscosity medium, i.e., <500 μm. The presence of a slight yield stress or elastic body at low shear rates may also induce permanent stability regardless of the apparent viscosity. The critical particle diameter can be calculated from the yield stress values. In the case of isolated spherical particles, the maximum shear stress developed in settling through a medium of given viscosity can be given as

$$\tau_{max} = 3V\mu/2r$$

For pseudoplastic fluids, the viscosity in this shear stress regime may well be the zero shear rate viscosity at the Newtonian plateau.

A stable suspension is an important characteristic for the manufacture of a pre-mix composition which is to be fed into the film casting machinery film, as well as the maintenance of this stability in the wet film stage until sufficient drying has occurred to lock-in the particles and matrix into a sufficiently solid form such that uniformity is maintained. For viscoelastic fluid systems, a rheology that yields stable suspensions for extended time period, such as 24 hours, must be balanced with the requirements of high-speed film casting operations. A desirable property for the films is shear thinning or pseudoplasticity, whereby the viscosity decreases with increasing shear rate. Time dependent shear effects such as thixotropy are also advantageous. Structural recovery and shear thinning behavior are important properties, as is the ability for the film to self-level as it is formed.

The rheology requirements for the inventive compositions and films are quite severe. This is due to the need to produce a stable suspension of particles, for example 30-60 wt %, in a viscoelastic fluid matrix with acceptable viscosity values throughout a broad shear rate range. During mixing, pumping, and film casting, shear rates in the range of $10\text{-}10^5$ sec.$^{-1}$ may be experienced and pseudoplasticity is the preferred embodiment.

In film casting or coating, rheology is also a defining factor with respect to the ability to form films with the desired uniformity. Shear viscosity, extensional viscosity, viscoelas-

US 8,603,514 B2

25

ticity, structural recovery will influence the quality of the film. As an illustrative example, the leveling of shear-thinning pseudoplastic fluids has been derived as

$$\alpha^{(n-1/n)} \approx \alpha_0^{(n-1/n)} - ((n-1)/(2n-1)) \\ (\pi/K)^{1/n}(2\pi/\lambda)^{(3+n)/n} t^{(2n+1)/n}$$

where $\alpha$ is the surface wave amplitude, $\alpha_o$ is the initial amplitude, $\lambda$ is the wavelength of the surface roughness, and both "n" and "K" are viscosity power law indices. In this example, leveling behavior is related to viscosity, increasing as n decreases, and decreasing with increasing K.

Desirably, the films or film-forming compositions of the present invention have a very rapid structural recovery, i.e. as the film is formed during processing, it doesn't fall apart or become discontinuous in its structure and compositional uniformity. Such very rapid structural recovery retards particle settling and sedimentation. Moreover, the films or film-forming compositions of the present invention are desirably shear-thinning pseudoplastic fluids. Such fluids with consideration of properties, such as viscosity and elasticity, promote thin film formation and uniformity.

Wet-Cast Film Forming Methods

The film products are generally formed by combining a properly selected polymer and polar solvent, as well as any active ingredient or filler as desired. Desirably, the solvent content of the combination is at least about 30% by weight of the total combination. The matrix formed by this combination is formed into a film, desirably by roll coating, and then dried, desirably by a rapid and controlled drying process to maintain the uniformity of the film, more specifically, a non-self-aggregating uniform heterogeneity. The resulting film will desirably contain less than about 10% by weight solvent, more desirably less than about 8% by weight, even more desirably less than about 6% by weight solvent and most desirably less than about 2%. The solvent may be water, a polar organic solvent including, but not limited to, ethanol, isopropanol, acetone, methylene chloride, or any combination thereof.

When the matrix is formed including the film-forming polymer and polar solvent in addition to any additives and the active ingredient, this may be done in a number of steps. For example, the ingredients may all be added together or a premix may be prepared. The advantage of a pre-mix is that all ingredients except for the active may be combined in advance, with the active added just prior to formation of the film. This is especially important for actives that may degrade with prolonged exposure to water, air or another polar solvent.

FIG. 6 shows an apparatus 20 suitable for the preparation of a pre-mix, addition of an active and subsequent formation of a film. The pre-mix or master batch 22, which includes the film-forming polymer, polar solvent, and any other additives except a drug active is added to the master batch feed tank 24. The components for pre-mix or master batch 22 are desirably formed in a mixer (not shown) prior to their addition into the master batch feed tank 24. Then a pre-determined amount of the master batch is controllably fed via a first metering pump 26 and control valve 28 to either or both of the first and second mixers, 30, 30'. The present invention, however, is not limited to the use of two mixers, 30, 30', and any number of mixers may suitably be used. Moreover, the present invention is not limited to any particular sequencing of the mixers 30, 30', such as parallel sequencing as depicted in FIG. 6, and other sequencing or arrangements of mixers, such as series or combination of parallel and series, may suitably be used. The required amount of the drug or other ingredient, such as a flavor, is added to the desired mixer through an opening, 32,

26

32', in each of the mixers, 30, 30'. Desirably, the residence time of the pre-mix or master batch 22 is minimized in the mixers 30, 30'. While complete dispersion of the drug into the pre-mix or master batch 22 is desirable, excessive residence times may result in leaching or dissolving of the drug, especially in the case for a soluble drug. Thus, the mixers 30, 30' are often smaller, i.e. lower residence times, as compared to the primary mixers (not shown) used in forming the pre-mix or master batch 22. After the drug has been blended with the master batch pre-mix for a sufficient time to provide a uniform matrix, a specific amount of the uniform matrix is then fed to the pan 36 through the second metering pumps, 34, 34'. The metering roller 38 determines the thickness of the film 42 and applies it to the application roller. The film 42 is finally formed on the substrate 44 and carried away via the support roller 46.

The films of the present invention must be formed into a sheet prior to drying. After the desired components are combined to form a multi-component matrix, including the polymer, water, and an active or other components as desired, the combination is formed into a sheet or film, by any method known in the art such as extrusion, coating, spreading, casting or drawing the multi-component matrix. If a multi-layered film is desired, this may be accomplished by co-extruding more than one combination of components which may be of the same or different composition. A multi-layered film may also be achieved by coating, spreading, or casting a combination onto an already formed film layer.

Although a variety of different film-forming techniques may be used, it is desirable to select a method that will provide a flexible film, such as reverse roll coating. The flexibility of the film allows for the sheets of film to be rolled and transported for storage or prior to being cut into individual dosage forms. Desirably, the films will also be self-supporting or in other words able to maintain their integrity and structure in the absence of a separate support. Furthermore, the films of the present invention may be selected of materials that are edible or ingestible.

Coating or casting methods are particularly useful for the purpose of forming the films of the present invention. Specific examples include reverse roll coating, gravure coating, immersion or dip coating, metering rod or meyer bar coating, slot die or extrusion coating, gap or knife over roll coating, air knife coating, curtain coating, or combinations thereof, especially when a multi-layered film is desired.

Roll coating, or more specifically reverse roll coating, is useful for forming films in accordance with the present invention. This procedure provides excellent control and uniformity of the resulting films, which is desired in the present invention. In this procedure, the coating material is measured onto the applicator roller 40 (see FIG. 6) by the precision setting of the gap between the upper metering roller 38 and the applicator roller. The coating is transferred from the applicator roller to the substrate 44 as it passes around the support roller 46 adjacent to the application roller. Both three roll and four roll processes are common.

The gravure coating process relies on an engraved roller running in a coating bath, which fills the engraved dots or lines of the roller with the coating material. The excess coating on the roller is wiped off by a doctor blade and the coating is then deposited onto the substrate as it passes between the engraved roller and a pressure roller.

Offset Gravure is common, where the coating is deposited on an intermediate roller before transfer to the substrate.

In the simple process of immersion or dip coating, the substrate is dipped into a bath of the coating, which is nor-

US 8,603,514 B2

27

mally of a low viscosity to enable the coating to run back into the bath as the substrate emerges.

In the metering rod coating process, an excess of the coating is deposited onto the substrate as it passes over the bath roller. The wire-wound metering rod, sometimes known as a Meyer Bar, allows the desired quantity of the coating to remain on the substrate. The quantity is determined by the diameter of the wire used on the rod.

A number of techniques may be employed in the mixing stage to prevent bubble inclusions in the final film. To provide a composition mixture with substantially no air bubble formation in the final product, anti-foaming or surface-tension reducing agents are employed. Additionally, the speed of the mixture is desirably controlled to prevent cavitation of the mixture in a manner which pulls air into the mix. Finally, air bubble reduction can further be achieved by allowing the mix to stand for a sufficient time for bubbles to escape prior to drying the film. Desirably, the inventive process first forms a masterbatch of film-forming components without active ingredients such as drug particles or volatile materials such as flavor oils. The actives are added to smaller mixes of the masterbatch just prior to casting. Thus, the masterbatch pre-mix can be allowed to stand for a longer time without concern for instability in drug or other ingredients.

The particles of the present invention may be added to the film-forming composition or matrix after the composition or matrix is cast into a film. For example, particles may be added to the film prior to the drying of the film. Particles may be controllably metered to the film and disposed onto the film through a suitable technique, such as through the use of a doctor blade (not shown) which is a device which marginally or softly touches the surface of the film and controllably disposes the particles onto the film surface. Other suitable, but non-limiting, techniques include the use of an additional roller to place the particles on the film surface, spraying the particles onto the film surface, and the like. The particles may be placed on either or both of the opposed film surfaces, i.e., the top and/or bottom film surfaces. Desirably, the particles are securably disposed onto the film, such as being embedded into the film. Moreover, such particles are desirably not fully encased or fully embedded into the film, but remain exposed to the surface of the film, such as in the case where the particles are partially embedded or partially encased.

Monitoring and control of the thickness of the film also contributes to the production of a uniform film by providing a film of uniform thickness. The thickness of the film may be monitored with gauges such as Beta Gauges. A gauge may be coupled to another gauge at the end of the drying apparatus, i.e. drying oven or tunnel, to communicate through feedback loops to control and adjust the opening in the coating apparatus, resulting in control of uniform film thickness.

The gap or knife over roll process relies on a coating being applied to the substrate which then passes through a "gap" between a "knife" and a support roller. As the coating and substrate pass through, the excess is scraped off.

Air knife coating is where the coating is applied to the substrate and the excess is "blown off" by a powerful jet from the air knife. This procedure is useful for aqueous coatings.

In the curtain coating process, a bath with a slot in the base allows a continuous curtain of the coating to fall into the gap between two conveyors. The object to be coated is passed along the conveyor at a controlled speed and so receives the coating on its upper face.

Anti-Foaming and De-Foaming Compositions

Anti-foaming and/or de-foaming components may also be used with the films of the present invention. These components aid in the removal of air, such as entrapped air, from the

28

film-forming compositions. As described above, such entrapped air may lead to non-uniform films. Simethicone is one particularly useful anti-foaming and/or de-foaming agent. The present invention, however, is not so limited and other anti-foam and/or de-foaming agents may suitable be used.

Simethicone is generally used in the medical field as a treatment for gas or colic in babies. Simethicone is a mixture of fully methylated linear siloxane polymers containing repeating units of polydimethylsiloxane which is stabilized with trimethylsiloxy end-blocking unites, and silicon dioxide. It usually contains 90.5-99% polymethylsiloxane and 4-7% silicon dioxide. The mixture is a gray, translucent, viscous fluid which is insoluble in water.

When dispersed in water, simethicone will spread across the surface, forming a thin film of low surface tension. In this way, simethicone reduces the surface tension of bubbles air located in the solution, such as foam bubbles, causing their collapse. The function of simethicone mimics the dual action of oil and alcohol in water. For example, in an oily solution any trapped air bubbles will ascend to the surface and dissipate more quickly and easily, because an oily liquid has a lighter density compared to a water solution. On the other hand, an alcohol/water mixture is known to lower water density as well as lower the water's surface tension. So, any air bubbles trapped inside this mixture solution will also be easily dissipated. Simethicone solution provides both of these advantages. It lowers the surface energy of any air bubbles that trapped inside the aqueous solution, as well as lowering the surface tension of the aqueous solution. As the result of this unique functionality, simethicone has an excellent anti-foaming property that can be used for physiological processes (anti-gas in stomach) as well as any for external processes that require the removal of air bubbles from a product.

In order to prevent the formation of air bubbles in the films of the present invention, the mixing step can be performed under vacuum. However, as soon as the mixing step is completed, and the film solution is returned to the normal atmosphere condition, air will be re-introduced into or contacted with the mixture. In many cases, tiny air bubbles will be again trapped inside this polymeric viscous solution. The incorporation of simethicone into the film-forming composition either substantially reduces or eliminates the formation of air bubbles.

Simethicone may be added to the film-forming mixture as an anti-foaming agent in an amount from about 0.01 weight percent to about 5.0 weight percent, more desirably from about 0.05 weight percent to about 2.5 weight percent, and most desirably from about 0.1 weight percent to about 1.0 weight percent.

Drying Wet Cast Films

The wet film may be dried using controlled bottom drying or controlled microwave drying, desirably in the absence of external air currents or heat on the top (exposed) surface of the film 48 (see FIG. 6). Controlled bottom drying or controlled microwave drying advantageously allows for vapor release from the film without the disadvantages of the prior art. Conventional convection air drying from the top is not employed because it initiates drying at the top uppermost portion of the film, thereby forming a barrier against fluid flow, such as the evaporative vapors, and thermal flow, such as the thermal energy for drying. Such dried upper portions serve as a barrier to further vapor release as the portions beneath are dried, which results in non-uniform films. As previously mentioned some top air flow can be used to aid the drying of the films of the present invention, but it must not create a condition that would cause particle movement or a rippling effect in the film,

US 8,603,514 B2

29                                                                   30

both of which would result in non-uniformity. If top air is employed, it is balanced with the bottom air drying to avoid non-uniformity and prevent film lift-up on the carrier belt. A balance top and bottom air flow may be suitable where the bottom air flow functions as the major source of drying and the top air flow is the minor source of drying. The advantage of some top air flow is to move the exiting vapors away from the film thereby aiding in the overall drying process. The use of any top air flow or top drying, however, must be balanced by a number of factors including, but not limited, to rheological properties of the composition and mechanical aspects of the processing. Any top fluid flow, such as air, also must not overcome the inherent viscosity of the film-forming composition. In other words, the top air flow cannot break, distort or otherwise physically disturb the surface of the composition. Moreover, air velocities are desirably below the value of the film, i.e., below any force level that can move the liquids in the film-forming compositions. For thin or low viscosity compositions, low air velocity must be used. For thick or high viscosity compositions, higher air velocities may be used. Furthermore, air velocities are desirable low so as to avoid any lifting or other movement of the film formed from the compositions.

The films of the present invention may contain particles that are sensitive to temperature, such as flavors, which may be volatile, or drugs, proteins, or antigens, which may have a low degradation temperature. In such cases, the drying temperature may be decreased while increasing the drying time to adequately dry the uniform films of the present invention. Furthermore, bottom drying also tends to result in a lower internal film temperature as compared to top drying. In bottom drying, the evaporating vapors more readily carry heat away from the film as compared to top drying which lowers the internal film temperature. Such lower internal film temperatures often result in decreased drug degradation and decreased loss of certain volatiles, such as flavors.

In alternative embodiments, it may be desirable to dry films at high temperatures. High heat drying produces uniform films, and leads to greater efficiencies in film production. Films containing sensitive active components, however, may face degradation problems at high temperatures. Degradation is the "decomposition of a compound . . . exhibiting well-defined intermediate products." The American Heritage Dictionary of the English Language (4th ed. 2000). Degradation of an active component is typically undesirable as it may cause instability, inactivity, and/or decreased potency of the active component. For instance, if the active component is a drug or bioactive material, this may adversely affect the safety or efficacy of the final pharmaceutical product. Additionally, highly volatile materials will tend to be quickly released from this film upon exposure to conventional drying methods.

Degradation of an active component may occur through a variety of processes, such as hydrolysis, oxidation, and light degradation, depending upon the particular active component. Moreover, temperature has a significant effect on the rate of such reactions. The rate of degradation typically doubles for every 10° C. increase in temperature. Therefore, it is commonly understood that exposing an active component to high temperatures will initiate and/or accelerate undesirable degradation reactions.

Proteins are one category of useful active ingredients that will degrade, denature, or otherwise become inactive when they are exposed to high temperatures for extended periods of time. Proteins serve a variety of functions in the body such as enzymes, structural elements, hormones and immunoglobulins. Examples of proteins include enzymes such as pancre-

atin, trypsin, pancrelipase, chymotrypsin, hyaluronidase, sutilains, streptokinaw, urokinase, altiplase, papain, bromelainsdiastase, structural elements such as collagen and albumin, hormones such as thyroliberin, gonadoliberin, adrenocorticottropin, corticotrophin, cosyntropin, sometrem, somatropion, prolactin, thyrotropin, somatostatin, vasopressin, felypressin, lypressin, insulin, glucagons, gastrin, pentagastrin, secretin, cholecystokinin-pancreozymin, and immunomodulators which may include polysaccharides in addition to glycoproteins including cytokines which are useful for the inhibition and prevention of malignant cell growth such as tumor growth. A suitable method for the production of some useful glycoproteins is disclosed in U.S. Pat. No. 6,281, 337 to Cannon-Carlson, et al., which is incorporated herein in its entirety.

Temperatures that approach 100° C. will generally cause degradation of proteins as well as nucleic acids. For example some glycoproteins will degrade if exposed to a temperature of 70° C. for thirty minutes. Proteins from bovine extract are also known to degrade at such low temperatures. DNA also begins to denature at this temperature.

