## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RECKITT BENCKISER PHARMACEUTICALS INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 13-1674-RGA (Consolidated) |
| v. | ) ) | |
| WATSON LABORATORIES, INC., | ) ) | |
| Defendant. | ) ) | |
| RECKITT BENCKISER PHARMACEUTICALS INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | ) ) ) ) ) | **HIGHLY CONFIDENTIAL** |
| Plaintiffs, | ) ) | C.A. No. 14-0422-RGA |
| v. | ) | |
| PAR PHARMACEUTICAL, INC., INTELGENX TECHNOLOGIES CORP., | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE PLAINTIFFS FROM RELYING ON REFERENCES DATED AFTER THE PRIORITY DATE OF THE '514 PATENT**

Defendants' motion seeks to exclude, from a bench trial, reliable published literature: peer-reviewed journal articles, a master's thesis, and a patent application. Dr. Robert Langer, Plaintiffs' expert, will explain how these references reflect what skilled artisans understood about the state of the art at the time of the invention, including the critical problem of achieving drug content uniformity ("DCU") in a pharmaceutical film, solved by the inventors of the '514 Patent. As Dr. Langer will explain, these references are consistent with his own experience in the field. This literature, written by scientists unaffiliated with the parties and before any litigation, is precisely the type of evidence experts in the "field would reasonably rely on … in forming an opinion on the subject." Fed. R. Evid. 703.

The literature Defendants seek to exclude is highly relevant and will assist the Court in assessing Defendants' obviousness allegations. It is precisely because of their relevance that Defendants attempt to exclude the references, which undermine Defendants' hindsight-driven and inaccurate assertions about the state of the art and purported obviousness. Defendants' motion is legally and factually meritless, and should be denied.

*First*, Defendants concede the references cited by Dr. Langer are admissible if there are "good grounds on which to find the [information] reliable." Mot. at 2 (alteration in original) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994)). Of the seven references, five are academic articles published in peer-reviewed journals,[1] one is a master's thesis, and the last is a published patent application in the field of the invention. *See* Mot. Ex. 2, ¶¶ 112–44. Dr. Langer has testified to the reliability of the references. Defendants have offered

---

[1] At a minimum, the "learned treatise" exception permits statements in peer-reviewed journals to be read into evidence when "relied on by the expert on direct examination," and Dr. Langer's testimony will establish each publication "as a reliable authority." Fed. R. Evid. 803(18); *see* Ex. 1 (Langer Dep. (Excerpts)) at 241:9–16, 254:10–21, 259:7, 263:6–8, 267:4–15.

nothing to suggest unreliability. The co-author of one of the articles is Dr. Jason McConville—one of Defendants' own experts in this case. The author of the master's thesis (Perumal) published a peer-reviewed article addressing the same subject matter of films and DCU. And, Defendants themselves rely on exactly the same types of references for their obviousness assertions. (*See* D.I. 328.) Experts in the field reasonably rely on the types of publications cited by Dr. Langer, and for this reason alone, Defendants' motion should be denied.

*Second*, Defendants' argument that the references should be excluded because Dr. Langer does not know their authors is meritless. Rule 703 imposes no such requirement, and Defendants cite no support for one. Dr. Langer, like scientists everywhere, reasonably relied on his knowledge of the art and his assessment of it, not personal knowledge of the authors, in citing these references. *See* Ex. 1 at 240:24–242:14, 258:21–259:7, 265:3–268:12.

*Third*, Defendants' argument that an expert must "independently assess the reliability of the techniques described" in an article has no merit. The argument is misleading, as Dr. Langer cites the references because they show what skilled artisans understood about the state of the art; discuss failures of others to solve the problem of DCU; and show praise for the invention. Defendants also misstate the record in alleging Dr. Langer "did not attempt to assert that the analysis conducted [in the references] was of the type on which an expert in his field would rely," Mot. at 1. As Dr. Langer stated in his expert report, "[a]ll of the materials and information I relied on are of a type reasonably relied on by people in my field." Mot. Ex. 2, ¶ 7. In any event, it is revealing that *none* of the cases Defendants cite supports any independent-verification requirement for articles, theses, or patent applications; each involved reliance on unpublished analyses specifically prepared for litigation or outside the witness's area of expertise. *See In re TMI Litig.*, 193 F.3d 613, 714 (3d Cir. 1999) (reliance on reports of other experts); *Muhsin v.*

*Pacific Cycle, Inc.*, No. 2010-060, 2012 WL 2062396, at \*7 (D.V.I. June 8, 2012) (reliance on presumably unpublished analysis in area outside of witness's expertise); *Jung v. Neschis*, No. 01 Civ. 6993, 2007 WL 5256966, at \*16 (S.D.N.Y. Oct. 23, 2007) (reliance on affidavits "specifically prepared for … litigation"). Indeed, Defendants' own experts did not undertake the type of independent assessment they now assert is imperative.

*Fourth*, Defendants wrongly charge that Dr. Langer is parroting "opinions" contained in this literature. As Dr. Langer explains, he knows from his own experience that DCU was a difficult problem in the early 2000s. *See* Ex. 1 at 137:8–138:9. The literature he cites corroborates this opinion and shows objective indicia of nonobviousness (*e.g.*, praise).

*Finally*, post-filing-date references "have long been allowed 'as evidence of the state of the art existing on the filing date of an application.'" *Disney Enterprises, Inc. v. Kappos*, 923 F. Supp. 2d 788, 801 (E.D. Va. 2013) (citations omitted); *cf. Gould v. Quigg*, 822 F.2d 1074, 1078 (Fed. Cir. 1987) (approving expert testimony based on "later dated publication … offered as evidence of the level of ordinary skill … at the time of the application"). The Federal Circuit has noted the relevance of evidence of non-obviousness arising after the date of invention. *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm., Inc.*, 748 F.3d 1354, 1360 (Fed. Cir. 2014). Obviousness requires analyzing the art as a whole and what a POSA would have thought at the time of invention; the references relied on by Dr. Langer are relevant to answering this question.

At bottom, if Defendants truly believe the references are unreliable, they have opportunity to cross-examine Dr. Langer at trial and argue about what weight the Court should give this evidence. But Defendants' assertions do not go to admissibility. The literature Dr. Langer cites is exactly the type of information experts properly rely upon and will assist the Court in evaluating Defendants' obviousness assertions. Defendants' motion should be denied.

Dated: October 8, 2015

Respectfully submitted,

*/s/ Daniel M. Attaway*
MaryW. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
WOMBLE CARLYLE SANDRIDGE &RICE, LLP
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
(302) 252-4320
(302) 252-4330 (Fax)
mbourke@wcsr.com
dseverance@wcsr.com
dattaway@wcsr.com

*Attorneys for Plaintiffs*

**EXHIBITS TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION *IN LIMINE* TO PRECLUDE PLAINTIFFS FROM RELYING ON
REFERENCES DATED AFTER THE PRIORITY DATE OF THE '514 PATENT**

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Excerpts from the deposition transcript of Robert Langer taken June 4, 2015<br>137:8–138:9,<br>147:14–148:6,<br>240:24-242:14,<br>254:10–21,<br>258:21-259:7,<br>262:27–263:8,<br>265:3-268:12 |
| 2 | Excerpts from the Rebuttal Expert Report of Robert Langer<br>¶ 7,<br>¶¶ 112–44 |

# Exhibit 1

```
 1            UNITED STATES DISTRICT COURT

 2               DISTRICT OF DELAWARE

 3

 4   RECKITT BENCKISER            )

 5   PHARMACEUTICALS, INC.,       )

 6   et al,                       )

 7             Plaintiffs,        )

 8   vs.                          ) Civil Action

 9   WATSON LABORATORIES, INC.,   ) No. 13-1674-RGA

10   et al,                       ) VOLUME I

11             Defendants.        )

12   _____

13

14

15       Videotaped Deposition of DR. ROBERT

16       LANGER, taken at 50 Broadway, Cambridge,

17       Massachusetts, commencing at 7:58 a.m.,

18       Thursday, June 4, 2015, before Jeanette

19       N. Maracas, Registered Professional

20       Reporter and Notary Public.

21

22

23

24   JOB No. 2078739

25   PAGES 1 - 270
```

                                              Page 1

| | |
|---|---|
| 1 said exactly.  And then I would have to see   11:47:39 | 1 thing I'm trying to say.                       11:50:23 |
| 2 whether they talked about the locking in and   11:47:42 | 2 Q.  I think I would like to actually pull out     11:50:53 |
| 3 other issues they're talking about here, but   11:47:43 | 3 the original priority application.  I believe   11:50:55 |
| 4 I'm happy to look at anything you'd like me   11:47:46 | 4 it was Langer Exhibit 2.                        11:51:01 |
| 5 to of Dyar's.                                   11:47:48 | 5 A.  Sure.  I have it.                           11:51:03 |
| 6 Q.  Okay.  Excellent.  I want -- before we get to   11:47:54 | 6 Q.  If you could turn to -- we talked about this   11:51:17 |
| 7 that, I want to do a couple more things --   11:47:57 | 7 a little bit earlier, but if you could turn   11:51:24 |
| 8 A.  Of course.                                  11:47:59 | 8 to Page 2 of that reference, Paragraph 6.   11:51:27 |
| 9 Q.  -- within Claim 1 --                        11:47:59 | 9 The last sentence of that paragraph says,   11:51:34 |
| 10 A.  Sure.                                       11:48:01 | 10 "currently, by law, dosage forms may not vary   11:51:37 |
| 11 Q.  -- of the '514 patent.  The next element that   11:48:01 | 11 more than ten percent in the amount of active   11:51:41 |
| 12 we hadn't covered yet is "a taste masking   11:48:07 | 12 present when applied to dosage units based on   11:51:44 |
| 13 agent coated or intimately associated with   11:48:09 | 13 films.  This virtually mandates that   11:51:49 |
| 14 said particulate to provide taste masking of   11:48:12 | 14 uniformity in the film be present."   11:51:52 |
| 15 the active."                                    11:48:16 | 15        And my question for you is, do you   11:51:59 |
| 16        Generally, as I read through your   11:48:17 | 16 agree that by September 27, 2002, as of the   11:52:02 |
| 17 report, I didn't see anywhere where you   11:48:20 | 17 priority date, that being within plus or   11:52:07 |
| 18 relied on taste masking to distinguish the   11:48:22 | 18 minus ten percent of the active present would   11:52:11 |
| 19 prior art.  Do you view anything about what   11:48:25 | 19 have been something that would be required in   11:52:18 |
| 20 the patentees did here regarding taste   11:48:29 | 20 a pharmaceutical product?                      11:52:20 |
| 21 masking as inventive or novel?                  11:48:31 | 21 A.  Well, I agree with the statement here, if   11:52:25 |
| 22        MR. BOLLINGER:  I'm going to object   11:48:34 | 22 that's what you're asking.                    11:52:26 |
| 23 to the form of that question.                   11:48:35 | 23 Q.  Yes.                                         11:52:27 |
| 24 A.  Well, it's part of the claim.  I mean, again,   11:48:37 | 24 A.  Yes, I would agree with that, but that's not   11:52:29 |
| 25 we're getting -- maybe getting into legal   11:48:41 | 25 standard deviation.  That's variation, but I   11:52:32 |
| Page 134 | Page 136 |

| | |
|---|---|
| 1 things.  I mean, I think taste masking is an   11:48:43 | 1 agree with the statement.                       11:52:40 |
| 2 important thing for lots of areas, and it   11:48:47 | 2 Q.  If a pharmaceutical formulator as of 2002   11:52:41 |
| 3 adds one more parameter of complexity to   11:48:53 | 3 were pursuing a commercial product, that   11:52:46 |
| 4 something that's already complex.  So I'm not   11:48:57 | 4 formulator would have had as a goal being   11:52:48 |
| 5 sure the best way to answer it.                  11:48:59 | 5 within ten percent variation, correct?   11:52:51 |
| 6 Q.  You saw prior art references for -- you're   11:49:13 | 6 A.  I would think that would be one of the   11:52:54 |
| 7 aware prior to 2001 that there are numerous   11:49:24 | 7 goals, yes.                                      11:52:56 |
| 8 references suggesting that if a particular   11:49:30 | 8 Q.  Is it your opinion, Doctor, that prior to the   11:52:57 |
| 9 active agent is bitter or unpleasant, that a   11:49:36 | 9 disclosure that led to the '514 patent,   11:53:46 |
| 10 taste masking agent should be used?             11:49:36 | 10 persons of ordinary skill in the art were   11:53:51 |
| 11 A.  I mean, certainly that's one thing that can   11:49:43 | 11 unable to make pharmaceutical film dosage   11:53:54 |
| 12 be done, sure.  I mean, there's lots of   11:49:51 | 12 forms with plus or minus ten percent content   11:54:00 |
| 13 things that can be done.  So I'm not sure   11:49:53 | 13 uniformity?                                     11:54:04 |
| 14 what the question is.  I've certainly seen   11:49:56 | 14 A.  That's my understanding from what I've read.   11:54:07 |
| 15 references that that's one way to deal with   11:49:58 | 15 Q.  I guess my question is a little broader than   11:54:20 |
| 16 the problem.                                    11:50:00 | 16 what you've read.  You were very experienced   11:54:23 |
| 17 Q.  And that was -- that was a well-known way of   11:50:01 | 17 in the art as of 2001.  You talked to all the   11:54:25 |
| 18 dealing with bitterness prior to 2001,   11:50:02 | 18 pharmaceutical companies out there.  You   11:54:29 |
| 19 correct?                                         11:50:04 | 19 probably had extensive experience with what   11:54:30 |
| 20 A.  Yes, but then when you -- like I say, the   11:50:04 | 20 their actual capabilities were.  Based on the   11:54:33 |
| 21 point that I'm trying to make is take any one   11:50:07 | 21 people you know, based on the technology that   11:54:36 |
| 22 thing in isolation and that's well-known.   11:50:10 | 22 you've seen in the art at that time, is it   11:54:40 |
| 23 Put ten things together, each of which has   11:50:14 | 23 your opinion that if the formulators at   11:54:42 |
| 24 their own degrees of complexity, and it's not   11:50:16 | 24 Pfizer or Merck had decided they wanted to   11:54:45 |
| 25 nearly as simple a problem.  That's the only   11:50:20 | 25 make a film with content uniformity, they   11:54:51 |
| Page 135 | Page 137 |

