## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RECKITT BENCKISER
PHARMACEUTICALS INC., RB
PHARMACEUTICALS LIMITED, and
MONOSOL RX, LLC,

                     Plaintiffs,

    v.

WATSON LABORATORIES, INC. and
ACTAVIS LABORATORIES UT, INC., et
al.

                     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 13-1674-RGA

Consolidated

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE EVIDENCE CONCERNING *INTER PARTES* REVIEW

John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 N. Broom Street
Wilmington, DE 19801
(302) 655-4200
jcp@pgslaw.com
mch@pgslaw.com

Steven J. Fineman (#4025)
Katharine Lester Mowery (#5629)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
fineman@rlf.com
mowery@rlf.com

*Attorneys for Defendant Watson*
*Laboratories, Inc.*

*Attorneys for Defendants Par*
*Pharmaceutical, Inc. and IntelGenx*
*Technologies Corp.*

Dated:  December 2, 2015

The Patent Trial and Appeal Board (PTAB) has held claims 15-19 of the '832 patent *anticipated* by, and *obvious* over, the *same references* relied on by Defendants in this case.  Ex. 1 (IPR Final Opinion); *see also* Ex. 2 (Davies Rebuttal Report) ¶¶ 102, 103; Ex. 3 (Bley Opening Report) ¶¶ 132, 161, 180, 193-210.[1]  In fact, Plaintiffs' expert Dr. Davies even adapted Plaintiffs' expert declaration from the IPR proceedings into his validity analysis.[2]  Ex. 2 (Davies Rebuttal Report) ¶ 25 n.1 ("I have adapted Dr. Johnston's report for my analysis").  So it is highly probative that the PTAB ultimately determined that claims 15-19 are anticipated by LabTec, rejecting Plaintiffs' arguments that LabTec is limited to peroral delivery of films to the GI tract.  Ex. 1 at 18.  On the contrary, the PTAB expressly found that "when only 60% of the active ingredient reaches the GI tract," as LabTec discloses, "the rest (40%) must have been absorbed through the oral mucosa."  Ex. 1 at 20.  And it is equally probative that the PTAB determined that claims 15-19 would have been obvious to a POSA in view of LabTec, Birch, and Yang, recognizing that a reference is prior art for all it teaches, and LabTec "suggests a film formulated for oral mucosal absorption."  Ex. 1 at 24.  The PTAB rejected Plaintiffs' arguments that LabTec's disclosure of buprenorphine was a mistake, and concluded that "to the extent LabTec's teaching on how to make a film is insufficient, Yang teaches such methods."  Ex. 1 at 22.

Now, in their motion *in limine*, Plaintiffs seek to hide the PTAB decision from the Court.  Its relevance can hardly be disputed; it represents an independent evaluation of the validity of claims 15-19 in light of the same prior art at issue in this case.  And Plaintiffs' claim construction

---

[1] Plaintiffs assert that Dr. Bley did not rely on the IPR final decision, however that decision did not issue until after the expert reports were served, and Dr. Bley presents no new or different opinions based on the IPR final decision.

[2] Plaintiffs assert that such declarations are hearsay, despite relying on one themselves. However, such evidence is admissible.  *See, e.g.*, Fed. R. Evid. 803(6) and/or 803(8).

1

argument is a red herring; no terms of claims 15-19 were construed by this Court.  True, the legal standard is different, but that does not mean that the "probative value" of the IPR decision is "*substantially* outweighed" by unfair prejudice, confusion, and wasting of time.  Fed. R. Evid. 403 (emphasis added).  Even with a different legal standard, the PTAB decision is highly persuasive, and easily satisfies Rule 403.  *See L.C. Eldridge Sales Co. v. Azen Mfg. Pte.*, No. 6:11cv599, 2013 U.S. Dist. LEXIS 186151, at *8 (E.D. Tex. Nov. 13, 2013) (denying a motion *in limine* to preclude evidence concerning an IPR because the "evidence [wa]s highly probative").

Plaintiffs' Rule 403 argument is particularly weak because this is a bench trial.  The concerns behind Rule 403 are not implicated without a jury present.  Delaware courts "have recognized that in the context of a bench trial, evidence should not be excluded under Rule 403 on the grounds that it is unfairly prejudicial, because the Court is capable of assessing the probative value of the article and excluding any arguably improper inferences." *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 497 (D. Del. 2005).  Unlike the cases cited by Plaintiffs, this trial is a bench trial, and there is no potential for jury confusion. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 04-1371-JJF, 2006 U.S. Dist. LEXIS 100909, at *3 (D. Del. Sept. 14, 2006) (denying a motion *in limine* to exclude evidence from a patent reexamination because the "risk of prejudice does not exist with respect to the bench trial"); *compare with InterDigital Commc'ns Inc. v. Nokia Corp.*, C.A. No. 13-10, 2014 WL 8104167 (D. Del. Sept. 19, 2014) (jury trial); *Personalized User Model, L.L.P. v. Google Inc.*, No. CV 09-525-LPS, 2014 WL 807736, at *3 (D. Del. Feb. 27, 2014) (jury trial); *IA Labs CA, LLC v. Nintendo Co.*, 857 F. Supp. 2d 550, 551-52 (D. Md. 2012) (jury trial).

Further, courts have found that even with a jury present, materials from post-grant

proceedings such as IPR or reexamination are sufficiently probative to outweigh any potential

prejudice or jury confusion. *See British Telecomm'ns PLC, v. Google Inc.*, No. 11-1249 (LPS),

Order (D. Del. Jan. 23, 2014) (denying Defendants' motion *in limine* requesting exclusion of

evidence relating to *ex parte* reexaminations in a jury trial) (Ex. 4); *Universal Elec., Inc. v.

Universal Remote Control, Inc.*, No. SACV 12-00329 AG (JPRx), Order (C.D. Cal. Apr. 21,

2014) (denying motion to exclude an IPR decision in a jury trial) (Ex. 5); *L.C. Eldridge Sales

Co.*, No. 6:11cv599, 2013 U.S. Dist. LEXIS 186151, at *8 (same).

 Plaintiffs' cited cases do not assist them.  In those cases, courts excluded the PTAB's

***denial*** of an IPR petition filed by an unrelated third-party as evidence of patent validity.

*InterDigital*, C.A. No. 13-10, 2014 WL 8104167, at *1; *IA Labs*, 857 F. Supp. 2d at 551-52.  In

other words, those cases rejected attempts to use PTAB denials against accused infringers who

had no role in the IPR proceedings and no opportunity to present their own arguments related to

the prior art in the IPR petitions.  Here, Defendants seek to use the PTAB decision against

Plaintiffs, who fully engaged in the IPR proceedings and presented their arguments to the PTAB

on the same prior art at issue in this case.  Accordingly, the IPR proceedings here reflect an

independent analysis as to how a person with ordinary skill in the art would consider claims 15-

19 of the '832 patent in view of the prior art after a full consideration of the Plaintiffs'

arguments.  Such an analysis is highly probative of the validity issues before the Court.  *L.C.

Eldridge Sales Co.*, No. 6:11cv599, 2013 U.S. Dist. LEXIS 186151, at *8.

 For these reasons, Plaintiffs' motion should be denied.

/s/ Megan C. Haney
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pgslaw.com
mch@pgslaw.com

Of Counsel:

George Lombardi
Michael K. Nutter
Tyler Johannes
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
glombard@winston.com
mnutter@winston.com
tjohannes@winston.com

Stephen Smerek
David P. Dalke
WINSTON & STRAWN LLP
333 S. Grand Ave., Suite 3800
Los Angeles, CA 90071
(213) 615-1700
ssmerek@winston.com
ddalke@winston.com

Melinda K. Lackey
Donald Mahoney, III
WINSTON & STRAWN LLP
1111 Louisiana, 25th Floor
Houston, TX 770022
(713) 651-2600
mlackey@winston.com
tmahoney@winston.com

*Attorneys for Defendant Watson Laboratories, Inc.*

Dated:  December 2, 2015

/s/ Steven J. Fineman
Steven J. Fineman (#4025)
Katharine Lester Mowery (#5629)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
fineman@rlf.com
mowery@rlf.com

Of Counsel:

Daniel G. Brown
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
(212) 906-1200
Daniel.Brown@lw.com

James K. Lynch
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
Jim.Lynch@lw.com

Terry Kearney
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600
Terry.Kearney@lw.com

Jennifer Koh
B. Thomas Watson
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400
Jennifer.Koh@lw.com
Thomas.Watson@lw.com

Emily C. Melvin
Brenda L. Danek
LATHAM & WATKINS LLP
330 North Wabash Drive, Suite 2800

Chicago, IL  60606
(312) 876-7700
Emily.Melvin@lw.com
Brenda.Danek@lw.com

*Attorneys for Defendants Par Pharmaceutical, Inc.
and IntelGenx Technologies Corp.*

## CERTIFICATE OF SERVICEE

I hereby certify that on December 2, 2015, true and correct copies of the foregoing

document were caused to be served upon the following counsel of record as indicated:

**VIA ELECTRONIC MAIL**
Mary W. Bourke
Dana K. Severance
Daniel Attaway
Womble Carlyle Sandridge & Rice, LLP
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
(302) 252-4320
mbourke@wcsr.com
dseverance@wcsr.com
dattaway@wcsr.com

**VIA ELECTRONIC MAIL**
Daniel Ladow
James M. Bollinger
Timothy P. Heaton
J. Magnus Essunger
Bennet J. Moskowitz
Sujatha Vathyam
Troutman Sanders LLP
875 Third Avenue
New York, NY 10022
(212) 704-6000
Daniel.ladow@troutmansanders.com
James.bollinger@troutmansanders.com
Timothy.heaton@troutmansanders.com
Magnus.essunger@troutmansanders.com
Bennet.moskowitz@troutmansanders.com
Sujatha.vathyam@troutmansanders.com

**VIA ELECTRONIC MAIL**
Jeffrey B. Elikan
Erica Andersen
Jeffrey Lerner
Ashley Kwon
Covington & Burling LLP
One City Center
850 Tenth Street NW
Washington, DC 20001-4956

**VIA ELECTRONIC MAIL**
James F. Hibey
Timothy C. Bickham
Rachel M. Hofstatter
Steptoe & Johnson LLP
1330 Connecticut Ave. NW
Washington, DC 20036
(202) 429-3000
jhibey@steptoe.com
tbickham@steptoe.com
rhofstatter@steptoe.com
MonoSolLit@steptoe.com

**VIA ELECTRONIC MAIL**
David L. Hecht
Cassandra Adams
Steptoe & Johnson LLP
1114  Avenue of the Americas
New York, NY 10036
(212) 506-3905
dhecht@steptoe.com
cadams@steptoe.com

**VIA ELECTRONIC MAIL**
Troy S. Kleckley
Puja R. Patel
Andrew D. Regan
Douglas D. Salyers
Troutman Sanders LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308
(404) 885-3000
Troy.kleckley@troutmansanders.com
Puja.patel@troutmansanders.com
Andrew.regan@troutmansanders.com
Doug.salyers@troutmansanders.com

(202) 662-5873
jelikan@cov.com
eandersen@cov.com
jlerner@cov.com
akwon@cov.com

**VIA ELECTRONIC MAIL**
Robert E. Browne, Jr.
Troutman Sanders LLP
55 West Monroe Street, Suite 300
Chicago, IL 60603
(312) 759-1923
Robert.browne@troutmansanders.com

**VIA ELECTRONIC MAIL**
Charanjit Brahma
Troutman Sanders LLP
580 California Street, Suite 1100
San Francisco, CA 94101-1032
(415) 477-5700
Charanjit.brahma@troutmansanders.com


*/s/ Katharine Lester Mowery*
Katharine Lester Mowery (#5629)
mowery@rlf.com

# EXHIBIT 1

Trials@uspto.gov                               Paper 43
571-272-7822                           Entered: June 30, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BIODELIVERY SCIENCES INTERNATIONAL, INC.,
Petitioner,

v.

RB PHARMACEUTICALS LIMITED,
Patent Owner.
_____

Case IPR2014-00325
Patent 8,475,832 B2
_____

Before TONI R. SCHEINER, JACQUELINE WRIGHT BONILLA, and
ZHENYU YANG, *Administrative Patent Judges*.

YANG, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-00325
Patent 8,475,832 B2

## INTRODUCTION

BioDelivery Sciences International, Inc. ("Petitioner") filed a Petition for an *inter partes* review of claims 15–19 of U.S. Patent No. 8,475,832 B2 (Ex. 1001, "the '832 patent").  Paper 8 ("Pet.").  On July 29, 2014, the Board instituted trial to review patentability of the challenged claims.  Paper 17 ("Dec.").  Thereafter, RB Pharmaceuticals Limited ("Patent Owner") filed a Corrected Response (Paper 25 ("PO Resp.")), and Petitioner filed a Reply (Paper 31).  Petitioner also filed a Motion to Exclude Exhibit 2043.  Paper 35.  Patent Owner filed an Opposition to the Motion (Paper 37), and Petitioner filed a Reply in support of the Motion (Paper 38).

In support of their respective positions, Petitioner relies on the Declarations of Drs. Maureen Reitman (Ex. 1004), Philip T. Lavin (Ex. 1005), David W. Feigal (Ex. 1029), and Christine S. Meyer (Ex. 1031), and the deposition testimony of Dr. Thomas P. Johnston (Ex. 1028); Patent Owner relies on the Declaration of Dr. Johnston (Ex. 2003).

Oral hearing was held on March 20, 2015.  *See* Paper 42 ("Tr.").

The Board has jurisdiction under 35 U.S.C. § 6(c) and issues this final written decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has established by a preponderance of the evidence that claims 15–19 of the '832 patent are unpatentable.  In rendering this Decision, we do not rely on Exhibit 2043, the subject of Petitioner's Motion to Exclude.  Thus, we dismiss the Motion as moot.