Applicants have discovered, however, that the films of the present invention may be exposed to high temperatures during the drying process without concern for degradation, loss of activity or excessive evaporation due to the inventive process for film preparation and forming. In particular, the films may be exposed to temperatures that would typically lead to degradation, denaturization, or inactivity of the active component, without causing such problems. According to the present invention, the manner of drying may be controlled to prevent deleterious levels of heat from reaching the active component.

As discussed herein, the flowable mixture is prepared to be uniform in content in accordance with the teachings of the present invention. Uniformity must be maintained as the flowable mass was formed into a film and dried. During the drying process of the present invention, several factors produce uniformity within the film while maintaining the active component at a safe temperature, i.e., below its degradation temperature. First, the films of the present invention have an extremely short heat history, usually only on the order of minutes, so that total temperature exposure is minimized to the extent possible. The films are controllably dried to prevent aggregation and migration of components, as well as preventing heat build up within. Desirably, the films are dried from the bottom. Controlled bottom drying, as described herein, prevents the formation of a polymer film, or skin, on the top surface of the film. As heat is conducted from the film bottom upward, liquid carrier, e.g., water, rises to the film surface. The absence of a surface skin permits rapid evaporation of the liquid carrier as the temperature increases, and thus, concurrent evaporative cooling of the film. Due to the short heat exposure and evaporative cooling, the film components such as drag or volatile actives remain unaffected by high temperatures. In contrast, skinning on the top surface traps liquid carrier molecules of increased energy within the film, thereby causing the temperature within the film to rise and exposing active components to high, potentially deleterious temperatures.

Second, thermal mixing occurs within the film due to bottom heating and absence of surface skinning. Thermal mixing occurs via convection currents in the film. As heat is applied to the bottom of the film, the liquid near the bottom increases in temperature, expands, and becomes less dense. As such, this hotter liquid rises and cooler liquid takes its place. While rising, the hotter liquid mixes with the cooler liquid and

US 8,603,514 B2

31

shares thermal energy with it, i.e., transfers heat. As the cycle repeats, thermal energy is spread throughout the film.

Robust thermal mixing achieved by the controlled drying process of the present invention produces uniform heat diffusion throughout the film. In the absence of such thermal mixing, "hot spots" may develop. Pockets of heat in the film result in the formation of particle aggregates or danger areas within the film and subsequent non-uniformity. The formation of such aggregates or agglomerations is undesirable because it leads to non-uniform films in which the active may be randomly distributed. Such uneven distribution may lead to large differences in the amount of active per film, which is problematic from a safety and efficacy perspective.

Furthermore, thermal mixing helps to maintain a lower overall temperature inside the film. Although the film surfaces may be exposed to a temperature above that at which the active component degrades, the film interior may not reach this temperature. Due to this temperature differential, the active does not degrade.

For instance, the films of the present invention desirably are dried for 10 minutes or less. Drying the films at 80° C. for 10 minutes produces a temperature differential of about 5° C. This means that after 10 minutes of drying, the temperature of the inside of the film is 5° C. less than the outside exposure temperature. In many cases, however, drying times of less than 10 minutes are sufficient, such as 4 to 6 minutes. Drying for 4 minutes may be accompanied by a temperature differential of about 30° C., and drying for 6 minutes may be accompanied by a differential of about 25° C. Due to such large temperature differentials, the films may be dried at efficient, high temperatures without causing heat sensitive actives to degrade.

Although the inventive process is not limited to any particular apparatus for the above-described desirable drying, one particular useful drying apparatus 50 is depicted in FIG. 7. Drying apparatus 50 is a nozzle arrangement for directing hot fluid, such as but not limited to hot air, towards the bottom of the film 42 which is disposed on substrate 44. Hot air enters the entrance end 52 of the drying apparatus and travels vertically upward, as depicted by vectors 54, towards air deflector 56. The air deflector 56 redirects the air movement to minimize upward force on the film 42. As depicted in FIG. 7, the air is tangentially directed, as indicated by vectors 60 and 60', as the air passes by air deflector 56 and enters and travels through chamber portions 58 and 58' of the drying apparatus 50. With the hot air flow being substantially tangential to the film 42, lifting of the film as it is being dried is thereby minimized. While the air deflector 56 is depicted as a roller, other devices and geometries for deflecting air or hot fluid may suitable be used. Furthermore, the exit ends 62 and 62' of the drying apparatus 50 are flared downwardly. Such downward flaring provides a downward force or downward velocity vector, as indicated by vectors 64 and 64', which tend to provide a pulling or drag effect of the film 42 to prevent lifting of the film 42. Lifting of the film 42 may not only result in non-uniformity in the film or otherwise, but may also result in non-controlled processing of the film 42 as the film 42 and/or substrate 44 lift away from the processing equipment.

FIG. 8 is a sequential representation of the drying process of the present invention. After mechanical mixing, the film may be placed on a conveyor for continued thermal mixing during the drying process. At the outset of the drying process, depicted in Section A, the film 1 preferably is heated from the bottom 10 as it travels via conveyor (not shown). Heat may be supplied to the film by a heating mechanism, such as, but not limited to, the dryer depicted in FIG. 7. As the film is heated, the liquid carrier, or volatile ("V"), begins to evapo-

32

rate, as shown by upward arrow 50. Thermal mixing also initiates as hotter liquid, depicted by arrow 30, rises and cooler liquid, depicted by arrow 40, takes its place. Because no skin forms on the top surface 20 of the film 1, as shown in Section B the volatile liquid continues to evaporate 50 and thermal mixing 30/40 continues to distribute thermal energy throughout the film. Once a sufficient amount of the volatile liquid has evaporated, thermal mixing has produced uniform heat diffusion throughout the film 1. The resulting dried film 1 is a visco-elastic solid, as depicted in Section C. The components desirably are locked into a uniform distribution throughout the film. Although minor amounts of liquid carrier, i.e., water, may remain subsequent to formation of the visco-elastic, the film may be dried further without movement of the particles, if desired.

In one embodiment, a specific example of an appropriate drying method is that disclosed by Magoon in U.S. Pat. No. 4,631,837. Magoon is specifically directed toward a method of drying fruit pulp. However, the present inventors have adapted this process toward the preparation of thin films.

The method and apparatus of Magoon are based on an important property of water. Although water transmits energy by conduction and convection both within and to its surroundings, water only radiates energy within and to water. Therefore, the apparatus of Magoon includes a surface onto which the fruit pulp is placed that is transparent to infrared radiation. The underside of the surface is in contact with a temperature controlled water bath. The water bath temperature is desirably controlled at a temperature slightly below the boiling temperature of water. When the wet fruit pulp is placed on the surface of the apparatus, this creates a "refractance window." This means that infrared energy is permitted to radiate through the surface only to the area on the surface occupied by the fruit pulp, and only until the fruit pulp is dry. The apparatus of Magoon provides the films of the present invention with an efficient drying time reducing the instance of aggregation of the components of the film.

Another method of controlling the drying process involves a zone drying procedure, employing an apparatus containing a drying tunnel having one or more drying zones and a continuous belt conveying the film through the drying zones. The conditions of each drying zone may vary, for example, temperature and humidity may be selectively chosen. It may be desirable to sequentially order the zones to provide a stepped up drying effect.

The speed of the zone drying conveyor may be constant, or altered at a particular stage of the drying procedure to increase or decrease exposure of the film to the conditions of the desired zone. Whether continuous or modified, the zone drying dries the film without surface skinning.

According to an embodiment of the zone drying apparatus 100, shown in FIG. 35, the film 110 may be fed onto the continuous belt 120, which carries the film through the different drying zones. The first drying zone that the film travels through 101 may be a warm and humid zone. The second zone 102 may be hotter and drier, and the third zone 103 may also be hot and dry. These different zones may be continuous, or alternatively, they may be separated, as depicted by the zone drying apparatus 200 in FIG. 36. The zone drying apparatus, in accordance with the present invention, is not limited to three drying zones. The film may travel through lesser or additional drying zones of varying heat and humidity levels, if desired, to produce the controlled drying effect of the present invention.

To further control temperature and humidity, the drying zones may include additional atmospheric conditions, such as inert gases. The zone drying apparatus further may be adapted

US 8,603,514 B2

33
34

to include additional processes during the zone drying procedure, such as, for example, spraying and laminating processes, so long as controlled drying is maintained in accordance with the invention.

The films may initially have a thickness of about 500 μm to about 1,500 μm, or about 20 mils to about 60 mils, and when dried have a thickness from about 3 μm to about 250 μm, or about 0.1 mils to about 10 mils. Desirably, the dried films will have a thickness of about 2 mils to about 8 mils, and more desirably, from about 3 mils to about 6 mils.

Extrusion Film Forming Methods

In alternative embodiments, the film products of the present invention may be formed by extrusion rather than casting methods. Extrusion is particularly useful for film compositions containing polyethylene oxide-based polymer components. For instance, a single screw extrusion process may be employed in accordance with the present invention. According to such an extrusion process, pressure builds in the polymer melt so that it may be extruded through a die or injected into a mold.

As further explanation, a single screw extruder for use in the process of the present invention may include a barrel **300** containing a number of zones **200**, as shown in the extruder **100** depicted in FIG. **37**. These zones **200** may have varying temperatures and pressures. For instance, it may be desirable for the zones to increase in temperature as the composition proceeds through the barrel **300** to the extrusion die **400**. Any number of zones may be included in accordance with the present invention. In addition, the speed of extrusion may be controlled to produce desired film properties. For example, the extrusion composition may be held for an extended time period in the screw mixing chamber. Although this discussion is directed to single screw extrusion, other forms of extrusion are known to those skilled in the art and are considered well within the scope of the present invention.

A further advantage to extrusion film forming methods is that no added solvent is normally employed, which simplifies the film forming process particularly where controlled release or taste-masked active agents are employed. Where the active agent is in a particle coated with a water soluble polymer, the absence of added solvent during manufacture reduces the likelihood of dissolution or release of the taste-masked or controlled-release coated active agent during manufacture due to dissolution or solvent effects.

It may be particularly desirable to employ extrusion methods for forming film compositions containing polyethylene oxide (PEO) polymer components. In this embodiment, the compositions may contain PEO or PEO blends in the polymer component, and may be substantially free of solvents. A particularly useful polymer that may be blended with PEO is a hydrophilic cellulosic polymer, such as hydroxypropylmethyl cellulose (HPMC), hydroxyethyl cellulose (HEC), hydroxypropyl cellulose (HPC), or hydroxymethyl cellulose (HMC). The aforementioned polymers are known in the art of hot melt extrusion as suitable thermoplastic, water soluble polymers for drugs. See, for example, McGinity et al., in Encycl. Pharm. Tech., 3d Ed., vol. 2, pp. 2004-2020 (2006). The PEO containing film forming compositions may optionally be essentially free of added plasticizers, surfactants, and polyalcohols. The compositions may be extruded as a sheet at processing temperatures of less than about 90° C. in an extrusion apparatus.

In a typical extrusion method, a pre-mix of water soluble polymers such as PEO or PEO blends is fed into the extrusion apparatus, such as a single screw extruder shown in FIG. **37**. The active, which may be a taste-masked particulate, may be added to the polymer feed or added to the extruder in a

separate feed. The mixture is blended, and warmed and melted in the extruder screw to provide a uniform liquid matrix. The film may be formed by forcing the matrix through rollers or a die. The extrudate may be deposited onto a moving substrate as it leaves the extrusion orifice. Optionally, the speed of the substrate can be faster than the speed of the extrudate leaving the orifice, which stretches the extrudate to a desired film thickness. The film so formed will have a highly uniform distribution of active.

The extruded film composition may then be cooled by any mechanism known to those of ordinary skill in the art. For example, chill rollers, air cooling beds, or water cooling beds may be employed. The cooling step is particularly desirable for these film compositions because PEO tends to hold heat.

Optional Components

A variety of other components and fillers may also be added to the films of the present invention. These may include, without limitation, surfactants; plasticizers which assist in compatibilizing the components within the mixture; polyalcohols; anti-foaming agents, such as silicone-containing compounds, which promote a smoother film surface by releasing oxygen from the film; and thermo-setting gels such as pectin, carageenan, and gelatin, which help in maintaining the dispersion of components.

The variety of additives that can be incorporated into the inventive compositions may provide a variety of different functions. Examples of classes of additives include excipients, lubricants, buffering agents, stabilizers, blowing agents, pigments, coloring agents, fillers, bulking agents, sweetening agents, flavoring agents, fragrances, release modifiers, adjuvants, plasticizers, flow accelerators, mold release agents, polyols, granulating agents, diluents, binders, buffers, absorbents, glidants, adhesives, anti-adherents, acidulants, softeners, resins, demulcents, solvents, surfactants, emulsifiers, elastomers and mixtures thereof. These additives may be added with the active ingredient(s).

Useful additives include, for example, gelatin, vegetable proteins such as sunflower protein, soybean proteins, cotton seed proteins, peanut proteins, grape seed proteins, whey proteins, whey protein isolates, blood proteins, egg proteins, acrylated proteins, water-soluble polysaccharides such as alginates, carrageenans, guar gum, agar-agar, xanthan gum, gellan gum, gum arabic and related gums (gum ghatti, gum karaya, gum tragancanth), pectin, water-soluble derivatives of cellulose: alkylcelluloses hydroxyalkylcelluloses and hydroxyalkylalkylcelluloses, such as methylcellulose, hydroxymethylcellulose, hydroxyethylcellulose, hydroxypropylcellulose, hydroxyethylmethylcellulose, hydroxypropylmethylcellulose, hydroxybutylmethylcellulose, cellulose esters and hydroxyalkylcellulose esters such as cellulose acetate phthalate (CAP), hydroxypropylmethylcellulose (HPMC); carboxyalkylcelluloses, carboxyalkylalkylcelluloses, carboxyalkylcellulose esters such as carboxymethylcellulose and their alkali metal salts; water-soluble synthetic polymers such as polyacrylic acids and polyacrylic acid esters, polymethacrylic acids and polymethacrylic acid esters, polyvinylacetates, polyvinylalcohols, polyvinylacetatephthalates (PVAP), polyvinylpyrrolidone (PVP), PVY/ vinyl acetate copolymer, and polycrotonic acids; also suitable are phthalated gelatin, gelatin succinate, crosslinked gelatin, shellac, water soluble chemical derivatives of starch, cationically modified acrylates and methacrylates possessing, for example, a tertiary or quaternary amino group, such as the diethylaminoethyl group, which may be quaternized if desired; and other similar polymers.

Such extenders may optionally be added in any desired amount desirably within the range of up to about 80%, desir-

US 8,603,514 B2

35

ably about 3% to 50% and more desirably within the range of 3% to 30% based on the weight of all components.

Further additives may be inorganic fillers, such as the oxides of magnesium aluminum, silicon, titanium, etc. desirably in a concentration range of about 0.02% to about 3% by weight and desirably about 0.02% to about 1% based on the weight of all components.

Further examples of additives are plasticizers which include polyalkylene oxides, such as polyethylene glycols, polypropylene glycols, polyethylene-propylene glycols, organic plasticizers with low molecular weights, such as glycerol, glycerol monoacetate, diacetate or triacetate, triacetin, polysorbate, cetyl alcohol, propylene glycol, sorbitol, sodium diethylsulfosuccinate, triethyl citrate, tributyl citrate, and the like, added in concentrations ranging from about 0.5% to about 30%, and desirably ranging from about 0.5% to about 20% based on the weight of the polymer.

There may further be added compounds to improve the flow properties of the starch material such as animal or vegetable fats, desirably in their hydrogenated form, especially those which are solid at room temperature. These fats desirably have a melting point of 50° C. or higher. Preferred are tri-glycerides with $C_{12}$-, $C_{14}$-, $C_{16}$-, $C_{18}$-, $C_{20}$- and $C_{22}$-fatty acids. These fats can be added alone without adding extenders or plasticizers and can be advantageously added alone or together with mono- and/or di-glycerides or phosphatides, especially lecithin. The mono- and di-glycerides are desirably derived from the types of fats described above, i.e. with $C_{12}$-, $C_{14}$-, $C_{16}$-, $C_{18}$-, $C_{20}$- and $C_{22}$-fatty acids.

The total amounts used of the fats, mono-, di-glycerides and/or lecithins are up to about 5% and preferably within the range of about 0.5% to about 2% by weight of the total composition

It may be useful to add silicon dioxide, calcium silicate, or titanium dioxide in a concentration of about 0.02% to about 1% by weight of the total composition. These compounds act as texturizing agents.

These additives are to be used in amounts sufficient to achieve their intended purpose. Generally, the combination of certain of these additives will alter the overall release profile of the active ingredient and can be used to modify, i.e. improve or accelerate the release.

Lecithin is one surface active agent for use in the present invention. Lecithin can be included in the feedstock in an amount of from about 0.25% to about 2.00% by weight. Other surface active agents, i.e. surfactants, include, but are not limited to, cetyl alcohol, sodium lauryl sulfate, the Spans™ and Tweens™ which are commercially available from ICI Americas, Inc. Ethoxylated oils, including ethoxylated castor oils, such as Cremophor® EL which is commercially available from BASF, are also useful. Carbowax™ is yet another modifier which is very useful in the present invention. Tweens™ or combinations of surface active agents may be used to achieve the desired hydrophilic-lipophilic balance ("HLB"). The present invention, however, does not require the use of a surfactant and films or film-forming compositions of the present invention may be essentially free of a surfactant while still providing the desirable uniformity features of the present invention.

As additional modifiers which enhance the procedure and product of the present invention are identified, Applicants intend to include all such additional modifiers within the scope of the invention claimed herein.