35 (Pages 134 - 137)

1 would have been unable to do so?        11:54:53
2 A. I think the answer is they were unable to do   11:54:54
3 so. I don't know of anybody that did it. I   11:54:57
4 mean, let me put it that way. And I think,   11:55:00
5 as I mentioned, even in 2008 in peer-reviewed   11:55:08
6 articles, people continued to say, "this is a   11:55:14
7 difficult thing to do, very difficult thing   11:55:16
8 to do." I can -- well, I'm sure we will go   11:55:20
9 over that later.        11:55:25
10 Q. Doctor, what is taste masking?        11:55:35
11 A. Well, the way I think of taste masking is you   11:55:38
12 have something and you don't like the taste   11:55:44
13 of it, so you add something in to the   11:55:47
14 formulation or food or whatever it is that   11:55:52
15 when you taste it or swallow it, you get a   11:55:57
16 different taste, you kind of mask the taste   11:56:01
17 of the original entity. Let's say it's very   11:56:04
18 bitter, you know. I put something in so it's   11:56:08
19 less bitter.        11:56:13
20 Q. A spoonful of sugar helps the medicine go   11:56:14
21 down?        11:56:20
22 A. That's an example.        11:56:20
23 Q. I'd like to go through --        11:56:33
24 A. Should I put this away again or not?        11:56:35
25 Q. You can put that away again.        11:56:37

Page 138

1 A. Okay.        11:56:39
2 Q. Doctor, prior to your involvement in this   11:57:00
3 case, were you familiar with any of the   11:57:03
4 inventors of the '514 patent?        11:57:10
5 A. I believe I know -- well, I -- let me put it   11:57:18
6 this way: "Familiar" meaning I know them   11:57:21
7 personally or heard of them?        11:57:23
8 Q. Yes, yes, let's start with know them   11:57:25
9 personally.        11:57:27
10 A. I don't believe I've met any of them   11:57:28
11 personally.        11:57:30
12 Q. Are there any of them that you're   11:57:30
13 reputationally aware of?        11:57:32
14 A. I'm pretty sure Fuisz, you know, I mean, I   11:57:34
15 know that name. I know that name, Fuisz. So   11:57:39
16 I don't recall necessarily meeting either of   11:57:43
17 them, but I could have, you know. I end up   11:57:47
18 giving a lot of lectures and a lot of   11:57:50
19 courses, and so sometimes people come up to   11:57:53
20 me and I could have met people. I don't want   11:57:54
21 to exclude that. But the name Fuisz   11:57:59
22 certainly meant something to me.        11:58:02
23         There was a company, and I don't   11:58:05
24 know the whole histories of these. It was   11:58:06
25 called Fuisz Technology, I recall, something   11:58:09

Page 139

1 like that, and I don't know if this -- if   11:58:13
2 they're related in some way to that or not.   11:58:16
3 I assume that they must be, but you all   11:58:18
4 probably know the histories much better than   11:58:21
5 I do.        11:58:23
6 Q. In your -- in the course of your work in this   11:58:23
7 case, have you ever spoken to any individuals   11:58:29
8 at MonoSol?        11:58:36
9 A. Not to my knowledge and not intentionally for   11:58:39
10 this case, but, I mean, I think the answer is   11:58:46
11 almost certainly no, but I -- again, you   11:58:48
12 know, like I say, I give lectures in front of   11:58:51
13 thousands of people sometimes and people come   11:58:54
14 up and whatever.        11:58:57
15 Q. And in the course of carrying out your work   11:58:58
16 in this case, did you have any conversations   11:59:00
17 or meetings with any individuals from Reckitt   11:59:02
18 Benckiser?        11:59:10
19 A. Same answer.        11:59:11
20 Q. And have you done consulting work for   11:59:12
21 MonoSol?        11:59:15
22 A. No, I mean, other than this.        11:59:18
23 Q. Other than this litigation, have you done   11:59:20
24 consulting work for Reckitt Benckiser?   11:59:22
25 A. No. Those names don't -- well, I'd say no.   11:59:26

Page 140

1 I don't -- like I say, I don't know if   11:59:29
2 there's prior histories of companies that   11:59:31
3 they merged or whatever, but not to my   11:59:32
4 knowledge to either of those.        11:59:36
5 Q. And about when were you first approached to   11:59:37
6 work on this case?        11:59:40
7 A. I don't remember exactly. I think it was   11:59:44
8 earlier this year, early this year. It could   11:59:46
9 have been late last year, but late last year   11:59:49
10 or early this year.        11:59:52
11 Q. Okay. Do you recall generally about how many   11:59:53
12 hours that you've worked on this case?   11:59:55
13 A. I've worked on it hard. I don't know the   11:59:58
14 number of hours. We could certainly find   12:00:00
15 out, but I -- you know, I spent a lot of time   12:00:03
16 on it. I mean, I -- it's a significant   12:00:05
17 report.        12:00:07
18 Q. If we can turn to Page 11 of the report.   12:00:09
19 A. 11?        12:00:21
20 Q. Yes.        12:00:22
21 A. Okay.        12:00:23
22 Q. And there's a discussion there from the '514   12:00:29
23 patent. Actually, let's go to the patent   12:00:32
24 itself at Column 2, Lines 7 to 26.        12:00:34
25 A. Sure.        12:00:39

Page 141

36 (Pages 138 - 141)

1   of films described in Column 2, Line 16 and   12:07:47
2   concluded that they suffered from the   12:07:55
3   aggregation or conglomeration of particles?   12:07:58
4      MR. BOLLINGER:  Column 2, Line 16 of   12:08:06
5   which patent?   12:08:08
6      MR. BROWN:  Of the '514.   12:08:10
7 A.  I mean, I don't know who specifically, no.   12:08:21
8 Q.  You don't have personal knowledge of this   12:08:34
9   experimental work that's reported in the '514   12:08:36
10   patent at Column 2, Lines 16 through 26,   12:08:39
11   correct?   12:08:44
12 A.  Not specifically, other than, like you say,   12:08:44
13   it's totally consistent with Perumal, Morales   12:08:47
14   and all the other things, but in terms of   12:08:51
15   this specific one, no, but it's very   12:08:53
16   consistent with what everything, you know,   12:08:55
17   even 2008 and beyond, said.  And, like I say,   12:08:57
18   I probably should go back and check whether   12:09:03
19   any of those talked about that specifically,   12:09:05
20   as well, but I -- as I mentioned earlier.   12:09:06
21 Q.  And then further down in Column 2, Line 47,   12:09:09
22   it says, "the problems of self-aggregation   12:09:19
23   leading to non-uniformity of a film were   12:09:22
24   addressed in U.S. Patent No. 4,849,246 to   12:09:25
25   Schmidt.  Schmidt specifically pointed out   12:09:30

Page 146

1   that the methods disclosed by Fuchs did not   12:09:34
2   provide a uniform film and recognized that   12:09:37
3   the creation of a non-uniform film   12:09:39
4   necessarily prevents accurate dosing, which,   12:09:42
5   as discussed above, is especially important   12:09:47
6   in the pharmaceutical area."   12:09:48
7      It then says, "Schmidt abandoned the   12:09:54
8   idea that a monolayer film, such as described   12:09:56
9   by Fuchs, may provide an accurate dosage form   12:09:59
10   and, instead, attempted to solve this problem   12:10:01
11   by forming a multi-layered film.  Moreover,   12:10:03
12   his process is a multi-step process that adds   12:10:08
13   expense and complexity and is not practical   12:10:11
14   for commercial use."   12:10:14
15      And my question here for you is, the   12:10:21
16   '514 patentees never report that the Schmidt   12:10:25
17   process failed to achieve content uniformity,   12:10:30
18   is that correct?   12:10:34
19 A.  So you're saying, did they talk about it   12:10:39
20   beyond this?   12:10:45
21 Q.  Yes.   12:10:46
22 A.  I don't -- well, I mean, I think that   12:10:47
23   they're -- so you're talking about -- I mean,   12:11:01
24   in a way -- how do I say this?  So this is a   12:11:02
25   multi-layered film.  Again, I may not be   12:11:08

Page 147

1   answering the question that you want, but if   12:11:12
2   it's a multi-layered film, it inherently   12:11:13
3   isn't uniform, right?  I mean...   12:11:18
4 Q.  Well, drug content uniformity deals with   12:11:20
5   dose-to-dose variation, correct?   12:11:22
6 A.  Well, I see what you're saying, but, I mean,   12:11:25
7   this is -- yeah, so if you look at it like   12:11:27
8   that.  But I'm just saying if you look at it   12:11:29
9   as a whole, there's a portion that has no   12:11:31
10   drug.  That's all I was trying to say.   12:11:33
11 Q.  Let me just see if I can frame it   12:11:36
12   differently -- my question a little   12:11:38
13   differently.   12:11:41
14 A.  Sure.   12:11:41
15 Q.  The criticisms the '514 patentees make of the   12:11:41
16   Schmidt reference is that it's a multi-step   12:11:44
17   process, it adds expense and complexity and   12:11:47
18   is not practical for commercial use, correct?   12:11:48
19      MR. BOLLINGER:  Objection to form.   12:11:52
20 A.  Well, those are some of the things they say.   12:11:55
21   I mean, you know, that's what they're saying   12:11:58
22   there, I mean, but I don't think there's   12:11:58
23   anything in Schmidt that talks about   12:12:01
24   controlling viscosity, as an example, or   12:12:06
25   controlling drying.  I mean, they've tried to   12:12:09

Page 148

1   solve the problem in a very different way by   12:12:12
2   using a backing layer, so to speak.  I'm not   12:12:13
3   disagreeing with what you read.  I'm just   12:12:22
4   adding to it.   12:12:24
5 Q.  Continuing on down in Column 2 of the '514   12:13:01
6   patent, it states, "other U.S. patents   12:13:06
7   directly address the problems of particle   12:13:09
8   self-aggregation and non-uniformity inherent   12:13:11
9   in conventional film-forming techniques."   12:13:15
10      And is it your understanding that   12:13:21
11   that sentence refers to both Horstmann and   12:13:21
12   Zerbe?   12:13:25
13 A.  I look at it that way, yes.   12:13:30
14 Q.  And in the second part of this -- well, let   12:13:32
15   me -- let's just go through the whole next   12:13:46
16   sentence.  It says, "in one attempt to   12:13:51
17   overcome non-uniformity, U.S. Patent No.   12:13:54
18   5,629,003 to Horstmann, et al., and U.S.   12:14:01
19   Patent No. 5,948,430 to Zerbe, et al.,   12:14:03
20   incorporated additional ingredients,   12:14:09
21   i.e., gel formers and polyhydric alcohols   12:14:13
22   respectively, to increase the viscosity of   12:14:17
23   the film prior to drying in an effort to   12:14:19
24   reduce aggregation of the components in the   12:14:22
25   film."   12:14:27