### *The '832 Patent*

The '832 patent relates to compositions and methods for treating narcotic dependence using an orally dissolvable film comprising

2

IPR2014-00325
Patent 8,475,832 B2

buprenorphine and naloxone, wherein the film provides a bioequivalent effect to Suboxone®. Ex. 1001, 4:53–58. The '832 patent defines bioequivalent as "obtaining 80% to 125% of the Cmax and AUC values for a given active in a different product." *Id.* at 3:48–50. According to the '832 patent, "Cmax refers to the mean maximum plasma concentration after administration of the composition to a human subject," and "AUC refers to the mean area under the plasma concentration-time curve value after administration of the compositions." *Id.* at 3:9–14.

At the time of the '832 patent invention, Suboxone®, an orally dissolvable tablet of buprenorphine and naloxone, was on the market for treating opioid dependency. *Id.* at 4:51–55. Buprenorphine, an opioid agonist, provides an effect of satisfying the body's urge for the narcotics, but not the "high" associated with misuse. *Id.* at 1:36–40. Naloxone, an opioid antagonist, reduces the effect of buprenorphine, and, thus, decreases the likelihood of diversion and abuse of buprenorphine. *Id.* at 1:46–52.

The tablet form, however, still has the potential for abuse because it can be removed easily from the mouth for later extraction and injection of buprenorphine. *Id.* at 1:55–62. According to the '832 patent,

> There [was] a need for an orally dissolvable film dosage form that provides the desired absorption levels of the agonist and antagonist, while providing an adhesive effect in the mouth, rendering it difficult to remove once placed in the mouth, thereby making abuse of the agonist difficult.

*Id.* at 1:65–2:2.

The '832 patent relates to film dosage compositions comprising buprenorphine and naloxone. *Id.* at 2:6–3:2. Such compositions are particularly useful for treating narcotic dependence. *Id.* at 1:13–14.

3

IPR2014-00325
Patent 8,475,832 B2

*Illustrative Claim*

Among the challenged claims, claim 15 is the sole independent claim.

It reads:

> 15. An orally dissolving film formulation comprising buprenorphine and naloxone, wherein said formulation provides an in vivo plasma profile having a Cmax of between about 0.624 ng/ml and about 5.638 ng/ml for buprenorphine and an in vivo plasma profile having a Cmax of between about 41.04 pg/ml to about 323.75 pg/ml for naloxone.

*Reviewed Grounds of Unpatentability*

The Board instituted trial on the following grounds of unpatentability:

| Claims Challenged | Basis | Reference(s) |
|---|---|---|
| 15–19 | § 102(b) | Labtec[1] |
| 15–19 | § 103 | Labtec, Birch,[2] and Yang[3] |

ANALYSIS

*Claim Construction*

In an *inter partes* review, the Board interprets a claim term in an unexpired patent according to its broadest reasonable construction in light of the specification of the patent in which it appears.  37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1280–81 (Fed. Cir. 2015).  Under that standard, absent any special definitions, we assign claim terms

_____

[1] Leichs et al., Int'l Pub. No. WO 2008/040534 A2, published on April 10, 2008 (Ex. 1017, "Labtec").

[2] Birch et al., U.S. Patent Publication No. 2005/0085440 A1, published on April 21, 2005 (Ex. 1019, "Birch").

[3] Yang et al., U.S. Patent No. 7,357,891 B2, issued on April 15, 2008 (Ex. 1016, "Yang").

IPR2014-00325
Patent 8,475,832 B2

their ordinary and customary meaning, as understood by a person of ordinary skill in the art, in the context of the entire patent disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

In the Decision to Institute, we concluded that "film formulation" encompasses film dosage, film composition, or film, but not a formulation that is not in the form of a film. Dec. 11. We also determined that the term "provides an in vivo plasma profile" needs no construction beyond its ordinary meaning. *Id.* at 12. During trial, the parties did not dispute these constructions. Having considered the complete record developed at trial, we see no reason to change our interpretation of those terms.

In its Response, however, Patent Owner presents arguments with respect to two additional terms. PO Resp. 18–26. First, Patent Owner challenges Petitioner's position that the wherein clause of claim 15 is not entitled to patentable weight. *Id.* at 18–20. Second, Patent Owner contends that "the challenged claims should be construed as requiring a film formulation that provides, and as reciting pharmacokinetic ranges resulting from, oral transmucosal absorption." *Id.* at 20–26. We address each issue in turn.

The "Wherein" Clause

Claim 15 recites an orally dissolving film formation, "wherein said formulation provides" specific pharmacokinetic profiles. Ex. 1001, 24:56–61. Petitioner argues that the wherein clause merely recites a desired result, and is not entitled to patentable weight. Pet. 23–26. Patent Owner counters that the pharmacokinetic ranges recited in the wherein clause "give crucial meaning to, and provide defining characteristics provided by the film formulation at issue." PO Resp. 19–20. We agree with Patent Owner.

5

IPR2014-00325
Patent 8,475,832 B2

A wherein clause is not given patentable weight if it merely expresses the intended result of a process. *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329 (Fed. Cir. 2005).  But, when the wherein clause states a condition that is material to patentability, it cannot be ignored. *Id.*

Here, a film formulation that meets the requirements of claim 15 must be capable of producing the pharmacokinetic profile recited in the wherein clause of the claim.  Petitioner does not contend that all orally dissolving films comprising buprenorphine and naloxone would provide the in vivo plasma profile recited in the wherein clause.  As a necessary property of the claimed formulation, the pharmacokinetic profile gives meaning and purpose to the claim. *See Griffin v. Bertina*, 285 F.3d 1029, 1033–34 (Fed. Cir. 2002).

After reviewing the entirety of the patent, we conclude that the wherein clause of claim 15 (as well as claims 16 and 17) is a meaningful limitation and, thus, is entitled to patentable weight.

Oral Transmucosal Absorption

Patent Owner asserts that "the challenged claims should be construed as requiring a film formulation that provides, and as reciting pharmacokinetic ranges resulting from, oral transmucosal absorption."  PO Resp. 20.  We disagree.

First, it is a bedrock principle of patent law that the words of the claims themselves define the scope of the patented invention. *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012).  None of the challenged claims includes any language to the effect of requiring oral transmucosal absorption.  Instead, the claims recite an "orally dissolving film

IPR2014-00325
Patent 8,475,832 B2

formulation." Dissolution and absorption are two distinct properties. Thus, "orally dissolving" does not translate into oral transmucosal absorption.

Second, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012). Here, contrary to Patent Owner's assertion, the Specification does not "make[] clear that . . . the claimed film delivers buprenorphine through the oral mucosa." *See* PO Resp. 21. The '832 patent describes its invention as an "orally dissolvable film" that is "preferably administered to a patient through the oral cavity of the patient, but may be administered in any desired means." Ex. 1001, 15:12–15; *see also id.* at 15:1–3 (stating administering the film "most desirably into the oral cavity"). These disclosures suggest that the film of the '832 patent can be administered through routes other than the oral cavity, albeit not preferred or most desired.

Patent Owner relies on various portions of the Specification. PO Resp. 21–23. None of the cited language, however, supports Patent Owner's position. For example, Patent Owner points out that the title of the '832 patent reads "Sublingual and Buccal Film Composition." *Id.* at 21. But, "if we do not read limitations into the claims from the specification that are not found in the claims themselves, then we certainly will not read limitations into the claims from the patent title." *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1312 (Fed. Cir. 1999).

Patent Owner refers to the Specification for disclosing "a method of treating narcotic dependence by providing an orally dissolvable film dosage, which provides a bioequivalent effect to Suboxone®." PO Resp. 22

7

IPR2014-00325
Patent 8,475,832 B2

(quoting Ex. 1001, 4:51–58).  According to Patent Owner, a skilled artisan would have understood that Suboxone® delivers buprenorphine through the oral mucosa and that the claimed film formulation is "intended to work the same way."  *Id.*  As support, Patent Owner cites the Specification for disclosing: "In a dosage form that is to be placed in the oral cavity, it is desired to ***absorb the agonist [buprenorphine] bu[c]cally*** so as to provide rapid integration of the agonist into the body of the user."  *Id.* (quoting Ex. 1001, 11:10–13).  This sentence, however, states that the buccal absorption (i.e., oral transmucosal absorption) is merely "desired," and not required.

Patent Owner also contends "the specification notes that a key criterion in polymer selection is 'the time period for which it is desired to maintain the film in contact with the mucosal tissue,'" because different actives may require different lengths of time "for ***delivery through the mucosal tissue***."  PO Resp. 23 (quoting Ex. 1001, 6:42–47).  According to Patent Owner, this "[f]urther confirm[s] the oral transmucosal nature of the claimed film."  *Id.*  Patent Owner, however, neglects to note the sentence immediately preceding the ones quoted, which reads: "Although a variety of different polymers may be used, it is *desired* to select polymers that provide mucoadhesive properties to the film, as well as a desired dissolution and/or disintegration rate."  Ex. 1001, 6:39–42 (emphasis added).  This disclosure provides the context for the language Patent Owner emphasizes.  Because mucoadhesiveness is only a desired property, we again, decline to read it, or oral transmucosal absorption, into the challenged claims.

IPR2014-00325
Patent 8,475,832 B2

Patent Owner further asserts that the Specification "repeatedly emphasizes the important role" of "local pH." PO Resp. 23. According to Patent Owner,

> The skilled person would appreciate that *the specification's strong emphasis on the use of a buffer to provide a local pH (in the presence of saliva as the matrix dissolves adjacent to the oral mucosa) is solely applicable to oral transmucosal absorption*.

*Id.* at 24. The challenged claims, however, do not recite a local pH. This is in sharp contrast to the unchallenged claims, all of which, either directly or through their dependency, require a local pH of about 3 to about 3.5. As a result, Patent Owner's reliance on the importance of a local pH does not support its argument on oral transmucosal absorption in relation to the challenged claims.

In addition, Patent Owner argues that a person of ordinary skill "would understand that *all* of the pharmacokinetic data provided about the test film formulations was intended to and did result from oral transmucosal absorption." *Id.* at 25. This, according to Patent Owner, is because "*all* of the pharmacokinetic data and ranges in the specification relating to Suboxone® sublingual tablets . . . result or would be expected to result from oral transmucosal absorption, the known route employed by that commercial product." *Id.* We are not persuaded.

First, the '832 patent does not mention that the pharmacokinetic data for Suboxone® tablets result from oral transmucosal absorption. In fact, when characterizing Suboxone®, the Specification only describes it as "an orally ingestible" (Ex. 1001, 1:54) or "an orally dissolvable" tablet (*id.* at 4:53). Neither can be reasonably equated with oral transmucosal absorption.

9

IPR2014-00325
Patent 8,475,832 B2

Second, during his deposition, Dr. Johnston explained:

> [I]f you give an orally dissolving film, and if the drug is not absorbed across the oral mucosa, sublingual, buccal, whatever, then it has to be swallowed, because the patient -- where else would it go?  The patient doesn't expectorate that saliva drug solution.  So to answer your question, it has to be swallowed.

Ex. 1028, 237:9–17, *see also id.* at 125:8–12 (testifying that Suboxone® tablets "dissolve[] in saliva, the majority of which is absorbed sublingually, then that saliva of buprenorphine solution is swallowed").  As a result, we find the evidence of record does not support Patent Owner's position that "*all* of the pharmacokinetic data" of Suboxone® tablets result from oral transmucosal absorption.

Third, Dr. Johnston opines that "[o]ne of ordinary skill in the art would understand that Suboxone® sublingual tablets deliver buprenorphine through the oral mucosa."  Ex. 2003 ¶ 66.  Patent Owner argues the same. PO Resp. 22–23.  As support, they both rely on the March 2006 version of the Data Sheet for Suboxone® tablets, which states:

> When taken orally, buprenorphine undergoes first-pass metabolism with N-dealkylation and glucuroconjugation in the small intestine and the liver.  The use of SUBOXONE by the oral route is therefore inappropriate.  SUBOXONE tablets are for sublingual administration.

PO Resp. 16 (quoting Ex. 2007, 2); Ex. 2003 ¶ 43 (quoting Ex. 2007, 2). Petitioner, however, pointing to the same document—indeed, the same page of the same Data Sheet—argues that the bioavailability of orally administered buprenorphine overlaps with that of sublingually administered Suboxone® tablets.  Reply 9–10 (citing Ex. 2007, 2).  We find that the evidence of record supports Petitioner's position.

IPR2014-00325
Patent 8,475,832 B2

During his deposition, Dr. Johnston testified that the mean absolute bioavailability of buprenorphine from oral administration is "anywhere from 5 percent to 14 percent." Ex. 1028, 76:8–14.  The Data Sheet for Suboxone® tablets states that the mean absolute bioavailability of buprenorphine from sublingual administration is 13.6% (range 5.1–24.9%). Ex. 2007, 2.  When questioned about this statement during a deposition, Dr. Johnston stated that he disagreed with the data.  Ex. 1028, 77:4–23, 80:14–19.  At the hearing, counsel for Patent Owner downplayed the data as "numbers in that one study that's in the label."  Tr. 23:23–24, *see also id.* at 24:19–21 (stating that "yes . . . the 13.6 is in the Suboxone tablet label, but that was one study").  According to Dr. Johnston, "the upper range thereof, essentially 25 percent, the upper range falls more in line with reported values."  Ex. 1028, 78:19–23.  Specifically, Patent Owner directs our attention to some "lengthy" and "extensive" review articles, including page 663 of Exhibit 2016[4] and page 302 of Exhibit 2029,[5] as "deal[ing] specifically with this issue about absorption."  Tr. 24:7–11.