Other ingredients include binders which contribute to the ease of formation and general quality of the films. Non-limiting examples of binders include starches, pregelatinize starches, gelatin, polyvinylpyrrolidone, methylcellulose,

36

sodium carboxymethylcellulose, ethylcellulose, polyacrylamides, polyvinyloxoazolidone, and polyvinylalcohols.

Further potential additives include solubility enhancing agents, such as substances that form inclusion compounds with active components. Such agents may be useful in improving the properties of very insoluble and/or unstable actives. In general, these substances are doughnut-shaped molecules with hydrophobic internal cavities and hydrophilic exteriors. Insoluble and/or instable actives may fit within the hydrophobic cavity, thereby producing an inclusion complex, which is soluble in water. Accordingly, the formation of the inclusion complex permits very insoluble and/or instable actives to be dissolved in water. A particularly desirable example of such agents are cyclodextrins, which are cyclic carbohydrates derived from starch. Other similar substances, however, are considered well within the scope of the present invention.

Testing Films for Uniformity

It may be desirable to test the films of the present invention for chemical and physical uniformity during the film manufacturing process. In particular, samples of the film may be removed and tested for uniformity in film components between various samples. Film thickness, color, assay of active ingredients, and overall appearance may also be checked for uniformity. Uniform films are desired, particularly for films containing pharmaceutical active components for safety and efficacy reasons.

A method for testing uniformity in accordance with the present invention includes conveying a film through a manufacturing process. This process may include subjecting the film to drying processes, dividing the film into individual dosage units, and/or packaging the dosages, among others. As the film is conveyed through the manufacturing process, for example on a conveyor belt apparatus, it is cut widthwise into at least one portion. The at least one portion has opposing ends that are separate from any other film portion. For instance, if the film is a roll, it may be cut into separate sub-rolls. Cutting the film may be accomplished by a variety of methods, such as with a knife, razor, laser, or any other suitable means for cutting a film.

The cut film then may be sampled by removing small pieces from each of the opposed ends of the portion(s), without disrupting the middle of the portion(s). Leaving the middle section intact permits the predominant portion of the film to proceed through the manufacturing process without interrupting the conformity of the film and creating sample-inducted gaps in the film. Accordingly, the concern of missing doses is alleviated as the film is further processed, e.g., packaged. Moreover, maintaining the completeness of cut portions or sub-rolls throughout the process will help to alleviate the possibility of interruptions in further film processing or packaging due to guilty control issues, for example, alarm stoppage due to notice of missing pieces.

After the end pieces, or sampling sections, are removed from the film portion(s), they may be tested for uniformity in the content of components between samples. Any conventional means for examining and testing the film pieces may be employed, such as, for example, visual inspection, use of analytical equipment, and any other suitable means known to those skilled in the art. If the testing results show non-uniformity between film samples, the manufacturing process may be altered. This can save time and expense because the process may be altered prior to completing an entire manufacturing run. For example, the drying conditions, mixing conditions, compositional components and/or film viscosity may be changed. Altering the drying conditions may involve

US 8,603,514 B2

37

changing the temperature, drying time, moisture level, and dryer positioning, among others.

Moreover, it may be desirable to repeat the steps of sampling and testing throughout the manufacturing process. Testing at multiple intervals may ensure that uniform film dosages are continuously produced. Alterations to the process can be implemented at any stage to minimize non-uniformity between samples.

The cut portions may be tested for chemical and physical uniformity using any conventional means for examining and testing the film pieces known in the art. For example, visual inspection, conventional or electron microscopy, chemical testing, or use of analytical equipment may be used.

The testing can be used for quality control purposes, for example to assure that the physical and chemical content of the film is uniform and matches desired specifications. Additionally, the testing can be used to assay for desired content of active ingredients. Testing can also be used for other purposes, such as adjusting the manufacturing process to achieve optimum efficiency and appropriate physical and chemical properties and uniformity.

Uses of Thin Films

The thin films of the present invention are well suited for many uses. The high degree of uniformity of the components of the film makes them particularly well suited for incorporating pharmaceuticals. Furthermore, the polymers used in construction of the films may be chosen to allow for a range of disintegration times for the films. A variation or extension in the time over which a film will disintegrate may achieve control over the rate that the active is released, which may allow for a sustained release delivery system. In addition, the films may be used for the administration of an active to any of several body surfaces, especially those including mucous membranes, such as oral, anal, vaginal, opthalmological, the surface of a wound, either on a skin surface or within a body such as during surgery, and similar surfaces.

The films may be used to orally administer an active. This is accomplished by preparing the films as described above and introducing them to the oral cavity of a mammal. This film may be prepared and adhered to a second or support layer from which it is removed prior to use, i.e. introduction to the oral cavity. An adhesive may be used to attach the film to the support or backing material which may be any of those known in the art, and is preferably not water soluble. If an adhesive is used, it will desirably be a food grade adhesive that is ingestible and does not alter the properties of the active. Mucoadhesive compositions are particularly useful. The film compositions in many cases serve as mucoadhesives themselves.

The films may be applied under or to the tongue of the mammal. When this is desired, a specific film shape, corresponding to the shape of the tongue may be preferred. Therefore the film may be cut to a shape where the side of the film corresponding to the back of the tongue will be longer than the side corresponding to the front of the tongue. Specifically, the desired shape may be that of a triangle or trapezoid. Desirably, the film will adhere to the oral cavity preventing it from being ejected from the oral cavity and permitting more of the active to be introduced to the oral cavity as the film dissolves.

The films of the present invention are desirably packaged in sealed, air and moisture resistant packages to protect the active from exposure oxidation, hydrolysis, volatilization and interaction with the environment. Referring to FIG. 1, a packaged pharmaceutical dosage unit 10, includes each film 12 individually wrapped in a pouch or between foil and/or plastic laminate sheets 14. As depicted in FIG. 2, the pouches 10, 10' can be linked together with tearable or perforated joints 16.

38

The pouches 10, 10' may be packaged in a roll as depicted in FIG. 5 or stacked as shown in FIG. 3 and sold in a dispenser 18 as shown in FIG. 4. The dispenser may contain a full supply of the medication typically prescribed for the intended therapy, but due to the thinness of the film and package, is smaller and more convenient than traditional bottles used for tablets, capsules and liquids. Moreover, the films of the present invention dissolve instantly upon contact with saliva or mucosal membrane areas, eliminating the need to wash the dose down with water.

Desirably, a series of such unit doses are packaged together in accordance with the prescribed regimen or treatment, e.g., a 10-90 day supply, depending on the particular therapy. The individual films can be packaged on a backing and peeled off for use.

The features and advantages of the present invention are more fully shown by the following examples which are provided for purposes of illustration, and are not to be construed as limiting the invention in any way.

EXAMPLES

Preparation of Taste-Masked Pharmaceutically Active Agents

The following drugs were coated with taste masking components and were used in the films of the present invention.

a. Fluidized Bed Coating: A taste-masked particle was prepared having a core material of northindrone (Norlutin®). Northindrone was first sieved through a 60 mesh screen having a 250 micron sieve opening. The resulting particles, i.e., having particles sizes of less than 250 microns, were then coated by the fluidized bed coating procedure in a Verse Glatt Fluidized Bed using a Wurster Column. Accordingly, a 625 grams of 5% methylcellulose and 0.5% Acesulfame® K (a non-caloric sweetener) solution was prepared. The solution was then applied onto 500 grams of the sieved northindrone powder at an air pressure of 40 psi through a Gustav Schlick nozzle model 941. The fluidized bed temperature was heated and maintained at 115° F. during the spraying process. At the end of coating, the resulting particles were further dried therein for 3 minutes. A total of 530 grams taste masked northindrone was obtained.

b. Agglomeration Process: A sweetener solution of 94 grams of 2.5% sodium saccharin and 2.5% Acesulfame® K was prepared. A dry blend of 60 grams of hydroxypropylmethyl cellulose and 40 grams of silica dioxide with 20 grams polythiazide (Renese®) was made. The sweetener solution was then sprayed a little at a time onto the dry blend powder during low-shear mixing. The dry powder was, at this point, being agglomerated through the granulation/absorption process. The wet mixture was then dried in a convection oven at 105° F. for 17 hours. The resulting dried product was ground in a Fitz Hammer Mill grinder and sieved through a 100 mesh screen having a 149 micron sieve opening.

c. Pelletization Process: The following product was made using a model RV02 Mix Pelletizer (made by Eirich Machines Ltd.) at maximum mixing speed. A small of crashed ice was added, slowly through a funnel, to the 40 grams Loratidine®, 40 grams Aspartame®, 10 grams hydroxypropyl cellulose and 5 grams gum arabic powder mix in the mixer while mixing at low settings of both pan rotation and mixing motor. It took 1 to 2 minutes to add the ice. Once the ice addition was completed, both the pan and the rotor mix were turned to high speed to form spherical particles. The end point was determined by examining the particles using a low power microscope. When the end point is not reached after 2

US 8,603,514 B2

39

minutes of intense mixing, additional 1 to 2 minutes mixing with or without adding more ice is tried. This procedure is repeated until the end point is reach, i.e., the spherical particles are formed. The wet samples obtained were dried in a tray dryer at 55° C. for about 5 hours. The resulting particles size ranged from 20 to 200 mesh. The particles were then sieved to obtain the desired particle size.

d. Infusion Method: A dry blend of 3.7 grams of Sucralose®, 10 grams fluoxetine HCl (Prozac®), and 1.25 grams polyvinylpyrrolidone were mixed uniformly. Water of 5.0 grams and 2.74 grams of propylene glycol were then added to the mixture and mixed thoroughly. To this mixture, 22 grams of hydroxypropylmethyl cellulose was added and blended under a high shear Stephan Mixer for at least 3 minutes. The resulting particles were sieved through a 100 mesh screen and were ready to be used in film matrix solution.

e. Triglyceride Reduction Formula™ microspheres from Southwest Research Institute were coated with ethylcellulose by a spinning and congealing particle producing process. The coated particles had a particle size of less than 100 microns. The polymer condensed on the drug particles thereby imparting a taste-masked pharmaceutically active agent.

f. Tamoxifen was produced by spray coating 50 to 100 micron sized particles of Eudragit® E100 (cationic methacrylate with dimethylamino ethyl ammonium groups). During fluidized coating, coated particles were isolated using a fractional separation device which insured particles having a size of less than 150 microns. The estimated level of coating was about 15%. The polymer condensed on the drug particles thereby imparting a taste-masked pharmaceutically active agent.

g. Torsemide was coated by a critical fluid process by dissolving torsemide in polyethylene glycol (400 molecular weight) which was added to a flowing stream of supercritical $CO_2$ by using a sonic spray nozzle. The resulting droplet size was controlled to produce approximated 150 micron sized spherical particles. The particles were then moved to an apparatus used for spraying a polymer coating. The polymer condensed on the drug particles thereby imparting a taste-masked pharmaceutically active agent. The polymer coating used was Eudragit® E100 dissolved in ethanol at 15% solids. The coated product was isolated by lowering the pressure and removal of the CO2 and the ethanol.

h. Felodipine was coated via an emulsion solvent evaporation method using acrylate methacrylate copolymers (Eudragit® RL or Eudragit® PO and Eudragit® RS or Eudragit® PO) as the coating materials. The mean sphere diameter was 12 microns with a drug loading of about 50%.

i. Digoxin was coated with Trappsol® cyclodextrin. A 50% (wt/vol) solution of chemically modified cyclodextrin was produced by mixing it with water at room temperature. A finely ground digoxtin (less than 15 microns) was suspended in the solution with mild stirring. The mix was stirred for 60 minutes and any undissolved drug was removed by centrifugation through a 0.45 micron sized membrane. Spray drying of the solution yielded a dry powder with a 10% drug loading. Preparation of the Film Forming Composition:

A film-forming composition, Composition A in Table 1, was prepared and mixed under vacuum to remove air bubbles. In further detail, a polymer mix of hydroxypropylmethyl cellulose (Methocel™ E15), polyvinylpyrrolidone and starch and xanthan were added to water with stirring over a short period of time of about 15 minutes. The stirring was set at 350

40

to 1500 rpm using an axial impeller. Stirring continued for another 45 minutes after combining the components to form a viscous, uniform mix.

To this viscous mix plasticizer (propylene glycol), flavor, antifoam and sweetener were sequentially added. The mixture was stirred for an additional 10 minutes at 500 rpm before the addition of a taste-masked drug.

TABLE 1

| Film Forming Polymer Composition Ingredient | Composition A |
|---|---|
| Hydroxypropylmethyl cellulose | 8.5 |
| Polyvinylpyrrolidone | 5.5 |
| Starch | 5.5 |
| Sweetener | 2.4 |
| Flavor (Mint Mix) | 3.3 |
| Xanthan Gum | 0.3 |
| Plasticizer | 3.4 |
| Antifoam agent | 0.8 |
| Water | 70.4 |
| Total: | 100 |

A taste-masked drug was added to the mixture in about a 5 minute time period. After the addition of the drug the mixture was placed under a vacuum from about 0.1 to about 0.7 torr for about 45 minutes.

Film Compositions with Taste-Masked Pharmaceutically Active Agents:

After removing the vacuum, the product mix was added to a coating pan and filmed using a three-roll coater. The suspension was coated at 250 microns onto siliconized paper substrate and moved through a drying oven heated at 90° C. The composition was dried in accordance with the process set forth in co-pending U.S. application Ser. No. 10/074,272.

The dried product was examined for physical appearance, dissolution in the mouth and bitterness.

The resultant uncut films of inventive composition A with the above-described taste-masked drugs exhibited uniformity in content particularly with respect to the tasted-masked drugs, as well as unit doses of ¾" by 1" by 5-6 mils cut therefrom. The inventive compositions also were observed to have a smooth surface, absent of air bubbles. The films had minimal taste when ingested. All films dissolved in the mouth in less than 15 seconds.

The film produced with the less than 100 micron sized taste-masked triglyceride had a loading of 20 mg per 25 $mm^2$ piece of film. The film produced with the less than 150 micron sized taste-masked tamoxifen had a loading of 10 mg per 20 $mm^2$ of film (assuming 85% active). The film produced with the less than 150 micron sized taste-masked torsemide had a loading of 10 mg per 25 $mm^2$ of film (assuming 90% active). The film produced with the taste-masked digoxin had a loading of 0.5 mg per 15 $mm^2$ of film (assuming 90% active).

Examples A'-I

Water soluble thin film compositions of the present invention are prepared using the amounts described in Table 1a.

US 8,603,514 B2

41                                                                42

TABLE 1a

| Ingredient | Weight (g) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A' | B | C | D | E | F | G | H | I |
| Hydroxypropylmethyl cellulose | | 1.76 | | 1.63 | 32.00 | | 3.67 | | 32.00 |
| Peppermint oil | | 0.90 | 1.0 | 1.05 | | 8.0 | 2.67 | | |
| Sweetener | 0.15 | 0.15 | 0.22 | 0.10 | | 4.6 | 1.53 | 0.15 | |
| Polyvinylpyrrolidone | | 0.94 | | 1.05 | | 7.0 | 2.33 | | |
| Tween 80[1] | 0.5 | 0.5 | 2.0 | 0.65 | 11.80 | | 1.35 | 0.5 | 11.80 |
| Simethicone[2] | 0.2 | 0.2 | 0.15 | 0.30 | 1.80 | | 0.21 | 0.2 | 1.80 |
| Listerine[3] | 83.35 | | | | | | | 83.35 | |
| Methylcellulose | 6.0 | | | | | | | | |
| Cornstarch[4] | | | 1.75 | | | | | | |
| Agar | | | 1.25 | | | | | | |
| Water | | 42.24 | 93.63 | 39.22 | 768.0 | 280.0 | 88.24 | | 768.0 |
| Loratadine[5] | | | | | 19.2 | | | | 19.2 |
| Pullulan[6] | | | | | | | | 6.0 | |
| Ibuprofen | | | | | | | | | 38.4 |

[1]Available from ICI Americas
[2]Available from OSI
[3]Available from Pfizer, Inc. including thymol (0.064%), eucalyptol (0.092%), methyl salicylate (0.060%), menthol (0.042%), water (up to 72.8%), alcohol (26.9%), benzoic acid, poloxamer 407, sodium benzoate, and caramel color
[4]Available from Grain Processing Corporation as Pure Cote B792
[5]Availabel from Schering Corporation as Claritin
[6]Available from Hayashibara Biochemical Laboratories, Inc., Japan

The ingredients of inventive compositions A'-I were combined by mixing until a uniform mixture was achieved. The compositions were then formed into a film by reverse roll coating. These films were then dried on the top side of an infrared transparent surface, the bottom side of which was in contact with a heated water bath at approximately 99° C. No external thermal air currents were present above the film. The films were dried to less than about 6% by weight water in about 4 to 6 minutes. The films were flexible, self-supporting and provided a uniform distribution of the components within the film.

The uniform distribution of the components within the film was apparent by examination by either the naked eye or under slight magnification. By viewing the films it was apparent that they were substantially free of aggregation, i.e. the carrier and the actives remained substantially in place and did not move substantially from one portion of the film to another. Therefore, there was substantially no disparity among the amount of active found in any portion of the film.

Uniformity was also measured by first cutting the film into individual dosage forms. Twenty-five dosage forms of substantially identical size were cut from the film of inventive composition (E) above from random locations throughout the film. Then eight of these dosage forms were randomly selected and additively weighed. The additive weights of eight randomly selected dosage forms, are as shown in Table 2 below:

TABLE 2

| | Additive Weight (g) | |
|---|---|---|
| Sample | Trial 1 | Trial 2 |
| 1 | 0.04 | 0.04 |
| 2 | 0.08 | 0.08 |
| 3 | 0.12 | 0.12 |
| 4 | 0.16 | 0.16 |
| 5 | 0.20 | 0.20 |
| 6 | 0.24 | 0.24 |
| 7 | 0.28 | 0.28 |
| 8 | 0.32 | 0.32 |

The individual dosages were consistently 0.04 gm, which shows that the distribution of the components within the film was consistent and uniform. This is based on the simple principal that each component has a unique density. Therefore, when the components of different densities are combined in a uniform manner in a film, as in the present invention, individual dosages forms from the same film of substantially equal dimensions, will contain the same mass.