Page 149

38 (Pages 146 - 149)

1    and tested for the amount of active in        03:36:04
2    films of particular size."                    03:36:07
3          Is that a chemical analysis as you      03:36:12
4    would describe it?                            03:36:15
5 A. It can be.  It depends what's done, but if    03:36:16
6    you have measurements of that molecule, then  03:36:20
7    I'd say yes.                                   03:36:25
8 Q. And that chemical testing that they're        03:36:27
9    describing in column 34 -- let me restate     03:36:31
10   the question.                                  03:36:38
11         This patent doesn't report any           03:36:38
12   data from the chemical analysis method that   03:36:40
13   they describe at column 42, line 34 through    03:36:46
14   38, correct?                                   03:36:51
15 A. Well, yes and no.  Like the example I gave    03:36:52
16   you earlier, it does with the dye.  I would    03:36:55
17   consider that a chemical analysis.             03:36:58
18 Q. They don't report any chemical analysis       03:37:04
19   data from any dosage form containing a         03:37:06
20   particulate active ingredient, correct?        03:37:10
21 A. I'd have to check on that.  I'd have to        03:37:12
22   check on that to be sure.                      03:37:16
23 Q. You don't recall any from your review of      03:37:23
24   the patent right now, correct?                 03:37:26
25 A. Again, it's something I would need to check.  03:37:28
Page 238

1    I'm not sure.                                 03:37:32
2          MR. BROWN:  Let's take a break and      03:37:34
3    we'll come back for the final.                03:37:36
4          VIDEOGRAPHER:  The time is 3:38.  We    03:37:38
5    are now off the record.                       03:37:40
6          (Break taken)                           03:37:44
7          VIDEOGRAPHER:  The time is 3:49.  We    03:49:27
8    are now back on the record.                   03:49:38
9          MR. BROWN:  Can we mark what I think    03:49:41
10   are 11 and 12.                                 03:49:42
11         (Exhibit 11 and Exhibit 12 marked       03:49:46
12   for identification.)                           03:50:13
13 Q. I marked Exhibits Langer 11 and Langer 12.   03:50:13
14   Do you recognize Langer 11 as the first       03:50:18
15   Perumal reference you discussed in your        03:50:25
16   expert report?                                 03:50:27
17 A. Yes.                                          03:50:28
18 Q. And do you recognize Langer Exhibit 12 as    03:50:29
19   the Perumal thesis?                            03:50:35
20 A. Yes, I do.                                    03:50:41
21 Q. So in Paragraph 164 --                        03:50:41
22 A. We're on my report?                           03:51:14
23 Q. In your report, yes.  Page 90, Paragraph 164, 03:51:15
24   you state, "the results obtained by Perumal,   03:51:22
25   et al, described in the Perumal 2008 and       03:51:26
Page 239

1    Perumal thesis references I discussed above   03:51:29
2    clearly support the conclusions that a high   03:51:29
3    degree of variability seen in the results     03:51:33
4    for dissolution testing of oral thin films    03:51:37
5    produced via conventional methods is          03:51:40
6    primarily due to a high degree of variability 03:51:42
7    associated with the drug content of said      03:51:46
8    films."  Now, I want to go back to Paragraphs 03:52:05
9    121 through 124 of your report.                03:52:15
10 A. 121 through 124, okay.                         03:52:22
11 Q. Yes.                                           03:52:29
12 A. Okay.                                          03:52:30
13 Q. So in Paragraph 121 -- sorry.                  03:52:31
14 A. It's fine.                                      03:53:33
15 Q. Let me start with a few background questions.  03:53:47
16   The Perumal thesis is identified -- I believe   03:53:52
17   her name is Velisha Ann Perumal.  Is this a     03:53:58
18   person you're familiar with?                    03:54:03
19 A. Not personally, no.                            03:54:04
20 Q. Do you have any opinion as to Valisha         03:54:06
21   Perumal's professional reputation?             03:54:16
22 A. Only that she's published things in reviewed 03:54:20
23   journals.                                       03:54:26
24 Q. Do you know any of the other authors of      03:54:26
25   Exhibit Langer 11, the first Perumal           03:54:29
Page 240

1    publication?                                  03:54:35
2 A. Again, I don't believe I know any of them     03:54:35
3    personally, though I would qualify them as I  03:54:40
4    said before, that people probably met me at   03:54:40
5    conferences just like I mentioned the others, 03:54:44
6    but none of those names ring any bells.        03:54:47
7 Q. Are you familiar with the University of       03:54:49
8    KwaZulu-Natal in Durban, South Africa?        03:54:51
9 A. I mean, I'm sure I probably heard of it at    03:54:57
10   some point.  Let me put it this way.  I'm      03:54:59
11   certainly familiar with the journal of Drug    03:55:01
12   Development and Industrial Pharmacy.  That's   03:55:04
13   a peer-reviewed journal, but I don't know      03:55:06
14   the university very well, let me put it that   03:55:08
15   way, or the people very well, but I do know    03:55:11
16   of the journal.                                03:55:14
17 Q. And the Perumal thesis was submitted in      03:55:16
18   January 2007, correct?                         03:55:22
19 A. Correct.                                       03:55:24
20 Q. And it says on the face of it, "submitted    03:55:24
21   in part fulfillment of the requirements for    03:55:28
22   the degree of Master of Medical Science,       03:55:30
23   Pharmaceutical Sciences."  Am I correct that   03:55:36
24   under your definition of a person of ordinary  03:55:42
25   skill in the art, Ms. Perumal would not        03:55:46
Page 241

61 (Pages 238 - 241)

| | |
|---|---|
| 1 qualify at the time of the thesis because 03:55:49 | 1 Q. The X axis in figure three from Perumal is 03:59:09 |
| 2 she would not have a Master's degree, plus 03:55:51 | 2 time and hours, correct? 03:59:14 |
| 3 two years of experience? 03:55:54 | 3 A. Mm-hmm. 03:59:15 |
| 4 A. She'd probably be less than that. That's 03:55:56 | 4 Q. And the X axis in figure five from Chen is 03:59:15 |
| 5 probably true, but that doesn't disqualify 03:55:59 | 5 time and minutes, correct? 03:59:21 |
| 6 her in any means from doing thorough 03:56:03 | 6 A. Yes. 03:59:23 |
| 7 literature reviews and doing experiments. 03:56:06 | 7 Q. And so the entirety of the chart in figure 03:59:26 |
| 8 And I don't see her -- I don't know whether 03:56:08 | 8 five, if it were superimposed on to figure 03:59:34 |
| 9 she's filed patents or not. 03:56:11 | 9 three of Perumal, would be the first little 03:59:36 |
| 10 Like I say, I'd like to say it 03:56:16 | 10 slice that we see, the first one-sixth of 03:59:41 |
| 11 this way. I have very good students at my 03:56:18 | 11 the time between zero and one hours, correct? 03:59:44 |
| 12 lab at MIT and they wouldn't qualify under 03:56:21 | 12 A. If that's the way you want to look at it, 03:59:50 |
| 13 my definition either, but I think anybody 03:56:22 | 13 that's fair. 03:59:52 |
| 14 would want to hire them and do. 03:56:25 | 14 Q. Am I correct that the drug in the drug dosage 03:59:57 |
| 15 Q. So let's go to the graphs that you reproduced 03:56:45 | 15 forms in Perumal were not prepared by any 04:00:00 |
| 16 from Perumal on Pages 92 and 94 of your 03:56:52 | 16 method described in the '514 patent? 04:00:09 |
| 17 expert report. 03:57:02 | 17 A. Correct. 04:00:15 |
| 18 A. Okay. 03:57:03 | 18 Q. And if we look -- 04:00:15 |
| 19 Q. Let's start with figure three. 03:57:17 | 19 A. Actually, let me just go through before I 04:00:27 |
| 20 A. Okay. 03:57:19 | 20 give you -- let me just take a look. 04:00:31 |
| 21 Q. As reported in your expert report, figure 03:57:20 | 21 (Witness examines document). 04:00:40 |
| 22 three is titled "drug release profiles of 03:57:25 | 22 Let me try to put it this way. To 04:01:03 |
| 23 films prepared from the silicon-molded tray 03:57:28 | 23 the extent that Dyar tries to claim that 04:01:06 |
| 24 for reproducibility studies." 03:57:31 | 24 some of the other things, other papers for 04:01:08 |
| 25 A. Correct. 03:57:34 | 25 which they didn't give very much detail on 04:01:10 |
| Page 242 | Page 244 |

| | |
|---|---|
| 1 Q. And, in your opinion, this dissolution 03:57:35 | 1 certain things could have been the same as 04:01:12 |
| 2 chart shows that Perumal obtained good drug 03:57:41 | 2 the '514, that may be also said here, too. 04:01:14 |
| 3 content uniformity, correct? 03:57:47 | 3 I don't personally think of it that way 04:01:18 |
| 4 A. No. I think what I was trying to say -- 03:57:49 | 4 because, which is why I answered that 04:01:20 |
| 5 where are you reading that from? 03:57:53 | 5 question the way I did initially, but I 04:01:22 |
| 6 Q. That is -- well, you state that, "as is 03:57:55 | 6 don't think that they've measured -- my 04:01:26 |
| 7 clearly evident from this figure" -- 03:58:08 | 7 sense here is that they're not measuring 04:01:27 |
| 8 A. Can you just tell me where you are? 03:58:10 | 8 viscosity, and the same thing with drying. 04:01:29 |
| 9 Q. Sorry. Paragraph 165 on Page 91, "figure 03:58:11 | 9 So you don't get the sense here just like 04:01:32 |
| 10 three from Perumal Exhibit P as shown below 03:58:14 | 10 you don't get the sense in Chen or any of 04:01:35 |
| 11 as is clearly evident from this figure as 03:58:19 | 11 the others that they're controlling the 04:01:38 |
| 12 compared to Chen figure five, the error 03:58:21 | 12 parameters that they do in the '514, but 04:01:40 |
| 13 bars associated with the data for trays A, 03:58:24 | 13 I guess what I'd say is it's certainly 04:01:43 |
| 14 B and C are much tighter than those shown 03:58:27 | 14 possible that certain of those things could 04:01:45 |
| 15 for the films in Chen figure five." 03:58:29 | 15 have been done. 04:01:46 |
| 16 A. Yes. 03:58:32 | 16 Q. Let's look at table six. 04:01:48 |
| 17 Q. What's the relevance of that? 03:58:32 | 17 A. Where are you now? 04:01:51 |
| 18 A. Well, it's just that if something is -- it 03:58:34 | 18 Q. Table six on Page 94 of your expert report. 04:01:53 |
| 19 goes to what we said before. If you got 03:58:39 | 19 A. Oh, okay. 04:01:58 |
| 20 reproducible release kinetics, to me that 03:58:41 | 20 Q. And what is -- let me restate the question. 04:01:59 |
| 21 supports the conclusion that you probably 03:58:45 | 21 In the left-hand column there are 04:02:16 |
| 22 have a more reproducible system, most likely 03:58:47 | 22 four dosage forms prepared that have large 04:02:19 |
| 23 that's due to a drug content uniformity. 03:58:50 | 23 error bars, correct? 04:02:30 |
| 24 That's what they were trying to achieve 03:58:57 | 24 A. Well, they have -- I mean, again, everything 04:02:32 |
| 25 here. 03:58:59 | 25 is relative. Certainly those error bars 04:02:35 |
| Page 243 | Page 245 |

62 (Pages 242 - 245)

1    date -- "no paper to date, to the best    04:14:20
2    of our knowledge, in the published    04:14:23
3    pharmaceutical literature has highlighted    04:14:25
4    this difficulty."  So is it your opinion    04:14:28
5    that the reason none of these 20-plus    04:14:31
6    published papers on film characterization    04:14:34
7    studies reported any problem with drug    04:14:37
8    content uniformity is because they were    04:14:40
9    just hiding negative data?    04:14:43
10 A.  No, I'm not saying that.  I really can't    04:14:45
11    speak to the -- I mean, I tried to answer    04:14:48
12    your last question as best I could.  I think    04:14:50
13    that the assumption they make is a reasonable    04:14:53
14    assumption, but I can't say for sure.  I    04:14:56
15    haven't done an analysis myself like they've    04:14:59
16    done so I'm taking them at their word and    04:15:03
17    I'm taking the reviewers at their word    04:15:05
18    because this does go through peer review    04:15:09
19    unlike in a way different than say a patent    04:15:11
20    or other things.  This is definitely a    04:15:13
21    peer-reviewed journal.    04:15:17
22 Q.  Isn't this at least an equally plausible    04:15:18
23    possibility for the reason that there was    04:15:21
24    no published pharmaceutical literature    04:15:23
25    highlighting the difficulty is because the    04:15:25