According to Exhibit 2016, "[s]tudies utilizing specific assays have reported buprenorphine sublingual solution's mean bioavailability of 28–51%.  The plasma bioavailability of the sublingual tablet has been estimated as 49–63% that of the sublingual solution."  Ex. 2016, 663 (internal citations omitted).  Thus, the bioavailability of buprenorphine sublingual tablet could

---

[4] Elkader and Sproule, *Buprenorphine Clinical Pharmacokinetics in the Treatment of Opioid Dependence*, 44 CLIN. PHARMACOKINET. 661–80 (2005).
[5] Johnson et al., *Buprenorphine: Considerations for Pain Management*, 3 J. PAIN AND SYMPTOM MANAGEMENT 297–326 (2005).

11

IPR2014-00325
Patent 8,475,832 B2

be 13.72% (28% x 49%), in line with the 13.6% average reported in the Data Sheet for Suboxone® tablets.

Exhibit 2029 notes, for buprenorphine sublingual tablets, an average systemic bioavailability of 55%. Ex. 2029, 302. This number, however, is not without qualification. Indeed, it is reported "with large intersubject variability." *Id.* Moreover, it appears to be based on the administration of 0.4 or 0.8 mg doses for postoperative pain management (*id.*),[6] significantly lower than the 2, 4, 8, or 16 mg doses of Suboxone® tablets for treating narcotic dependency (Ex. 1001, 16:40–17:13).

Considering the data in Exhibit 2007 relied on by Petitioner against the data in Exhibits 2016 and 2029 relied on by Patent Owner, we assign the former more weight. We do so because a party may not selectively point to one portion of an exhibit to buttress its argument, and, meanwhile, ask us to disregard another part of the same document that undermines its contention. Here, Patent Owner relies on Exhibit 2007 to support its position. *See* Prelim. Resp. 16 (quoting Ex. 2007, 2); Ex. 2003 ¶ 43 (quoting Ex. 2007, 2). We accord Exhibit 2007 more weight also because it is the Data Sheet for Suboxone® tablets, an official document from Patent Owner itself, informing both regulatory agencies and the public of its own Suboxone® tablet data. As a result, we decline to discount the 13.6% bioavailability of

---

[6] Exhibit 2029 cites two references (endnotes 76 and 77) in support of this portion of the discussion. Ex. 2029, 302. They are entitled "*Sublingual buprenorphine used postoperatively: Clinical observations and preliminary pharmacokinetic analysis*," and "*Sublingual buprenorphine used postoperatively: Ten-hour plasma drug concentration analysis*," respectively. *Id.* at 319–20.

12

IPR2014-00325
Patent 8,475,832 B2

sublingual Suboxone® tablets, shown on the same page of the same document, as a single-study abnormality.

Given that the undisputed bioavailability of buprenorphine from oral administration is "anywhere from 5 percent to 14 percent," we find that the evidence of record supports Petitioner's position that the bioavailability of orally administered buprenorphine overlaps with that of sublingually administered Suboxone® tablets.

In sum, we decline to construe the challenged claims as requiring oral transmucosal absorption, because the challenged claims do not explicitly recite such a limitation, and because neither the '832 patent nor any other evidence Patent Owner relies on sufficiently demonstrates otherwise.

*Patentability Analysis*

Prior Art Disclosures[7]

Labtec describes "non-mucoadhesive orally disintegrating film dosage forms that mimic the pharmacokinetic profile of orally administered drug products such as tablets." Ex. 1017, 2.  It lists Suboxone® as such a tablet. *Id.* at 22.

Specifically, Table A of Labtec lists "[e]xamples of doses for specific pharmaceutically active agents that can be delivered per one strip of rapidly dissolving oral film . . . along with preferred dosing schedules and

---

[7] Petitioner relies on Birch for its discussion of a pH range.  Pet. 43.  As explained in our Decision to Institute, because the challenged claims do not recite any pH levels, "we do not rely on Birch in our obviousness determination."  Dec. 17–18.  We, therefore, do not discuss the teachings of Birch.

13

IPR2014-00325
Patent 8,475,832 B2

pharmacokinetic parameters." *Id.* at 20.  One such example is a film that mimics the pharmacokinetic profile of Suboxone®. *Id.* at 22.  The example discloses the combination of buprenorphine HCl/naloxone HCl dehydrate as the pharmaceutically active agents. *Id.*  It also describes the Cmax for buprenorphine and naloxone and AUC for buprenorphine. *Id.*

Yang "relates to rapidly dissolving films and methods of their preparation."  Ex. 1016, 1:27–28.  It teaches a process for making a film from a polymer component, polar solvent, and an active component. *Id.* at 4:23–35.  Yang is one of the two U.S. patents incorporated by reference into the '832 patent for disclosing suitable processes to form the claimed film. Ex. 1001, 15:29–31.

Anticipation by Labtec

Petitioner asserts that Labtec anticipates claims 15–19.  Pet. 38–41. After reviewing the entire record, we conclude Petitioner has shown by a preponderance of the evidence that Labtec discloses each and every limitation of the challenged claims.

According to Petitioner, Labtec discloses a film comprising pharmaceutical active agents, a film-forming agent, and other ingredients. *Id.* at 39 (citing Ex. 1017, 13–14).  Specifically, Labtec discloses an orally disintegrating film comprising buprenorphine and naloxone, as recited in claim 15. *Id.* at 38 (citing Ex. 1017, 20, 22).  In addition, Labtec discloses formulating a film to ensure bioequivalence between the film and an existing product, such as the Suboxone® tablets. *Id.* at 40 (citing Ex. 1017, 2, 22).  It discloses formulating the film to mimic the known pharmacokinetics of Suboxone®, including Cmax and mean AUC of buprenorphine and

14

IPR2014-00325
Patent 8,475,832 B2

naloxone, as recited in claims 15–17.  *Id.* (citing Ex. 1017, 2, 12, 22).

Labtec further discloses preferred doses for buprenorphine and naloxone, as

recited in claims 18 and 19.  *Id.* at 41 (citing Ex. 1017, 22).

Patent Owner contends that Labtec does not anticipate the challenged

claims because it only discloses films designed to provide absorption

through the gastrointestinal ("GI") tract, while the claimed film requires oral

transmucosal absorption.  PO Resp. 27–30.  Patent Owner also argues that

Labtec merely discloses a wish or a goal, and not the claimed film itself.  *Id.*

at 30–32.  Further, Patent Owner asserts that, because Labtec fails the

enablement requirement, it is not an anticipatory reference.  *Id.* at 32–38.

We address each argument in turn.

First, as explained above in the Claim Construction section, we reject

Patent Owner's proposal to read oral transmucosal absorption into the

challenged claims.  As a result, Patent Owner's attempt to distinguish the

claimed invention over Labtec based on the route of absorption is

unpersuasive.

Second, Patent Owner is correct that Labtec does not disclose any

specific embodiment of a buprenorphine-containing film.  PO Resp. 30–31.

As we explained in our Decision to Institute, however, "anticipation does not

require actual performance of suggestions in a disclosure."  Dec. 16 (quoting

*Novo Nordisk Pharm., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1355

(Fed. Cir. 2005)).  In other words, a reference may anticipate a claim "even

if the author or inventor did not actually make or reduce to practice that

subject matter."  *Id.* (quoting *Schering Corp. v. Geneva Pharm.*, *Inc.*,

339 F.3d 1373, 1380 (Fed. Cir. 2003)).  We stated our position in the context

of enablement.  *See id.*  Patent Owner, however, appears to argue Labtec's

15

IPR2014-00325
Patent 8,475,832 B2

lack of an example of a buprenorphine-containing film in its disclosure in the context of insufficient written description.  PO Resp. 31.

Nevertheless, the written description requirement does not demand examples or an actual reduction to practice either.  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) (en banc).  Instead, "a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement."  *Id.*  In this case, Labtec lists Suboxone® in Table A as a drug of interest, and describes an oral film that mimics the pharmacokinetics of Suboxone®.  Ex. 1017, 22.  Labtec describes that the film formulation comprises buprenorphine and naloxone, as recited in claim 15.  *Id.*  It states that buprenorphine is to be dosed at 4–16 mg/day.  *Id.*  Cmax is 1.84 and 3.0 ng/ml and $AUC_{0-48}$ is 12.52 and 20.22 hr.ng/ml, for 4 mg and 8 mg buprenorphine, respectively.  *Id.*  Labtec further states that "[m]ean peak naloxone levels range from 0.11 to 0.28 ng/ml in dose range of 1–4 mg."  *Id.*  This description amounts to a constructive reduction to practice that describes an oral film with the specified composition and pharmacokinetic profile.  Nothing more is needed.  Thus, Labtec does not fail as anticipatory prior art merely because it does not disclose any specific embodiment of the recited film.

Third, Patent Owner asserts that Labtec fails to enable a skilled artisan to practice the claimed invention.  PO Resp. 32.  According to Patent Owner, a skilled artisan would have recognized that, as Labtec is devoted to films

IPR2014-00325
Patent 8,475,832 B2

with peroral delivery[8] of the active ingredients, listing Suboxone®, a sublingual tablet absorbed through oral mucosa, "must simply be a mistake." *Id.* at 32–33.  In addition, regardless of whether the challenged claims are limited to oral transmucosal films, Patent Owner contends, Labtec is inoperable if applied to Suboxone® (*id.* at 33–35), and a buprenorphine film formulated for GI-tract absorption would not be therapeutically acceptable (*id.* at 35–36).  We are not persuaded.

Patent Owner's arguments center on the alleged "large differences in bioavailability" of buprenorphine and naloxone when absorbed through oral mucosal membrane compared to when absorbed through the GI tract.  *Id.* at 34.  But, as explained above, the evidence of record supports Petitioner's position that the bioavailability of orally administered buprenorphine overlaps with that of sublingually administered Suboxone® tablets.  *See supra* at 11–13.  Thus, regardless of whether Labtec is limited to providing GI-tract absorption only, we are not persuaded that Labtec is not enabled with respect to buprenorphine.

We similarly are not persuaded that Labtec is not enabled with respect to naloxone.  We conclude so although we disagree with Petitioner's argument that orally and sublingually administered naloxone have "similar bioavailability" (Reply 10), and Petitioner's characterization of Dr. Johnston's deposition testimony as "reluctantly admitt[ing] that the mean absolute bioavailability of oral naloxone is 'one-third' that of a Suboxone tablet" (*id.* at 12 (citing Ex. 1028, 45:7–20)).  We conclude so

---

[8] According to Dr. Johnston, peroral delivery "means a dosage form is swallowed for subsequent absorption in the gastrointestinal tract."  Ex. 1028, 3:23–25.

17

IPR2014-00325
Patent 8,475,832 B2

also despite our recognition of Patent Owner's evidence showing that oral administration of naloxone, even at 4 mg or 5 mg, cannot achieve the Cmax range recited in claim 15.  *See* PO Resp. 37–38 (citing Ex. 2003 ¶¶ 90–92).

We conclude so because we agree with Petitioner that "Labtec is not limited to 'peroral GI-absorbed dosages.'"  *See* Reply 5.  We note Patent Owner's argument that Labtec summarizes its invention as providing "film dosage forms that are formulated or administered for gastrointestinal absorption of the active pharmaceutical agent, and that are bioequivalent to and interchangeable with existing orally administered drug products."  PO Resp. 32 (citing Ex. 1017, 2).  We further note Patent Owner's argument that Labtec describes its film as "non-mucoadhesive," and defines the term to mean that "the dosage form is not designed for administration of the active pharmaceutical agent through the oral mucosa."  *Id.* at 27 (citing Ex. 1017, 8).

Petitioner, on the other hand, points to Labtec for disclosing an invention that "provides an orally disintegrating film comprising: (a) an active pharmaceutical agent that is absorbable through the oral mucosa when dissolved; and (b) means for retarding absorption of said active pharmaceutical ingredient through the oral mucosa."  Reply 5 (citing Ex. 1017, 14).  Labtec also discloses various means, for example, using pH adjusting agents, for retarding absorption of the active ingredient through the oral mucosa.  *Id.* (citing Ex. 1017, 14–15).

The evidence of record supports a finding that the active ingredients in Labtec's films are absorbed through not only the GI tract, but also the oral mucosa.  Despite its stated object to formulate the film to promote GI-tract absorption, Labtec explains in its Summary of the Invention that the active

18

IPR2014-00325
Patent 8,475,832 B2

ingredients from its non-mucoadhesive film dosages are absorbed "predominantly" through the GI tract.  Ex. 1017, 3; *see also id.* at 14 ("The active ingredient from the dosage form is preferably absorbed predominantly through the gastrointestinal tract.").  The question, then, is whether the rest of the active ingredient is absorbed through the oral mucosa, or not absorbed at all.  Evidence supports a finding that the answer is the former.

According to Petitioner, "Labtec discloses that, in some embodiments, as little as about 60% of the active ingredient is delivered to the GI tract." Reply 6 (citing Ex. 1017, 14).  In those cases, Petitioner argues, "as much as about 40%" is absorbed through the oral mucosa.  *Id.*  Patent Owner disputes this conclusion, arguing that "the point [is] not just delivery.  It's absorption, gastrointestinal absorption."  Tr. 34:11–12.  Patent Owner correctly notes that delivery is not the same as absorption.  In fact, Labtec makes clear this distinction:

> [O]f the active ingredient absorbed, the predominant amount (greater than 60, 70, 80, 90, 95 and up to 100 wt.%) is preferably *absorbed* through the GI tract.  Therefore, the means should be able to *deliver* greater than 60, 70, 80, 90 or 95 and up to 100 wt.% of the active ingredient to the gastrointestinal tract.

Ex. 1017, 14 (emphases added).  For this analysis, we focus our attention on the delivery of the drug.