An alternative method of determining the uniformity of the active is to cut the film into individual doses. The individual doses may then be dissolved and tested for the amount of active in films of particular size. This demonstrates that films of substantially similar sizes cut from different locations on the same film contain substantially the same amount of active.

When the films formed from inventive compositions A'-H are placed on the tongue, they rapidly dissolve, releasing the active ingredient. Similarly, when they are placed in water, the films rapidly dissolve which provides a flavored drink when the active is chosen to be a flavoring.

Examples J-L

Thin films that have a controlled degradation time and include combinations of water soluble and water insoluble polymers and water soluble films that allow controlled release of an active are prepared using approximately the amounts described in Table 3.

TABLE 3

| Ingredient | Weight (g) | | |
|---|---|---|---|
| | J | K | L |
| Hydroxypropylmethyl cellulose | | 1.0 | 1.0 |
| Tween 80[1] | 0.7 | 0.7 | 0.7 |
| Water | | | 5.0 |
| Aquacoat ECD[2] | 17.0 | 17.0 | 17.5 |
| Peppermint oil | 1.0 | 0.4 | 1.1 |

[1]Available from ICI Americas
[2]A 30% by weight aqueous dispersion of ethyl cellulose available from FMC

The components of inventive compositions J-L were combined and formed into films using the methods for preparing

US 8,603,514 B2

43

inventive compositions A'-I above. These films were also flexible, self-supporting and provided a uniform distribution of active which permits accuracy in dosing.

The uniformity of the films prepared from inventive compositions J-L may also be tested by either visual means measuring the weights of individual dosage films, or by dissolving the films and testing for the amount of active as described above.

### Examples M-O

An alternative method of preparing films which provides an accurate dosing may be used for any of inventive compositions A'-I. The method begins with first combining the ingredients with mixing. The combination of ingredients is then divided among individual wells or molds. In such a method, aggregation of the components during drying is prevented by the individual wells.

TABLE 4

| Ingredient | Weight % | | |
|---|---|---|---|
| | M | N | O |
| 5% Methylcellulose Solution[1] | 73.22 | 44.22 | 74.22 |
| Raspberry Flavor | 3.28 | 3.28 | 3.28 |
| Sweetener Blends | 1.07 | 1.07 | 1.07 |
| Tween-80[2] | 2.47 | 2.47 | 2.47 |
| Polyvinylpyrrolidone | 3.30 | 3.30 | 3.30 |
| Ethanol 95% | 8.24 | 8.24 | 8.24 |
| Propylene Glycol | 1.65 | 1.65 | 1.65 |
| Calcium Carbonate | 4.12 | 4.12 | 4.12 |
| Cornstarch[3] | 1.65 | 1.65 | 1.65 |
| Red Dye[4] | 1.00 | | |
| Corn Syrup[5] | | 30.00 | |

[1]Available from Dow Chemical Co. as Methocel K35
[2]Available from ICI Americas
[3]Available from Grain Processing Corporation as Pure Cote B792
[4]Available from McCormick
[5]Available from Bestfoods, Inc. as Karo Syrup

The ingredients in the above Table 4 were combined and formed into a film by casting the combination of ingredients onto the glass surface and applying heat to the bottom side of the glass. This provided inventive compositions M-O.

The film of composition M was examined both prior to and after drying for variations in the shading provided by the red dye. The film was examined both under sunlight and by incandescent bulb light. No variations in shade or intensity of color were observed.

Further testing of the films of composition M included testing of absorption which is directly related to concentration. The film was cut into segments each measuring 1.0 in. by 0.75 in., which were consecutively assigned numbers. Approximately 40 mg of the scrap material from which the segments were cut was dissolved in about 10 ml of distilled water and then quantitatively transferred to a 25 ml volumetric flask and brought to volume. The solution was centrifuged and scanned at 3 nm intervals from 203-1200 nm. The frequency of maximum absorption was found to be 530 nm. The solution was then re-centrifuged at a higher RPM (for the same length of time) and re-scanned, which demonstrated no change in the % transmission or frequency.

Each of the segments were weighed to 0.1 mg and then dissolved in 10 ml distilled water and transferred quantitatively to a 25 ml volumetric flask and brought to volume with distilled water. Each segment solution was then analyzed as above, and then scanned, at first from 203-1200 nm and later from only 500 nm to 550 nm at a 1 nm scanning speed.

44

The value recorded was the % transmission at the lowest wave length, which was most frequently 530 nm.

The absorption values are shown in Table 5 below:

TABLE 5

| Segment | mg/% A |
|---|---|
| 1-2 | 1.717 |
| 3-4 | 1.700 |
| 5-6 | 1.774 |
| 7* | 1.701 |
| 9-10 | 1.721 |
| 11-12 | 1.729 |
| 13-14 | 1.725 |
| 15-16 | 1.713 |

*segment 8 was lost

The overall average absorption was 1.724. Of the 15 segments tested, the difference between the highest and lowest values was 0.073 units, or 4% based on the average. This shows excellent control over the uniformity of the dye within the composition because the absorption is directly proportional to the concentration of the dye within each segment.

The film of inventive composition N provided a very flexible film. This film was able to be stretched and exhibited a very high tensile strength.

After forming the film of inventive composition O, the film was removed from the glass by very rapidly stripping the length of the glass with a razor. This provided very tightly wound "toothpick-like" dosage forms. Each dosage form consistently weighed 0.02 g. This demonstrates the uniformity of the dosage forms as well as the superior self-supporting properties of the films.

### Examples P-W

Compositions P-W were prepared to demonstrate the interaction among various conditions in production of films as they relate to the present invention. The ingredients in the below Table 6 were combined and formed into a film using the process parameters listed in Table 7 below, prepared in a 6 m drying tunnel designed to incorporate bottom drying of the films. Each of the examples shows the effect of different ingredient formulations and processing techniques on the resultant film products.

TABLE 6

| Ingredient | Weight (g) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | P | Q | R | S | T | U | V | W |
| Hydroxy-propyl-methyl cellulose | 320 | 320 | 320 | 320 | 320 | 320 | 345 | 345 |
| Water | 1440 | 1440 | 1440 | 1440 | | 1440 | 999 | 999 |
| Sweetener | | | | | | 60 | 60 | 45 |
| Mint Flavor | | | | | | 80 | 80 | |
| Propylene Glycol | 50 | 50 | 50 | 100 | 100 | 100 | 100 | 69.3 |
| Xanthan | 22 | | 11 | 11.23 | 10 | 10 | 10 | 6.9 |
| Water/ Ethanol (60/40) | | | | | 1440 | | | |
| Orange Flavor | | | | | | | | 42 |

US 8,603,514 B2

45

TABLE 7

| | Film Thickness (Micron) | Top[1] v (m/sec) | Bot.[1] v (m/sec) | T[1] (°C.) | Top[2] v (m/sec) |
|---|---|---|---|---|---|
| P1 | 100 | 0 | 22 | 75 | 0 |
| P2 | 350 | 0 | 22 | 75 | 0 |
| P3 | 350 | 0 | 40 | 75 | 0 |
| P4 | 350 | 0 | 40 | 75 | 0 |
| P5 | 350 | 10 | 40 | 75 | 10 |
| Q | 350 | 0 | 40 | 75 | 10 |
| R | 350 | 0 | 40 | 85 | 10 |
| S1 | 250 | 0 | 40 | 100 | 0 |
| S2 | 300 | 0 | 40 | 100 | 0 |
| S3 | 350 | 0 | 40 | 100 | 0 |
| T1 | 250 | 0 | 40 | 100 | 0 |
| T2 | 350 | 0 | 40 | 100 | 0 |
| U1 | 300 | 0 | 40 | 100 | 0 |
| U2 | 250 | 0 | 40 | 100 | 0 |
| U3 | 300 | 0 | 40 | 100 | 0 |
| V1 | 300 | 0 | 40 | 100 | 0 |
| V2 | 300 | 0 | 40 | 100 | 0 |
| V3 | 300 | 0 | 40 | 100 | 0 |
| W1 | 300 | 0 | 40 | 93 | 0 |
| W2 | 250 | 0 | 40 | 90 | 0 |
| W3 | 200 | 0 | 40 | 90 | 0 |

| | Bot.[2] v (m/sec) | T[2] (°C.) | Film Weight (g) | Coater Speed m/min | % Moisture |
|---|---|---|---|---|---|
| P1 | 23 | 60 | 109 | 5 | >20 |
| P2 | 23 | 60 | n/a | 5 | >20 |
| P3 | 40 | 60 | 161 | 3 | >20 |
| P4 | 40 | 75 | 191 | 3 | >20 |
| P5 | 40 | 75 | 253 | 3 | >20 |
| Q | 40 | 75 | n/a | 3 | >20 |
| R | 0 | 85 | | 2.5 | >20 |
| S1 | 40 | 90 | 163 | 1.5 | <5 |
| S2 | 40 | 90 | 193 | 1.5 | <5 |
| S3 | 40 | 90 | 225 | 1.5 | <5 |
| T1 | 40 | 90 | | 1.5 | <5 |
| T2 | 40 | 90 | 83 | 1.5 | <5 |
| U1 | 40 | 90 | 208 | 1.5 | 20 |
| U2 | 40 | 90 | 177 | 1.5 | 20 |
| U3 | 40 | 90 | 212 | 1.3 | 20 |
| V1 | 40 | 90 | 237 | 1.3 | 20 |
| V2 | 40 | 100 | 242 | 1.3 | 20 |
| W1 | 40 | 90 | 220 | 1.3 | 5 |
| W2 | 40 | 90 | 199 | 1.3 | 5 |
| W3 | 40 | 90 | 169 | 1.3 | 5 |

[1]First Heater Section (3 m)
[2]Second Heater Section (3 m)

In Table 7, each of the process parameters contributes to different properties of the films. Film thickness refers to the distance between the blade and the roller in the reverse roll coating apparatus. Bottom velocity and top velocity refer to the speed of air current on the bottom and top sides of the film, respectively. The film weight is a measure of the weight of a circular section of the substrate and the film of 100 cm$^2$.

Compositions P-R show the effects of visco-elastic properties on the ability to coat the film composition mixture onto the substrate for film formation. Composition P displayed a stringy elastic property. The wet film would not stay level, the coating was uneven, and the film did not dry. In Composition Q, substantially the same formulation as P was used however the xanthan was not included. This product coated the substrate but would not stay level due to the change in the visco-elastic properties of the wet foam. Composition R was prepared using substantially the same formulation, but incorporated one-half of the amount of xanthan of Composition P. This formulation provided a composition that could be evenly coated. Compositions P-Q demonstrate the importance of proper formulation on the ability of the film matrix to conform to a particular coating technique.

46

The films produced from Composition S contained a large amount of air in the films. This is shown by the dried film thickness which was the same despite that variation in the coated thickness as in Table 7. Microscopic examination of the film revealed a large number of air bubbles in the film. In order to correct for the addition of air in the films, care must be taken in the mixing process to avoid air inclusion.

Composition T included a change in the solvent to 60/40 water ethanol. Composition T was stirred slowly for 45 min. to deaerate the mixture. The dried weight film products T1 and T2 were consistent with the increase in solids from T1 to T2. The films dried much faster with less than 5% moisture. With the particular combination of ingredients in Composition T, the substitution of part ethanol for part water allowed the film to dry more quickly. The elimination of air from the film as a result of the slow stirring also contributed to the uniformity of the final film product and the faster drying time.

Only water was used as a solvent in Composition U. The dried weight of the U1-U3 changed consistently in accordance with the change in coating thickness indicating that no air bubbles were present. However, these films contained 20% moisture upon exit from the oven, unlike the films of Composition T, which included part ethanol and dried completely.

The amount of solids was increased and the amount of water was decreased in Compositions V1 and V2. The dried weight was greater than U1-U3 due to the increase in solids, however the films still contained 20% moisture upon exit from the oven, similar to Composition U.

The coating line speed was reduced for Composition V3, to prevent premature drying of the exposed top film surface. This film product dried to 6% moisture.

While increasing the amount of solids improved the film weight, longer drying times were required. This was due to the surface of the film sealing preventing easy removal of the water. Therefore, for Compositions W1-W3, the temperature in the first 3 m section of the dryer was decreased. This prevented the premature drying of the top surface of the films. Even at greater film thicknesses, the films were dried to 5% moisture even at faster coater line speeds.

Examples X-AA

TABLE 8

| | Weight (g) | | | |
|---|---|---|---|---|
| Ingredient | X | Y | Z | AA |
| Loratadine | 104.69 | | | |
| Zomig | | 52.35 | | |
| Paxil | | | 104.69 | |
| Hydroxypropyl methylcellulose | 320 | 320 | 320 | 150 |
| Sweetener blend | 60 | 60 | 60 | 0.4 |
| Simethicone | 1.5 | 1.5 | 1.5 | 1.5 |
| Propylene glycol | 100 | 100 | 100 | |
| Water | 1440 | 1440 | 1440 | 790 |
| Cream essence | | | | 0.4 |
| Polyvinyl pyrrolidinone | | | | 4 |
| Ethanol | | | | 40 |
| Cocoa | | | | 55.2 |
| Polyoxyl-40-stearate | | | | 7 |

Compositions X, Y and Z of Table 8 were taste mask coated using a Glatt coater and Eudragit E-100 polymethacrylate polymer as the coating. The coating was spray coated at a 20% level. Therefore 10 mg of drug 12.5 mg of the final dry product must be weighed.

US 8,603,514 B2

47

The base formula which excluded the drug additive was mixed with care to not incorporate air. After initial mixing the formula was slowly mixed to deaerate over 30 min. During this time the drug was weighed and prepared for addition to the base mix.

For Composition X, the Loratadine (80% drug) was added slowly to the mix with stirring. After 5 min. of stirring, the total mix was added to the pan of a three roll coater set (reverse roll coater) at 30 micron coating thickness.

The process bottom temperature was set at 90° C. with no top heat or air, the bottom air velocity was set at 40 m/sec., and the line speed was set at 1.3 m/min. Total drying time for the film was 4.6 min.

The liquid was coated at 30 microns and dried in the oven in less than 5 min. The film was flexible and a 1"x0.75" piece weighed 70 mg and contained 10 mg of Loratadine.

The experiment was repeated for Compositions Y and Z, Zomig and Paxil, respectively. Both produced flexible films with the target weight of 70 mg containing 5 mg of Zomig and 70 mg containing 10 mg of Paxil, respectively.

The products were sweet without any noticeable drug aftertaste.

The ingredients of Composition AA were mixed in order to reduce air captured in the fluid matrix. After mixing 45 g of

48

uniform film that substantially reduced or eliminated air bubbles in the film product, but also provided other benefits. The films displayed more desirable organoleptic properties. The films had an improved texture that was less "paper-like" provided a better mouth-feel to the consumer.

The compositions in Table 9 were prepared (including the addition of simethicone in inventive compositions BA-BG) and mixed under vacuum to remove air bubbles.

The resultant uncut films of inventive compositions BA-BG exhibited uniformity in content particularly with respect to the insoluble active, as well as unit doses of ¾" by 1" by 5 mils cut therefrom. The inventive compositions also were observed to have a smooth surface, absent of air bubbles. The significantly higher amounts of simethicone present in inventive compositions BF-BG also provided a very uniform film, but not significantly improved from that of inventive compositions BA-BE.

By contrast, comparative examples BH-BI were observed to have a rougher surface, exhibiting the inclusion of air bubbles in the resultant film which provided a less uniform texture and distribution of the ingredients.

TABLE 9

| Ingredient | BA | BB | BC | BD | BE | BF | BG | BH | BI |
|---|---|---|---|---|---|---|---|---|---|
| Hydroxypropylmethyl cellulose | 0 | 3.77 | 3.70 | 3.84 | 0 | 3.67 | 0 | 0 | 3.84 |
| Peppermint oil | 2.94 | 1.93 | 2.39 | 0 | 0 | 2.67 | 2.94 | 2.67 | 0 |
| Sweetener | 2.20 | 0.32 | 0.23 | 0 | 0.17 | 1.53 | 2.20 | 1.54 | 0 |
| Polyvinylpyrrolidone | 2.68 | 2.01 | 2.39 | 0 | 0 | 2.33 | 2.68 | 2.34 | 0 |
| Tween 80[1] | 2.24 | 1.07 | 1.48 | 1.42 | 0.55 | 1.35 | 2.24 | 0 | 1.42 |
| Simethicone[2] | 0.66 | 0.42 | 0.68 | 0.22 | 0.22 | 5.00 | 2.00 | 0 | 0 |
| Listerine[3] | 0 | 0 | 0 | 0 | 92.41 | 0 | 0 | 0 | 0 |
| Methylcellulose | 4.03 | 0 | 0 | 0 | 0 | 0 | 4.03 | 0 | 0 |
| Cornstarch[4] | 2.68 | 0 | 0 | 0 | 0 | 0 | 2.68 | 0 | 0 |
| Water | 73.53 | 90.47 | 89.14 | 92.22 | 0 | 83.45 | 72.19 | 93.46 | 92.44 |
| Loratadine[5] | 4.29 | 0 | 0 | 2.31 | 0 | 0 | 4.29 | 0 | 2.31 |
| Pullulan[6] | 0 | 0 | 0 | 0 | 6.65 | 0 | 0 | 0 | 0 |
| Calcium Carbonate | 1.43 | 0 | 0 | 0 | 0 | 0 | 1.43 | 0 | 0 |
| Xanthan Gum | 0.30 | 0 | 0 | 0 | 0 | 0 | 0.30 | 0 | 0 |
| Propylene Glycol | 3.02 | 0 | 0 | 0 | 0 | 0 | 3.02 | 0 | 0 |

[1]Available from ICI Americas
[2]Available from OSI
[3]Available from Pfizer, Inc. including thymol (0.064%), eucalyptol (0.092%), methyl salicylate (0.060%), menthol (0.042%), water (up to 72.8%), alcohol (26.9%), benzoic acid, poloxamer 407, sodium benzoate, and caramel color
[4]Available from Grain Processing Corporation as Pure Cote B792
[5]Available from Schering Corporation as Claritin
[6]Available from Hayashibara Biochemical Laboratories, Inc., Japan

loratadine coated at an 80% active level and 20% coating using Eudragit E-100, this mixture was added slowing with mixing until the drug was evenly dispersed, approximately 5 min. The liquid was then deposited into the 3 roll coater (reverse roll coater) and coated at 30 microns at a line speed of 1.3 m/min. The oven temperature was set at 90° C. to apply air and heat to the bottom only, with an air velocity set at 40 m/sec. The dried film was 0.005 inch. thick (5 mil) and was cut into 1 in.x0.75 in. pieces weighing 70 mg+/−0.7 mg, demonstrating the uniformity of the composition of the film. The film was flexible with 5% moisture, free of air bubbles, and had uniform drug distribution as seen under the light microscope, as well as shown by the substantially identical weight measurements of the film pieces.