Page 254

1    Perumal authors were having difficulties    04:15:30
2    that no other folks in the scientific    04:15:33
3    literature were having?    04:15:38
4 A.  No, I don't agree with that because you    04:15:39
5    can go and take a look at other papers like    04:15:41
6    Morales and others, and they make similar    04:15:43
7    points.  So I would say that that's, you    04:15:46
8    know, there's a number of papers and patents    04:15:48
9    that I cited after the fact that came well    04:15:49
10    after 2001.  If you want, I can pull out    04:15:53
11    Morales and some of the comments that they    04:15:56
12    make, but I think what you want to do is    04:15:58
13    read these in light of together collectively,    04:16:02
14    and when you do, I think there's something    04:16:06
15    like seven or eight papers that discuss    04:16:08
16    that it is a problem and none that discusses    04:16:10
17    that it's an easily solved problem, so I    04:16:14
18    think that's how you have to take it    04:16:17
19    scientifically.    04:16:19
20      We can get Morales, if you want,    04:16:22
21    I'll go over some of that, but you certainly    04:16:25
22    get the impression from all the reviews    04:16:27
23    and all the patents that this statement is    04:16:29
24    reasonable.  You can't isolate those, take    04:16:33
25    away those papers.  I didn't see any paper    04:16:38

Page 255

1    that said, boy, this is simple, everybody's    04:16:45
2    done it, and I didn't see any patent that    04:16:47
3    said it either, and I don't think Dyar ever    04:16:50
4    found anything close to that.  If I saw    04:16:52
5    that, that might change my opinion, but I    04:16:58
6    didn't and we looked.    04:17:00
7 Q.  Within the Perumal reference and going to    04:17:06
8    Page 1038, there is a discussion in the    04:17:10
9    second column about halfway down, maybe    04:17:27
10    nine or ten lines down, there's a sentence    04:17:34
11    that says, "some approaches that attempted    04:17:37
12    to prevent agglomeration are briefly    04:17:39
13    described."  Do you see that?    04:17:41
14 A.  Yes.    04:17:42
15 Q.  And there's a discussion of the Schmidt    04:17:42
16    reference, and just if you would read    04:17:46
17    starting with Schmidt all the way forward    04:17:55
18    to the top of the next column.    04:18:04
19 A.  You want me to read it out loud?    04:18:07
20 Q.  No, just to yourself.    04:18:09
21 A.  (Witness examines document)    04:18:11
22 Q.  Then in there's a citation at the end, U.S.    04:18:30
23    patent number --    04:18:35
24 A.  Right.    04:18:36
25 Q.  Do you recognize all of the text that you    04:18:36

Page 256

1    just read as being taken directly from    04:18:40
2    the specification of the '514 patent?    04:18:42
3 A.  It's certainly similar.  I'd have to check    04:18:50
4    it word for word, and I'm happy to take your    04:18:52
5    word for it that it's similar.  They're    04:18:55
6    referring to it also.  They're referring to    04:18:57
7    the '741.    04:19:03
8 Q.  Correct.  And then in the following sentence    04:19:03
9    Perumal says, "approaches described in U.S.    04:19:06
10    patent No. 60/443,741 for enhancing drug    04:19:09
11    uniformity required sophisticated drying    04:19:15
12    equipment and additional pharmaceutical    04:19:18
13    excipients which led to unfeasible increased    04:19:20
14    manufacturing costs and multi-step    04:19:22
15    processing."    04:19:25
16      So Perumal did not view the teaching    04:19:28
17    of the '514 patent as a solution to the drug    04:19:31
18    content uniformity difficulties that had    04:19:37
19    been, that she posits existed, correct?    04:19:41
20 A.  Well, I mean, I can't know that I would    04:19:45
21    agree with that.  They're just simply saying    04:19:49
22    that it's not perfect, they're saying other    04:19:52
23    things that need to be done.    04:19:54
24      By the way, Schmidt, just to go    04:19:57
25    over a point that you raised also, if we go    04:19:59

Page 257

65 (Pages 254 - 257)

1  over it I recall said that this is an          04:20:01
2  unsolved problem, that people have been        04:20:04
3  trying to do for many years in addition to     04:20:07
4  the ones in the future. After 2001 there       04:20:09
5  were ones like Schmidt that -- and I could     04:20:12
6  get that quote for you, if it's helpful,       04:20:14
7  that said this is a big problem.               04:20:17
8       Would it be helpful if I read            04:21:32
9  the exact quote from Schmidt, or do you not    04:21:34
10 want you to do that?                           04:21:36
11 Q. I don't need you to do that right now.      04:21:37
12 A. Okay.                                       04:21:41
13 Q. Let's go to Morales.                        04:21:42
14 A. Sure. Also I just wanted to get a time      04:21:46
15 check, if we could.                            04:21:49
16      VIDEOGRAPHER: Six hours,                  04:21:49
17 40 minutes.                                    04:21:51
18 A. Okay.                                       04:21:56
19      (Exhibit 13 marked for                    04:21:57
20 identification.)                               04:22:34
21 Q. So Morales is Exhibit Langer 13. Are you    04:22:34
22 familiar with either Javier Morales or Jason   04:22:53
23 McConville?                                    04:22:57
24 A. You know, I'm not sure. I've lectured at    04:22:58
25 the University of Texas at Austin so I may     04:23:05

Page 258

1  have met them, but, again, I'd have to         04:23:08
2  give you the same answer that I've given       04:23:09
3  before, that they're certainly not names       04:23:15
4  that ring any bells for me.                    04:23:16
5  Q. You're not personally familiar with their  04:23:18
6  professional reputation?                       04:23:21
7  A. No. Again, this a review journal also.     04:23:23
8  Q. So let's turn to Page 191.                  04:23:46
9  A. Okay.                                       04:24:04
10 Q. And there is a sentence in the first full   04:24:05
11 paragraph that I believe you rely on. It       04:24:11
12 states, "since the early development of        04:24:14
13 medicated films, content uniformity has been   04:24:15
14 a major challenge for the pharmaceutical       04:24:19
15 scientist."                                    04:24:21
16 A. Mm-hmm.                                     04:24:21
17 Q. And the first -- the next sentence says,    04:24:23
18 "Schmidt proposed one of the earliest          04:24:27
19 approaches to increase the drug uniformity     04:24:29
20 of medicated films by stating that the         04:24:32
21 non-uniformity of the films is inherent to     04:24:35
22 their mono-layered nature."                    04:24:38
23 A. Right.                                      04:24:42
24 Q. And the next sentence, "Schmidt proposed a  04:24:43
25 multi-step method for the manufacture of       04:24:44

Page 259

1  multi-layered films to overcome the            04:24:47
2  heterogeneity of the mono-layered form,"       04:24:49
3  and then it continues, "however, Yang, et      04:24:54
4  al., reported that using the protocol          04:24:56
5  proposed by Schmidt did not render uniform     04:24:59
6  films and went on to say that to overcome      04:25:03
7  the non-uniformity of films, a manufacturing   04:25:07
8  process for orally disintegrating films        04:25:09
9  could be easily adapted for the manufacture    04:25:12
10 of mucoadhesive buccal films." And Yang,       04:25:16
11 et al., is, I think, footnoted as reference    04:25:24
12 73, and just have a look at that. But you      04:25:29
13 recognize that statement as being attributed   04:25:35
14 to the inventors of the '514 patent?           04:25:38
15 A. Which statement now?                        04:25:41
16 Q. The statement where it says, "Yang, et al,  04:25:42
17 reported that using the protocol proposed      04:25:45
18 by Schmidt did not render uniform films        04:25:48
19 and went on to say that to overcome the        04:25:51
20 non-uniformity of the film, the manufacturing  04:25:56
21 process for orally disintegrating films        04:25:56
22 could be easily adapted for the manufacture    04:25:59
23 of mucoadhesive buccal films."                 04:26:01
24 A. I think they said it differently, if I      04:26:04
25 recall. Maybe I'll try to get that for you,    04:26:06

Page 260

1  if you want. My recollection was that they     04:26:08
2  said it was -- it wasn't, that it couldn't     04:26:10
3  be done, but that it was more complex. Why     04:26:14
4  don't I try to find that just to --            04:26:16
5  Q. I don't have that question. I only have a   04:26:19
6  few minutes left. So my question is, the       04:26:21
7  entire sentence that I just read is            04:26:24
8  attributed to the inventors of the '514        04:26:27
9  patent, correct, that's footnote --           04:26:33
10 A. It's attributed, but I'm saying that may    04:26:35
11 not be exactly correct. That's all.            04:26:38
12 Q. This sentence does not reflect any          04:26:39
13 independent evaluation by the authors of       04:26:45
14 this publication, is that correct?             04:26:48
15 A. That single sentence?                       04:26:50
16 Q. Yes.                                        04:26:52
17 A. I can't say. I mean, I don't know. I        04:26:56
18 don't know what they did or not, and I         04:27:01
19 don't know, you know, the way they wrote       04:27:06
20 it, I certainly can see what you're saying,    04:27:07
21 but I can't say that for sure from reading     04:27:09
22 this. They certainly could have done it        04:27:12
23 or they may not have done it.                  04:27:14
24 Q. I guess I have the same question for the    04:27:16
25 entire remainder of this paragraph. Do you     04:27:17

Page 261

66 (Pages 258 - 261)

1    have any view as to whether this reflects    04:27:25
2    any independent analysis by the Morales    04:27:28
3    authors or are they just reporting what's    04:27:34
4    stated by the '514 patent inventors?    04:27:38
5 A. Well, see, I would make a broader statement    04:27:41
6    than that. This is -- when you looked at    04:27:44
7    the first page, this in contrast to the    04:27:44
8    Perumal article which is, say, an original    04:27:47
9    research article, this is actually now if    04:27:51
10   you go to the front page a review article.    04:27:53
11 Q. Yes.    04:27:56
12 A. When somebody writes a review article,    04:27:57
13   that's more of an analysis of what other    04:27:59
14   people have done. I would say this entire    04:28:01
15   paper is an analysis of what other people    04:28:03
16   have done.    04:28:07
17       Look, ideally, and I've been an    04:28:09
18   editor of journals as well, so ideally what    04:28:11
19   you expect and hope when people write these    04:28:14
20   things is that they are analyzing and writing    04:28:16
21   about what other people have done, but    04:28:20
22   trying to be, put their own thinking into it.    04:28:22
23   That's usually what a review article does,    04:28:27
24   so you want to maybe distinguish. So I'm    04:28:30
25   not disagreeing with what you're saying.    04:28:32

Page 262

1    I'm just saying the whole point of this    04:28:34
2    article, not just that statement, but the    04:28:36
3    entire article is to do these kinds of    04:28:38
4    things, if that's helpful.    04:28:41
5 Q. Yes.    04:28:43
6 A. This is a peer-reviewed review article,    04:28:44
7    and many times review articles are even    04:28:48
8    requested. I don't know if it has been here.    04:28:50
9 Q. These authors don't report that Yang, et al,    04:29:00
10   solved the challenge of content unionformity    04:29:03
11   for cast films, correct?    04:29:10
12 A. No. I think you can only read what they    04:29:11
13   wrote. They decided what Yang did was    04:29:16
14   important enough so that they made statements    04:29:18
15   that they went on to say that they overcame    04:29:22
16   it, so they're qualifying it. But they    04:29:25
17   clearly felt it was important enough to put    04:29:30
18   in this peer-reviewed article that they felt    04:29:31
19   that they overcame it, so I take it at its    04:29:34
20   face.    04:29:38
21       If they didn't think -- by the way,    04:29:42
22   usually if you write a critical review    04:29:44
23   article and you felt that the person who    04:29:46
24   said something made some errors or overstated    04:29:48
25   something, it would be very reasonable in a    04:29:52