During his deposition, Dr. Johnston testified:

> [I]f you give an orally dissolving film, and if the drug is not absorbed across the oral mucosa, sublingual, buccal, whatever, then it has to be swallowed, because the patient -- where else would it go?  The patient doesn't expectorate that saliva drug solution.  So to answer your question, it has to be swallowed.  If it isn't absorbed, it has to go somewhere.

19

Ex. 1028, 237:9–17. In other words, after an orally dissolving film is administered through the oral cavity, because a patient does not spit out the drug, the amount of the drug that is swallowed and, thus, delivered to the GI tract, is the amount not absorbed in the mouth. Thus, we are persuaded that, when only 60% of the active ingredient reaches the GI tract, the rest (40%) must have been absorbed through the oral mucosa. *See* Tr. 21:3–7.

Labtec discloses a film with 2.0 mg naloxone (Ex. 1017, 22), within the "about 0.5 to about 4 mg of naloxone" range recited in claim 19. For a film that delivers 60% of naloxone to the GI tract, 0.8 mg (2.0 mg x 40%) naloxone is absorbed through the oral mucosa. Because plasma level increases as the dose of naloxone increases (Ex. 2007, 2; Ex. 1028, 51:20–52:4), the Cmax and AUC for 0.8 mg naloxone would necessarily fall within the ranges recited in claims 15 and 17.[9] *See* Ex. 1001, 17:20–48 (disclosing the Cmax and mean AUC ranges for naloxone as between 80% of the Cmax and AUC for 0.5 mg naloxone and 125% of those for 4 mg naloxone).

Patent Owner contends that "[d]ue to its much lower bioavailability, peroral delivery of a given amount of buprenorphine or naloxone cannot possibly give close to the same or substantially bioequivalent Cmax and AUC values (80–125%) compared to oral-transmucosal delivery of the same amounts of those active ingredients." PO Resp. 34. As explained above, the challenged claims are not limited to oral transmucosal absorption, and Labtec is not limited to GI-tract absorption. Thus, the comparison argued by Patent Owner is not meaningful in our analysis. Furthermore, the challenged

---

[9] To illustrate our point in this analysis, we compare the pharmacokinetic profile as if the claims were, as Patent Owner urges, limited to oral transmucosal absorption.

IPR2014-00325
Patent 8,475,832 B2

claims do not recite any dosage amount of either buprenorphine or naloxone. Nor does the Specification include any dosage requirement when defining what is considered bioequivalent. Ex. 1001, 17:42–48. During the oral argument, the panel inquired whether orally administering 16 mg buprenorphine to achieve a Cmax of 0.624 ng/ml would be considered bioequivalent. Tr. 25:16–19, 27:12–19. Counsel for Patent Owner responded affirmatively (*id.* at 25:20–22, 27:20–21), even though 16 mg is the upper limit of the buprenorphine dosing range, whereas 0.624 ng/ml is the lower limit of the Cmax range, calculated based on 80% of the Cmax of sublingually administered buprenorphine (2 mg) Suboxone® tablets. *See* Ex. 1001, 17:30–40. In other words, according to the '832 patent, to be considered the same or substantially bioequivalent does not require peroral delivery of the *same amount* of buprenorphine or naloxone as in oral-transmucosal delivery.

Patent Owner recognizes so, but qualifies its admission "with the caveat that if [the active ingredient is administered] perorally, it would be understood to be therapeutically unacceptable because of the variability involved with the peroral dosing." Tr. 27:20–24. We are not persuaded. As Petitioner points out, the Data Sheet for Suboxone® tablets (again, an official drug label from Patent Owner itself) acknowledges "a wide inter-patient variability" in the absorption of buprenorphine and naloxone even from sublingually administered Suboxone® tablets. Reply 10 (citing Ex. 2007, 2). Further, naloxone has no detectable pharmacological activity whether administered orally or sublingually. Ex. 2007, 1. We, therefore, are not persuaded that Labtec is not enabled with respect to naloxone.

21

IPR2014-00325
Patent 8,475,832 B2

For the foregoing reasons, Labtec, disclosing an oral film comprising buprenorphine and naloxone with the pharmacokinetic profiles recited in the challenged claims, anticipates claims 15–19.

Obviousness over Labtec, Birch, and Yang

Petitioner argues that the challenged claims would have been obvious over the combination of Labtec, Birch,[10] and Yang.  Pet. 44–45.  After reviewing the complete record, we conclude Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art would have had reason to combine the teachings of Labtec and Yang to make an orally dissolving film as recited in the challenged claims, and would have had a reasonable expectation of success in doing so.

According to Petitioner, because "[t]he law provides three year market exclusivity for new dosages of existing drug products" (*id.* at 45 (citing Ex. 1024[11,12])), a skilled artisan would have been motivated to create a film formulation of Suboxone® to enjoy the market exclusivity.  *Id.*  Petitioner argues that Labtec already discloses components suitable for making films.  *Id.*  But, to the extent Labtec's teaching on how to make a film is insufficient, Yang teaches such methods.  *Id.*

Patent Owner does not dispute that Yang teaches processes for making a film but contends that the teaching of Yang "does not address the

_____

[10] *See supra* at 14 n.7.

[11] M.A. VOET, THE GENERIC CHALLENGE: UNDERSTANDING PATENTS, FDA & PHARMACEUTICAL LIFE-CYCLE MANAGEMENT 110 (Brown Walker Press 2d ed. 2008).

[12] Petitioner mistakenly cites "Ex. 1025" but correctly describes Exhibit 1024.  Pet. 45.

IPR2014-00325
Patent 8,475,832 B2

deficiencies of Labtec."  PO Resp. 45.  According to Patent Owner, one of ordinary skill in the art would not look to Labtec to develop a buprenorphine film, and would not have had a reasonable expectation of success in combining the teachings of Labtec and Yang.  *Id.* at 40–47.  Patent Owner rests these arguments on the premise that Labtec is limited to peroral delivery of films formulated for GI-tract absorption only.  *See id.* at 39–41, 45–47.  As explained above, however, Labtec is not so limited.  *See supra* at 18–20.  Thus, we reject Patent Owner's contentions on this basis.

In addition, even if we were to find that films according to Labtec's invention deliver active ingredients solely for absorption through the GI tract, we still would be unpersuaded by Patent Owner's arguments.  Patent Owner asserts that Labtec merely makes "an obviously mistaken and unintentional suggestion to pursue" a buprenorphine film "that was understood to be therapeutically ineffective and unacceptable."  PO Resp. 41.  In addition, Patent Owner contends that a skilled artisan would not have a reasonable expectation of success because combining the prior art to arrive at the claimed invention would "transmogrify Labtec beyond recognition." *Id.* at 47.  We are not persuaded.

"Under an obviousness analysis, a reference need not work to qualify as prior art; it qualifies as prior art, regardless, for whatever is disclosed therein."  *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1302 (Fed. Cir. 2010) (citations and internal quotation marks omitted). As Patent Owner points out, Labtec recognizes that several manufacturers proposed film formulations for the delivery of prescription drugs.  PO Resp. 27 (citing Ex. 1017, 2).  According to Labtec, "[t]he vast majority of these formulations are 'mucoadhesive' formulations designed for adhesion of the

23

IPR2014-00325
Patent 8,475,832 B2

dosage form to the mucosal tissue in the mouth, and transmission of the drug from the dosage form through the mucosal tissue into the systemic circulation." Ex. 1017, 1. Labtec acknowledges that the "advantage of these mucoadhesive films resides in their ability to bypass the gastrointestinal tract, and barriers in the gastrointestinal tract to drug absorption such as first pass metabolism and decomposition of the active ingredient in the stomach." *Id.* at 2.

Patent Owner emphasizes that these teachings appear in the background section of Labtec. A person of ordinary skill, however, would read a reference for all that it teaches, including uses beyond its primary purpose. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418–21 (2007); *see also Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989) (stating that a prior art reference is relevant "for all that it teaches" to those of ordinary skill in the art). Here, regardless of which section the teaching of "mucoadhesive film" appears in, Labtec suggests a film formulated for oral mucosal absorption. Thus, a person of ordinary skill in the art would have considered Labtec, and combining Labtec and Yang would not be, as Patent Owner contends, "completely antithetical" to Labtec's teaching and a skilled artisan's expectation. *See* PO Resp. 26.

Patent Owner further argues that even if the prior art references are combined, it would require undue experimentation to arrive at the claimed invention. *Id.* at 48–53. Undue experimentation is part of the enablement inquiry. *See Impax Labs., Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008) ("[A] prior art reference must enable one of ordinary skill in the art to make the invention without undue experimentation."). A reference, however, qualifies as prior art in determining obviousness,

24

IPR2014-00325
Patent 8,475,832 B2

independent of enablement.  *In re Antor Media Corp.*, 689 F.3d 1282, 1292
(Fed. Cir. 2012); *see also In re Morsa*, 713 F.3d 104, 111–12 (Fed. Cir.
2013) (remanding for proper enablement analysis in anticipation rejection,
but affirming obviousness rejection based on the same prior art).  Thus, we
do not engage in enablement analyses in our obviousness determination.[13]

Instead, we interpret Patent Owner's undue-experimentation argument
as an assertion of no reasonable expectation of success.  Here, Patent Owner
presents contentions based on the alleged different delivery and absorption
routes (*see* PO Resp. 50–53), which we have addressed above.  We also note
Patent Owner's emphasis on how recent and complex pharmaceutical film
technology is, and how extensive research and development was required to
develop Suboxone® film.  PO Resp. 48–50.  Obviousness, however, does
not require absolute predictability of success.  *In re O'Farrell*, 853 F.2d 894,
903–04 (Fed. Cir. 1988).  Instead, all that is required is a reasonable
expectation of success.  *Id.*  Based on evidence before us, we are persuaded
that the teachings of Labtec, as explained above, combined with the
information in Yang, which the '832 patent itself relies on as teaching
suitable processes to make the claimed film (Ex. 1001, 15:29–32), provides
such a reasonable expectation of success.

Patent Owner asserts that objective indicia support a finding of
nonobviousness.  PO Resp. 53–57.  Specifically, Patent Owner argues that
"Suboxone® sublingual films, which are covered by the challenged claims
of the '832 patent, have achieved significant commercial success and have

---

[13] As explained above in the discussion of the anticipation ground, we are
not persuaded by Patent Owner's enablement challenge of Labtec.  *See
supra* at 17–22.

IPR2014-00325
Patent 8,475,832 B2

received praise from others in the field, which provides objective indicia that claims 15–19 are nonobvious." *Id.* at 53.  The evidence of record, however, does not persuade us that the asserted commercial success and praise overcome Petitioner's showing of obviousness here.

For objective evidence of secondary considerations to be accorded substantial weight, Patent Owner must establish a nexus between the evidence and the merits of the claimed invention.  *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010).  In this case, Suboxone® tablets, with the combination of buprenorphine and naloxone as the pharmaceutical ingredients, were already on the market when the application for the '832 patent was filed.  Ex. 1013.  Thus, the alleged inventive aspect of the challenged claims resides only in the film dosage form.  According to Patent Owner, evidence shows that in 2013, "sales of Suboxone sublingual film increased to more than $1.3 billion in the U.S. while the total market grew to more than $1.7 billion."  PO Resp. 55 (citing Ex. 2046, 2).  But, Patent Owner fails to account for the market share of, and revenue generated by, Suboxone® tablets before the film dosage form was introduced.  Here, the lack of such information is critical for analyzing secondary considerations, especially in view of the fact that on March 18, 2013, Patent Owner voluntarily withdrew Suboxone® tablets from the US market.  Pet. 3; Ex. 1003, 3.  With the tablets no longer on the market, it is unclear whether the sales increase or the alleged patient preference was due to the film dosage form, or because film was the only available form.  As a result, we find the evidence of secondary considerations in this case cannot overcome the evidence of obviousness.

IPR2014-00325
Patent 8,475,832 B2

*Motion to Exclude*

Petitioner filed a Motion to Exclude Exhibit 2043.  Paper 35.
According to Petitioner, Exhibit 2043 is a paper filed by a subsidiary of
Petitioner in an unrelated IPR proceeding.  *Id.* at 1.  Patent Owner opposed
the Motion.  Paper 37.  Because we do not rely on Exhibit 2043 in rendering
our Decision, we dismiss the Motion as moot.


CONCLUSION

Petitioner has shown, by a preponderance of the evidence, that Labtec
anticipates claims 15–19, and that the combination of Labtec, Birch, and
Yang would have rendered claims 15–19 obvious.


ORDER

Accordingly, it is

ORDERED that claims 15–19 of the '832 patent are determined to be
unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is
*dismissed as moot.*

27

IPR2014-00325
Patent 8,475,832 B2

For PETITIONER:

Danielle L. Herritt
dherritt@mccarter.com

Kia L. Freeman
kfreeman@mccarter.com

For PATENT OWNER:

James M. Bollinger
james.bollinger@troutmansanders.com

Daniel A. Ladow
daniel.ladow@troutmansanders.com

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

RECKITT BENCKISER
PHARMACEUTICALS INC., RB
PHARMACEUTICALS LIMITED, and
MONOSOL RX, LLC,

               Plaintiffs,

v.

WATSON LABORATORIES, INC.,

               Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 13-1674-RGA
(Consolidated)

RECKITT BENCKISER
PHARMACEUTICALS INC., RB
PHARMACEUTICALS LIMITED,  and
MONOSOL RX, LLC,

               Plaintiffs,

        v.