Examples BA-BI

The incorporation of the anti-foaming/de-foaming agent (i.e., simethicone) provided a film that not only provided a

Examples CA-CC

The following examples of the present invention describe films and film-forming compositions that use an ethoxylated castor oil as a surfactant, or alternatively are free of surfactants, plasticizers and/or polyalcohols. Desirably, the films or film-forming compositions of the present invention are essentially free of surfactants. Moreover, the films or film-forming compositions of the present invention are desirably formulated to be essentially free of surfactants. Furthermore, the films or film-forming compositions of the present invention are desirably formulated to be essentially free of plasticizers. Still furthermore, the films or film-forming compositions of the present invention are desirably formulated to be essentially free of polyalcohols. Moreover, the films or film-forming compositions of the present invention are desirably formulated to be essentially free of surfactants and plasticizers. Furthermore, the films or film-forming compositions of the

US 8,603,514 B2

49

present invention are desirably formulated to be essentially free of surfactants, plasticizers and polyalcohols.

TABLE 10

| Ingredient | (parts by wt.) CA |
|---|---|
| POLYMERS: | |
| Hydroxypropylmethyl cellulose | 15.6 |
| Cornstarch[1] | 10.41 |
| Polyvinylpyrrolidone | 10.41 |
| Xanthan Gum | 1.14 |
| SURFACTANT[2]: | 2.0 |
| PLASTICIZER[3]: | 11.67 |
| ANTI-FOAM AGENT[4] | 2.44 |
| OTHER | |
| Spearmint Flavor | 10.43 |
| Loratadine (drug) | 16.62 |
| Calcium Carbonate | 5.54 |
| Sweetener | 9.36 |

[1]Available from Grain Processing Corporation as Pure Cote B792
[2]Ethoxylated caster oil, Cremophor ® EL available from BASF
[3]Propylene Glycol
[4]Silicone Emulsion

The above ingredients were added at 30% to 70% water and stirred until polymers were fully hydrated which took 45 min. The mix was then put under vacuum to eliminate entrapped air. Vacuum was added in a steady manner starting at 500 mm and progressing up to 760 mm over 45 min.

After release of the vacuum, 6 grams of the liquid was added to a coating paper using a 200 micron spiral wound rod and a K Control Coater Model 101 (RK Print Coat Inst. Ltd.). The paper substrate onto which the coating was added was a silicone coated paper. The coated paper was then dried at 90° C. until about 5% moisture remained. The formula coated and dried to a film thickness of approx. 60 microns and quickly dissolved in the mouth.

TABLE 11

| Ingredient | (parts by wt.) CB |
|---|---|
| POLYMERS: | |
| Hydroxypropylmethyl cellulose | 15.6 |
| Cornstarch[1] | 10.41 |
| Polyvinylpyrrolidone | 10.41 |
| PLASTICIZER/SOLVENT[2]: | 22.1 |
| ANTI-FOAM AGENT[3] | 2.44 |
| OTHER | |
| Raspberry Flavor | 0.3 |
| Calcium Carbonate[4] | 30.38 |
| Sweetener | 8.36 |

[1]Available from Grain Processing Corporation as Pure Cote B792
[2]Propylene Glycol
[3]Polydimethyl Siloxane Emulsion
[4]Functioned to mimic drug loading

The above ingredients were added to water at 40% until a homogeneous suspension was made. Vacuum was added over 20 min. starting at 500 mm Hg. and ending at 660 mm Hg. until all air was removed from suspension. Film was made as described in prior experiments. The liquid coated the silicone release substrate and dried to a uniform flexible film. The film passed the 180° bend test without cracking and dissolved in the mouth.

50

TABLE 12

| Ingredient | (parts by wt.) CC |
|---|---|
| POLYMERS: | |
| Hydroxypropylmethyl cellulose | 7.8 |
| Hydroxypropyl cellulose | 7.8 |
| ANTI-FOAM AGENT[1] | 0.75 |
| OTHER | |
| Peppermint & Bittermint Flavor | 2.25 |
| Tastemasking Flavor[2] | 0.3 |
| Calcium Carbonate[3] | 15.2 |
| Sweeteners | 0.9 |

[1]Polydimethyl Siloxane Emulsion
[2]Prosweet from Virginia Dave
[3]Functioned to mimic drug loading

The above ingredients were added at 30% to 70% water and stirred until polymers were fully hydrated which took 20 min. The mix was then put under vacuum to eliminate entrapped air. Vacuum was added in a steady manner up to 760 mm over 35 min.

After release of the vacuum, the liquid was added to a coating paper using a 350 micron smooth bar and a K Control Coater Model 101 (RK Print Coat Inst. Ltd.). The paper substrate onto which the coating was added was a silicone coated paper. The coated paper was then dried at 90° C. until about 4% moisture remained. The formula coated and dried to a film. The film had an acceptable taste and quickly dissolved in the mouth. The taste-masking flavor is an ingredient that affects the taste receptors to mask the receptors from registering a different, typical undesirable, taste. The film passed the 180° bend test without cracking and dissolved in the mouth.

Example CD

The following example of the present invention describes films and film-forming compositions that use a taste-masked, pharmaceutically active agent which also contains flavors and taste-masking aids. A taste-masking flavor is an ingredients that effects taste receptors to mask the receptors from registering a different, typically undesirable, taste.

TABLE 13

| Ingredient | (grams) CD |
|---|---|
| Hydroxypropylmethyl cellulose | 4.26 |
| Hydroxypropyl cellulose | 1.42 |
| Precipitated calcium Carbonate | 1.22 |
| Sweetner[1] | 0.6 |
| Taste-Masking flavor[2] | 0.08 |
| Taste-masked Acetaminophen[3] | 5.86 |
| Cinnamon Flavor | 0.9 |
| Spearmint Flavor | 0.43 |
| Polydimethylsiloxane emulsion | 0.23 |

[1]Sucralose, available from McNeil Nutritionals
[2]Magna Sweet, available from Mafco Worldwide Corp.
[3]Gutte Enteric, coated acetaminophen, Gatte, LLC

The above ingredients, except for the pharmaceutically active agent and flavors, were added at 35 grams water and stirred until polymers were fully hydrated which took about 20 min. Food coloring (7 drops of red food coloring and 1 drop of yellow fool coloring) was also added. The mix was then put under vacuum to eliminate entrapped air. Vacuum was added in a steady manner starting at 500 mm and progressing up to 760 mm over about 10 to 20 minutes. The

US 8,603,514 B2

51 / 52

taste-masked Acetaminophen was added to the mix in about 4 minutes was stirring under vacuum. The flavors were then added to the mix in about 4 minutes was stirring under vacuum.

After release of the vacuum, the liquid solution was added to a coating paper using a 350 micron smooth bar. The paper substrate onto which the coating was added was a silicone coated paper. The coated paper was then dried at 90° C. for about 11 minutes until about 3% moisture remained.

The formula coated and dried to a film. The film had an acceptable taste and moderately quickly dissolved in the mouth. The film did not curl on standing. The film passed the 180° bend test without cracking and dissolved in the mouth.

While there have been described what are presently believed to be the preferred embodiments of the invention, those skilled in the art will realize that changes and modifications may be made thereto without departing from the spirit of the invention, and it is intended to include all such changes and modifications as fall within the true scope of the invention.

### Examples CE-CF

Thin film compositions of the present invention were prepared using the amounts described in Table 14.

TABLE 14

| Component | Weight (g) |
| --- | --- |
| Hydroxypropylmethyl cellulose | 3.92 |
| Pullulan | 3.92 |
| Trehalose[1] | 3.5 |
| Precipitated Calcium Carbonate | 3.85 |
| Propylene Glycol | 1.96 |
| Simethicone[2] | 0.35 |
| Bovine Extract[3] | 32.5 |
| Water | q.s. |

[1]Available from Cargill Inc.
[2]Available from Sentry
[3]Available from Amarillo Biosciences Inc.

The above ingredients were combined by mixing until a uniform mixture was achieved. A sufficient amount of water was present in the film compositions prior to drying, i.e., q.s., which may range between about 200 g to about 1000 g. The bovine extract protein contained in the compositions is a heat sensitive protein. After mixing, the compositions were cast into films on release paper using a K-Control Coater with a 250 micron smooth bar.

In Example CE, the films subsequently were dried in an oven at approximately 80° C. for about 6 minutes. The films were dried to about 4.3 percent moisture. In Example CF, the films were dried in an oven at approximately 60° C. for about 10 minutes. The films were dried to about 5.06 percent moisture. After drying, the protein derived from bovine extract, which was contained in the films, was tested to determine whether or not it remained substantially active. To test the activity, a film dosage unit of this example was administered to a human. After ingesting the dosage, a microarray on the human's blood was conducted. The results, listed in Appendix A which is incorporated by reference herein, and graphically represented in FIG. 32, demonstrate that the protein was approximately 100 percent active in the final, dried film products of both Examples CE and CF. Therefore, the heat sensitive active did not substantially degrade or denaturize during the drying process.

### Example CG

Thin film compositions of the present invention were prepared using the amounts described in Table 15.

TABLE 15

| Component | Weight (g unless otherwise indicated) | |
| --- | --- | --- |
| | CG | CH |
| Hydroxypropylmethyl cellulose | 4.59 | 9.18 |
| Hydroxypropyl cellulose | 1.53 | 3.06 |
| Sucralose[1] | 0.7 | 1.4 |
| Magna Sweet[2] | 0.09 | 0.18 |
| Precipitated calcium carbonate | 2.0 | 4 |
| Fat-coated dextromethorphan hydrobromide | 5.96 | 11.93 |
| Orange concentrate flavor | 1.05 | 2.1 |
| Prosweet MM24[3] | 0.18 | 0.35 |
| Propylene glycol | 1.22 | 2.45 |
| Simethicone[4] | 0.18 | 0.35 |
| Water | 32.5 | 65 |
| Red food color | | 4 drops |
| Yellow food color | | 6 drops |

[1]Available from McNeil Nutritional
[2]Taste-masking flavor, available from Mafco Worldwide Corp.
[3]Taste-masking flavor, available from Virginia Dare
[4]Available from Sentry

The above ingredients in the amounts listed for CG were combined by mixing, and then cast into two films on release paper using a K-Control Coater with a 350 micron smooth bar. The films were subsequently dried according to conventional drying techniques, rather than via the uniform drying process of the present invention. One film was dried in an oven at 80° C. for 9 minutes on a wire rack. The second film was dried in an oven at 80° C. for 9 minutes on a wire screen. Both films were dried to about 2.4 percent moisture.

The resulting dried films showed imprints of the wire rack and screen after drying. These configurations comprise imprints of wire supports typically used in the drying process. Without uniform heat diffusion, the wire supports conducted heat more intensely at the points of contact with the substrate, leading to increased evaporation at these points. This caused more vigorous mixing, thereby pulling more particles to the contact points. The result is increased particle density seen as aggregations at the contact points.

The solution was cast into two more films on release paper using the K-Control Coater with a 350 micron smooth bar. These films were dried by the process of the present invention, under the same time and temperature conditions as above. In particular, the films were dried in an 80° C. air oven for 9 minutes on trays lined with furnace filters, which uniformly disperse heat. The films were dried to about 1.89 percent moisture. The resulting films had no streaks, and were homogenous. Due to uniform heat diffusion throughout the film, no particle aggregations developed.

### Example CH

The ingredients in Table 15, in the amounts listed for CH, were combined by mixing, and then cast into three films on release paper using a K-Control Coater with a 350 micron smooth bar. The films were dried for 9 minutes in an 80° C. air oven on trays lined with furnace filters, which uniformly distribute heat. The films were dried to about 2.20 percent moisture. As depicted in FIG. 17, the dried films 200 had no streaks, and were homogenous, i.e., no particle aggregations developed. The active particles appeared intact in the dried films. The films exhibited adequate strength and passed the 180° bend test without cracking, in which the films are bent in half with pressure.

The mixed solution was cast into three more films on release paper using a K-Control Coater with a 350 micron

US 8,603,514 B2

53      54

smooth bar. These films similarly were dried for 9 minutes in an 80° C. air oven, but by conventional top and bottom drying means. Two of the films were dried on wire racks, while the third was dried on a wire screen. All three films were dried to about 2.65 percent moisture. The dried films showed the imprints of the wire racks and screen, for the reasons described above in Example CG.

More particularly, the dried films 100 exhibited aggregations 110 of particles in both line and diamond configurations, as shown in FIGS. 9-16. These configurations comprise imprints of wire supports used in the drying process to display the disuniformity in heat transfer which occurs in conventional top and bottom drying. As discussed above, the wire supports conducted heat more intensely at the points of contact with the substrate, leading to increased evaporation at these points. This caused more vigorous mixing, thereby pulling more particles to the contact points. The resulting increased particle density at the contact points is depicted in FIGS. 9-16.

Moreover, the fat-coated dextromethorphan particles contained within the films of this example were not destroyed by the drying processes. FIGS. 28-31 depict fat-coated dextromethorphan particles 500 prior to any processing, and particularly, their substantially spherical shape. After exposure to drying conditions of 80° C. for 9 minutes, the fat-coated drug particles 500 were found to have remained intact within the films, i.e., maintained their spherical shape, as shown in FIGS. 18-25. Although the active particles were exposed to potentially deleterious temperatures, they did not degrade. In contrast, fat-coated dextromethorphan particles placed in an evaporating dish and heated in an air oven at 80° C. for 9 minutes substantially degrade. As seen in FIGS. 26 and 27, the fat-coated dextromethorphan particles appear completely melted after the exposure.

Example CI

Thin film compositions of the present invention were prepared using the amounts described in Table 16.

TABLE 16

| Component | Weight (g unless otherwise indicated) |
|---|---|
| Hydroxypropylcellulose | 6.00 |
| Polyethylene oxide | 2.00 |
| Sucralose[1] | 0.84 |
| Magna sweet[2] | 0.09 |
| Mixture of microcrystalline cellulose and sodium carboxymethylcellulose[3] | 0.18 |
| Precipitated calcium carbonate | 1.55 |
| Sildenafil[4] | 2.91 |
| Peppermint & bittermint flavor | 1.75 |
| Prosweet[5] | 0.44 |
| Masking flavor[6] | 1.31 |
| N,2,3-trimethyl-2-isopropylbutanamide[7] | 0.075 |
| Simethicone[8] | 0.035 |
| Water | 32.5 |
| Blue food coloring | 3 drops |

[1]Available from McNeil Nutritional
[2]Taste-masking flavor, available from Mafco Worldwide Corp.
[3]Avicel CL-611, available from FMC Biopolymer
[4]Available from Pfizer, Inc. as Viagra ®
[5]Taste-masking flavor, available from Virginia Dare
[6]Available from Ungerer and Co.
[7]Cooling agent
[8]Available from Sentry

The above ingredients were combined by mixing until a uniform mixture was achieved, and then cast into two films on release paper using a K-Control Coater with a 350 micron smooth bar. One film was dried for 10 minutes in an 80° C. air oven to a moisture level of 3.52%, while the second film was dried for 10 minutes in an 80° C. air oven to a moisture level of 3.95%. The dried films had adequate strength and tear resistance. The films passed the 180° bend test without breaking. The films also dissolved at a moderately fast rate in the mouth and exhibited an acceptable flavor.

As mentioned above, the controlled drying process of the present invention allows for uniform drying to occur, whereby evaporative cooling and thermal mixing contribute to the rapid formation of viscoelastic film and the "locking-in" of uniformity of content throughout the film. One of the additional advantages of the present invention is that the film composition reaches its viscoelastic state, and even the fully dried state, without exposing the components of the composition to temperatures which will cause them to be altered or unusable for their intended purpose. For example, heat sensitive drugs, proteins, flavors, sweeteners, volatile components, antigens, antibodies and the like, readily decompose at certain temperatures become inactive or denature, making them ineffective for their intended use. In the present invention, due to the combination of a short heat history required to dry, and the controlled non-top-skinning drying process, the film composition never need to attain the oven temperature (or other heat source) to reach the dried state. To demonstrate this, films were made in accordance with the present invention and dried as discussed below. A first thermocouple was placed within the film and a second thermocouple was suspended in the oven in order to measure the temperature differential between the oven environment and the film composition during the drying process.