Page 263

1    review article to state something like that,    04:29:54
2    and they did not. They just simply said    04:29:56
3    Yang says he did this.    04:29:59
4       So I think when I read something    04:30:12
5    like that, I take it as he did something    04:30:13
6    important or they wouldn't have put it in,    04:30:17
7    but I'm not a mindreader there either.    04:30:18
8       VIDEOGRAPHER: There are ten minutes    04:30:57
9    remaining.    04:30:59
10 A. Should I put this away?    04:31:37
11 Q. Yes, you can.    04:31:40
12       MR. BROWN: Why don't we go off    04:32:33
13   the record. I just want to confer with my    04:32:35
14   co-counsel and see if we have anything more.    04:32:37
15       VIDEOGRAPHER: The time is 4:32. We    04:32:39
16   are now off the record.    04:32:41
17       (Break taken)    04:32:45
18       VIDEOGRAPHER: The time is 4:37. We    04:36:50
19   are now back on the record.    04:36:57
20 BY MR. BROWN:    04:36:59
21 Q. So, Doctor, I'm just right now, I'm looking    04:36:59
22   at the table of contents of your expert    04:37:02
23   report, and looking at --    04:37:05
24       MR. BOLLINGER: It's at the very    04:37:09
25   bottom.    04:37:09

Page 264

1 A. I see, okay. You guys are trying to give    04:37:10
2    me a hard time. Okay.    04:37:13
3 Q. And I'm looking -- you've listed seven    04:37:15
4    references in part Roman numeral 11B as    04:37:18
5    publications that post-date the invention    04:37:24
6    of the '514 patent and acknowledge the    04:37:27
7    problems and addressed and confirm it was    04:37:30
8    a novel solution. So we covered Perumal,    04:37:32
9    both Perumal references and Morales, and    04:37:37
10   now continuing for references four through    04:37:41
11   seven, are you familiar with who Nowak, et    04:37:50
12   al, are?    04:38:05
13 A. Do you mean -- what do you mean by that.    04:38:05
14       MR. BOLLINGER: No. 4.    04:38:06
15 A. Do I know them personally?    04:38:08
16 Q. Yes.    04:38:09
17 A. I'd have to give you the same answer on    04:38:10
18   all these people, though I should probably    04:38:13
19   take -- just to be safe, why -- do you have    04:38:20
20   those four papers and I'll take a quick    04:38:23
21   look at the authors?    04:38:25
22 Q. Yes.    04:38:26
23 A. Nowak, him, herself, I don't think I know,    04:38:28
24   but there may be some, if that's what you're    04:38:30
25   asking when you say, et al, I feel...    04:38:33

Page 265

67 (Pages 262 - 265)

1 Q. The questions that I will ask for each of      04:38:36
2   these references are do you know the          04:38:38
3   individual personally and do you have an      04:38:40
4   opinion as to their professional reputation?  04:38:44
5 A. Okay.                                        04:38:46
6 Q. While we're getting the process of marking   04:39:08
7   that, for any of these, any of the authors    04:39:10
8   that you identify in Roman numeral 11B, one   04:39:20
9   through eight, do you know if any of those    04:39:26
10   authors had personal knowledge of the state  04:39:30
11   of the art in thin film technologies as of   04:39:38
12   2001?                                        04:39:41
13 A. As opposed to doing reviews?                04:39:44
14 Q. Correct.                                    04:39:49
15 A. I'll just give you my best answers, and     04:39:52
16   the question is do I know?                   04:39:55
17 Q. Yes.                                        04:39:56
18 A. So why don't I take a look.                 04:40:01
19       MR. BOLLINGER:  Why don't you just       04:40:11
20   clip them all together.                      04:40:12
21 A. If you want, just give me...                04:40:13
22       MR. BROWN:  We can just mark this        04:40:22
23   as one exhibit.                              04:40:26
24       (Exhibit 14 marked for                   04:40:28
25   identification.)                             04:40:31

Page 266

1 A. Okay.  So I'll just go through this one.     04:41:16
2   These are all of them?                        04:41:20
3 Q. Yes.                                         04:41:21
4 A. I would say that none of these people --     04:41:22
5   well, George Coelho, that sounds somewhat     04:41:30
6   familiar, but I can't say for sure, but       04:41:33
7   he sounds somewhat familiar, but I don't      04:41:37
8   know the answer to what their -- I really     04:41:43
9   can't speak to their reputation.  I think     04:41:45
10   this is a high-impact journal, so a journal  04:41:47
11   that is a well-respected journal so I think  04:41:54
12   that's significant.  It's got an impact       04:41:57
13   factor of about seven.  I don't know either   04:42:01
14   of them with the same caveats I've been      04:42:04
15   answering with you earlier.                   04:42:06
16 Q. Next the Goel reference?                    04:42:07
17 A. Yes -- no, no, that's the Kathpalia          04:42:09
18   reference.  And the Goel reference, I don't   04:42:19
19   know them personally either, as far as I     04:42:21
20   know.  And Nowak, I don't think I know him,   04:42:23
21   though I've done some work for McDermott,     04:42:28
22   Will & Emery also, but I don't think I've     04:42:31
23   met him, but I could be wrong.  Is that what  04:42:35
24   you're looking for?                          04:42:41
25 Q. Correct.  And do you know whether any of the 04:42:42

Page 267

1   individuals who authored the publications     04:42:46
2   listed in Part 11B, one through seven, were   04:42:52
3   working in the field of pharmaceutical film   04:43:00
4   formulations as of 2002 and, thus, would      04:43:06
5   have personal knowledge of the art at that    04:43:10
6   time?                                        04:43:12
7 A. I don't know one way or the other, but my    04:43:12
8   expectation would be if they were asked to    04:43:15
9   write these reviews or if they wrote them,    04:43:16
10   there's a reasonable chance they could be,   04:43:18
11   but I haven't investigated that one way or   04:43:20
12   the other.                                   04:43:22
13 Q. Thank you, Doctor.  I have no further        04:43:23
14   questions.  Thank you for your time.         04:43:25
15       MR. BOLLINGER:  I'll spare you the       04:43:27
16   blistering cross.                            04:43:29
17       THE WITNESS:  Okay.  We have a           04:43:31
18   deal.  Thank you.                            04:43:31
19       VIDEOGRAPHER:  The time is 4:43.         04:43:32
20   This is the end of Tape No. 4 as well as the 04:43:35
21   deposition, and we are now off the record.   04:43:37
22       (Whereupon the deposition was            04:43:39
23   concluded at 4:43 p.m.)
24
25

Page 268

1   I declare under penalty of perjury
2 under the laws that the foregoing is
3 true and correct.
4
5   Executed on _____ , 20___,
6 at _____, _____.
7
8
9
10
11   _____
12     DR. ROBERT LANGER
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 269

68 (Pages 266 - 269)

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RECKITT BENCKISER PHARMACEUTICALS INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) | C.A. No. 13-1674-RGA (Consolidated) |
| v. | ) ) | |
| WATSON LABORATORIES, INC., | ) ) | |
| Defendant. | ) | |
| RECKITT BENCKISER PHARMACEUTICALS INC., RB PHARMACEUTICALS LIMITED,  and MONOSOL RX, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) | C.A. No. 14-0422-RGA |
| v. | ) ) | |
| PAR PHARMACEUTICAL, INC., INTELGENX TECHNOLOGIES CORP., | ) ) ) | |
| Defendants. | ) ) | |

**EXPERT REPORT OF ROBERT S. LANGER, Sc.D.
REGARDING VALIDITY OF U.S. PATENT No. 8,603,514**

skill have ignored the prevalent teachings in the prior art that would have discouraged them from making the patented invention; and

- Objective indicia of at least (1) a long-felt but unmet need for a way to create oral films that did not suffer from the problem of active content non-uniformity, and (2) failure of others who tried and failed to create sufficiently uniform films to support a commercial pharmaceutical film product like the ones described and claimed in the '514 patent, support my conclusion that the claimed invention was not obvious at the time it was made.

## IV.    EVIDENCE CONSIDERED

7.    The documents I reviewed and/or relied upon in forming my opinions expressed in this report are listed in Exhibit A attached to this report.  I have also relied upon and applied my personal knowledge, skill, training, experience, and knowledge in the field.  All of the materials and information I relied on are of a type reasonably relied on by people in my field.  I reserve the right to supplement this report to address any additional information or discovery that may become available.

## V.    SUMMARY OF QUALIFICATIONS

8.    In addition to the brief summary provided below, I have attached my most recent curriculum vitae as Exhibit B to this report, which summarizes my educational background, research and publications, honors and awards, and other credentials relevant to my qualifications as an expert in this case.

9.    I have authored or co-authored over 1,300 articles and also have over 1080 issued or pending patents worldwide, one of which was cited as the outstanding patent in Massachusetts in 1988 and one of 20 outstanding patents in the United States.  My patents have been licensed or sublicensed to over 300 pharmaceutical, chemical, biotechnology and medical device companies. A number of these companies were launched on the basis of these patent licenses.

skill in the art (or even of more than ordinary skill) credited the inventors of the '514 patent as the first to teach a monolayer film casting process that yielded individual film dosage units with substantial drug content uniformity.

> **1.      V.A. Perumal et al., "Investigating a New Approach to Film Casting for Enhanced Drug Content Uniformity in Polymeric Films,"** ***Drug Dev. & Indust. Pharm.***, **34:1036-1047 (2008) ("Perumal 2008 article," Ex. P)**

113.    The Perumal 2008 article describes the results of studies examining a new approach to enhancing the drug content uniformity of polymeric oral thin films that involves the use of individual wells to prepare films versus cutting individual film dosage units from a larger film-cast sheet, as was done conventionally.   In the course of describing this new technique, the Perumal 2008 article makes the following points that are relevant to the non-obviousness of the Challenged Claims of the '514 patent:

- Lack of DCU was a known problem with drug-containing films that was not addressed and largely ignored in the research literature but was addressed in the patent literature;
- Conventional oral thin film-forming methods and processes, such as those disclosed in the Chen application, typically resulted in the production of films with poor DCU;
- The '514 patent was one of only a few patents/applications that attempted to provide novel solutions to address this issue even as of 2008, years after the priority date of the '514 patent.

114.    Perumal 2008 teaches the fact that films formed via conventional casting processes were known to be associated with poor DCU:

> "***Films prepared by conventional casting onto trays such as teflon-coated perspex trays (TCPTs) suffer from poor drug content uniformity.*** The aim of this study was to prepare a silicone molded tray (SMT) with individual wells for film casting and to evaluate it in terms of enhancing drug content uniformity. Films were prepared by solvent evaporation or emulsification and cast onto TCPT and SMT. ***Preparation of films by the SMT method was superior in terms of meeting drug content uniformity requirements.*** As compared with the TCPT

58

> method, the SMT casting method also reduced the variability in mucoadhesivity,
> drug release, and film thickness. Reproducibility of the SMT method was
> demonstrated in terms of drug content, mucoadhesion, and drug release."

(Perumal 2008, Ex. P abstract; emphasis added.)

115.    The Perumal 2008 article teaches that, although DCU was known to be an important

quality attribute of oral thin films for drug delivery with respect to therapeutic efficacy and

regulatory approvability, films produced by conventional methods typically displayed poor

results with respect to DCU and were thus non-uniform with respect to their drug content when

divided into individual dosing units.

> "Preliminary investigations in our laboratories using both methods of film
> preparation and casting onto teflon-coated trays as above for cutting into specified
> sizes indicated nonuniform drug distribution across the individual film units. A
> prerequisite for therapeutic efficacy, safety, and regulatory approval of a medicine
> is drug content uniformity. Failure to achieve a high degree of accuracy with
> respect to the amount of drug in individual unit doses of the film can result in
> therapeutic failure, nonreproducible effects, and, importantly, toxic effects to the
> patient."

(Perumal 2008, Ex. P at p. 1036.)

116.    The process of developing drug-containing oral thin films was described to be a complex

and multivariate process, with researchers attempting to create new oral thin film products

attempting to optimize several attributes relevant to the therapeutic efficacy of said films, such as

mucoadhesivity, mechanical properties and drug release.   With respect to conventional film-

forming methods, the Perumal 2008 article states that:

> "Films are conventionally prepared by the solvent-casting method in which the
> drug and polymer(s) of similar solubilities are dissolved in a single vehicle and
> cast onto trays, which are then left to dry to facilitate solvent evaporation. This
> forms a sheet of film which is cut into desired sizes to provide a specified dose of
> drug (Amnuaikit, Ikeuchi, Ogawara, Higaki, & Kimura, 2005; Dhanikula &
> Panchagnula, 2004; Perugini, Genta, Conti, Modena, & Pavanetto, 2003;
> Remunan-Lopez, Portero, Vila- Jato, & Alonso, 1998). Simultaneous
> optimization of mucoadhesivity and drug release profiles of monolayered films

> may require the blending of drug and polymer(s) of opposing solubilities and
> therefore may not be simply dissolved in a single vehicle for film casting."