PAR PHARMACEUTICAL, INC.,
INTELGENX TECHNOLOGIES CORP.,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

**HIGHLY CONFIDENTIAL**

C.A. No. 14-0422-RGA

**RESPONSIVE EXPERT REPORT OF MARTYN C. DAVIES, Ph.D.**

- In re Drosperinone / Ethinyl Estradiol (Yasmin) Patent Litigation, Bayer Pharma Aktiengesellschaft v. Generic Health Pty Ltd (ACN 110 617 859), In the Federal Court of Australia, District Registry: New South Wales, No. NSD 236 of 2012 (Bayer)

- In re Rivastigmine (Exelon Patch) Patent Litigation, Novartis Pharmaceuticals and LTS Lohmann Therapie-Syteme AG v. Watson , Par, Actavis, (District of Deleware) C.A. Nos 1:11-cv-01077-RGA and Case No. 1:11-cv-01112-RGA (Novartis)

- In re Oxycontin Litigation, Purdue Pharma v. Teva Pharmaceuticals, Par, Impax, Sandoz, Amneal. Case nos. 1:2011cv02037, 02038, 02400, 04694, 08153, Southern District of New York, (Purdue)

- In re Omeprazole Patent Litigation, Astrazeneca AB, Aktiebolaget Hässle, KBI-E Inc., KBI Inc and Astrazeneca, LP v. Apotex Corp., Apotex, Inc. and Torpharm, Inc. Civil Action No. 01-CIV-9351 (DLC) and M-21-81 (DLC) MDL Docket No. 1291, Southern District of New York

- In re Omeprazole Patent Litigation, Astrazeneca Canada Inc. and Aktiebolaget Hässle v. Apotex Inc. Court File No. T-1409-04 and Astrazeneca AB and Aktiebolaget Hässle v. Apotex Inc. Court File No. T-1890-11, Federal Court of Canada (Toronto)

- In re Surgiflo Patent Litigation, Baxter International Inc., Baxter Healthcare Corporation and Baxter Healthcare SA v. Ethicon and Ferrosan Medical Devices A/S, Court File No. 337-TA-913,  US International Trade Commission Washington, DC

## II.    MATERIALS CONSIDERED

25.    In providing this report, I have considered the following materials, as well as others referred to in this report (**Ex. QQ**: Materials Considered):

(i)    the '832 patent and its prosecution history;

(ii)    the Court's December 12, 2014 decision on claim construction as it relates to the '832 patent (Doc ID 156);

(iii)    the November 7, 2014 Declaration of Professor Thomas P. Johnston in Support of Patent Owner's Response in IPR2014-00325[1]; and

---

[1] Dr. Johnston discusses, among other issues, the Labtec reference (Bley Ex. 38) and the therapeutically unacceptable nature of oral administration of buprenorphine for GI absorption in detail.  Where appropriate, I have adapted Dr. Johnston's report for my analysis.

8

Suboxone® tablet to be a "thin film or sheet."

101.    Dr. Bley then opines that a "Suboxone® sublingual tablet melts when placed sublingually in the mouth, and forms a gel-like film in the oral cavity upon melting."  Bley Report at ¶ 231.  Thus, Dr. Bley appears to assert that the claimed "film" is the result of the tablet dissolving in the mouth of the user.  Again, Dr. Bley's allegation is inconsistent with the use of the term "film" in both the claims and the specification.  For example, claim 15 recites an "orally dissolving film", i.e., a film exists prior to being inserted in the mouth of a user and the film then dissolves once in the mouth.  The specification confirms that the claimed films exist as films prior to insertion into the mouth of a user.  *Id.* at 3:60-61.  ("The films described herein . . . may be placed into the oral cavity of the user.").  Under Dr. Bley's line of argument, however, unlike the claimed films of the '832 patent, the Suboxone® tablet itself is not a film that dissolves in the mouth; rather, the film is allegedly formed in the mouth when the tablet dissolves.

102.    I also understand that in an inter partes review proceeding initiated by Biodelivery Sciences International, Inc. ("BDSI"), the Patent Trial and Appeal Board, in its decision to institute the *inter partes* review, stated that the term "'film formulation' encompasses film dosage, films composition, or film, but not a formulation that is not in the form of a film." Bely Ex. 49, 11.  The Board went on to hold that because Suboxone® tablets are not "in the form of a film", "[BDSI] has not established . . . that Suboxone Tablet Label anticipates the challenged claims."  *Id.* at 12-13.

103.    For these reasons, a person of ordinary skill in the art would not understand the claimed films to read on Suboxone® sublingual tablets.  Further, because Suboxone® sublingual tablets are not films, as that term is understood in the '832 patent, Suboxone® sublingual tablets

cannot anticipate any claim of the '832 patent.

**B.     Obviousness Based on Suboxone® Sublingual Tablets**

**1.     A Person Skilled in the Art Would Not Have Believed that the Citrate Buffer in Suboxone® Tablets was Necessary for Absorption**

104.    The centerpiece of Dr. Bley's argument that the claims of the '832 patent are obvious relies on the assertion that, based on the SBOA, EMEA, McElnay, and Stanley, a person of ordinary skill in the art at the time of the invention "would have concluded that [] pH values would be important to achieving the Cmax and AUC values necessary for bioequivalence." Bley Report at ¶ 129.   That pH plays a role in absorption, however, is not disputed.   Indeed, as discussed above, e.g., Weinberg and Hao, pH has long been known to play a large role in the absorption of pharmaceutical actives across the oral mucosal membrane.   Indeed, this is the very basis of the pH Partition Theory, i.e., that as pH of a weak base decreases, the degree of ionization also increases leading to a decrease in absorption.   The problem with Dr. Bley's argument, however, is that the relevant inquiry in this obviousness analysis is not whether pH plays a role in absorption, which of course it does.   Rather, the relevant inquiry is whether a person of ordinary skill in the art would have had reason to believe that the citrate buffer in Suboxone® tablets was necessary to achieve the desired absorption profile for buprenorphine and naloxone, and thus would have been motivated to include it in the film design, let alone at an acidified level.

105.    Sodium citrate and citric acid have been used as a buffer in buprenorphine containing products since the late 1970's.   For example, Temgesic tablets used the buffer sodium citrate and citric acid as early as 1976.   Temgesic Development Report, RBP02774671. There, however, the buffer was described as being used for the purpose of "stabili[zing] buprenorphine to dealkylation, thereby extending shelf life of tablets." As discussed above, the same buffer was

38

## VI.    CONCLUSIONS

Claims 1-7, 9-12, and 15-19 of the '832 patent are not invalid.

I reserve the right to revise or supplement my opinions as additional information becomes available.  Exhibits to be used in support of the opinions stated in this report include all of the tables, graphics, and information contained herein as well as materials cited in or accompanying this report.  Additional demonstrative exhibits may be prepared for trial and used to support my opinions.

Dated: April 10, 2015                             _____

                                                                Martyn C. Davies, PhD

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RECKITT BENCKISER PHARMACEUTICALS, INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 13-1674-RGA |
| | ) | Consolidated |
| v. | ) ) | |
| WATSON LABORATORIES, INC., | ) ) | |
| Defendant. | ) ) | |

_____

| | | |
|---|---|---|
| RECKITT BENCKISER PHARMACEUTICALS, INC., RB PHARMACEUTICALS LIMITED, and MONOSOL RX, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PAR PHARMACEUTICAL, INC., INTELGENX TECHNOLOGIES CORP., | ) ) ) | C.A. No. 14-422-RGA |
| Defendants. | ) ) | |

**<u>EXPERT REPORT OF KEITH R. BLEY, Ph.D.</u>**

**MAY CONTAIN HIGHLY CONFIDENTIAL INFORMATION**

130.    The SBOA, EMEA and the 2002 Suboxone[®] Label were not the only references that taught that pH was important to absorption.  For instance, McElnay taught that "[b]ecause the un-ionized form of a drug is the lipid-soluble diffusible form, the pKa of the drug plays an important role in its absorption across the lipid membranes of the oral mucosa."[178]  Further, the "many studies illustrate the importance of ionization on drug absorption," but "the pH of saliva is relatively constant" "in the absence of a buffer."[179]

131.    Along these lines, Stanley taught that "[b]uffering agents provide the ability to place the medication in the mouth in a favorable pH environment for passage across the mucosal tissues of the mouth, pharynx, and esophagus."[180]  These buffers create "a pH change in the salival environment of the mouth in order to favor the existence of a unionized form of the active ingredient or drug which more readily moves through the mucosal tissues."[181]

132.    Thus, the POSA would have known—without even considering Suboxone[®] tablets—that pH is generally important to the oral absorption of a drug in the mouth. LabTec discloses a film designed to mimic the Suboxone[®] tablets.  The pH upon dissolution is an inherent property of the tablet.  The POSA would easily have dissolved a Suboxone[®] tablet in water (or in a saliva substitute) and measured the pH to implement LabTec and mimic the tablet. In fact, this is precisely what Dr. Reitman did in the BDSI IPR.[182]  Specifically, Dr. Reitman measured the pH of 8 mg Suboxone[®] tablets that had been dissolved in either 1.5 mL or 3 mL of

---

[178] Ex. 31, McElnay, at 803.

[179] Ex. 31, McElnay, at 803.

[180] Ex. 32, Stanley, at 12:5-8.

[181] Ex. 32, Stanley, at 12:10-13.

[182] Ex. 41, *Inter partes* Review (BDSI) of U.S. Pat. No. 8,475,832, Decl. by Maureen Reitman, SC.D., at 3 (hereinafter "Reitman Decl.").

deionized water, using a Mettler Toledo EL20 pH meter.[183]  Dr. Reitman determined the pH

produced by the Suboxone® tablet in those environments to be 3.5.[184]  Further, I note that at a

deposition, Dr. Thomas Johnston, an expert for the patent owner in the BDSI IPR, testified to his

belief that Suboxone® tablets and film have the same pH.[185]  This would not have been a

surprise: both the tablet and film test formulation (as disclosed in the '832 patent) use precisely

the same ratios of sodium citrate and citric acid to constitute their buffering systems.[186]  Finally,

Reckitt's corporate witness admitted that the tablet formulation was all that was needed to

calculate the pH produced by the Suboxone® tablet.[187]  Even without measuring the pH produced

by the tablet, a POSA would have determined this information through routine testing.  Given

the guidance in the art, it would have been a simple matter for the POSA to adjust the pH

produced by a film dosage form in order to achieve the absorption profile disclosed in LabTec

and SBOA.  In fact, as discussed below, a POSA would have been specifically motivated to look

for a desirable pH range within the range from  about 3 to about 6 because that is the range in

which citric acid-based buffers operate.[188]

### b.  A POSA Would Have Known How to Prepare the Film Dosage Disclosed in LabTec

133.    As an initial matter, a POSA would have prepared a film dosage sample

producing any desired pH.  Based on Yang, the POSA would have prepared a film.  The

---

[183] Ex. 41, Reitman Decl., at 3.

[184] Ex. 41, Reitman Decl., at 3.

[185] Ex. 42, 1/23/15 Johnston Dep., 146:8-13

[186] *Compare* Ex. 43, RBP00231663-64, at 64 *and* Ex. 44, FDA New Drug Application NDA No. 20-733 for Suboxone Sublingual Tablets – Volume 2 (RBP01087681-7913) (hereinafter "RBP01087681") at RBP01087721 (Table 16) *with* Ex. 3, '832 patent, Example 5, Test Formulation 2.

[187] Ex. 30, 1/21/15 Speight Dep. 155:3-156:7.

[188] Ex. 28, Dawson, at 428.

159.    After reading Euro-Celtique, a POSA would have been motivated to create the disclosed film, because the film would be just as effective as Suboxone® tablets.  And FDA law allows for three-year market exclusivity for a new dosage form for existing drug products.[216]

160.    As I explained above, the Yang reference would have taught the POSA everything she needed to know about how to make such a film composition.  Further, the Suboxone® tablet label, SBOA, EMEA, McElnay, and Stanley all would have taught that the pH of the film composition would be important to absorption.  *See supra* ¶¶ 122-131, 142-143.

161.    Euro-Celtique inherently discloses the claimed pH range of 3 to 3.5 to the extent that it discloses an oral film composition that is bioequivalent to Suboxone® tablets.  The POSA would easily have dissolved a Suboxone® tablet in water and measured the pH.  As I explained above, Dr. Reitman did exactly that in the BDSI IPR.  *See supra* ¶ 132.  Dr. Johnston testified that the Suboxone® tablets and film have the same pH.  *See id.*  This is no surprise: both the tablet and film test formulation (as disclosed in the '832 patent) use precisely the same ratios of sodium citrate and citric acid to constitute their buffering systems.[217]  Finally, Reckitt's corporate witness admitted that the tablet formulation was all that was needed to calculate the pH of the Suboxone tablet.[218]

162.    But even without testing the tablets, a POSA would have determined the claimed pH range by routine experimentation.  As I described above, it would have been a simple matter for the POSA to adjust the pH of a film in order to achieve a given absorption profile.  In fact, a

---

[216] Ex. 46, Voet, M., The Generic Challenge, Brown Walker Press (2d ed. 2008.), at 110 (hereinafter "Voet").

[217] *Compare* Ex. 43, RBP00231663-64, at 64 *and* Ex. 44, RBP01087721 (Table 16) *with* Ex. 3, '832 patent , Example 5, Test Formulation 2.

[218] Ex. 30, 1/21/2015, Speight Dep., 155:3-156:7.

176.    First, FDA law allows for three-year market exclusivity for a new dosage form for existing drug products.[224]  Simply put: new dosage forms of effective drugs are moneymakers, even without patent protection.

177.    Second, oral tablets can move around in the mouth, thereby increasing the chance of swallowing.  The tablet label explicitly warns that "swallowing the tablets reduces the bioavailability of the drug"[225] and that "you may get withdrawal symptoms" if the tablets are swallowed.[226]  In order to reduce the likelihood of swallowing, the POSA would have been motivated to develop a film formulation.

178.    Third, films can deliver drug more quickly than tablets.  According to the label, the tablets will dissolve in "2 to 10 minutes."[227]

179.    As I have described above, the Yang reference would have taught a POSA how to make oral films.  With the teachings of the Yang reference, a POSA would have known how to make an oral film with many of the same key ingredients as the Suboxone® tablet.