To measure the temperature differentials, a thermocouple, which was connected to a Microtherma 1 thermometer, was placed within the films, and another thermocouple was suspended in the drying oven. Temperature readings in the films and oven were recorded every 30 seconds during the drying of the films.

The thermocouple results for the first film are listed in Table 17 below, and graphically represented in FIG. 33. The results for the second film are listed in Table 18 below, and graphically represented in FIG. 34. The results show that even after 10 minutes of drying, the temperatures of the film were substantially below (at least about 5° C.) the oven environment. Films dried for less than 10 minutes may experience significantly greater temperature differentials. For example, drying for 4 to 6 minutes, which is a particularly desirable time frame for many films of the present invention, produces differentials of about 25° C. to about 30° C. Accordingly, films may be dried at high, potentially deleterious temperatures without harming heat sensitive actives contained within the films.

TABLE 17

| Time (Min.) | Probe Temp (° C.) | Oven Temp (° C.) |
|---|---|---|
| 0 | 42.7 | 78 |
| 1 | 48.1 | 80 |
| 2 | 48.8 | 81 |
| 3 | 50 | 80 |
| 4 | 51.6 | 80 |
| 5 | 53.6 | 80 |
| 6 | 56.8 | 80 |
| 7 | 61.4 | 80 |

US 8,603,514 B2

55

TABLE 17-continued

| Time (Min.) | Probe Temp (° C.) | Oven Temp (° C.) |
|---|---|---|
| 8 | 66.8 | 80 |
| 9 | 72.7 | 80 |
| 10 | 76.1 | 80 |

TABLE 18

| Time (Min.) | Probe Temp (° C.) | Oven Temp (° C.) |
|---|---|---|
| 0 | 44.4 | 77 |
| 1 | 49.8 | 81 |
| 2 | 49.2 | 81 |
| 3 | 49.4 | 80 |
| 4 | 51 | 80 |
| 5 | 52 | 80 |
| 6 | 55 | 80 |
| 7 | 58.9 | 80 |
| 8 | 64.5 | 80 |
| 9 | 69.8 | 80 |
| 10 | 74.4 | 80 |

Example CJ-DB

The following examples describe film compositions of the present invention, which contain water-soluble polymers including polyethylene oxide (PEO) alone or in combination with hydroxypropyl cellulose (HPC) or hydroxypropylm-ethyl cellulose (HPMC). Thin film compositions were prepared using the polymer amounts listed in Table 19.

56

TABLE 19

| Composition | PEO (g) | HPC (g) | HPMC (g) |
|---|---|---|---|
| CJ | | 32 | 8 |
| CK | | 24 | 16 |
| CL | | 16 | 24 |
| CM | | 8 | 32 |
| CN | | | 40 |
| CO | 8 | | 32 |
| CP | 16 | | 24 |
| CQ | 24 | | 16 |
| CR | 32 | | 8 |
| CS | 40 | | |
| CT | 4 | | 36 |
| CV | 6 | | 34 |
| CV | 32 | 8 | |
| CW | 24 | 16 | |
| CX | 16 | 24 | |
| CY | 8 | 32 | |
| CZ | | 40 | |
| DA | 4 | 36 | |
| DB | 6 | 34 | |

The above polymer components were combined with equal amounts of precipitated calcium carbonate (mimics drug loading), simethicone emulsion, and water to form the film compositions. The components were combined by mixing until a uniform mixture was achieved, and then cast into films on release paper using a K-Control Coater with a 350 micron smooth bar. The films were dried for about 9 minutes at 80° C. in accordance with the present invention. The film compositions were tested for various properties, the results of which are described in Table 20 below.

TABLE 20

| Composition Film | Composition of Polymer in Film | Solution Coating Rating | Solution Leveling Rating | % Moisture in Film | 180° Bend Test | Dissolution Test (seconds) | Curl Test |
|---|---|---|---|---|---|---|---|
| CJ | 20% HPMC/ 80% HPC | well | well | 2.9 | Failed at crease | 12, 15 | Curl |
| CK | 40% HPMC/ 60% HPC | well | well | 1.70 | Failed at crease | 21, 22 | Curl |
| CL | 60% HPMC/ 40% HPC | well | well | 2.40 | Failed at crease | 24, 27 | Curl |
| CM | 80% HPMC/ 20% HPC | well | well | 2.76 | Failed at crease | 31, 31 | Curl |
| CN | 100% HPMC | reasonably well | well | 2.66 | Failed at crease | 35, 38 | Curl |
| CO | 10% PEO/ 90% HPMC | some streaking | well | 2.27 | Failed at crease | 31, 32 | Curl |
| CP | 15% PEO/ 85% HPMC | well | well | 3.31 | Failed | 24, 27 | Curl |
| CQ | 20% PEO/ 80% HPMC | well | well | 2.06 | Passed | 22, 31 | Slight curl |
| CR | 40% PEO/ 60% HPMC | well | well | 2.01 | Passed | 13, 12 | Slight curl |
| CS | 60% PEO/ 40% HPMC | well | well | 1.40 | Passed | 5, 6 | Very slight curl |
| CT | 80% PEO/ 20% HPMC | well | well | 1.35 | Passed | 5, 6 | Very slight curl |
| CU | 100% PEO | well | well | 0.98 | Passed | 5, 5 | No curl |
| CV | 20% HPC/ 80% PEO | well | well | 1.01 | Passed | 5, 5 | No curl |
| CW | 40% HPC/ 60% PEO | well | well | 2.00 | Passed | 6, 6 | No curl |
| CX | 60% HPC/ 40% PEO | well | well | 0.97 | Passed | 7, 7 | Slight curl |
| CY | 80% HPC/ 20% PEO | well | well | 1.41 | Passed | 12, 12 | Very slight curl |
| CZ | 85% HPC/ 15% PEO | well | well | 1.86 | Failed at crease | 13, 14 | Curl |
| DA | 90% HPC/ 10% PEO | well | well | 1.62 | Failed at crease | 14, 13 | Curl |

US 8,603,514 B2

57

58

TABLE 20-continued

| Composition | Composition of Polymer in Film | Solution Coating Rating | Solution Leveling Rating | % Moisture in Film | 180° Bend Test | Dissolution Test (seconds) | Curl Test |
|---|---|---|---|---|---|---|---|
| DB | 100% HPC | well | well | 2.01 | Failed at crease | 16, 17 | Curl |

The solution coating rating and solution leveling rating were both based upon panel observations made during casting of the film compositions.

For the 180° bend test, the dried films were placed in a moisture analyzer (HR73 Moisture Analyzer from Mettler Toledo) to obtain percent moisture and to remove any solvent (e.g. water) remaining in the films after drying at 80° C. in accordance with the present invention. The films then were creased to about 180° and observed for break. Films that broke during creasing were considered a failure. If the film did not break during creasing, a 200 g weight was dropped onto the creased film from a height of about 8.5 mm. Films that broke were considered a failure, and those that did not break were considered a pass. It should be noted, however, that this flexibility test is an extreme test. Films that failed this test are still considered operable within the scope of the present invention. More specifically, there may be certain applications that do not require such extreme flexibility properties.

The films also were tested for dissolution rate. An approximately 20 mm by 100 mm piece of film, having a 2.85 g weight attached, was lowered into a 32.5° C. water bath to a depth of about 50 mm. The time required for the film to dissolve and separate into two pieces was determined (in seconds).

For the curl test, samples of film (about 35 mm by 35 mm) were placed on a glass plate in a laboratory window ledge. The film samples were allowed to stand in the window ledge at room conditions for two to three days and then were observed for curling.

In accordance with the present invention, desirable film compositions are flexible, fast dissolving, and not likely to substantially curl. As indicated by the results in Table 20, Compositions CQ-CY performed best, exhibiting good flexibility, dissolution, and curling properties. In particular, Compositions CQ-CY passed the 180° bend test and dissolved at moderate to fast rates. These compositions also exhibited no or only slight curl. Accordingly, it may be desirable to employ polymer components as in Compositions CQ-CY, particularly about 20% to 100% PEO in the polymer component optionally combined with about 0% to 80% HPC or HPMC.

Examples DC-DG

The following examples of the present invention describe films that include PEO or PEO-polymeric blends and an active component. Thin film compositions with these components were prepared using the amounts described in Table 21.

TABLE 21

| | Weight (g unless otherwise indicated) | | | | |
|---|---|---|---|---|---|
| Component | DC | DD | DE | DF | DG |
| PEO[1] | 8.75 | 7 | 1.75 | 7 | 1.75 |
| Sucralose | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |

TABLE 21-continued

| | Weight (g unless otherwise indicated) | | | | |
|---|---|---|---|---|---|
| Component | DC | DD | DE | DF | DG |
| Precipitated calcium carbonate | 3.65 | 3.65 | 3.65 | 3.65 | 3.65 |
| Orange concentrate flavor | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 |
| Vanilla | 0.5 | | | 0.5 | 0.5 |
| HPMC | | 1.75 | 7.0 | | |
| HPC | | | | 1.75 | 7.0 |
| Simethicone[2] | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 |
| Water | 32.5 | 32.5 | 32.5 | 32.5 | 32.5 |
| Loratadine[3] | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 |
| Yellow food coloring | 3 drops | 3 drops | 3 drops | 3 drops | 3 drops |
| Red food coloring | 2 drops | 2 drops | 2 drops | 2 drops | 2 drops |

[1]Available from the Dow Chemical Company
[2]Available from Sentry
[3]Available from Schering Corporation as Claritin

The above components for each of Compositions DC through DG were combined by mixing until a uniform mixture was achieved, and then cast into films on release paper using a K-Control Coater with a 350 micron smooth bar. The films were dried for about 9 minutes at 80° C. in accordance with the method of the present invention to varying moisture levels.

After drying, the films were tested for various properties, including the 180° bend test, dissolution test, and curl test, as described above in Examples CJ-DB. The films also were tested for resistance to tearing. Tear resistance was measured by a panel test in which members tried to tear the film apart by pulling on opposing ends of the film. Films that tore cleanly received a low grade. Films that stretched a little and began to break received a moderate grade, and films that stretched and were difficult to tear received a high grade.

Composition DC, which included a 100% PEO film base, was dried in accordance with the method of the present invention to about 1.30 percent moisture. The dried film had good strength, and passed the 180° bend test. The film also exhibited good resistance to tearing (high grade). The film dissolved at a fast rate on the tongue, and had a dissolution testing rate of about 3.5 to 4 seconds. The film exhibited no curling.

Composition DD, which included an 80%/20% PEO/HPMC film base, was dried in accordance with the method of the present invention to about 2.30 percent moisture. The dried film exhibited adequate strength, and passed the 180° bend test. The film also exhibited good resistance to tearing. It dissolved at a moderate to fast rate on the tongue, and had a dissolution testing rate of about 5 seconds. The film exhibited slight curling.

Composition DE, which included a 20%/80% PEO/HPMC film base, was dried in accordance with the method of the

US 8,603,514 B2

59

present invention to about 3.0 percent moisture. The film had good strength, and passed the 180° bend test. The film exhibited moderate tear resistance, dissolved on the tongue at a slow rate, and had a dissolution testing rate of 16 seconds. The film exhibited some curling.

Composition DF, which included an 80%/20% PEO/HPC film base, was dried in accordance with the method of the present invention to about 2.52 percent moisture. The film exhibited good strength, passed the 180° bend test, and exhibited high tear resistance. The film also dissolved at a fast rate on the tongue, and had a dissolution rating of 4 seconds. The film exhibited very slight curling.

Composition DG, which included a 20%/80% PEO/HPC film base, was dried in accordance with the method of the present invention to about 2.81 percent moisture. The film had adequate strength, passed the 180° bend test, and exhibited moderate tear resistance. The film dissolved on the tongue at a fast rate, and had a 10 second dissolution testing rate. The film exhibited no curling.

As indicated above, each of Compositions DC-DG contained about 20% to 100% PEO in the polymer component, optionally in combination with varying levels of HPC or HPMC. The results indicate that varying the polymer component achieved different film properties.

Examples DH-DZ

The following examples of the present invention describe films that include PEO or PEO-HPC polymer blends. The film compositions include PEO of varying molecular weights. Thin film compositions with these components were prepared using the amounts described in Table 22 (listed by weight percent of the polymer component).

60

TABLE 22

| Composition | 100,000 PEO (wt. %) | 200,000 PEO (wt. %) | 300,000 PEO (wt. %) | 900,000 PEO (wt. %) | HPC (wt. %) |
|---|---|---|---|---|---|
| DH | | | 20 | | 80 |
| DI | | | 50 | | 50 |
| DJ | | | 80 | | 20 |
| DK | | 50 | | | 50 |
| DL | | 67.5 | | | 32.5 |
| DM | | 70 | | | 30 |
| DN | | 75 | | | 25 |
| DO | | 100 | | | |
| DP | 50 | | | | 50 |
| DQ | 100 | | | | |
| DR | | | | 10 | 90 |
| DS | | | | 20 | 80 |
| DT | | 40 | | 10 | 50 |
| DU | 25 | | | 15 | 60 |
| DV | 20 | 80 | | | |
| DW | | 80 | | 20 | |
| DX | | 80 | 20 | | |
| DY | | 50 | 50 | | |
| DZ | | 20 | 80 | | |

The above polymer components were combined with sucralose, precipitated calcium carbonate (mimics drug loading), orange concentrate flavor, Tween 80 (available from ICI Americas), vanilla flavor, simethicone emulsion, water, and yellow and red food coloring to form the film compositions. The components were combined by mixing until a uniform mixture was achieved, and then cast into films on release paper using a K-Control Coater with a 350 micron smooth bar. The solution coating and leveling properties were observed. The films then were dried for about 9 minutes at 80° C. in accordance with the method of the present invention. The film compositions were tested for various properties to determine the effect of varying the PEO molecular weight and level in the polymer component, the results of which are described in Table 23 below.

TABLE 23

| Composition | Film thickness (mils) | % Moisture | Roof of Mouth Tendency | 180° Bend Test | Dissolution Test (seconds) | Tear Resistance |
|---|---|---|---|---|---|---|
| DH | 3.5 | 2.5 | low | passed | 8 | poor |
| DI | 3.8 | 2.01 | low | passed | 7 | moderate |
| DJ | 2.6 | 2.63 | high | passed | 3 | excellent |
| DK | 3.4 | 2.35 | low | passed | 4 | poor |
| DL | 3.5 | 1.74 | low | passed | 4 | good to excellent |
| DM | 3.5 | 1.68 | low | passed | 4 | good to excellent |
| DN | 3.3 | 2.33 | moderate | passed | 3 | good to excellent |
| DO | 3.1 | 2.14 | high | passed | 4 | excellent |
| DP | 4.1 | 1.33 | high | passed | 3.5 | poor |
| DQ | 3.2 | 2.07 | high | passed | 4 | good |
| DR | 3.4 | 1.90 | low | passed | 10 | poor |
| DS | 3.5 | 2.04 | low | passed | 10 | poor |
| DT | 3.3 | 2.25 | moderate | passed | 5 | good |
| DU | 3.6 | 2.84 | low to moderate | passed | 6 | moderate |
| DV | 2.5 | 3.45 | high | passed | 2 | excellent |
| DW | 2.5 | 2.83/1.68 | high | passed | 3-4 | excellent |
| DX | 3.5 | 2.08 | high | passed | 5 | excellent |
| DY | 2.8 | 1.67 | high | passed | 3 | excellent |
| DZ | 2.5 | 1.89/0.93 | high | passed | 3 | excellent |

US 8,603,514 B2

61

The films were tested for various properties, including the 180° bend test, dissolution test, and tear resistance, as described above. The films also were tested for adhesion, i.e., tendency to go to the roof of the mouth. Adhesion was rated by a panel test in which films that did not stick to the roof of the mouth received a low grade, films that stuck somewhat received a moderate grade, and films that stuck completely received a high grade.

As indicated above, the level and molecular weight of PEO in the polymer component were varied to achieve different film properties. In general, the higher the level of PEO in the polymer component, the greater the adhesiveness and tear resistance exhibited by the film. Film compositions containing about 50% or greater levels of PEO attained higher tear resistance ratings than those with less than 50% PEO. The tear resistance of lower levels of PEO, however, was shown to be improved by combining small amounts of higher molecular weight PEOs with the lower molecular weight PEOs (e.g. Compositions DT and DU).

Compositions containing about 20% to 75% PEO performed best with respect to adhesion prevention (lower tendencies to go to the roof of the mouth). Compositions containing higher levels of PEO performed well when adhesion was desired.

As regards dissolution rate, polymer components containing about 50% or higher levels of PEO performed best, providing faster dissolving film compositions. In those films containing combinations of varying molecular weight PEOs, those with about 60% or higher of the lower molecular weight PEOs (100,000 to 300,000) in the PEO combination dissolved faster.

Example EA

The following example of the present invention describes films that include PEO and polyvinyl pyrrolidone (PVP) polymeric blends. Thin film compositions with these components were prepared using the amounts described in Table 24. In particular, the polymer component of the films contained about 80% PEO and 20% PVP, or a ratio of 4:1 PEO to PVP.