(Perumal 2008, Ex. P at p. 1036.)

117.   Despite the importance of DCU, the Perumal 2008 article teaches that researchers in the field appeared to focus on the other attributes of their oral thin films besides DCU when reporting their studies.  This led Perumal et al. to conclude that DCU was an issue with said films that was inadequately addressed in the research literature even as of 2008:

> "An extensive literature search with respect to drug content uniformity in polymeric films showed that although the literature is replete with formulation and several physicochemical characterization studies on films, surprisingly, the majority of papers did not report any assay values (Table 1). Of the very few that did, in three researchers had measured drug content by dissolving a known weight of the film for analysis (Ahmed et al., 2004; Amnuaikit, Ikeuchi, Ogawara, Higaki, & Kimura, 2005; Dhanikula & Panchagnula, 2004). This is not an accurate reflection of drug uniformity because sheets of film are cut into unit doses. An assay of film area rather than weight would be more appropriate for assessing drug content uniformity in such films. In addition, Dhanikula and Panchagnula (2004) only stated that uniformity results in their study indicated that the variation in drug distribution was <15%, but they did not report any data, whereas Perugini et al. (2003) reported assay values as a statement of drug content being more than 70%. The lack of reported data on this crucial characterization property of any novel drug delivery system led to the assumption that researchers in this field may also have been experiencing difficulty with this aspect of film characterization. Yet no paper to date, to the best of our knowledge, in the published pharmaceutical literature has highlighted this difficulty."

(Perumal 2008, Ex. P at pp. 1036-37.)  That the authors' "extensive literature search … with respect to drug content uniformity in polymeric films" turned up 23 papers concerning pharmaceutical films of which only 5 were published in 2001 or earlier, speaks to the limited understanding of drug-containing thin films like those contemplated in the '514 patent.  And even in 2008, although the difficulty of maintaining DCU in such films was understood, few researchers focused on that problem.  As I describe further below, this may at least be in part that

the development of pharmaceutical thin films was still a new endeavor in its early stages of development as of 2008 with no such prescription films being approved until after this date.

118.     In contrast to the results seen in the literature (or lack thereof), the Perumal 2008 article teaches that the issue of DCU was discussed and addressed in several patent applications as of 2008, with the '514 patent and its related applications being a key example.  The Perumal 2008 article notes that the problem of DCU in cast films and the causes for that nonuniformity in films produced by traditional casting and drying methods was described in detail in the U.S. Provisional Patent App. Ser. No. 60/443,741 ("'741 Provisional," Ex. I), one of the patent applications from which the '514 patent claims priority:

> "It was only a search of patent applications that confirmed the assumption that difficulties with achieving uniform drug distribution in films did indeed exist, as some patent applications that attempted to directly address the problems encountered with nonuniformity in films were identified. Although the identification of these patents confirmed the existence of this problem, it was intriguing that the published pharmaceutical literature omitted the reporting of assay values, yet revealed the undertaking of other complex characterization studies (Table 1) without focusing on overcoming this simple but mandatory prerequisite for development of any drug delivery system. *In these patent applications, it was explained that films prepared via the conventional casting technique, as used in the literature, suffered from the aggregation or conglomeration of particles, which rendered them inherently nonuniform in terms of all film components, including polymers and drug. It was found that the formation of agglomerates randomly distributed the film components as well as any active present, thus leading to the poor drug content uniformity (US Patent No. 60/443,741, 2004). The formation of agglomerates was attributed to the relatively long drying times, which facilitated intermolecular attractive forces, convection forces, and air flow which aided in the formation of such conglomerates (US Patent No. 60/443,741, 2004)."*

(Perumal 2008, Ex. P at p. 1038; emphasis added.)  Thus, the Perumal 2008 article cites the '741 Provisional as the primary example of a patent application that addressed the issues related to lack of DCU for films produced via conventional methods and proposed a novel solution to this issue.  As is also described in the '514 patent, as evidenced in the above quote, the Perumal 2008

article refers to the fact that the lack of drug content uniformity in conventionally produced films was thought to arise from the formation of aggregates due to the long drying times and other process features associated with conventional film casting and drying methods.

119.     The Perumal 2008 article also discussed the prior art Schmidt patent (U.S. Patent No. 4,849,246), which attempted to avoid these shortcomings of traditional casting methods by "abandon[ing] the concept that a monolayered film may provide accurate dosing and instead attempted to solve the problems of aggregation by forming a multilayered film."  (Perumal 2008 article, Ex. P at p. 1038.) But the Perumal 2008 article noted that these efforts in the Schmidt patent "had the disadvantage[s] of requiring additional components, which translated to additional cost and manufacturing steps," "employ[ing] the use of time-consuming drying methods such as high-temperature air-bath using a drying oven, drying tunnel, vacuum dryer, or other such drying equipment, all of which aided in promoting the aggregation of film components and active" and "subject[ing] the active to prolonged exposure to moisture and elevated temperatures, which might render it ineffective or even harmful ….":

> "Some approaches that attempted to prevent agglomeration are described briefly. Schmidt (US Patent No. 4,849,246 in US Patent No. 60/443,741, 2004) abandoned the concept that a monolayered film may provide accurate dosing and instead attempted to solve the problem of aggregation by forming a multilayered film. The incorporation of additional excipients, i.e. gel formers and polyhydric alcohols respectively, to increase the viscosity of the film prior to drying in an effort to reduce aggregation of the components in the film is described (US Patent No. 60/443,741, 2004). These methods had the disadvantage of requiring additional components, which translated to additional cost and manufacturing steps. Furthermore, these methods employed the use of time-consuming drying methods such as high-temperature air-bath using a drying oven, drying tunnel, vacuum dryer, or other such drying equipment, all of which aided in promoting the aggregation of film components and active. In addition, such processes subjected the active to prolonged exposure to moisture and elevated temperatures, which might render it ineffective or even harmful (US Patent No. 60/443,741, 2004). Also, approaches described in US Patent No. 60/443,741, 2004 for enhancing drug uniformity, required sophisticated drying equipment and additional pharmaceutical excipients, which lead to unfeasible increased

manufacturing costs and multi-step processing. Thus, a method that uses minimal additional excipients into the formulation, uses simple technology, and also provides uniform drug content throughout the film clearly needed to be identified."

(Perumal 2008, Ex. P at p. 1038-39.)

120.    Although the Perumal 2008 article focuses on only a few of the aspects of '741 Provisional (*i.e.*, the optimization of the viscosity of the matrix in order to reduce the potential for aggregation and the use of alternative drying methods), a distinction is clearly drawn between the disclosures of the '741 Provisional versus patents and patent applications focusing on oral thin films produced utilizing conventional methods (such as the Chen Application).  Claiming that the '741 Provisional application requires the use of additional excipients and complex drying methods, Perumal et al. allege simpler methods for producing oral thin films, such as their proposed method utilizing individual wells (SMT films), still needed to be identified even as of 2008:

> "Thus, a method that uses minimal additional excipients into the formulation, uses simple technology, and also provides uniform drug content throughout the film clearly needed to be identified. Instead of considering additional excipients or introducing new expensive and complicated drying technologies, a specially designed tray with built-in predetermined wells for forming polymeric films with uniform drug content was proposed and evaluated in this study. It was expected that this simple approach, which would involve casting specified volumes of polymer–drug mixtures into wells, would lead to improved drug uniformity because the drug would be entrapped in each film unit, irrespective of the migration of the active within that well during drying. Such an improvement will not only be useful in the field of buccal drug delivery for formulation optimization, but it will also impact on other fields because mucosal films are used for a variety of other routes of administration, that is, vaginal, rectal, and ocular."

(Perumal 2008, Ex. P at p. 1038.)

121.    The experimental results that the Perumal 2008 article reported with respect to drug content uniformity and drug dissolution/release for their SMT films (produced in individual

wells) versus those produced via conventional methods are particularly relevant with respect to the allegations made by Dr. Dyar with respect to Figure 5 from the Chen Application for at least two reasons.  First, the Perumal 2008 article, and several of the prior studies described in this article, show that standard and routine methods for assessing the dissolution and drug release from oral thin films were known and utilized in the art over the time period from at least 2000 to 2008 and were known to be associated with low variability.  As I discuss further below with respect to my opinions concerning Figure 5 from Chen, these methods typically employed a standard USP dissolution apparatus or variant thereof combined with routine UV analysis of release media samples in order to quantify the amount of drug present.

122.    Second, by comparing the results of the conventionally prepared films and those made using Perumal et al.'s individual well method (SMT), it is clear that the lack of drug content uniformity in the conventionally prepared films resulted from the formulation and preparation process itself, not from measurement errors or analytical variability.  The authors of the Perumal article, with full knowledge of the teachings of the prior art, created a cast film by applying a coating preparation containing the active ingredient propranolol hydrochloride (PHCl) to the surface of a teflon-coated perspex tray (TCPT), drying the film using typical, prior-art conditions ("at 30°C for approximately 24 h"), and cutting it into individual dosage units.  (Perumal 2008, Ex. P at p. 1039 (Materials and Methods) and 1040 (Preparation of Polymer-Drug Solutions/Emulsions for Film Casting).)  The results reported in Perumal confirm that prior art film drying processes were inadequate to ensure active content uniformity.  "This yielded films with uniform surface morphology ***but poor drug content uniformity values***, i.e., 110.00 ± 66.63%, indicating a large coefficient of variation (CV) of 60.57%."  (Perumal 2008, Ex. P at p.

64

1042; emphasis added.)   The authors attributed the lack of drug content uniformity in these conventionally prepared films to drug agglomeration and migration during drying:

> "Table 2 depicts the pictures of trays used in the study for film casting and a summary of the assay and morphology of films generated.  Homopolymeric CHT films were initially prepared by employing the conventional casting technique whereby the polymeric solution is cast onto TCPTs to form a sheet of film that is cut into individual film units of desired sizes. ***This yielded films with uniform surface morphology but poor drug content uniformity values, i.e., 110.00 ± 66.63%, indicating a large coefficient of variation (CV) of 60.57%. The poor drug uniformity with these TCPTs was attributed to the reasons given in several patent applications, that is, to the formation of conglomerates and migration of drug throughout the tray during the drying process.***"

(Perumal 2008, Ex. P at pp. 1041-42; emphasis added.)

123.   Based on the statements from Perumal 2008 shown in paragraph 119 above, Perumal et al. appear to be referring to the '741 Application and its related applications in the statement shown above, thus experimentally confirming the teachings and disclosures of the '741 Application (and thus the '514 patent) with respect to the fact that conventionally produced films were prone to displaying poor DCU due to drug aggregation and migration during the film forming process, with the single well technique developed by Perumal et al. resulting in films with a significantly higher degree of DCU:

> "This modification, that is, using the SMT with inserts, resulted in films that satisfied the desired requirements, that is, good surface morphology and once again acceptable assay values of 104.84 ± 1.30% were achieved, as required by compendial specifications for PHCl dosage forms (92–107.5%) (British Pharmacopoeia, 2003)."

(Perumal 2008, Ex. P at p. 1043.)  Thus, these results indicate that the large variability seen for the films made via conventional methods resulted from the process used to make them, not from errors in the standard and routine assay method utilized to measure drug content.  The Perumal 2008 article also reported conducting reproducibility experiments that confirm the low degree of variability in drug content uniformity for their STM films.

65

> "The CV for assay values for each tray was low, indicating minimal intra-tray variability. Also these values were all within the compendial specifications of 92–107.5% (British Pharmacopoeia, 2003).
>
> …
>
> The in vitro drug release profiles of films from the three trays were also compared, as shown in Figure 3. The profiles for films from all three trays appeared to be almost superimposable."

(Perumal 2008, Ex. P at p. 1044.)  As can be seen in Figure 3 from the Perumal 2008 article, the error bars associated with the drug release profiles were tight, again indicating a low degree of variability associated with the standard and routine dissolution assay utilized by Perumal et al.