180.    The Suboxone® 2002 Label inherently discloses the claimed pH range of 3 to 3.5 to the extent that it discloses Suboxone® tablets.  The POSA would easily have dissolved a Suboxone® tablet in water and measured the pH.  As I explained above, Dr. Reitman did exactly that in the BDSI IPR.  See supra ¶ 132.  Dr. Johnston testified that the Suboxone® tablets and film have the same pH.  See id.  This is no surprise: both the tablet and film test formulation (as disclosed in the '832 patent) use precisely the same ratios of sodium citrate and citric acid to

---

[224] Ex. 46, Voet, at 110.

[225] Ex. 27, Suboxone® 2002  Label, at 22.

[226] Ex. 27, Suboxone® 2002  Label, at 28.

[227] Ex. 27, Suboxone® 2002  Label, at 28.

constitute their buffering systems.[228]  Finally, Reckitt's corporate witness admitted that the tablet formulation was all that was needed to calculate the pH of the Suboxone® tablet.[229]

181.    But even without testing the tablets, a POSA would have determined the claimed pH range by routine experimentation.  As I described above, it would have been a simple matter for the POSA to adjust the pH of a film in order to achieve a given absorption profile.  In fact, a POSA could have made a film composition containing buprenorphine and naloxone with *any* desired pH within the range of the citrate buffering system.  *See supra* ¶¶ 133, 136-137.

182.    The Suboxone® 2002 Label discloses that the tablets contain sodium citrate and citric acid.  A POSA would have known that this combination is an effective buffer in a pH range of 3.0 to 6.2.[230]  This would have suggested to a POSA that pH was important to the efficacy of the tablets, and would have motivated a POSA to buffer the film in the range of 3.0 to 6.2.

183.    As I described above, the POSA would have found additional motivation in the SBOA and/or EMEA.  *See supra* ¶¶ 125-129, 142-143.  Indeed, the SBOA, even more directly than the Suboxone® 2002 Label, would have taught the POSA that the pH of the film is important.  Specifically, this document disclosed several redacted pH values in a section called "Absorption," and made clear that those pH values are important to the efficacy of the drug.  The SBOA also would have taught the POSA that in order for buprenorphine to dissolve, the pH of the tablets had to be ***below*** a certain pH.  But for naloxone to dissolve, the pH of the tablets had

---

[228] *Compare* Ex. 43, RBP00231663-64, at 64 *and* Ex. 44, RBP01087721 (Table 16) *with* Ex. 3, '832 patent, Example 5, Test Formulation 2.

[229] Ex. 30, 1/21/2015 Speight Dep., 155:3-156:7.

[230] Ex. 28, Dawson, at 428.

| Claim Limitations | Knowledge of One of Skill in the Art |
|---|---|
|  | publication at [213].)  The Suboxone® 2002 Label describes that in one clinical study, "[s]ubjects were instructed to hold the medication under the tongue for approximately 5 to 10 minutes until completely dissolved." (Ex. 27, Suboxone® 2002 Label, at 12.) |
| Formulation provides a mean AUC of between about 5.431 hr·ng/mL to about 56.238 hr·ng/mL for buprenorphine (claim 16) | Suboxone® tablets are described as providing an $AUC_{0-48}$ of 12.52 hr·ng/mL (4 mg) and 20.22 hr·ng/mL (8 mg) for buprenorphine. (Ex. 27, Suboxone® 2002 Label, at 10.)<br><br>Suboxone® tablets are also described as providing an $AUC_{o-t}$ of 13.09 (4 mg), 23.23 (8 mg), 39.38 (16 mg) and 47.55 hr·ng/mL (24 mg) for buprenorphine.  (Ex. 7, EMEA, at 12; Ex. 29, Ciraulo, at 184.) |
| Formulation provides a mean AUC of between about 102.88 hr·pg/mL to about 812.00 hr·pg/ml for naloxone (claim 17) | Suboxone® tablets are described as providing an $AUC_{o-t}$ of 0.12, 0.30, 0.53 and 0.60 hr·ng/ml for naloxone.  (Ex. 7, EMEA, at 12.) This equates to 120, 300, 530 and 600 hr·pg/ml, for 1, 2, 4 and 6 mg doses, respectively, of naloxone. |
| Naloxone present in about 0.5 to about 4 mg of naloxone or a salt thereof (claim 19) | The Suboxone® 2002 label describes that "[i]t is available in two dosage strengths, 2 mg buprenorphine with 0.5 mg naloxone, and 8 mg buprenorphine with 2 mg naloxone free bases." (Ex. 27, Suboxone® 2002 Label, at 8.) |

### D.    Challenges to the '832 Patent at the Patent and Trademark Office

193.    I understand that the validity of claims 15 to 19 of the '832 patent is being

challenged in an *Inter Partes* Review initiated by BioDelivery Sciences International, Inc.

("BDSI").  The case has been assigned number IPR2014-00325.  In particular, BDSI filed a

petition seeking IPR review on January 15, 2014.[234]  In its petition, BDSI asserted that claims

15-19 are invalid based on several different theories, including:

- Anticipation by the Suboxone® tablet label

---

[234] Ex. 47, *Inter partes* Review (BDSI) of U.S. Pat. No. 8,475,832, Petition, at 46 (hereinafter "IPR (BDSI) Petition").

- Obviousness over the Suboxone® tablet label

- Obviousness over the Suboxone® tablet label in view of Yang

- Obviousness the Suboxone® tablet label in view of Yang and Birch

- Anticipation by LabTec

- Obviousness over LabTec

- Obviousness over LabTec in view of Birch

- Obviousness over LabTec in View of Birch and Yang

- Anticipation by Euro-Celtique

- Obviousness over Euro-Celtique

- Obviousness over Euro-Celtique in view of Birch

- Obviousness over Euro-Celtique in view of Birch and Yang

194.    As discussed above, BDSI also included a declaration from Dr. Maureen Reitman, who measured the pH of Suboxone® tablets after being dissolved in deionized water.  Dr. Reitman determined that pH to be 3.5.[235]

195.    On April 30, 2014, the patent owner submitted its preliminary response.[236]  In the response, the patent owner argued that petitioner's proposed constructions for the terms "film formulation" and "provides an in vivo plasma profile" were improper.[237]  Additionally, the patent owner argued that the Reitman declaration should be disregarded because (a) it relates to a type of evidence – a tablet – that is not a patent or a printed publication and thus, should not be

---

[235] Ex. 41, Reitman Decl., at 3.

[236] Ex. 48, *Inter partes* Review (BDSI) of U.S. Pat. No. 8,475,832, Patent Owner Preliminary Response, Paper No. 15 (hereinafter "IPR (BDSI) Preliminary Response").

[237] Ex. 48, IPR (BDSI) Preliminary Response, at 9-19.

considered in an IPR proceeding, and (b) it does not establish that the tests conducted on the tablet were reliable.[238]

196.    The patent owner also argued that petitioner's anticipation arguments fail because the cited references do not disclose the claimed composition or direct a skilled artisan to the claimed composition.[239]  In particular, the patent owner alleged that the Suboxone® tablet does not anticipate any of the challenged claims because the tablet label does not disclose a film.[240] The patent owner also argued that neither Euro-Celtique nor LabTec anticipates claims 15-19 because the references "suggest the *idea* of making a film containing buprenorphine and naloxone" but do not provide a specific embodiment of such a film.[241]

197.    The patent owner argued that LabTec "clearly teaches away from the subject matter claimed in the '832 patent" because LabTec allegedly describes a "non-mucoadhesive film" that delivers active via the intestinal tract, rather than the oral mucosa.[242]

198.    To distinguish the Yang reference, the patent owner argued that Yang provides no teaching relating to the bioavailability or absorption of active ingredients.[243]  Further, the patent owner alleged that Yang does not provide a means for controlling the absorption of buprenorphine and naloxone from a pharmaceutical film through oral mucosa tissue to achieve

---

[238] Ex. 48, IPR (BDSI) Preliminary Response, at 21.

[239] Ex. 48, IPR (BDSI) Preliminary Response, at 23-24.

[240] Ex. 48, IPR (BDSI) Preliminary Response, at 24-25.

[241] Ex. 48, IPR (BDSI) Preliminary Response, at 25 (emphasis in original).

[242] Ex. 48, IPR (BDSI) Preliminary Response, at 39.

[243] Ex. 48, IPR (BDSI) Preliminary Response, at 42-43.

substantial equivalence with Suboxone® tablets, which allegedly was "surprisingly discovered and disclosed by the inventors of the '832 patent."[244]

199.    To distinguish the Birch reference, the patent owner argued that Birch describes an aqueous solution for intranasal administration of buprenorphine.[245]  Therefore, argued the patent owner, Birch has nothing to do with pharmaceutical films and should not be considered as a potentially invalidating reference.[246]

200.    The PTAB issued its decision to initiate the IPR on July 29, 2014.  In reaching its decision, the PTAB determined that BDSI presented arguments and evidence sufficient to demonstrate a reasonable likelihood of success that claims 15-19 (a) were anticipated by LabTec and (b) would have been obvious over the combination of LabTec, Yang and Birch.[247]

201.    In particular, the PTAB determined that "one of ordinary skill in the art reading Lab[T]ec would have known how to prepare burprenorphine/naloxone films as described in Table A [that is, films having a preferred pharmacokinetics profile], *i.e.,* the film formulations recited in challenged claims 15-19."[248]  The Board determined that petitioner's arguments based on Euro-Celtique were duplicative of the arguments based on LabTec; accordingly, the Board relied only on the LabTec arguments.[249]  Because challenged claim 15 is directed to a "film

---

[244] Ex. 48, IPR (BDSI) Preliminary Response, at 43.

[245] Ex. 48, IPR (BDSI) Preliminary Response,  at 44.

[246] Ex. 48, IPR (BDSI) Preliminary Response, at 44-45.

[247] Ex. 49, *Inter partes* Review (BDSI) of U.S. Pat. No. 8,475,832, Institution Decision, Paper No. 17, at 21 (hereinafter "IPR (BDSI) Institution Decision").

[248] Ex. 49, IPR (BDSI) Institution Decision, at 17.

[249] Ex. 49, IPR (BDSI) Institution Decision, at 17.

formulation," which is not disclosed in the Suboxone® Tablet Label, the Board denied

petitioner's arguments that the label anticipates the challenged claims.[250]

202.    The Board also determined that one of ordinary skill in the art would have been

motivated to look to Yang for the method of making a film.[251]

203.    The Board rejected the patent owner's arguments that LabTec "teaches away"

from the claimed invention because LabTec relates only to non-mucoadhesive films.[252]  In any

event, the Board noted that claims 15-19 do not include any limitations directed to muco-

adhesiveness.[253]

204.    Because the claims of Birch do not recite specific pH ranges, the Board opted not

to rely on that reference.[254]

205.     On November 7, 2014, the patent owner submitted its Response.[255]  With the

Response, the patent owner submitted the expert declaration of Dr. Thomas Johnston.[256]

Generally, the Response and the Johnston declaration argue that the LabTec reference does not

anticipate the challenged claims because LabTec is directed to "peroral" administration (that is,

administration by swallowing), as opposed to sublingual administration (that is, administration

by dissolution under the tongue).[257]  According to the Response, peroral administration of

---

[250] Ex. 49, IPR (BDSI) Institution Decision, at 12-13.

[251] Ex. 49, IPR (BDSI) Institution Decision, at 19.

[252] Ex. 49, IPR (BDSI) Institution Decision, at 19-20.

[253] Ex. 49, IPR (BDSI) Institution Decision, at 19-20.

[254] Ex. 49, IPR (BDSI) Institution Decision, at 17-18.

[255] Ex. 50, *Inter partes* Review (BDSI) of U.S. Pat. No. 8,475,832, Patent Owner's Corrected Response (hereinafter "IPR (BDSI) Corrected Response").

[256] Ex. 51, *Inter partes* Review (BSI) of U.S. Pat. No. 8,475,832, Decl. of Prof. Thomas P. Johnston (hereinafter "IPR (BDSI) Johnston Decl.").

[257] Ex. 50, IPR (BDSI) Corrected Response, at 2-3.

buprenorphine would not be therapeutically effective due to buprenorphine's well-known and extensive first-pass metabolism.[258]  In other words, buprenorphine is extensively metabolized in the liver, dramatically reducing the amount of drug that ultimately enters the bloodstream.  the patent owner also argued that LabTec is limited to dosage forms that provide absorption in the gastrointestinal tract and, therefore, inclusion of Subutex® and Suboxone® in the LabTec reference must have been a "mistake."[259]

206.    I disagree with the patent owner's characterization of LabTec for at least two reasons.

207.    First, in my opinion, LabTec is not limited to "peroral" administration.  Indeed, as BDSI noted in its Reply, LabTec describes film products that are intended to follow the same absorption "pathways" as the brand name products.[260]  Moreover, in my opinion, oral transmucosal absorption and peroral absorption are not mutually exclusive, as peroral absorption will inevitably occur for all sublingual formulations, and oral – that is, local – absorption can occur for many peroral formulations.[261]

208.    Second, I have seen no evidence that inclusion of Suboxone® in Table A of LabTec is a mistake, particularly because LabTec is not limited to "peroral" administration.  Indeed, I find the patent owner's contention to be baseless.

209.    Alternatively, the patent owner argued that even if one could properly consider the LabTec and Yang references, one of ordinary skill in the art would not be able to make a pharmaceutically acceptable film that provides the recited pharmacokinetic values without

---

[258] Ex. 50, IPR (BDSI) Corrected Response, at 2.

[259] Ex. 50, IPR (BDSI) Corrected Response, at 3-4.