TABLE 24

| Component | Weight (g unless otherwise noted) |
|---|---|
| PVP | 3.75 |
| PEO | 15 |
| Sucralose[1] | 1.5 |
| Precipitated calcium carbonate | 14.57 |
| Orange concentrate flavor | 2.25 |
| Tween 80[2] | 0.056 |
| Simethicone[3] | 0.38 |
| Water | 62.5 |
| Yellow food color | 6 drops |
| Red food color | 4 drops |

[1]Available from McNeil Nutritionals
[2]Available from Fisher
[3]Available from Sentry

62

The above components were combined by mixing until a uniform mixture was achieved, and then cast into films on release paper using a K-Control Coater with a 350 micron smooth bar. The films were dried for about 9 minutes at 80° C. in accordance with the method of the present invention to a moisture level of about 2.19%. The films exhibited good strength, dissolved in the mouth at a moderate to fast rate, had high tear resistance, a thickness of about 4 mils, good flavor, low tendency to adhere to the roof of the mouth, and passed the 180° bend test. The film had a dissolution rate of 4 seconds, according to the test described above. In addition, the film easily released from the release paper.

Example EB-ED

The following examples of the present invention describe extruded films that include PEO-based polymer components. Film compositions were prepared using the amounts described in Table 25 for Example EC and Table 26 for Example ED.

TABLE 25

| COMPONENT | WEIGHT (g unless otherwise noted) |
|---|---|
| HPC | 73.78 |
| Polyethylene oxide | 153.22 |
| Sucralose | 18.16 |
| Precipitated calcium carbonate | 176.38 |
| Orange concentrated flavor | 27.24 |
| Tween 80 | 0.68 |
| Simethicone | 4.54 |
| Yellow food coloring | 27 drops |
| Red food coloring | 18 drops |

TABLE 26

| COMPONENT | WEIGHT (g unless otherwise noted) |
|---|---|
| Polyethylene oxide | 227 |
| Sucralose | 18.16 |
| Precipitated calcium carbonate | 176.38 |
| Orange concentrated flavor | 27.24 |
| Tween 80 | 0.68 |
| Simethicone | 4.54 |
| Yellow food coloring | 27 drops |
| Red food coloring | 18 drops |

The films of Examples EB-ED were extruded using a single screw extruder in accordance with the specifications provided in Table 27 below (temperatures are in ° F.).

TABLE 27

| Composition | RPM | Temp. Barrel Zn. 1 | Temp. Barrel Zn. 2 | Temp. Barrel Zn. 3 | Temp. Zn. 4 | Temp. Die | Temp. Melt | PSI Pressure P1 | P2 | Amps |
|---|---|---|---|---|---|---|---|---|---|---|
| EB | 73 | 175 | 181 | 185 | 190 | 190 | 194 | 600 | 1250 | 12 |
| EB | 153 | 177 | 181 | 199 | 211 | 210 | 217 | 175 | 1070 | 7.8 |

US 8,603,514 B2

63

64

TABLE 27-continued

| Composition | RPM | Temp. Barrel Zn. 1 | Temp. Barrel Zn. 2 | Temp. Barrel Zn. 3 | Temp. Zn. 4 | Temp. Die | Temp. Melt | P1 | PSI Pressure P2 | Amps |
|---|---|---|---|---|---|---|---|---|---|---|
| ED | 253 | 175 | 181 | 200 | 211 | 210 | 222 | 0 | 761 | 6.3 |
| ED | 109 | 175 | 181 | 200 | 211 | 210 | 207 | 0 | 1000 | 6.0 |
| EC | 109 | 175 | 181 | 200 | 211 | 210 | 217 | 0 | 875 | 12.1 |
| EC | 149 | 175 | 200 | 226 | 248 | 239 | 258 | 0 | 583 | 7.3 |

More specifically, for Example EB, two pounds of PEO having a molecular weight of about 200,000 were weighed and placed in a polyethylene plastic bag. This PEO flush was then extruded according to the specifications in Table 27.

For Example EC, a blend of the components listed in Table 25 was prepared. The HPC, PEO, sucralose, and precipitated calcium carbonate were placed in a large electric blender and allowed to mix. A solution of orange concentrate flavor and Tween 80 was added to the blender while mixing, after which a solution of simethicone and the food colors was added to the blender while mixing. The blended composition was extruded in accordance with the specifications in Table 27.

For Example ED, a blend of the components listed in Table 26 was prepared. The PEO, sucralose, and precipitated calcium carbonate were placed in a large electric blender and allowed to mix. A solution of orange concentrate flavor and Tween 80 was added to the blender while mixing, after which a solution of simethicone and the food colors was added to the blender while mixing. The blended composition was extruded in accordance with the specifications in Table 27.

The extruded films did not exhibit stickiness to each other during processing. As such, the resulting film could be rolled or wound onto itself without the need for a backing material.

Examples EE-EH

The following examples of the present invention describe films that include a densifying agent. A thin film composition including PEO-polymeric blends and a densifying agent (simethicone) were prepared using the amounts described in Table 28.

TABLE 28

| Component | Weight (g unless otherwise indicated) | | | |
|---|---|---|---|---|
| | EE | EF | EG | EH |
| Hydroxypropylcellulose | 3.05 | 3.05 | 3.05 | 3.05 |
| Polyethylene oxide | 6.33 | 6.33 | 6.33 | 6.33 |
| Sucralose | 0.75 | 0.75 | 0.75 | 0.75 |
| Precipitated calcium carbonate | 7.47 | 7.47 | 7.09 | 7.09 |
| Orange concentrate flavor | 1.12 | 1.12 | 1.12 | 1.12 |
| Tween 80 | 0.028 | 0.028 | 0.028 | 0.028 |
| Simethicone | 0 | 0 | 0.38 | 0.38 |
| Water | 31.25 | 31.25 | 31.25 | 31.25 |
| Yellow food coloring | 3 drops | 3 drops | 3 drops | 3 drops |
| Red food coloring | 2 drops | 2 drops | 2 drops | 2 drops |

The densities of these thin film compositions were measured, the results of which are shown in Table 29.

TABLE 29

| Composition | Average Weight of Film/Density |
|---|---|
| EE | 146.5 mg/1.123 |
| EF | 126.5 mg/0.969 |

TABLE 29-continued

| Composition | Average Weight of Film/Density |
|---|---|
| EG | 137 mg/1.057 |
| EH | 146 mg/1.119 |

Vacuum conditions were added to two of the film compositions (EE and EH). Composition EE contained 0% simethicone and vacuum was applied. Composition EF contained 0% simethicone and no vacuum applied. As shown in Table 29 above, the density increased with the addition of vacuum conditions from 0.969 (EF) to 1.123 (EE). Composition EG contained 2% simethicone and no vacuum applied. Composition EH contained 2% simethicone and vacuum was applied. Again, density increased from 1.057 (EG) to 1.119 (EH). Overall, the density of the films increased from 0.969 (EF: no simethicone and no vacuum) to 1.057 (EG: simethicone but no vacuum) to 1.119 (EH: simethicone and vacuum).

Examples EI-EW

The following examples of the present invention describe films that include PEO or PEO-polymeric blends. In particular, PEO was combined with polyvinylpyrrolidone (PVP), starch (pregelatinized modified corn starch), sodium carboxymethyl cellulose (CMC), hydroxypropylcellulose (HPC), hydroxypropylmethyl cellulose (HPMC) or polyvinyl alcohol (PVA) to form the polymer components of the films. Thin film compositions with these components were prepared in accordance with the method of the present invention using the amounts described in FIG. 38.

In addition to the polymer components listed in FIG. 38, each of these film compositions included: about 4% sucralose, about 38.85% calcium carbonate, about 6% orange flavor, about 0.15% Tween 80, about 1% simethicone, and food coloring. The PEO included in the polymer component of these examples had a molecular weight of about 200,000.

FIG. 38 also displays certain properties of these films, including: percent solids of solution; viscosity; percent moisture; film thickness; film strength; tear resistance of the film; tendency of the film to go to the roof of the mouth; the 180° bend test; whether molding, or aggregations, are present in the film; dissolution times of the film; rating of dissolution in the mouth; and time in drying oven. Each of these film property tests is described in detail above. The results of these various tests are indicated in FIG. 38.

Examples EX-FK

The following examples of the present invention describe films that include PEO or PEO-polymeric blends (with HPC) and different active components. Thin film compositions with these components were prepared in accordance with the method of the present invention using the amounts described in Tables 30 and 31.

US 8,603,514 B2

65

66

TABLE 30

| Component | Weight (in g, unless otherwise indicated) | | | | | | |
|---|---|---|---|---|---|---|---|
| | EX | EY | EZ | FA | FB | FC | FD |
| HPC | 5.68 | 5.64 | 6 | 6.73 | 6.22 | 6.22 | |
| PEO | 1.89 | 1.88 | 2 | 2.25 | 1.78 | 1.78 | 9.04 |
| Sucralose | 0.84 | 0.84 | 0.44 | 0.66 | 0.84 | 0.84 | 0.44 |
| Magna Sweet | 0.08 | 0.08 | 0.09 | 0.10 | 0.09 | 0.09 | |
| Avicel CL 611[1] | 0.18 | 0.18 | 0.18 | 0.20 | 0.18 | 0.18 | |
| Precipitated calcium carbonate | 0.67 | | 2.2 | | 0.71 | 3.07 | |
| Dextromethorphan | 5.83 | 6.94 | | | | | |
| Caffeine | | | 3.28 | | | | |
| Tadalafil[2] | | | | 4.92 | | | |
| Sildenafil[3] | | | | | 4.38 | | |
| Loperamide[4] | | | | | | 2.8 | |
| Prosweet | 0.18 | 0.18 | | 0.20 | 0.61 | 0.18 | |
| Taste Masking Flavor | | | 0.87 | | 1.31 | 0.89 | |
| Peppermint | | | 0.87 | | | | |
| Peppermint Bittermask flavor | | | 1.07 | | | | |
| Vanilla flavor | | | | 0.56 | | | |
| Watermelon artificial flavor | 1.23 | 1.23 | | | 1.22 | | |
| Orange flavor | | | | 1.18 | | | |
| Hawaiian punch flavor | | | | | | 1.22 | |
| Strawberry & cream flavor | | | | | | | 1.11 |
| WS-23[5] | 0.075 | 0.075 | 0.075 | 0.084 | 0.075 | 0.075 | |
| WS-3[6] | | | | | | | 0.025 |
| Simethicone | 0.08 | 0.08 | 0.18 | 0.39 | 0.09 | 0.18 | 46.43 |
| Propylene glycol | 0.76 | 0.38 | 0.25 | 0.22 | | | |
| Water | 32.5 | 32.5 | 32.5 | 32.5 | 32.5 | 32.5 | |
| Green color | 5 drop | 5 drop | | | 5 drop | | |
| Red color | | | | 2 drop | | 5 drop | 7 drop |
| Blue color | | | 3 drop | | | | |
| Yellow color | | | | 3 drop | | | |

[1]Mixture of microcrystalline cellulose and sodium carboxymethylcellulose, available from FMC Biopolymer
[2]Available from Lilly ICOS, LLC, as Cialis ®
[3]Available from Pfizer, Inc. as Viagra ®
[4]Available as Imodium
[5]N-2,3-trimethyl-2-isopropyl butanamide
[6]N-Ethyl-p-menthane-3-carboxamide

TABLE 31

| Component | Weight (in g, unless otherwise indicated) | | | | | | |
|---|---|---|---|---|---|---|---|
| | FE | FF | FG | FH | FI | FJ | FK |
| HPC | 1.28 | 3.05 | 4.5 | 3.29 | 2.6 | 2.92 | 3.29 |
| PEO | 2.66 | 6.33 | 3 | 6.83 | 5.4 | 6.08 | 6.83 |
| Sucralose | 0.31 | 0.9 | 0.6 | | 0.64 | | |
| Magna Sweet | | 0.09 | | | | | |
| Avicel CL 611[1] | | 0.56 | 0.45 | | | | |
| Precipitated calcium carbonate | 1.07 | 2.02 | 0.99 | 6.05 | 0.90 | 2.67 | 1.39 |
| Meloxicam[2] | 1.97 | | | | | | |
| Risperidone[3] | | 0.62 | | | | | |
| Zyrtec ®[4] | | | 3.75 | | | | |
| Five Grass Powder[5] | | | | 2.207 | | | |
| Tea Tree Oil[6] | | | | | 4 | | |
| Antibacterial concentrate[7] | | | | | | 6.12 | |
| Mite extract[8] | | | | | | | 6.87 |
| Prosweet | | 0.66 | | | | | |
| Taste Masking Flavor | | 1.41 | | | | | |
| Peppermint Bittermask flavor | | 2.81 | | | 2.24 | | |
| Orange flavor | 0.47 | | | | | | |
| Strawberry & cream flavor | | | 1.5 | | | | |
| WS-3[9] | 0.020 | 0.081 | 0.038 | | 0.04 | | |
| Tween 80 | 0.012 | 0.028 | 0.022 | | 0.024 | 0.027 | |
| Simethicone | 0.08 | 0.19 | 0.15 | 0.37 | 0.16 | 0.18 | 0.37 |
| Water | 14.63 | 31.25 | 25 | 31.25 | 24 | 22 | 31.25 |
| Red color | 2 drop | | 5 drop | | | | |

US 8,603,514 B2

67
68

TABLE 31-continued

| Component | Weight (in g, unless otherwise indicated) | | | | | | |
|---|---|---|---|---|---|---|---|
| | FE | FF | FG | FH | FI | FJ | FK |
| Blue color | | 3 drop | | | 3 drop | | |
| Yellow color | 3 drop | | | | | | |

[1]Mixture of microcrystalline cellulose and sodium carboxymethylcellulose, available from FMC Biopolymer
[2]Available as Mobic ®
[3]Available as Risperdal ®
[4]Available from Pfizer, Inc.
[5]Allergy treatment
[6]Antibiotic
[7]MegaBac ™, available from Nicrosol Technologies
[8]Allergy treatment
[9]N-Ethyl-p-menthane-3-carboxamide

The above components were combined by mixing until a uniform mixture was achieved, and then cast into films on release paper using a K-Control Coater with a 250 or 350 micron smooth bar. The films were dried for about 9 to 10 minutes at 80° C. in accordance with the method of the present invention resulting in dried films having adequate to good strength.

While there have been described what are presently believed to be the preferred embodiments of the invention, those skilled in the art will realize that changes and modifications may be made thereto without departing from the spirit of the invention, and it is intended to include all such changes and modifications as fall within the true scope of the invention.

The invention claimed is:

1. A drug delivery composition comprising:
(i) a cast film comprising a flowable water-soluble or water swellable film-forming matrix comprising one or more substantially water soluble or water swellable polymers; and a desired amount of at least one active;
wherein said matrix has a viscosity sufficient to aid in substantially maintaining non-self-aggregating uniformity of the active in the matrix;
(ii) a particulate active substantially uniformly stationed in the matrix; and
(iii) a taste-masking agent coated or intimately associated with said particulate to provide taste-masking of the active;
wherein the combined particulate and taste-masking agent have a particle size of 200 microns or less and said flowable water-soluble or water swellable film-forming matrix is capable of being dried without loss of substantial uniformity in the stationing of said particulate active therein; and
wherein the uniformity subsequent to casting and drying of the matrix is measured by substantially equally sized individual unit doses which do not vary by more than 10% of said desired amount of said at least one active.

2. The drug delivery composition of claim 1, wherein the size of said combined particulate and taste-masking agent have a particle size of 150 microns or less.

3. The drug delivery composition of claim 1, wherein the size of said combined particulate and taste-masking agent have a particle size of 100 microns or less.

4. The drug delivery composition of claim 1, wherein said taste-masking agent is a thin film coating over portions of said active.

5. The drug delivery composition of claim 1, wherein the taste-masking agent is a polymer.

6. The drug delivery composition of claim 1, wherein the taste-masking agent is a water-soluble polymer.

7. The drug delivery composition of claim 6, wherein said water-soluble polymer has an average molecular weight of equal to or greater than about 40,000.

8. The drug delivery composition of claim 1, wherein the taste-masking agent is selected from the group consisting of acrylic polymers, cellulosic polymers, vinyl polymers, crown ethers, hydrogenated oils and waxes, and combinations thereof.

9. The drug delivery composition of claim 1, wherein said variation of drug content is less than 5% by weight per film dosage unit.

10. The drug delivery composition of claim 1, wherein said variation of drug content is less than 2% by weight per film dosage unit.

11. The drug delivery composition of claim 1, wherein said variation of drug content is less than 0.5% by weight per film dosage unit.

12. The drug delivery composition of claim 1, wherein said taste-masking agent is present in the amount of about 15-80% by weight of the particle.

13. The drug delivery composition of claim 1, wherein said taste-masking agent is present in the amount of about 20-60% by weight of the particle.

14. The drug delivery composition of claim 1, wherein said taste-masking agent is present in the amount of about 25-35% by weight of the particle.

15. The drug delivery composition of claim 1, wherein said active is selected from the group consisting of antimicrobial agents, non-steroidal anti-inflammatory drugs, anti-tussives, decongestants, antihistamines, expectorants, anti-diarrheals, $H_2$ antagonists, proton pump inhibitors, general non-selective CNS depressants, general non-selective CNS stimulants, selective CNS functional modifiers, anti-parkinsonism drugs, narcotics, analgesics, erectile dysfunction therapies, anti-pyretics, psychopharmacological drugs and combinations thereof.

16. A thin film drug delivery composition comprising:
(a) a cast film comprising an edible water-soluble or water swellable film-forming matrix comprising at least one water-soluble or water swellable polymer comprising polyethylene oxide alone or in combination with a hydrophilic cellulosic polymer; and a desired amount of at least one active;

US 8,603,514 B2

**69**

wherein said matrix has a viscosity sufficient to aid in substantially maintaining non-self-aggregating uniformity of the active in the matrix;

and

(b) a coated particulate active component substantially uniformly stationed in the matrix;

wherein the coating on the particulate active component is a taste-masking agent, and

wherein the active component is substantially uniformly distributed in the film composition; and

wherein the uniformity subsequent to casting and drying of the matrix is measured by substantially equally sized individual unit doses which do not vary by more than 10% of said desired amount of said at least one active.