124.   Based on all of these results, Perumal et al. concluded that (i) conventional methods of oral thin film formulation and manufacture were associated with a high degree of variability with respect to drug content uniformity that prevented them from meeting industry-accepted compendia standards for acceptability; and (ii) utilizing individual wells for the production of thin films greatly reduced this variability via locking in the drug content present in the precursor film matrix (and thus removing the potential for the drying process to result in agglomeration and drug migration):

> "Therefore, multipolymeric films with PHCl+CHT+HPMC (drug and polymers with similar solubilities) and films with PHCl+CHT+EUD 100 (drug and polymers with opposing solubilities) were prepared by using the conventional TCPT and the SMT with inserts for film casting. The findings for both these methods were compared. Table 5 indicates the assay values, whereas Table 6 presents a composite summary of the drug release profiles of the films prepared in both types of trays. ***As is evident from Table 5 all films prepared with the SMT were within compendial specifications (92–107.5%) (British Pharmacopoeia, 2003) and all CVs for assays were low, that is, less than 4%, thus indicating the suitability of the SMT for the preparation of both homopolymeric and multipolymeric films with drug and polymer(s) of similar and/or opposing solubilities.  None of the films prepared with the TCPT were within compendial specifications. They exhibited very high CVs for assays, that is, as high as 60%, indicating the unsuitability of these trays for all types of film preparation.***"

(Perumal 2008, Ex. P at p. 1045; emphasis added.)

125.    The fact that the SMT individual well technique led to such markedly improved drug content uniformity supported the conclusion in the Perumal 2008 article that lack of drug content uniformity in the conventionally prepared films resulted from the migration and agglomeration of drug that occurs during the relatively long film drying process:

> "As can be seen from the drug release profiles (Table 6), the percentage drug released from all films prepared in the TCPT have relatively large SDs at each time point, whereas those prepared in the SMT with inserts have relatively small SDs. These results can be attributed to the migration of drug that occurs during the formation of aggregates during the drying process, leading to nonuniform drug content resulting in nonreproducible drug release profiles in the case of the TCPT. The small SDs and reproducible release profiles of all films prepared in the SMT with inserts are due to the containment of the drug within a predetermined well that prevents drug migration during drying and that maintains uniformity of content (US Patent No. 60/443,741, 2004)."

(Perumal 2008, Ex. P at p. 1045.)   Table 6 referred to in the passage above shows that the conventionally-produced films all displayed relatively large error bars with respect to their release profiles (i.e., greater than +/- 10%),  whereas the SMT-inserts displayed relatively tight error bars (within +/- 5%).  These results from Perumal 2008 indicate that the variability in drug content uniformity observed in these films is due to the conventional casting process itself and not to the standard and routine assay and dissolution methods utilized to measure drug release.

### 2.    V. A. Perumal, "Multipolymeric Monolayered Mucoadhesive Films for Drug Therapy," Master's Thesis (2007) ("Perumal Thesis"; Ex. Q)

126.    The Perumal Thesis also supports the results described above with respect to the Perumal 2008 article and provides additional details that support the conclusions above with respect to the validity of the assay and dissolution analytical methods utilized for the characterization of oral thin films.  For example, the Perumal Thesis also discusses the known association of poor drug content uniformity with conventionally-produced drug-containing oral thin films:

> "It was discovered through preliminary investigations and a comprehensive literature search that the conventional film casting method of film preparation suffered from poor drug content uniformity."

(Perumal Thesis, Ex. Q at p. iv.)

127.    The Perumal Thesis also discusses the influence of the long drying times associated with conventional methods of oral thin film production on a lack of DCU of the resultant films:

> "Although this method is cost effective and does not require the use of sophisticated apparatus, it has certain limitations.  These limitations are due to the use of relatively long drying times during which the formation of agglomerates randomly distributes the film components and any active present as well.  Since sheets of film are usually cut into unit doses, certain doses may therefore be devoid of or contain an insufficient amount of drug for the recommended treatment, which is ultimately harmful to the patient (US Patent No. 60/443,741, 2004)."

(Perumal Thesis, Ex. Q at pp. 49-50.)

128.    Chapter 4 of the Perumal Thesis discusses the same studies that were described in Perumal 2008 reference described above and provides additional information concerning the qualification/validation of the analytical methods utilized, the results of which again in my opinion support the conclusion that the variability seen for the conventionally produced films described in Perumal 2008 was not due to analytical method variability, instead being due primarily to the variability in DCU observed for films produced via conventional film casting methods:

> "This is the standard method of film coating as described in the literature (Kohda et al., 1997; Remunan-Lopez et al., 1998; Okamoto et al., 2001; Perugini et al., 2003; Yoo et al., 2006).  A pre-requisite for therapeutic efficacy, safety and regulatory approval of a medicine is drug content uniformity. Therefore initial characterization studies on MMFs encompassed assays of the films.  However, the preliminary data indicated non-uniform drug distribution across the individual film units."

(Perumal Thesis, Ex. Q at p. 96.)   The Perumal Thesis also stresses the importance of DCU related to the regulatory approval or pharmaceutical oral thin film candidates:

68

> "Failure to achieve a high degree of accuracy with respect to the amount of drug in individual unit doses of the film can result in therapeutic failure, non-reproducible effects and, importantly, toxic effects on the patient.  Hence, drug content uniformity is mandatory for regulatory approval of new medicines by regulatory authorities, i.e. the Medicines Control Council (MCC) (SA), Food and Drug Administration (FDA) (USA) and the European Medicines Agency (EMEA) (UK).  Current requirements by various world regulatory authorities specify small variations only from the stated active amount in a dosage form.  Generally, a $\pm5\%$ deviation from the stated active amount is allowed.  For registration and commercialization of products by regulatory bodies and, more importantly, for reproducible therapeutic effects in patients, it is essential that drug uniformity across the individual film units be achieved."

(Perumal Thesis, Ex. Q at p. 96.)

129.    Section 4.1 of the Perumal Thesis contains the same discussion that I reviewed above related to Perumal 2008 regarding (i) the lack of literature articles published as of 2007 discussing pharmaceutical oral thin films and DCU and (ii) the fact that DCU is addressed in several patents published prior to 2007, including the discussion concerning the teachings and disclosures of the '741 Application as well as the Schmidt, Zerbe and Hortsmann patents.

130.    Section 4.2.2.3 of the Perumal Thesis entitled "Drug Quantification in Films" details the method development and qualification that were conducted related to the qualification of the assay and in vitro dissolution methods that were utilized to quantify the amounts of drugs initially present in the films under study as well as the amount of drug released as a function of time in the in vitro dissolution tests.  As described on pages 107 through 117 of the Perumal Thesis, the method development procedures followed were: (i) a wavelength scan of the model drug (propranolol HCl) to determine the maximum absorbance wavelength, including a confirmation that the other film components (polymers) and reagents utilized did not interfere with the drug at this wavelength, (ii) preparation of a calibration curve to be utilized in both assay and dissolution studies, including an assessment of linearity (noting that, as indicated on pages 108 and 117, the relative standard deviations for the concentration were all less than 0.3%

and the correlation coefficient of the calibration curve was 0.999, indicative of low method variability and good reproducibility) and (iii) precision and accuracy methods (the results of which again confirmed the low degree of variability associated with the method).

131.    Section 4.2.2.4 of the Perumal Thesis entitled "In Vitro Drug Release Method" describes the method development that was performed towards the identification and qualification of an in vitro dissolution method to assess drug release from the oral thin films understudy.  Perumal first notes that, as of 2007 (and thus earlier), there were no official in vitro dissolution methods specified for the testing of such dosage forms:

> "Currently,there are no official methods for the in vitro dissolution testing for buccalmucoadhesive controlled release dosage forms. Therefore, researchers are using several different methods as describedin the literature.  These include:rotating basket in a beaker (Ishida et al., 1981); USP rotating paddle method(Remunan Lopez et al., 1998; Perugini et al., 2003); shaking water bath (Gavender et al., 2005) and Franz diffusion cells (Rossi et al., 2003)."

(Perumal Thesis, Ex. Q at p. 110)

132.    As described on page 110, Perumal chose a shaking water bath dissolution method for film drug release analysis.  The analytical methods and qualification procedures utilized by Perumal et al. described above constituted standard analytical methods and method development activities that were well known and associated with the characterization of several different types of oral dosage forms, including oral thin films.  In my opinion, such methods based on the analysis of drug content via either UV absorption or HPLC-based analytical methods were routinely used for the analysis of such films and typically demonstrated a relatively high degree of accuracy and precision.  As a result, as I will describe further below with respect to the Chen Application, I disagree with Dr. Dyar's comments concerning the source of variability associated with the data shown in Figure 5 of the Chen Application to be due to method variability or analytical error versus being due to the variability in the DCU in the films under study by Chen.

133.    Similar conclusions are described in Section 4.4 of the Perumal Thesis as were described

above for the Perumal 2008 article concerning the lack of DCU of conventionally-produced

pharmaceutical oral thin films:

> "Preliminary investigations in our laboratories, as well as a comprehensive search
> of the literature and patents filed, indicated that the conventional film casting
> method onto Teflon-coated trays produced a sheet of film that suffered from poor
> drug content uniformity.  The aim of this study was therefore to prepare a
> specially designed tray for film casting and to evaluate it in terms of enhancing
> drug content uniformity."

(Perumal Thesis, Ex. Q at p. 127.)

134.    Thus, both the Perumal 2008 article and the Perumal Thesis support the conclusion that

(i) DCU was a major issue with respect to the development of pharmaceutical oral thin films as

of 2007 and earlier, (ii) this issue was poorly addressed in the literature, (iii) as indicated in

several patents and patent applications dealing with pharmaceutical oral thin films, conventional

film formulation and production methods resulted in films with poor DCU and (iv) the '741

patent application disclosed a novel approach to addressing this issue.

###    3.    Morales et al., "Manufacture and Characterization of Mucoadhesive Buccal Films," European Journal of Pharmaceutics and Biopharmaceutics, 77:187-199 (2011) ("Morales 2011"; Ex. N)

135.    The 2011 article entitled "Manufacture and Characterization of Mucoadhesive Buccal

Thin Films" authored by J. Morales and J. McConville (Morales 2011; Ex. N) also discusses the

inherent issues with respect to drug content uniformity associated with oral thin films of various

types and singles out U.S. Patent No. 7,425,292 to Yang et al. (Ex. E) as addressing this issue.

Morales 2011 first provides an overview of the process steps associated with the production of

conventional oral thin films and the importance of rheology with respect to these steps:

> "The film casting method is undoubtedly the most widely used manufacturing
> process for making films found in the literature. This is mainly due to the ease of
> the process and the low cost that the system setup incurs at the research laboratory

scale. The process consists of at least six steps: preparation of the casting solution; deaeration of the solution; transfer of the appropriate volume of solution into a mold; drying the casting solution; cutting the final dosage form to contain the desired amount of drug; and packaging. ***During the manufacture of films, particular importance is given to*** the rheological properties of the solution or suspension, air bubbles entrapped, **content uniformity**, and residual solvents in the final dosage form [65]. ***The rheology of the liquid to be casted will determine the drying rates and uniformity in terms of the active content as well as the physical appearance of the films.***"

(Morales 2011, Ex. N at p. 189; emphasis added.)

136.    The Morales 2011 article (i) teaches that drug content uniformity was known to be a major challenge with respect to the production of oral thin films via conventional formulation and processing methods; (ii) teaches that prior art attempts to create drug-containing films, such as the Schmidt patent (U.S. Patent No. 4,849,246, Dyar Ex. 36) did not adequately solve this problem; and (ii) specifically cites the work of Yang et al. (the '292 patent from which the Challenged Claims of the '514 patent claim priority is cited in this example) as the primary example of research that was conducted to identify solutions to this important issue:

"Since the early development of medicated films, content uniformity has been a major challenge for the pharmaceutical scientist. Schmidt proposed one of the earliest approaches to increase the drug uniformity of medicated films [72], by stating that the nonuniformity of films is inherent to their monolayered nature. Schmidt proposed a multistep method for the manufacture of multilayered films to overcome the heterogeneity of the monolayered form. However, Yang et al. reported that using the protocol proposed by Schmidt did not render uniform films [73] and went onto say that to overcome the non-uniformity of films, a manufacturing process for orally disintegrating films could be easily adapted for the manufacture of mucoadhesive buccal films. Yang et al. indicated that self-aggregation was one of the main reasons why films usually show poor uniformity, and in particular the drying process was found to be crucial in preventing aggregation or conglomeration of the ingredients of the film formulation [73]. During an inherently long drying process, intermolecular attractive and convective forces are favored, leading to the problem of self-aggregation. In order to avoid non-uniformity, addition of viscous agents such as gel formers or polyhydric alcohols was proposed to alleviate potential self-aggregation [73]."