[260] Ex. 52, *Inter partes* Review (BDSI) of U.S. Pat. No. 8,475,832, Petitioner's Reply, at 5 (citing LabTec, at 3:15-18) (hereinafter "IPR (BDSI) Petitioner's Reply").

[261] Ex. 31, McElnay, at 800.

undertaking undue experimentation.[262]  But the patent owner did not provide any evidence of undue experimentation to support its arguments.[263]

210.    On June 20, 2014, BDSI filed a second Petition for *Inter Partes* review challenging claims 15-19 of the '832 patent.[264]  In its June Petition, BDSI sought to bring to PTAB's attention a subset of the references that were previously addressed in its January Petition.[265]  On December 19, 2014, the Board exercised its discretion and declined to institute a separate IPR to challenge claims 15-19, noting the BDSI's arguments and prior art had already been presented in the earlier proceeding and considered in the determination to institute the earlier proceeding.[266]

### E.    Objective Indicia of Nonobviousness

211.    I have been informed that, although defendants bear the ultimate responsibility for proving invalidity, Plaintiffs may submit evidence of objective indicia to suggest the nonobviousness of the claimed invention.  I understand that Plaintiffs may address this issue more fully in their expert reports.  I reserve the right to respond to any specific bases for these secondary considerations that Plaintiffs may identify in any expert report.

## IX.    Claims 1-2, 4-7, 9-12, and 15-19 of the '832 Patent Are Anticipated

212.    In my opinion, claims 15-19 of the '832 patent are anticipated by LabTec.

213.    In my opinion, claims 1-2, 4-7, 9-12, and 15-19 of the '832 patent are anticipated by the Suboxone® sublingual tablet.

---

[262] Ex. 50, IPR (BDSI) Corrected Response, at 9.

[263] Ex. 52, IPR (BDSI) Petitioner's Reply, at 13-14.

[264] Ex. 53, *Inter partes* Review (BDSI) of U.S. Pat. No. 8,475,832, Petition (Second), at 2 (hereinafter "IPR (BDSI – 2)").

[265] Ex. 53, IPR (BDSI – 2), at 2.

[266] Ex. 54, *Inter partes* Review (BDSI) of U.S. Pat. No. 8,475,832, Institution Decision (Second), Paper No. 12, at 8-9 (hereinafter "IPR (BDSI – 2) Institution Decision").

Respectfully submitted,

Dated: March 3, 2015

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRITISH TELECOMMUNICATIONS PLC,      )
                                      )
            Plaintiff,                )          C. A. No.: 11-1249 (LPS)
                                      )
      v.                              )          **JURY TRIAL DEMANDED**
                                      )
GOOGLE INC.,                          )
                                      )
            Defendant.                )

## [PROPOSED] ORDER

At Wilmington this 17th day of ___January___, 2014, having considered Defendant

Google's Motion *in Limine* Requesting Exclusion of Evidence Relating to *Ex Parte* Reex-

aminations of U.S. Patent Nos. 6,151,309 and 6,397,040, Plaintiff British Telecommunica-

tions plc's Opposition to Defendant Google Inc.'s Motion *in Limine* No. 2 Requesting Ex-

clusion of Evidence Relating to *Ex Parte* Reexaminations of U.S. Patent Nos. 6,151,309 and

6,397,040, related pleadings and arguments,

IT IS HEREBY ORDERED that Defendant Google's Motion *in Limine* Requesting

Exclusion of Evidence Relating to *Ex Parte* Reexaminations of U.S. Patent Nos. 6,151,309

and 6,397,040 is DENIED.

_____
United States District Judge

# EXHIBIT 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

| Present: The Honorable | ANDREW J. GUILFORD | |
|---|---|---|
| Lisa Bredahl | Not Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:      Attorneys Present for Defendants:

**Proceedings:**      **[IN CHAMBERS] ORDER RE JURY SELECTION PROCEDURES AND MOTIONS IN LIMINE**

With the trial approaching, the Court here provides its instructions concerning its jury selection procedure and its rulings on the parties' motions in limine.

**1. JURY SELECTION PROCEDURE**

The Court will use the Arizona Blind Strike Method of jury selection, and will provide additional material on this later.

**2. PLAINTIFF'S MOTIONS IN LIMINE**

Proper and improper reasons for motions in limine are set forth in *Mixed Chicks LLC v. Sally Beauty Supply LLC*, 879 F. Supp. 2d 1093 (C.D. Cal. 2012).

**2.1 Plaintiff's MIL No. 1, To Exclude Opinions of Stephen Bristow (Dkt.**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

No. 249)

Stephen Bristow is Defendant's technical witness. Plaintiff seeks to exclude Bristow's invalidity testimony about the '906 Patent because (1) it allegedly relies upon an erroneous claim interpretation, and (2) because Bristow did not provide sufficient reasons for his conclusion that the '906 Patent is invalid for failure to comply with 35 U.S.C. § 112. Plaintiff also seeks to exclude any testimony by Bristow that the '426 Patent is invalid for failure to name the correct inventor because he never disclosed any such opinions. The claim construction portion of the motion should have been brought earlier as a motion to strike the expert testimony as contrary to the agreement that no construction was necessary as to the term at issue. But because the motion implicates the Court's duty to construe the claims, the Court will decide it.

The claim limitation at issue is step (a) from claim 1 of the '906 Patent:

> assigning an effects observable command from each of said plurality of command sets to one of said plurality of assignable user actuated switches or keys, each assigned, effects observable command to be transmitted when the corresponding one of the assignable user actuated switches or keys is actuated

Plaintiff argues that despite the fact that neither party submitted this term for the Court's construction, Bristow opined that:

> The plain language of this claim limitation **requires that this phrase be interpreted to mean** "assigning an effects observable command from each of the plurality of command sets to one assignable user actuated switch or key of the plurality of assignable user actuated switches or keys." That is, several effects observable commands, one from each of the plurality of command sets, is assigned to one of the plurality of assignable user actuated

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

switches or keys.

(Dkt. No. 249-1 at 3 (quoting Bristow Rep. 80, Kennealy Decl. 21) (emphasis in Mot.).) Plaintiff complains that Bristow then relies on that interpretation to opine that the '906 Patent is invalid under 35 U.S.C. § 112 because Bristow's interpretation requires multiple commands to be assigned to a single key, but the specification only describes assigning individual commands to individual buttons. (Dkt. 249-1 at 4). Plaintiff is correct that "an interpretation which excludes a disclosed embodiment from the scope of the claim is rarely, if ever, correct." (Dkt. No. 249-1 at 4 (quoting *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013).) And as Plaintiff notes, the '906 Patent's Abstract states that the keys are pressed one by one, and the specification highlights the advantage of "assigning a single command set to a single user actuated key." (Dkt. No. 249-1 at 5 (quoting '906 Patent Abstract, 2:54-55).) And the clause of claim 1 at issue also states that "**each** assigned, effects observable command [is] to be transmitted when **the corresponding one of** the assignable user activated switches or keys is activated."

The Court agrees that Bristow's circular logic—first interpreting the claim to differ from the specification and then arguing that the claim is invalid because it differs from the specification—is too clever by half. It is no answer to say that Bristow's interpretation is acceptable because he claims it is the ordinary and customary meaning to a person of ordinary skill in the art in question at the time of the invention. (Opp'n 3, Dkt. No. 292.) Absent a special meaning specified by the inventor, the ordinary and customary meaning to a PHOSITA is precisely what the Court attempts to define in claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

Defendant's interpretation, which requires multiple command sets to be assigned to a single key, conflicts with the claim language itself, which includes:

(a) assigning an effects observable command from each of said plurality of command sets to one of said plurality of assignable user actuated switches

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

or keys, each assigned, effects observable command to be transmitted when the corresponding one of the assignable user actuated switches or keys is actuated;

(b) actuating sequentially and individually each one of the plurality of assignable user actuated switches or keys, to individually transmit each assigned effects observable command until the proper effect is observed;

Defendant's interpretation focuses myopically on the claim fragment "from **each** of said plurality of command sets to **one** of said plurality of" keys. If those words were considered in isolation, Defendant's argument would be plausible. But "the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). Even reading the rest of step (a) itself makes it clear that the assigned effects observable commands are each assigned to a "**corresponding** one of the assignable user actuated switch**e**s or key**s** . . . . " (plural). That is, each command is assigned to one corresponding key—not all commands to a single "one" key.

And step (b) further makes clear that a separate command is sent when each of the keys is pressed. Defendant complains that this reading changes the claim language from "one" to "each one." (Opp'n 6, Dkt. No. 292.) But that is simply what the word means in context. By way of analogy, the Court will require each witness at trial to be examined by one lawyer per side, but that does not mean that the same lawyer from each side must examine every witness. Defendant's construction also conflicts with the specification, which "is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315.

Bristow's opinion relying on his interpretation is therefore improper. *See Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) (affirming exclusion of expert opinion evidence as irrelevant because it was based on an impermissible claim construction).

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|----------|--------------------------|------|----------------|

| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. |
|-------|----------------------------------------------------------------|

But Defendant argues that Bristow's expert report considered alternative interpretations of the assigning step, including Plaintiff's alternative construction. (Opp'n 1, Dkt. No. 292.) Bristow's report stated that his "analysis, however, will take into consideration alternative constructions such as assigning individual effects observable commands to individual assignable user actuated keys." (Bristow Rep.83, Dkt. No. 292-1.) Defendant argues that Bristow employed Plaintiff's construction in eight of his nine invalidity arguments, and from the materials presented, it appears that Bristow in fact did so at least four times. (Opp'n 7-10, Dkt. No. 292, Bristow Rep. 91-92, 119, 129, 145, Dkt. 292-1.)

As to inventorship, Defendant argues that Bristow did not offer an opinion on the legal conclusion of inventorship, but is properly "offering an opinion on how the belated addition of Mr. Darbee affected the priority date of the '426 patent and consequently his invalidity opinions." (Opp'n, Dkt. No. 292 at 1.) A review of the cited pages of the report shows that Bristow merely opined that "[w]hile I understand that the propriety of this petition [to correct inventorship] is in question, regardless of whether the petition was proper, the asserted claims of the '426 Patent are not entitled to such priority in view of the Patent Owner's admission in the specification that the subject matter of asserted claims 2-3 was not disclosed in the prior '810 patent." (Bristow Rep., Dkt. No. 292-1 at 30.) Thus, Bristow does not offer an opinion that Plaintiff's correction of inventorship was improper. He only explains that even if the correction was proper, it would not affect his opinions.

To the extent Bristow's testimony relies on his interpretation of the claim limitation, the motion is **GRANTED**. For clarity, the motion is specifically **GRANTED** as to Bristow's 35 U.S.C. § 112 invalidity opinion, which relies on the rejected construction. But the motion is **DENIED** to the extent Bristow otherwise relies on Plaintiff's claim construction. The motion is also **GRANTED** as to incorrect inventorship, because Bristow's report did not set forth an opinion on that subject, but Bristow may provide the opinions contained in his report on how correction of inventorship would not affect his conclusions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

**2.2    Plaintiff's MIL No. 2, To Exclude Any Evidence or Argument by Defendant Concerning Post-February 2013 Sales and Profit Information Based on Defendant's Refusal to Produce Such Information (Dkt. No. 250)**

Plaintiff argues that despite a July 25, 2013, Order from Judge Rosenbluth requiring Defendant to produce a summary chart of quarterly and annual sales, Defendant has refused to supplement its production to account for the period after February 2013. (Dkt. No. 250-1 at 1–4.) Plaintiff therefore seeks to preclude Defendant from offering evidence or argument regarding its accused sales after February 2013, or from contesting Plaintiff's calculations of the post-February 2013 sales and profits information. *See* Fed. R. Civ. P. 26(e) (requiring a party to supplement its discovery responses when ordered by the court); Fed. R. Civ. P. 37(c)(1) (precluding use of evidence at trial that a party failed to identify in violation of Rule 26(e)).

But Judge Rosenbluth didn't require Defendant to supplement its production to account for post-February 2013 sales. Plaintiff's Interrogatory No. 4, dated March 4, 2013, requested data on sales "from January 2006 *through the present*." (Kennealy Decl., Dkt. No. 268, ¶ 6 & Ex. 5 at 7–8 (emphasis added).) Plaintiff filed a Motion to Compel, but Plaintiff didn't argue that Defendant had failed to supply requested data past February 2013. (Motion to Compel, Dkt. No. 82.) Rather, Plaintiff complained that what Defendant produced in response to Interrogatory No. 4 was 25,000 pages that were "simply spreadsheet after spreadsheet of revenue and sales figures," and Judge Rosenbluth responded that Defendant was obligated to put those documents "into some kind of understandable summary." (Hearing Transcript, Dkt. No. 100, at 13–14.) Judge Rosenbluth's Order didn't require Defendant to produce additional data. Rather, Judge Rosenbluth's Order simply required Defendant to produce a summary of documents already produced, and Plaintiff doesn't argue that Defendant failed to produce that summary.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES - GENERAL**

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

The Motion is **DENIED**.

### 2.3 Plaintiff's MIL No. 3, To Exclude Bob Watson from Testifying at Trial (Dkt. 251)

Plaintiff argues that Defendant has identified a trial witness, "Bob Watson," a former employee of Time Warner, whom Defendant never identified in any of its Rule 26(a)(1) initial disclosures or in response to any other discovery. (Dkt. No. 251-1 2.) Rule 37(c)(1) prohibits a party from using a witness at trial who was not identified as required by Rule 26(a) "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Defendant argues the failure is substantially justified and nonprejudicial, noting that Defendant listed Time Warner in its Rule 26(a)(1) disclosures, that Plaintiff declined to seek any discovery from Time Warner, and that Defendant has offered to make Watson available for deposition before trial. (Dkt. No. 293.)

Plaintiff has failed to show that the failure to identify Watson by name was neither substantially justified nor harmless. The Motion is **DENIED**.