**17**. The drug delivery composition of claim **16**, wherein said thin film drug delivery composition is extruded.

**18**. The drug delivery composition of claim **16**, wherein the taste-masking agent is a thin film coating over the particulate active component.

**19**. The drug delivery composition of claim **16**, wherein the taste-masking agent is a water-soluble polymer.

**20**. The drug delivery composition of claim **16**, wherein the composition is free of added plasticizers, surfactants, or polyalcohols.

**21**. The drug delivery composition of claim **1**, wherein the taste-masking agent is selected from the group consisting of carboxymethyl cellulose; methyl cellulose; ethyl cellulose; hydroxyl methyl cellulose; hydroxyethyl cellulose; hydroxypropyl cellulose; hydroxypropylmethyl cellulose; hydroxymethylpropyl cellulose; gum arabic; xanthan gum; tragacanth; acacia; carageenan; guar gum; locust bean gum; pectin; alginates; gelatinized, modified or unmodified starch; polyvinyl alcohol; polyacrylic acid; polyvinyl pyrrolidone; poly(meth)acrylate; poly(meth)copolymers; dextrin; dextran; proteins; whey protein isolate; casein; levin; collagen; chitin; chitosin; polydextrose and combinations thereof.

**22**. The drug delivery composition of claim **1**, wherein said active is selected from the group consisting of ace-inhibitors, antianginal drugs, anti-arrhythmias, anti-asthmatics, anti-cholesterolemics, analgesics, anesthetics, anti-convulsants, anti-depressants, anti-diabetic agents, anti-diarrhea preparations, antidotes, anti-histamines, anti-hypertensive drugs, anti-inflammatory agents, anti-lipid agents, anti-manics, anti-nauseants, anti-stroke agents, anti-thyroid preparations, anti-tumor drugs, anti-viral agents, acne drugs, alkaloids, amino acid preparations, anti-tussives, anti-uricemic drugs, anti-viral drugs, anabolic preparations, systemic and non-systemic anti-infective agents, anti-neoplastics, anti-parkinsonian agents, anti-rheumatic agents, appetite stimulants, biological response modifiers, blood modifiers, bone metabolism regulators, cardiovascular agents, central nervous system stimulates, cholinesterase inhibitors, contraceptives, decongestants, dietary supplements, dopamine receptor agonists, endometriosis management agents, enzymes, erectile dysfunction therapies, fertility agents, gastrointestinal agents, homeopathic remedies, hormones, hypercalcemia and hypocalcemia management agents, immunomodulators, immunosuppressives, migraine preparations, motion sickness treatments, muscle relaxants, obesity management agents, osteoporosis preparations, oxytocics, parasympatholytics, parasympathomimetics, prostaglandins, psychotherapeutic agents, respiratory agents, sedatives, smoking cessation aids, sympatholytics, tremor preparations, urinary tract agents, vasodilators, laxatives, antacids, ion exchange resins, anti-pyretics, appetite suppressants, expectorants, anti-anxiety agents, anti-ulcer agents, anti-inflammatory substances, coronary dilators, cerebral dilators, peripheral

**70**

vasodilators, psycho-tropics, stimulants, anti-hypertensive drugs, vasoconstrictors, migraine treatments, antibiotics, tranquilizers, anti-psychotics, anti-tumor drugs, anti-coagulants, anti-thrombotic drugs, hypnotics, anti-emetics, anti-nauseants, anti-convulsants, neuromuscular drugs, hyper- and hypo-glycemic agents, thyroid and anti-thyroid preparations, diuretics, anti-spasmodics, terine relaxants, anti-obesity drugs, erythropoietic drugs, anti-asthmatics, cough suppressants, mucolytics, DNA and genetic modifying drugs, and combinations thereof.

**23**. The drug delivery composition of claim **1**, wherein the film forming matrix has the viscosity in an amount sufficient to substantially prevent an active from settling out during mixing or coating.

**24**. The drug delivery composition of claim **1**, wherein said taste-masking agent is selected from the group consisting of flavors, sweeteners, flavor enhancers, and combinations thereof.

**25**. The drug delivery composition of claim **1**, wherein said active is an opiate or opiate derivative.

**26**. The drug delivery composition of claim **16**, wherein said taste-masking agent is selected from the group consisting of flavors, sweeteners, flavor enhancers, and combinations thereof.

**27**. The drug delivery composition of claim **16**, wherein said active is an opiate or opiate derivative.

**28**. A drug delivery composition comprising:

(i) a cast film comprising a flowable water-soluble or water swellable film-forming matrix comprising one or more substantially water soluble or water swellable polymers; and a desired amount of at least one active;

wherein said matrix has a viscosity sufficient to aid in substantially maintaining non-self-aggregating uniformity of the active in the matrix;

(ii) a particulate active substantially uniformly stationed in the matrix; and

(iii) a taste-masking agent coated or intimately associated with said particulate to provide taste-masking of the active;

wherein the combined particulate and taste-masking agent have a particle size of 200 microns or less and said flowable water-soluble or water swellable film-forming matrix is capable of being dried without loss of substantial uniformity in the stationing of said particulate active therein;

wherein the uniformity subsequent to casting and drying of the matrix is measured by substantially equally sized individual unit doses which do not vary by more than 10% of said desired amount of said at least one active; and

wherein the coated particulate active has a shape selected from the group consisting of spherically shaped particles, ellipsoidally shaped particles, irregularly shaped particles, and combinations thereof.

**29**. The drug delivery composition of claim **28**, wherein the size of said combined particulate and taste-masking agent have a particle size of 150 microns or less.

**30**. The drug delivery composition of claim **28**, wherein the size of said combined particulate and taste-masking agent have a particle size of 100 microns or less.

**31**. The drug delivery composition of claim **28**, wherein said taste-masking agent is a thin film coating over portions of said active.

**32**. The drug delivery composition of claim **28**, wherein the taste-masking agent is a polymer.

**33**. The drug delivery composition of claim **28**, wherein the taste-masking agent is a water-soluble polymer.

US 8,603,514 B2

71

72

**34**. The drug delivery composition of claim **33**, wherein said water-soluble polymer has an average molecular weight of equal to or greater than about 40,000.

**35**. The drug delivery composition of claim **28**, wherein the taste-masking agent is selected from the group consisting of acrylic polymers, cellulosic polymers, vinyl polymers, crown ethers, hydrogenated oils and waxes, and combinations thereof.

**36**. The drug delivery composition of claim **28**, wherein said variation of drug content is less than 5% by weight per film dosage unit.

**37**. The drug delivery composition of claim **28**, wherein said variation of drug content is less than 2% by weight per film dosage unit.

**38**. The drug delivery composition of claim **28**, wherein said variation of drug content is less than 0.5% by weight per film dosage unit.

**39**. The drug delivery composition of claim **28**, wherein said taste-masking agent is present in the amount of about 15-80% by weight of the particle.

**40**. The drug delivery composition of claim **28**, wherein said taste-masking agent is present in the amount of about 20-60% by weight of the particle.

**41**. The drug delivery composition of claim **28**, wherein said taste-masking agent is present in the amount of about 25-35% by weight of the particle.

**42**. The drug delivery composition of claim **28**, wherein said active is selected from the group consisting of antimicrobial agents, non-steroidal anti-inflammatory drugs, antitussives, decongestants, antihistamines, expectorants, anti-diarrheals, $H_2$ antagonists, proton pump inhibitors, general non-selective CNS depressants, general non-selective CNS stimulants, selective CNS functional modifiers, anti-parkinsonism drugs, narcotics, analgesics, erectile dysfunction therapies, anti-pyretics, psychopharmacological drugs and combinations thereof.

**43**. The drug delivery composition of claim **28**, wherein the taste-masking agent is selected from the group consisting of carboxymethyl cellulose; methyl cellulose; ethyl cellulose; hydroxyl methyl cellulose; hydroxyethyl cellulose; hydroxypropyl cellulose; hydroxypropylmethyl cellulose; hydroxymethylpropyl cellulose; gum arabic; xanthan gum; tragacanth; acacia; carageenan; guar gum; locust bean gum; pectin; alginates; gelatinized, modified or unmodified starch; polyvinyl alcohol; polyacrylic acid; polyvinyl pyrrolidone; poly(meth)acrylate; poly(meth)copolymers; dextrin; dextran; proteins; whey protein isolate; casein; levin; collagen; chitin; chitosin; polydextrose and combinations thereof.

**44**. The drug delivery composition of claim **28**, wherein said active is selected from the group consisting of ace-inhibitors, antianginal drugs, anti-arrhythmias, anti-asthmatics, anti-cholesterolemics, analgesics, anesthetics, anti-convulsants, anti-depressants, anti-diabetic agents, anti-diarrhea preparations, antidotes, anti-histamines, anti-hypertensive drugs, anti-inflammatory agents, anti-lipid agents, anti-manics, anti-nauseants, anti-stroke agents, anti-thyroid preparations, anti-tumor drugs, anti-viral drugs, acne drugs, alkaloids, amino acid preparations, anti-tussives, anti-uricemic drugs, anti-viral drugs, anabolic preparations, systemic and non-systemic anti-infective agents, anti-neoplastics, anti-parkinsonian agents, anti-rheumatic agents, appetite stimulants, biological response modifiers, blood modifiers, bone metabolism regulators, cardiovascular agents, central nervous system stimulates, cholinesterase inhibitors, contraceptives, decongestants, dietary supplements, dopamine receptor agonists, endometriosis management agents, enzymes, erectile dysfunction therapies, fertility agents, gastrointestinal agents, homeopathic remedies, hormones, hypercalcemia and hypocalcemia management agents, immunomodulators, immunosuppressives, migraine preparations, motion sickness treatments, muscle relaxants, obesity management agents, osteoporosis preparations, oxytocics, parasympatholytics, parasympathomimetics, prostaglandins, psychotherapeutic agents, respiratory agents, sedatives, smoking cessation aids, sympatholytics, tremor preparations, urinary tract agents, vasodilators, laxatives, antacids, ion exchange resins, anti-pyretics, appetite suppressants, expectorants, anti-anxiety agents, anti-ulcer agents, anti-inflammatory substances, coronary dilators, cerebral dilators, peripheral vasodilators, psycho-tropics, stimulants, anti-hypertensive drugs, vasoconstrictors, migraine treatments, antibiotics, tranquilizers, anti-psychotics, anti-tumor drugs, anti-coagulants, anti-thrombotic drugs, hypnotics, anti-emetics, anti-nauseants, anti-convulsants, neuromuscular drugs, hyper-and hypo-glycemic agents, thyroid and anti-thyroid preparations, diuretics, anti-spasmodics, terine relaxants, anti-obesity drugs, erythropoietic drugs, anti-asthmatics, cough suppressants, mucolytics, DNA and genetic modifying drugs, and combinations thereof.

**45**. The drug delivery composition of claim **28**, wherein the film forming matrix has the viscosity in an amount sufficient to substantially prevent an active from settling out during mixing or coating.

**46**. The drug delivery composition of claim **28**, wherein said taste-masking agent is selected from the group consisting of flavors, sweeteners, flavor enhancers, and combinations thereof.

**47**. The drug delivery composition of claim **28**, wherein said active is an opiate or opiate derivative.

**48**. A thin film drug delivery composition comprising:

(a) a cast film comprising an edible water-soluble or water swellable film-forming matrix comprising at least one water-soluble or water swellable polymer comprising polyethylene oxide alone or in combination with a hydrophilic cellulosic polymer; and a desired amount of at least one active;

wherein said matrix has a viscosity sufficient to aid in substantially maintaining non-self-aggregating uniformity of the active in the matrix;

and

(b) a coated particulate active component substantially uniformly stationed in the matrix;

wherein the coating on the particulate active component is a taste-masking agent, and

wherein the active component is substantially uniformly distributed in the film composition;

wherein the uniformity subsequent to casting and drying of the matrix is measured by substantially equally sized individual unit doses which do not vary by more than 10% of said desired amount of said at least one active; and

wherein the at least one water-soluble polymer comprises about 20% to about 100% by weight polyethylene oxide.

**49**. The drug delivery composition of claim **48**, wherein said thin film drug delivery composition is extruded.

**50**. The drug delivery composition of claim **48**, wherein the taste-masking agent is a thin film coating over the particulate active component.

**51**. The drug delivery composition of claim **48**, wherein the taste-masking agent is a water-soluble polymer.

**52**. The drug delivery composition of claim **48**, wherein the composition is free of added plasticizers, surfactants, or polyalcohols.

US 8,603,514 B2

73

**53**. The drug delivery composition of claim **48**, wherein said taste-masking agent is selected from the group consisting of flavors, sweeteners, flavor enhancers, and combinations thereof.

**54**. The drug delivery composition of claim **48**, wherein said active is an opiate or opiate derivative.

**55**. A thin film drug delivery composition comprising:

(a) a cast film comprising an edible water-soluble or water swellable film-forming matrix comprising at least one water-soluble or water swellable polymer comprising polyethylene oxide alone or in combination with a hydrophilic cellulosic polymer; and a desired amount of at least one active;

wherein said matrix has a viscosity sufficient to aid in substantially maintaining non-self-aggregating uniformity of the active in the matrix;

and

(b) a coated particulate active component substantially uniformly stationed in the matrix;

wherein the coating on the particulate active component is a taste-masking agent, and

wherein the active component is substantially uniformly distributed in the film composition;

wherein the uniformity subsequent to casting and drying of the matrix is measured by substantially equally sized individual unit doses which do not vary by more than 10% of said desired amount of said at least one active; and

wherein the at least one water-soluble polymer comprises a hydrophilic cellulosic polymer in a ratio of up to about 4:1 with polyethylene oxide.

**56**. The drug delivery composition of claim **55**, wherein said thin film drug delivery composition is extruded.

**57**. The drug delivery composition of claim **55**, wherein the taste-masking agent is a thin film coating over the particulate active component.

**58**. The drug delivery composition of claim **55**, wherein the taste-masking agent is a water-soluble polymer.

**59**. The drug delivery composition of claim **55**, wherein the composition is free of added plasticizers, surfactants, or polyalcohols.

**60**. The drug delivery composition of claim **55**, wherein said taste-masking agent is selected from the group consisting of flavors, sweeteners, flavor enhancers, and combinations thereof.

**61**. The drug delivery composition of claim **55**, wherein said active is an opiate or opiate derivative.

**62**. A drug delivery composition comprising:

(i) a cast film comprising a flowable water-soluble or water swellable film-forming matrix comprising one or more substantially water soluble or water swellable polymers; and a desired amount of at least one active;

wherein said matrix has a viscosity sufficient to aid in substantially maintaining non-self-aggregating uniformity of the active in the matrix;

(ii) a particulate active substantially uniformly stationed in the matrix; and

(iii) a taste-masking agent selected from the group consisting of flavors, sweeteners, flavor enhancers, and combinations thereof to provide taste-masking of the active;

74

wherein the particulate active has a particle size of 200 microns or less and said flowable water-soluble or water swellable film-forming matrix is capable of being dried without loss of substantial uniformity in the stationing of said particulate active therein; and

wherein the uniformity subsequent to casting and drying of the matrix is measured by substantially equally sized individual unit doses which do not vary by more than 10% of said desired amount of said at least one active.

**63**. The drug delivery composition of claim **62**, wherein the particulate active has a particle size of 150 microns or less.

**64**. The drug delivery composition of claim **62**, wherein the particulate active has a particle size of 100 microns or less.

**65**. The drug delivery composition of claim **62**, wherein said variation of drug content is less than 5% by weight per film dosage unit.

**66**. The drug delivery composition of claim **62**, wherein said variation of drug content is less than 2% by weight per film dosage unit.

**67**. The drug delivery composition of claim **62**, wherein said variation of drug content is less than 0.5% by weight per film dosage unit.

**68**. The drug delivery composition of claim **62**, wherein the particulate active has a shape selected from the group consisting of spherically shaped particles, ellipsoidally shaped particles, irregularly shaped particles, and combinations thereof.

**69**. The drug delivery composition of claim **62**, wherein said taste-masking agent is present in the amount of about 0.1-30% by weight of the drug delivery composition.

**70**. The drug delivery composition of claim **62**, wherein said taste-masking agent is present in the amount of about 0.01-10% by weight of the drug delivery composition.

**71**. The drug delivery composition of claim **62**, wherein said active is selected from the group consisting of antimicrobial agents, non-steroidal anti-inflammatory drugs, antitussives, decongestants, antihistamines, expectorants, antidiarrheals, $H_2$ antagonists, proton pump inhibitors, general non-selective CNS depressants, general non-selective CNS stimulants, selective CNS functional modifiers, anti-parkinsonism drugs, narcotics, analgesics, erectile dysfunction therapies, anti-pyretics, psychopharmacological drugs and combinations thereof.

**72**. The drug delivery composition of claim **62**, wherein the film forming matrix has the viscosity in an amount sufficient to substantially prevent an active from settling out during mixing or coating.

**73**. The drug delivery composition of claim **62**, wherein said active is an opiate or opiate derivative.

**74**. The drug delivery composition of claim **73**, wherein said taste masking agent is peppermint oil.

**75**. The drug delivery composition of claim **1**, wherein said active is an opiate or opiate derivative and said taste masking agent is selected from the group consisting of flavors, sweeteners, flavor enhancers, and combinations thereof.

**76**. The drug delivery composition of claim **75**, wherein said taste masking agent is peppermint oil.

* * * * *