(Morales 2011, Ex. N at p. 191)

137.    The Morales 2011 article also discusses the results of the work performed in the Perumal

2008 article (which it refer to as reference [74]) with respect to the known issues related to the

lack of drug content uniformity of conventionally produced oral thin films as of 2007:

> "Recently, one of the main challenges in the film casting process, content
> uniformity along the casting surface, has been addressed [74]. Film
> characterization in terms of mucoadhesive, mechanical, permeation, and release
> properties has been widely investigated. However, prior to 2007, few reports
> pertaining to drug content uniformity can be found [70,86,99–101,141,151,153].
> The most common approach to measure the content uniformity is the
> determination of drug by weight and not by casting area. Perumal et al. postulate
> that the determination by weight is erroneous because the final dosage form is
> determined by area instead of weight in the particular case of films. They
> demonstrate that custom-made silicone-molded trays, with individual casting
> wells for each dosage form, improved several characteristics significantly,
> including the content uniformity per casting area unit, mucoadhesive properties,
> drug release, and thickness uniformity of monopolymeric or multipolymeric films
> [74]. Even though this approach may solve the problem of uniformity per dosage
> form, it does not guarantee the uniformity along the dosage unit itself and also
> imposes limitations on scaling up possibilities."

(Morales 2011, Ex. N at p. 191.)

138.    Thus, similar to the case described above with respect to Perumal 2008 and the Perumal

Thesis, Morales 2011 also supports the conclusion that that (i) DCU was a major issue with

respect to the development of pharmaceutical oral thin films as of 2007 and earlier, (ii)

conventional film formulation and production methods resulted in films with poor DCU and (iii)

the work of Yang et al. as represented by the '292 patent disclosed the mechanisms behind the

lack of DCU of conventionally produced pharmaceutical oral thin films and disclosed a novel

approach to addressing this issue.

### 4.    U.S. Patent Publication. No. US2007/0184099 to Nowak et al. ("Nowak Publication"; Ex. F)

139.    The Nowak Publication (filed February 18, 2005, claiming priority to a U.K. Patent App.

No.  0403808.9  filed  February  20,  2004,  and  published  Aug.  9,  2007  as  Pub.  No.

US2007/0184099; "Nowak Publication", Ex. F) also shows that those of ordinary skill working in the field after the invention of the '514 patent had been disclosed acknowledged that the problem of active ingredient aggregation in cast films was known:

> "Water-soluble films cast from aqueous solutions containing medications can suffer from the aggregation or conglomeration of particles.  Self-aggregation of any active ingredient will make the film inherently non-uniform in its composition.  If such films were to include low dosages of an active ingredient, it is possible that portions of the film may be substantially devoid of any e.g. medication."

(Nowak Publication, Ex. F at ¶ [0006].) The Nowak Publication also teaches the effect of long drying on the lack of DCU of the resultant films due to the aggregation of the active ingredient:

> "Furthermore, conventional film casting employs the use the [sic: of] time-consuming drying equipment such as a high-temperature air-bath, drying ovens, drying tunnels, vacuum driers, or other such drying equipment.  The long length of drying time aids in promoting the aggregation of the active ingredient and/or other adjuvant.  Such process also run the risk of exposing the active ingredient, i.e., a drug or vitamin or other components[,] to prolonged exposure to moisture and elevated temperatures, which may render it ineffective or even harmful."

(Nowak Publication, Ex. F at ¶ [0007].)

### 5.  Goel et al. "Orally Disintegrating Systems: Innovations in Formulation and Technology", Recent Patents on Drug Delivery & Formulation, 2:258-274 (2008) ("Goel 2008"; Ex. L)

140.   Goel 2008 is a review article summarizing the innovations made with respect to orally disintegrating systems as of 2008.  Pages 269 through 270 of this article contains a section summarizing the state of the art (with a focus on the patent literature) with respect to orally disintegrating films.  The authors first discuss the disclosures of the Fuchs, Schmidt, Hortsmann and Zerbe patents that were discussed above with respect to the specification of the '514 patent, then provide a discussion concerning the issues associated with conventional drying methods (skin formation, rippling and lack of DCU, etc.) that supports the teachings and disclosures of the '514 patent with respect to this point (Goel 2008; Ex. L at p. 269, ¶ 4).  Goel then discusses the

disclosures of patent applications to Fuisz et al. (US20080075825, Ex. G) and Myers et al. (US20080050422, Ex. H) as examples of disclosures related to non self-aggregating orally disintegrating films that address the issues described above (Goel 2008; Ex. L at p. 270, ¶¶ 3-4).

### 6. Kathpalia and Gupte "An Introdution to Fast Dissolving Oral Thin Film Drug Delivery Systems: A Review", Drug Delivery & Formulation, 10:667-684 (2013) ("Kathpalia 2013"; Ex. M)

141.   Kathpalia 2013 (Ex. M) is another review article focusing on summarizing the development history and state of the art with respect to fast dissolving oral thin films as of its publication date.  Like other review articles describing the status of oral thin film development, Kathpalia et al. state that although oral thin films were known for several years with respect to oral hygiene and OTC products, pharmaceutical (i.e., prescription) oral thin films were still in the early stages of becoming mainstream products even as of 2013.  Kathpalia et al. note that two of the first approved prescription oral thin films (OTFs) were both based on the MonoSol technology associated with the '514 patent, these being Zuplenz (Ondansetron) and Suboxone® film:

> "USFDA defines OTFs as, "a thin, flexible, non-friable polymeric film strip containing one or more dispersed active pharmaceutical ingredients (APIs) which is intended to be placed on the tongue for rapid disintegration or dissolution in the saliva prior to swallowing for delivery into the gastrointestinal tract" [3]. OTFs are coming into their own as mainstream pharmaceutical products. The first approved prescription OTF was Zuplenz (Ondansetron hydrochloride- 4 mg, 8 mg) which was approved in 2010. The second approved one was Suboxone (Buprenorphine and Naloxone)."[6]

(Kathpalia 2013, Ex. M at p. 667.)  With respect to DCU, even as late as 2013, Kathapalia et al. also state that one of the disadvantages of OTFs is that "[d]ose uniformity is difficult to maintain" (Kathpalia 2013, Ex. M at p. 668.)

---

[6] I understand that the FDA had approved one other prescription film before these in 2009, a fentanyl containing film called Onsolis made by BioDelivery Sciences International (BDSI).  I understand that Suboxone® film was the first prescription sublingual film approved by the FDA.

7.   **Borges et al. "Oral Films: Current Status and Future Perspectives I –
     Galenical Development and Quality Attributes, Journal of Controlled
     Release, 206:1-19 (2015) ("Borges 2015-I"; Ex. J) and II – Intellectual
     Property, Technologies and Market Needs, Journal of Controlled
     Release, 206:108-121 (2015) (Borges 2015-II; Ex. K)**

142.   The two articles authored by Borges et al. from 2015 also summarize the current status of

OTFs as well as summarize the patent landscape related to these films. Borges 2015-I teaches the

importance of DCU with respect to the development of OTFs:

> "The individual weight of the films and the dosage uniformity must also be
> controlled during the process. It is also important to have a deep knowledge of the
> process and the product so slight adjustments may be performed during
> manufacturing if necessary."

(Borges 2015-I, Ex. J at p. 13.)   Borges et al. also describe the evolution of OTFs from oral

hygiene products to approved pharmaceutical thin films, and indicate that MonoSol was one of

the pioneering companies with respect to the latter:

> "MonoSol, one of the pioneer companies in the oral film industry owns a
> protected drug delivery technology, PharmFilm®. MonoSol's film technology is
> supposed to be more stable and robust than other conventional dosage forms with
> a loading capacity up to 80 mg. The Pharmfilm® is a polymeric matrix based on
> polyethylene oxide and hydroxypropylmethyl cellulose,which normally is related
> with fast dissolution rates and rapid drug absorption [19]. However, MonoSol
> claims that this technological platform can be used for both fast dissolving system
> or buccal delivery. In fact, ondansetron hydrochloride had been successfully
> incorporated into the PharmFilm® technology as fast dissolving system and other
> drug substances such as montelukast sodium, rizatriptan, escitalopram oxalate,
> donezepil hydrochloride and epinephrine are being considered or under
> development as oral quick release formulations [20–25]. Additionally, as
> previously referred, the Pharmfilm® technology is also available as a slower
> release sublingual formulation (Suboxone® sublingual film) [25]."

(Borges 2015-II, Ex. K at p. 109.)

143.   Similar to the case described above for Kathapalia 2013, Borges et al. refer to the 2010

approval of ondansetron OTF products (Setofilm and Zuplenz) based on MonoSol technologies

as originating the market with respect to prescription OTFs, with the following approval of

Suboxone® film being hugely successful:

> "It was only in 2010 that the first Rx oral film, the ondansetron
> Rapidfilm® (Setofilm®) and the ondansetron Pharmfilm® (Zuplenz®), received
> European and FDA approval, respectively. Labtec GmBh, APR Applied Pharma
> Research SA (APR) and MonoSol Rx LLC (MonoSol) entered in the market with
> an ondansetron oral thin film for the prevention of nausea and vomiting, staunch
> that would capture a broad share of an appellative market that generated 1.9
> billion dollars in the same year [139]. A month after Zuplenz® launch, MonoSol
> together with Reckitt Benckiser Pharmaceuticals received FDA approval for
> Suboxone® sublingual film [135,140]. This thin film, with two drug substances,
> buprenorphine and naloxone, approved for the treatment of opioid dependence in
> adults, was a huge success contributing to boost the oral films market. In 2011,
> Suboxone® thin film recorded sales of 513 million dollars and accounted for 96%
> of the oral transmucosal film market [141]. In 2012, US sales of Suboxone®
> sublingual film alone exceeded 1.5 billion dollars and continue with gradual
> growth [142]. During clinical trial the patients seemed to prefer the Suboxone®
> sublingual film rather than Suboxone® sublingual tablets, due to its fast
> dissolution and more pleasant taste profile [140]. These factors attracted other
> companies, as Alvogen Pine Brook, Actavis, Intelgenx and BioDelivery Sciences
> International (BDSI) to develop similar technologies. In fact, the first three
> companies have recently filled abbreviated new drug applications (ANDAs) for
> generic products of Suboxone® sublingual film whereas BDSI submitted a NDA
> with its own buccal film technology, the BUNAVAIL™. BDSI believes that
> BUNAVAIL™, which adheres to the inside of the cheek, has the potential to offer
> advantages over the Suboxone® sublingual film [43,142].
> At the moment, none of these competitors' products are on the market
> since a patent infringement lawsuit against these applicants was submitted by
> Reckitt Benckiser [143]. The success of the Reckitt Benckiser's prescription thin
> film proved the viability and value of this pharmaceutical form in the Rx market.
> In the US the oral films had come into a strong prominence and the prescriptions
> confirm the preference of these pharmaceutical forms [144]."

(Borges 2015-II, Ex. K at p. 116.)

144. Thus, these references published subsequent to 2002 indicate that ensuring DCU was still

a critical issue associated with pharmaceutical oral thin films, in particular for those made via

convention film formulation and drying processes, such as those described in the Chen patents

and applications as I discuss further below.  The Perumal 2008 and Morales 2011 references

discussed above also indicate that the inventions of Yang et al. represented the leading attempts

at both understanding the mechanisms behind the lack of DCU in conventionally produced films as well as the disclosure of novel formulation and processing methods for the production of pharmaceutical oral thin films with significantly enhanced DCU. Additionally, in my opinion, these multiple references from independent groups of researchers acknowledged that the invention of the '514 patent was pioneering and overcame a substantial obstacle of drug content uniformity that had confounded others trying to develop such films prior to 2001.

### C.      Deficiencies in particular prior art references cited by Dr. Dyar

145.    With respect to the specific prior art references that Dr. Dyar alleges make obvious the Challenged Claims of the '514 patent, it is my opinion that none of these references considered alone, together or in the context of the entirety of the state of the art as of October 2002 make obvious the Challenged Claims of the '514 patent.  I discuss my opinions with respect to each of the references considered by Dr. Dyar with respect to obviousness below.

### 1.      Chen Application (WO2000/42992 – Dyar Ex. 28) and U.S. Patent No. 6,552,024 to Chen et al. ("'024 Patent" – Dyar Ex. 23)

146.    The Chen Application was discussed extensively during the prosecution of the application from which the '514 patent issued before the Patent Office deemed the Challenged Claims valid and nonobvious.  The disclosures of the '024 patent are substantially the same as those of the Chen Application, and I have focused my citations below on those from the Chen Application.

147.    The Chen Application relied upon by Dr. Dyar does not directly report data regarding content uniformity of the active ingredient in any film the reference discloses.  Nevertheless, Dr. Dyar suggests that the Chen Application discloses a film that meets the limitation in the Challenged Claims that "the uniformity subsequent to casting and drying of the matrix is measured by substantially equally sized individual unit doses which do not vary by more than