### 2.4 Plaintiff's MIL No. 4, To Bar Defendant from Presenting Unidentified South Korean Witnesses (Byung-Ki Choi, Ki-Ok Kim, and Han Bok Song) (Dkt. No. 252)

Plaintiff argues that Defendant did not disclose Byung-Ki Choi, Ki-Ok Kim, or Han-Bok Song as witnesses having potentially relevant knowledge in its Rule 26(a)(1) disclosures. (Dkt. 252-1 at 2.) Defendant seeks to use these witnesses only to authenticate business records, and does not even plan to call them if Plaintiff stipulates to authenticity. Under the circumstances here, and encouraging stipulation, the Court will permit Defendant to call these witnesses for the limited purpose of authentication.

The Motion is **DENIED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

### 2.5 Plaintiff's MIL No. 5, To Exclude Defendant From Reading Jak You Testimony In Lieu Of Live Testimony (Dkt. No. 267)

Plaintiff seeks an order barring Defendant from using Jack You's deposition testimony at trial while allowing Plaintiff to do so, on the ground that You's unavailability was procured by Defendant. (Dkt. No. 267-1 at 2.) Rule 32 provides that "[a] party may use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . that the witness is more than 100 miles from the place of hearing or trial . . . unless it appears that the witness's absence was procured by the party offering the deposition." Fed. R. Civ. P. 32(a)(4)(B). Plaintiff argues that even though You is an employee of Defendant, Defendant has procured You's unavailability by insisting that You is not its employee. (Dkt. No. 267-1 at 2, 8.)

The parties dispute whether You is an employee of Defendant. But even if You is an employee, Plaintiff has not shown how Defendant procured You's unavailability. "Under the case law interpreting Rule 32, the mere fact that the deponents are employed by the defendant and that there is an identity of interest between the deponents and their employer is not enough to trigger exclusion because procuring absence and doing nothing to facilitate presence are quite different things." *See Carey v. Bahama Cruise Lines*, 864 F.2d 201, 204 (1st Cir. 1988) (internal quotation marks omitted) (rejecting plaintiffs' argument that the defendant procured the absence of a witness where plaintiffs had "offered absolutely no evidence to support the allegation that [the defendant] 'actively took steps to keep the deponents from setting foot in the courtroom'").

The Motion is **DENIED**.

### 2.6 Plaintiff's MIL No. 6, To Preclude Evidence or Argument Relating to Issues No Longer in the Case (Dkt. No. 253)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

Plaintiff seeks an order "precluding [Defendant] from referring to or offering any evidence regarding the parties' claims, defenses, and counterclaims regarding the '067, '426, and '367 patents, including any reference to the Court's prior rulings on the same." (Dkt. No. 253-2.) This motion is duplicative of Plaintiff's motion to dismiss and is overbroad. It is **DENIED**, without prejudice to Plaintiff raising specific objections at trial.

### 2.7    Plaintiff's MIL No. 7, To Preclude URC from Raising an Unclean Hands Defense (Dkt. No. 254)

Plaintiff seeks an order to preclude Defendant from raising an unclean hands defense. (Dkt. No. 254 at 2.) This is a belated motion for summary judgment, and even one to dismiss an affirmative defense. (Dkt. No. 254-2 at 4 (citing *Bell Atlantic Corp v. Twombly*, 550 U.S. 544 (2007).) It is not proper to use motions in limine as a substitute for summary judgment. *Mixed Chicks*, 879 F. Supp. 2d at 195. The motion is **DENIED**.

### 2.8    Plaintiff's MIL No. 8, to Exclude Rule 408 Communication (Dkt. No. 255)

Plaintiff seeks an order, under Federal Rules of Evidence 401–403 and 408, preventing Defendant from introducing a July 2002 letter to prove that the '426 Patent is invalid for improper inventorship. (Dkt. No. 255-1 at 1.) Plaintiff sent the 2002 letter to Defendant to discuss settlement of a previous lawsuit, and the letter states that "an error was unintentionally made in the inventorship" of the '426 Patent. (Dkt. No. 287 Ex. A.)

Rule 408 prohibits admitting "statement made during compromise negotiations about the claim . . . to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a). But Rule 408 does not prohibit the admission of this evidence for "another purpose." Fed. R. Evid. 408(b). Proving that a party had knowledge of particular conduct is one such permissible purpose. *See* Fed. R. Evid. 408 Advisory Committee Notes. ("Rule 408 is inapplicable when evidence of the compromise is offered to prove notice.")

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

Permitting Defendant to use the letter to show that Plaintiff knew of the error in inventorship, which is relevant to Defendant's patent misuse argument, does not implicate the text of or policy underlying Rule 408.

Plaintiff also argues that Rules 401–403 prohibit the introduction of the letter because the '426 Patent issues are no longer in this case. This argument depends on how the Court rules on Plaintiff's pending motion to dismiss. Plaintiff's Motion in Limine No. 8 is **DENIED**, but Plaintiff may renew this argument if the Court grants the motion to dismiss in its entirety.

### 2.9 Plaintiff's MIL No. 9, to Preclude Reference to URC's and/or Chang Park's Charities (Dkt. No. 255)

Plaintiff moves to bar Defendant from eliciting testimony about charitable donations by its CEO, Chang Park, or suggesting that Plaintiff's claim for patent infringement against URC has taken or will take money and time away from his charities, arguing that this testimony would be unfairly prejudicial under Rule 403. (Dkt. 257-1 2.) Defendant does not contest that this testimony is prejudicial under Rule 403, only conditionally opposing the motion if the Court refuses to grant Defendant's similar Motion in Limine No. 7. (Dkt. No. 288.)

The motion is **GRANTED**.

### 3. DEFENDANT'S MOTIONS IN LIMINE (DKT. NO. 280)

### 3.1 Defendant's MIL No. 1, To Exclude Testimonial Evidence Other Than

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|----------|--------------------------|------|----------------|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

**the Testimony of its Technical Expert, Dr. Burke, To Prove Infringement of the '906 Patent**

In resolving discovery disputes, Magistrate Judge Rosenbluth already entered an order that:

> UEI will rely solely on expert testimony at trial in this action and will not call any other UEI employee or officer to testify concerning the URC accused products and UEI's positions on direct and indirect infringement. This order does not, however, bar UEI from (a) producing a witness to discuss the events and analysis in 2010 leading up to its discovery of the potential infringement by URC of the patents-in-suit as substantially set forth in prior deposition testimony and discovery responses or (b) relying on or presenting documents, testimony, or other information produced by the parties and third parties during discovery in this case.

(Dkt. No. 153 at 2.) That order stands. No further order is needed to address Defendant's request. The motion is **DENIED** as duplicative.

### 3.2 Defendant's MIL No. 2, To Preclude Assertion of the '906 Patent Under 35 U.S.C. § 271(c) (Contributory Infringement)

Defendant argues that (1) Plaintiff's expert did not provide opinions about contributory infringement under 35 U.S.C. § 271(c), (2) Plaintiff is limited to proving infringement though expert testimony, and (3) therefore, Plaintiff should be precluded from asserting infringement under § 271(c) at trial. (Dkt. No. 280 at 2-3.)

As the Court has just discussed, Judge Rosenbluth's order limits the evidence that Plaintiff may use to prove infringement, and that order stands. But in arguing that Plaintiff cannot prove a claim for contributory infringement based on permissible

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|----------|-------------------------|------|----------------|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

evidence, Defendant is belatedly seeking summary judgment. *See Mixed Chicks*, 879 F. Supp. 2d at 195. This motion is **DENIED**.

> **3.3** **Defendant's MIL No. 3, To Exclude Evidence Concerning the Proceedings Before and Decision by the U.S. Patent and Trademark Office Regarding URC's *Inter Partes* Review Petition Against the '906 Patent**

Defendant argues that introducing evidence of the PTO's rejection of Defendant's *inter partes* review petition would be irrelevant because the legal standards applicable to an *inter partes* review are different than those that apply here, and that it would increase the complexity of the trial and confuse the jury. (Dkt. No. 280 3-4.)

Any potential confusion can be addressed by appropriate jury instructions on the standard of proof applicable to patent invalidity defenses and counterclaims. The motion is **DENIED**.

> **3.4** **Defendant's MIL No. 4, To Exclude Argument Regarding Damages Based on Lost Profits or Price Erosion Theories**

This motion is Defendant's third attack on Plaintiff's damages theories, following Defendant's motion for summary judgment and *Daubert* motions. Defendant now raises arguments based on the timeliness of Plaintiff's disclosure of its damages theories, arguing that they were made clear only in Plaintiff's expert's report, after fact discovery had closed. But these theories were timely disclosed in Plaintiff's expert's report and in disclosures earlier in discovery. Further, motions in limine are not substitutes for motions summary judgment or for discovery sanctions that should have been brought earlier. *See Mixed Chicks*, 879 F. Supp. 2d at 1095. The motion is **DENIED**.

> **3.5** **Defendant's MIL No. 5, To Exclude Direct or Indirect Appeals to**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

**Prejudice Based on Racial or National Origin at Trial**

Defendant seeks an order prohibiting Plaintiff from, for example, referring to Defendant, its CEO Chang Park, other URC employees, or Ohsung as "Asian" or "Korean," or from making racist or xenophobic references. (Dkt No. 280 11-12.) Of course, racist or xenophobic references, explicit or implicit, will not be tolerated. But Defendant seeks an order prohibiting Plaintiff's witnesses or counsel from "remarking on the fact that a major supplier of the remote control devices sold by URC are manufactured in Mexico and/or Korea, or that the supplier's parent company is a Korean-based corporation." (Dkt. No. 280 at 12.) That request is overbroad, as it covers any incidental and potentially appropriate mention of facts. The motion is **DENIED**, but all counsel shall refrain from unnecessarily mentioning, dwelling on, remarking on, or encouraging inferences related to national origin or foreign incorporation, manufacturing, or ownership. To assure that there are no racist or xenophobic references, the Court will, if appropriate, admonish counsel in front of the jury for making such references.

### 3.6 Defendant's MIL No. 6, To Exclude References to "Knock-Offs," "Predatory," and the Use of Similarly-Pejorative and Emotionally-Charged Terms

There is no probative value in the use of a term with negative connotations to describe Defendant's products or pricing strategy, and the use of the pejorative terms "knock-off," "pirated," or "predatory" are therefore unduly prejudicial under FRE 403. As to these terms, the motion is **GRANTED**. To the extent Defendant seeks to more broadly prohibit Plaintiff from making relevant arguments as to copying and pricing, the motion is **DENIED**.

### 3.7 Defendant's MIL No. 7, To Exclude Evidence or Argument Concerning Personal Income or Net Worth of Defendant's CEO Chang Park and Irrelevant Defendant Sales and Revenue Information

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |

Defendant moves to exclude any evidence or argument concerning the net worth and personal income of Defendant's CEO, Chang Park, as well as any evidence of company-wide URC financial information that was not disclosed in discovery. (Dkt. No. 258 at 1.) Plaintiff argues that some of this evidence is probative of bias of the witness, and may be relevant to other issues that arise in trial. (Dkt. No. 290 at 19–21.) Though much of this evidence, particularly evidence concerning the net worth of Mr. Park, likely runs afoul of Rule 403, these determinations will be better made in the context of trial. The motion is **DENIED**, with Defendant free to object at trial. Again, the Court will, if appropriate, admonish counsel in front of the jury for inappropriate references.

### 3.8 Defendant's MIL No. 8, To Exclude Evidence or Argument Concerning Reasons Why Plaintiff Changed the Inventorship of the '426 Patent or Why it Took So Much Time to Make the Change

Defendant argues that during discovery, Plaintiff refused to answer questions as to why it failed to correct the inventorship of the '426 Patent in 2002 and instead waited over a decade to correct inventorship. (Dkt. No. 280 at 16.) Defendant requests that Plaintiff now be precluded from answering these questions, and that the Court grant the adverse inference recognized on summary judgment that Plaintiff was unable to add Darbee as an inventor. (*Id.*) Defendant cites a number of questions on this subject that Plaintiff's witness refused to answer on the grounds of attorney-client privilege. (*Id.* at 17–18.) Certainly, Plaintiff cannot now provide answers to those questions. But the cited questions asked about the connection between the inventorship correction and litigation, and did not ask about the correction of inventorship alone. Further, as Plaintiff points out, the witness did answer some questions about the decision to correct inventorship. (*See* Dkt. No. 290-1 at 291–95.) Defendant's request is therefore overly broad.

Defendant can ask the jury to draw the adverse inference it seeks from the Court. That inference could have a broader meaning and wider implications than the Court's observation made in the summary judgment context. The motion is **DENIED**.

Case 1:18-cv-01672-RGA  Document 374-5  Filed 12/09/21  Page 76 of 76 PageID #: 12132
Case 8:12-cv-00329-AG-JPR  Document 357  Filed 04/21/14  Page 15 of 15  Page ID
#:15506

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES - GENERAL**

| Case No. | SACV 12-00329 AG (JPRx) | Date | April 21, 2014 |
|---|---|---|---|
| Title | UNIVERSAL ELECTRONICS, INC. v. UNIVERSAL REMOTE CONTROL, INC. | | |


**3.9  Defendant's MIL No. 9, To Exclude Evidence of Patents and Applications Not At Issue In This Case, or Comparisons Between Plaintiff's Patent Portfolio and Defendant's Patent Portfolio**

Defendant seeks exclusion of evidence of non-asserted patents or applications, including Plaintiff's research and development expenditures for inventions not at issue in this case. (Dkt. No. 280 at 20.) Whether this evidence is admissible under Rule 403 will better be determined in the context of trial. The Motion is **DENIED**.


**DISPOSITION**

These rulings shall govern trial.


_____  :  __0__

**Initials of Preparer**    **lmb**